JMK:WMP/AES
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MARTIN SHKRELI and
EVAN GREEBEL,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MATSUMOTO, J.**

**LEVY, M.J.**

INDICTMENT

**CR 15 - 637**

(T. 15, U.S.C., §§ 78j(b) and 78ff;
T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1349, 2 and 3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.     The Defendants and Relevant Entities

1.     The defendant MARTIN SHKRELI was a resident of Brooklyn, New

York and New York, New York. From approximately 2006 to 2007, SHKRELI served as the

managing member and portfolio manager of Elea Capital Management ("Elea Capital"), a hedge

fund located in New York, New York. From approximately September 2009 to December 2012,

SHKRELI served as the managing member and portfolio manager of MSMB Capital

Management LP ("MSMB Capital"), a hedge fund located in New York, New York, that focused

its investments in the healthcare sector. From approximately February 2011 to December 2012,

SHKRELI served as the managing member and portfolio manager for MSMB Healthcare LP

("MSMB Healthcare"), a hedge fund located in New York, New York, that focused its

investments in the healthcare sector. From approximately December 2012 to September 2014,

SHKRELI was the Chief Executive Officer of Retrophin, Inc. ("Retrophin" or "RTRX"), a

publicly traded biopharmaceutical company with its principal place of business in New York, New York.

2.        The defendant EVAN GREEBEL was a resident of Scarsdale, New York, and an attorney licensed to practice law in New York.  From approximately December 2012 to September 2014, GREEBEL was a partner in the New York office of Katten Muchin Rosenman LLP and served as lead outside counsel to Retrophin.

3.        MSMB Capital was a Delaware limited partnership founded by the defendant MARTIN SHKRELI and Co-Conspirator 1, an individual whose identity is known to the Grand Jury, in or about September 2009.  The securities offered to investors by MSMB Capital were limited partner interests, and investors in the fund became limited partners (the "Capital Limited Partners").  The sole general partner of MSMB Capital was MSMB Investors LLC, a Delaware limited liability company, which was controlled by SHKRELI.  MSMB Capital Management LLC, a Delaware limited liability company controlled by SHKRELI, served as the investment adviser to MSMB Capital.

4.        MSMB Healthcare was a Delaware limited partnership founded by the defendant MARTIN SHKRELI in or about February 2011.  The securities offered to investors by MSMB Healthcare were limited partner interests, and investors in the fund became limited partners (the "Healthcare Limited Partners").  The sole general partner of MSMB Healthcare was MSMB Healthcare Investors LLC, a Delaware limited liability company, which was controlled by SHKRELI.  MSMB Healthcare Management LLC, a Delaware limited liability company controlled by SHKRELI, served as the investment adviser to MSMB Healthcare.

5.        Retrophin LLC ("Retrophin LLC") was a Delaware limited liability company founded by the defendant MARTIN SHKRELI in or about March 2011.  At its

2

inception, Retrophin LLC focused on finding a cure for children who suffered from muscular dystrophy.

6.     Retrophin was a Delaware corporation founded by the defendant MARTIN SHKRELI in or about 2011.  In or about December 2012, Retrophin became a publicly traded company that traded under the ticker symbol RTRX on the Over-the-Counter (OTC) markets.  In or about January 2014, Retrophin began trading on the NASDAQ Global Market under the ticker symbol RTRX.  Retrophin was a biopharmaceutical company focused on the discovery, acquisition, development and commercialization of drugs for the treatment of debilitating and life-threatening diseases for which there are currently limited patient options.

II.     The Fraudulent Schemes

7.     In or about and between September 2009 and September 2014, the defendant MARTIN SHKRELI, together with the defendant EVAN GREEBEL and others, orchestrated three interrelated fraudulent schemes:

a.     a scheme to defraud investors and potential investors in MSMB Capital by inducing them to invest in MSMB Capital through material misrepresentations and omissions about, inter alia, the prior performance of the fund, its assets under management and the retaining of an independent auditor and administrator; and then by preventing redemptions by investors in MSMB Capital through material misrepresentations and omissions about, inter alia, the performance of the fund and the misappropriation by SHKRELI and others of fund assets;

b.     a scheme to defraud investors and potential investors in MSMB Healthcare by inducing them to invest in MSMB Healthcare through material misrepresentations and omissions about, inter alia, the prior performance of the fund, its assets under management and existing liabilities; and then by preventing redemptions by the investors through material

misrepresentations and omissions about, <u>inter alia</u>, the performance of the fund and the
misappropriation by SHKRELI and others of fund assets; and

                c.      a scheme to defraud Retrophin by misappropriating Retrophin's
assets through material misrepresentations and omissions in an effort to satisfy SHKRELI's
personal and unrelated professional debts and obligations.  Specifically, SHKRELI, assisted by
GREEBEL and others, defrauded Retrophin by causing it to: (i) transfer Retrophin shares to
MSMB Capital even though MSMB Capital never invested in Retrophin; (ii) enter into
settlement agreements with defrauded MSMB Capital and MSMB Healthcare investors to settle
liabilities owed by the MSMB Capital and MSMB Healthcare funds (the "MSMB Funds") and
SHKRELI; and (iii) enter into sham consulting agreements with other defrauded MSMB Capital,
MSMB Healthcare and Elea Capital investors as an alternative means to settle liabilities owed by
the MSMB Funds and SHKRELI.

        A.      <u>The MSMB Capital Hedge Fund Scheme</u>

           8.      In or about and between September 2009 and December 2010, the
defendant MARTIN SHKRELI, together with Co-Conspirator 1, in an effort to induce
investments in MSMB Capital, represented to potential investors, <u>inter alia</u>, that: (i) MSMB
Capital was a transparent investment vehicle for sophisticated investors with monthly liquidity;
(ii) the investment adviser was entitled to receive a one percent management fee per year based
on net assets of the partnership; (iii) the general partner was entitled to receive twenty percent of
the limited partners' net profits for the year; and (iv) MSMB Capital had retained independent
certified public accountants as auditors who would issue an audit report on the annual financial
statements.  Based on these representations and additional representations about SHKRELI's
success as a portfolio manager and personal investment in the fund, from approximately

4

September 2009 through November 2010, SHKRELI, together with Co-Conspirator 1, induced investments of approximately $700,000 from a total of four Capital Limited Partners. In fact, MSMB Capital did not retain an independent auditor, was not transparent and did not have the necessary monthly liquidity to satisfy large redemption requests. Additionally, SHKRELI failed to disclose to the Capital Limited Partners that he had lost all the money he managed in Elea Capital, his prior hedge fund, and that there was a $2.3 million default judgment against him from Lehman Brothers resulting from his trading activity.

9.      In approximately December 2010 and January 2011, the defendant MARTIN SHKRELI, together with others, continued to induce investments in MSMB Capital based on material misrepresentations and omissions. On or about December 2, 2010, Investor 1, a Capital Limited Partner whose identity is known to the Grand Jury and whom SHKRELI had been encouraging to invest in MSMB Capital since early 2010, asked SHKRELI in an email about, inter alia, the fund's assets under management and the names of its independent auditor and fund administrator. SHKRELI told Investor 1 that MSMB Capital had $35 million in assets under management and that the fund's independent auditor and administrator were Rothstein, Kass & Company, P.C. ("Rothstein Kass") and NAV Consulting Inc. ("NAV Consulting"), respectively. At the time of this representation, MSMB Capital did not have an independent auditor or administrator, and SHKRELI had lost through trading the approximately $700,000 that had been invested by the four Capital Limited Partners. In fact, as of November 30, 2010, the value of assets in MSMB Capital's bank and brokerage accounts totaled approximately $700.

10.      In reliance on the defendant MARTIN SHKRELI's material misrepresentations and omissions, on or about December 8, 2010, Investor 1 sent $1,000,000 by wire transfer to MSMB Capital's brokerage account. Approximately one month later, on or

about January 5, 2011, Investor 1 sent $250,000 by wire transfer to MSMB Capital's brokerage account. In approximately January 2011, three additional individuals invested approximately $1,000,000 in MSMB Capital based on SHKRELI's material misrepresentations and omissions. In sum, eight investors, whose identities are known to the Grand Jury, invested a total of approximately $3 million in MSMB Capital.

11.     On or about February 1, 2011, the defendant MARTIN SHKRELI took a large short sale position in Orexigen Therapeutics, Inc. ("OREX") in MSMB Capital's brokerage account at Merrill, Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch"). Specifically, SHKRELI sold short over 32 million shares of OREX. Contrary to SHKRELI's representations to Merrill Lynch, MSMB Capital had failed to locate OREX shares to borrow in order to settle MSMB Capital's short sales. As a result, MSMB Capital failed to settle a short position of over 11 million shares of OREX, which Merrill Lynch ultimately closed at a loss of over $7 million. In addition to the losses in the Merrill Lynch account, MSMB Capital suffered over $1 million in other trading losses in approximately February 2011. Based on these trading losses, the value of assets in MSMB Capital's bank and brokerage accounts, not including the OREX losses at Merrill Lynch, declined from more than $1.12 million on or about January 31, 2011 to $58,500 at the end of February 2011. MSMB Capital did not engage in any trading after February 2011.

12.     In furtherance of the scheme of defraud, the defendant MARTIN SHKRELI concealed MSMB Capital's true performance from the Capital Limited Partners. For months following the complete loss of the investments in MSMB Capital and the end of trading activity, SHKRELI continued to send fabricated performance updates to the Capital Limited Partners that touted profits of as high as forty percent since inception. For example, on or about April 10, 2011, SHKRELI sent an email to Investor 2, a Capital Limited Partner whose identity

6

is known to the Grand Jury, informing him that MSMB Capital had returned a profit of 8.93 percent since the beginning of the year and a profit of 42.57 percent since inception on November 1, 2009. SHKRELI also informed Investor 2, who had first invested in MSMB Capital on or about November 1, 2009, that his total investment of $400,000 was now approximately $509,514. Similarly, on or about January 25, 2012, almost one year after MSMB Capital had ceased trading and lost all its assets, SHKRELI informed Investor 1 that his total investment of $1,250,000 was now "approximately $1,318,872, net of fees."

13.     The defendant MARTIN SHKRELI, together with Co-Conspirator 1, also misappropriated funds from MSMB Capital by withdrawing funds from MSMB Capital that were far in excess of the one percent management fee and the twenty percent net profit incentive allocation permitted by the partnership agreement. Specifically, without the Capital Limited Partners' knowledge or consent, SHKRELI withdrew and spent more than $200,000 from MSMB Capital during the life of the fund, which was far in excess of any permitted fees.

14.     On or about September 5, 2012, the defendant MARTIN SHKRELI, Co-Conspirator 1 and MSMB Capital entered into a settlement agreement with Merrill Lynch to resolve a Financial Industry Regulatory Authority, Inc. ("FINRA") arbitration proceeding in connection with the OREX trading losses of approximately $7 million. Pursuant to the settlement with Merrill Lynch, SHKRELI, Co-Conspirator 1 and MSMB Capital agreed to pay Merrill Lynch a total of $1,350,000 on or before December 15, 2012. Notably, in the settlement agreement, SHKRELI and Co-Conspirator 1 admitted that MSMB Capital had $0 in assets.

15.     On or about September 10, 2012, a mere five days after the defendant MARTIN SHKRELI and Co-Conspirator 1 admitted that MSMB Capital had no assets, SHKRELI sent an email (the "Liquidation Email") to the Capital Limited Partners, including

7

Investor 2, and stated, in part: "I have decided to wind down our hedge fund partnerships with a

goal of completing the liquidation of the funds by November or December 1st, 2012. . . .

Original MSMB investors (2009) have just about doubled their money net of fees. . . . investors

will have their limited partnership interests redeemed by the fund for cash. Alternatively,

investors may ask for a redemption of Retrophin shares, or a combination of Retrophin shares

and cash." Contrary to SHKRELI's representations: (i) the MSMB Capital investors who

invested in 2009 had lost their investments, not "doubled their money net of fees"; and (ii)

SHKRELI had not yet fulfilled a redemption request by Investor 1, who had made the request in

or about November 2011.

B.    The MSMB Healthcare Hedge Fund Scheme

16.    Following the collapse of MSMB Capital after the failed OREX trade,

from approximately February 2011 to November 2012, the defendant MARTIN SHKRELI,

together with others, solicited investments in MSMB Healthcare from potential investors based

on material misrepresentations and omissions about, inter alia, SHKRELI's past performance as

a portfolio manager. Specifically, SHKRELI and his co-conspirators concealed from potential

investors SHKRELI's disastrous past performance as a portfolio manager for MSMB Capital and

Elea Capital and the $7 million liability that SHKRELI owed Merrill Lynch for the February

2011 OREX trades. For example, on or about April 7, 2011, Investor 3, a Healthcare Limited

Partner whose identity is known to the Grand Jury, invested $1,000,000 in MSMB Healthcare

following telephone conversations and meetings with SHKRELI and Corrupt Employee 1, an

individual employed by SHKRELI whose identity is known to the Grand Jury, during which

Investor 3 was provided with only positive information about SHKRELI, was never informed of

SHKRELI's performance with MSMB Capital and Elea Capital and was never informed about

8

SHKRELI's liability to Merrill Lynch. In sum, thirteen individuals invested a total of approximately $5 million in MSMB Healthcare.

17. In furtherance of the scheme to defraud, the defendant MARTIN SHKRELI made material misrepresentations to potential investors about MSMB Healthcare's assets under management. For example, on or about April 18, 2012, in response to an inquiry by a potential investor, SHKRELI informed Corrupt Employee 1 to tell the potential investor that MSMB Healthcare had $55 million in assets under management. At no point, from inception to liquidation, did the total amount of investments in MSMB Healthcare exceed $6 million.

18. The defendant MARTIN SHKRELI also made material misrepresentations to the Healthcare Limited Partners in an effort to prevent them from seeking redemption of their investments in MSMB Healthcare. In fact, on or about September 10, 2012, SHKRELI also sent the Liquidation Email to the Healthcare Limited Partners, including Investor 3. Contrary to SHKRELI's representations: (i) the original MSMB Capital investors who invested in 2009 had lost their investments, not "doubled their money net of fees"; and (ii) MSMB Healthcare did not have the necessary funds to have its limited partners redeem their investments for cash.

19. The defendant MARTIN SHKRELI, together with others, also misappropriated funds from MSMB Healthcare by withdrawing funds from MSMB Healthcare that were far in excess of the one percent management fee permitted by the partnership agreement and the twenty percent net profit incentive allocation afforded to the general partner of the fund. Additionally, without the Healthcare Limited Partners' knowledge or consent, SHKRELI improperly used MSMB Healthcare assets to pay for obligations that were not the responsibility of MSMB Healthcare. For example, SHKRELI caused assets from MSMB

Healthcare to be used to pay money owed by MSMB Capital, SHKRELI and Co-Conspirator 1 to settle claims brought by Merrill Lynch in connection with the failed OREX trades.

20.     To achieve this fraudulent objective, in or about November 2012, the defendant MARTIN SHKRELI improperly reclassified a $900,000 equity investment by MSMB Healthcare in Retrophin LLC as an interest-bearing loan through the use of a backdated promissory note, thereby causing 22,500 Retrophin LLC shares that had been issued to MSMB Healthcare at the time of the equity investment to be deleted from Retrophin LLC's capitalization table. A capitalization table is a record of all the major shareholders of a company, along with their pro-rata ownership of all the securities issued by the company (equity shares, preferred shares and options), and the various prices paid by these stakeholders for these securities. On or about January 18, 2013, SHKRELI caused Retrophin, the publicly traded company, to transfer $150,000 into MSMB Healthcare's bank account as partial payment of the improperly reclassified loan, $125,000 of which he wire transferred to Merrill Lynch to get an extension for a settlement payment owed by MSMB Capital, SHKRELI and Co-Conspirator 1. Finally, on or about March 4, 2012, SHKRELI caused Retrophin to transfer $773,000 into MSMB Healthcare's bank account as the remaining repayment of the "loan," which amount he then wire transferred that same day to Merrill Lynch to satisfy the debt owed to Merrill Lynch by SHKRELI, Co-Conspirator 1 and MSMB Capital pursuant to the OREX trade settlement.

C.     The Retrophin Misappropriation Scheme

21.     The defendants MARTIN SHKRELI and EVAN GREEBEL, together with others, engaged in a scheme to defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy SHKRELI's personal and unrelated professional debts and obligations. Specifically, SHKRELI, assisted by

10

GREEBEL and others, defrauded Retrophin by causing it to: (i) transfer Retrophin shares to

MSMB Capital even though MSMB Capital never invested in Retrophin; (ii) enter into

settlement agreements with defrauded MSMB Capital and MSMB Healthcare investors to settle

liabilities owed by the MSMB Funds and SHKRELI; and (iii) enter into sham consulting

agreements with other defrauded MSMB Capital, MSMB Healthcare and Elea Capital investors

as an alternative means to settle liabilities owed by the MSMB Funds and SHKRELI.

      (i).    The Fabricated MSMB Capital Interest

      22.    In or about March 2011, the defendant MARTIN SHKRELI valued

Retrophin LLC as a $20 million company based on 100,000 outstanding shares and SHKRELI's

valuation that each share or unit was worth $200, even though Retrophin LLC had no products or

assets.  In 2011 and 2012, SHKRELI began using MSMB Healthcare funds to invest in

Retrophin LLC and solicited investments in Retrophin LLC, including additional investments

from Capital Limited Partners and Healthcare Limited Partners who had been misled by

SHKRELI and others that their investments were performing exceptionally well.  These

investments were recorded on Retrophin LLC's capitalization table.

      23.    As of July 31, 2012, Retrophin LLC's capitalization table, which was

reviewed by the defendants MARTIN SHKRELI and EVAN GREEBEL, among others, revealed

that MSMB Healthcare had invested approximately $2,135,000 in Retrophin LLC.  The records

did not reflect any investments by MSMB Capital.  Similarly, as of September 5, 2012, the

capitalization table, which was reviewed by SHKRELI and GREEBEL, among others, revealed

approximately $5 million in investments in Retrophin LLC, but no investments by MSMB

Capital.  On or about November 14, 2012, Accounting Firm 1, which was retained by Retrophin

LLC to review its books and records, was provided an updated capitalization table that revealed

11

approximately $4.75 million in investments in Retrophin LLC, but no investments by MSMB Capital.

24. In or about November 2012, the defendant MARTIN SHKRELI responded to inquiries by the United States Securities and Exchange Commission ("SEC") about his management of MSMB Capital and MSMB Healthcare. On or about November 4, 2012, SHKRELI sent an email to the SEC, in which he stated, in part: "We have decided to end the MSMB limited partnerships . . . limited partners have been notified of the plans for the redemption of assets." SHKRELI then grouped the MSMB Funds together and stated that Retrophin LLC was the "most successful and largest effort" of the MSMB group of funds, which included MSMB Capital. Additionally, SHKRELI claimed that MSMB Capital was still active, had $2,600,000 in assets under management and was in the process of being liquidated. Contrary to these representations, MSMB Capital had essentially no assets following the February 2011 OREX trades and was in debt to Merrill Lynch.

25. Faced with an SEC inquiry, the defendants MARTIN SHKRELI and EVAN GREEBEL, together with others, engaged in a scheme to fabricate an investment by MSMB Capital in Retrophin LLC and engineered a series of fraudulent transactions that were backdated to the summer of 2012 to create the appearance of an investment by MSMB Capital prior to the SEC inquiry. Specifically, in or about November and December 2012, SHKRELI and GREEBEL orchestrated a transfer of shares to SHKRELI from Co-Conspirator 1, as well as Corrupt Employee 1 and Corrupt Employee 2, individuals whose identities are known to the Grand Jury, and backdated them to the summer of 2012. SHKRELI then immediately transferred, also pursuant to a backdated agreement, 75,000 shares to MSMB Capital that he received from Co-Conspirator 1, Corrupt Employee 1 and Corrupt Employee 2. SHKRELI and

12

GREEBEL, together with others, convinced Co-Conspirator 1, Corrupt Employee 1 and Corrupt

Employee 2 to transfer their Retrophin LLC shares to SHKRELI by enticing them with the

opportunity to acquire, for a nominal amount, approximately five percent of the unrestricted or

free trading shares of Retrophin, the publicly traded company that SHKRELI was in the process

of creating through a reverse merger. The following series of emails provides a glimpse into the

scheme perpetrated by SHKRELI and GREEBEL:

       a.     On or about November 20, 2012, GREEBEL provided RTRX

Employee 1, an individual whose identity is known to the Grand Jury, with a template share

transfer agreement that he had previously provided to SHKRELI.

       b.     On or about November 25, 2012, in response to an inquiry from

SHKRELI about cancelling a transfer of Retrophin shares previously given by SHKRELI,

GREEBEL responded, "hard to unwind stuff – easier if they transfer back."

       c.     On or about November 29, 2012, at 3:20 p.m., RTRX Employee 1

sent an email to GREEBEL, and Accountant 1 and Accountant 2, whose identities are known to

the Grand Jury, and attached an agreement that transferred 4,167 shares from Co-Conspirator 1

to SHKRELI. The agreement was signed by SHKRELI and Co-Conspirator 1 and dated

November 29, 2012.

       d.     On or about November 29, 2012, between 3:29 p.m. and 3:46 p.m.,

SHKRELI, GREEBEL, Co-Conspirator 1 and RTRX Employee 1 exchanged emails where

SHKRELI stated, "that agreement was signed in June." Notably, GREEBEL removed the

outside accountants for this email exchange.

       e.     A few minutes later, at 3:55 p.m., RTRX Employee 1 sent an email

to SHKRELI and GREEBEL, copying Co-Conspirator 1, and attached the same transfer

13

agreement, with one change: the November 29, 2012 dates below the signature lines for SHKRELI and Co-Conspirator 1 were covered by clearly visible redacting tape and replaced with a date of July 1, 2012.

      f.    One minute later, in response to the email sent by RTRX Employee 1, GREEBEL sent an email to RTRX Employee 1 and stated, "please call me."

      g.    Amidst this email exchange, at 4:04 p.m., Accountant 1, who had received the original share transfer agreement from RTRX Employee 1, exclaimed, "WT....F."

      h.    At 4:32 p.m., approximately thirty minutes after GREEBEL asked RTRX Employee 1 to call him, RTRX Employee 1 sent an email to SHKRELI and GREEBEL, copying Co-Conspirator 1, and attached the transfer agreement between SHKRELI and Co-Conspirator 1. This version, however, had a new signature page without any visible redacting tape and a new date, June 1, 2012, was typed, rather than handwritten.

      i.    On or about December 3, 2012, RTRX Employee 1 sent Accountant 1 an email attaching Co-Conspirator 1's backdated agreement, similar backdated share transfer agreements executed by Corrupt Employee 1 and Corrupt Employee 2, both dated July 1, 2012, and an agreement between SHKRELI and MSMB Capital, dated July 1, 2012, transferring 75,000 shares from SHKRELI to MSMB Capital. Notably, although each of these agreements reflects a date in the summer of 2012, none of the transfers in the agreements are reflected in the capitalization tables that were prepared in July, September and November 2012.

      j.    A few hours later, SHKRELI sent an email to GREEBEL and RTRX Employee 1 and attached the "final capitalization table," which contained an entry for MSMB Capital for 75,000 shares.

(ii).   The Fraudulent Settlement Agreements

26.   In or about and between February 2013 and August 2013, the defendants

MARTIN SHKRELI and EVAN GREEBEL, together with others, caused Retrophin to enter into

settlement agreements with three Capital Limited Partners and four Healthcare Limited Partners

to resolve claims and threats of claims made by the limited partners against SHKRELI and

MSMB Capital or MSMB Healthcare. SHKRELI and GREEBEL, who were present at all

relevant Retrophin Board of Directors (the "Board") meetings, did not seek authorization from

the Board prior to entering into these fraudulent settlements.

27.   The defendants MARTIN SHKRELI and EVAN GREEBEL engaged in

this scheme to defraud Retrophin of its assets in an effort to conceal the material

misrepresentations that SHKRELI made to the three Capital Limited Partners and four

Healthcare Limited Partners about, inter alia, performance and liquidity. For example, on or

about September 10, 2012, SHKRELI had falsely represented to the three Capital Limited

Partners, whose identities are known to the Grand Jury, that their investments had returned

profits ranging from 41.12 percent to 79.49 percent. Similarly, on or about September 9, 2012,

SHKRELI had falsely represented to the four Healthcare Limited Partners that their investments

had returned profits ranging from 15.58 percent to 34.48 percent. The next day, in the

Liquidation Email, SHKRELI had informed the limited partners of MSMB Capital and MSMB

Healthcare that he was winding down the funds and that they could have their interests redeemed

by the fund for cash. Contrary to these representations, MSMB Capital had ceased operating in

February 2011 and all investments by the Capital Limited Partners had been lost following the

February 2011 OREX trades. Similarly, SHKRELI's performance updates to the Healthcare

15

Limited Partners were false because they were based on an internal, inflated valuation of Retrophin, and MSMB Healthcare did not have liquid assets to fulfill cash redemptions.

28.     In sum, the defendants MARTIN SHKRELI and EVAN GREEBEL, together with others, caused Retrophin to pay more than $3.4 million in cash and RTRX stock to settle claims with the seven Capital Limited Partners and Healthcare Limited Partners even though Retrophin was not responsible for those claims.

29.     In or about August 2013, Retrophin's external auditor questioned the settlement agreements that had been as of that time and determined that Retrophin was not responsible for the claims resolved in the settlement agreements. Consequently, Retrophin's public filings had to be restated and amended. On or about August 23, 2013, the defendants MARTIN SHKRELI and EVAN GREEBEL discussed the impact of the auditor's determination in a lengthy email exchange. When SHKRELI suggested that the old agreements should be annulled, GREEBEL responded that the auditor "didn't like that idea." When SHKRELI then admitted that "there were serious faults with the [settlement] agreements including lack of board approval" and that redoing the settlement agreements may be a good idea, GREEBEL responded: "That will open up some very big issues. The current thinking is let rtrx pay, get a note from the fund[,] and if the fund cant [sic] fulfill the note[,] rtrx will write it off as a bad debt. It would be easier than the road you are referring to. Also, [the auditor] would get very spooked with what you are talking about (which could also spook your investors and counter parties)." In response, SHKRELI stated, "[o]n current thinking: that works for me."

30.     A few days later, the defendants MARTIN SHKRELI and EVAN GREEBEL caused MSMB Capital and MSMB Healthcare to execute indemnification agreements and promissory notes for the benefit of Retrophin even though they knew that the

MSMB Funds had no assets.  In furtherance of the scheme, SHKRELI and GREEBEL assured

Retrophin and the auditors that the promissory notes would be repaid.  Retrophin was never

indemnified for these fraudulent settlement agreements.

(iii).   The Sham Consulting Agreements

31.    After Retrophin's external auditors had determined that Retrophin was not

responsible for the claims settled in the settlement agreements, the defendants MARTIN

SHKRELI and EVAN GREEBEL, together with others, devised an alternative approach to settle

with defrauded limited partners from SHKRELI's hedge funds: settlement agreements under the

guise of consulting agreements.  SHKRELI and GREEBEL's fraudulent scheme is evident in an

email exchange on or about October 16, 2013.  Initially, GREEBEL sent an email to SHKRELI

informing him that Investor 1 wanted 100,000 RTRX shares as part of his settlement and did not

want to enter into a consulting agreement.  When SHKRELI indicated that the proposal was

acceptable to him, GREEBEL stated, "Where will the 100k come from?  If it's from the

company it would need to be in a consulting agreement."  SHKRELI questioned GREEBEL's

approach and stated, "Why would it need to be a consulting agreement???!  Have you heard of

the term settlement?"  In response, GREEBEL explained, "We can call it a settlement agreement,

but given [the auditor's] recent behavior they may require it to be disclosed in the financials.  I

was trying to prevent that issue."

32.    In or about and between September 2013 and March 2014, the defendants

MARTIN SHKRELI and EVAN GREEBEL, together with others, caused Retrophin to enter into

four sham consulting agreements with defrauded investors from Elea Capital, MSMB Capital

and MSMB Healthcare to resolve claims and threats of claims by those investors against

SHKRELI and the MSMB Funds.  Three of the four sham consulting agreements, which

17

included agreements with Investor 1 and Investor 3, provided that the defrauded investors would provide consulting services "on strategic and corporate governance matters to the management of the company" and contained releases as to, inter alia, SHKRELI, the MSMB Funds and Retrophin. The fourth sham consulting agreement, which was entered into with the defrauded Elea Capital investor, provided that the investor would provide consulting services "on cluster headache drug development and other matters to the Company" but did not include any releases. Retrophin did not receive any legitimate consulting services based on these sham agreements.

33.     The defendants MARTIN SHKRELI and EVAN GREEBEL, who were present at all relevant Board meetings, never presented three of the four sham consulting agreements to the Board for approval, and although the consulting agreement with Investor 3 was placed on the Board's agenda, it was never approved. Additionally, SHKRELI and GREEBEL concealed from the Board that the purpose of that consulting agreement was to resolve Investor 3's complaints about his MSMB Healthcare investment. As another example of the scheme to conceal the true nature of the sham consulting agreements, on or about April 19, 2013, GREEBEL sent an email to SHKRELI attaching a form consulting agreement to use to settle claims with Investor 3, and stated, in part: "I think you should get blanket approval from the board for you to retain consultants who may be paid in cash or stock up to an aggregate amount of $."

34.     As with the settlement agreements, the defendants MARTIN SHKRELI and EVAN GREEBEL, together with others, devised the sham consulting agreements to conceal the material misrepresentations that SHKRELI made to the Capital Limited Partners and Healthcare Limited Partners about, inter alia, performance and liquidity. For example, on or about January 25, 2012, in the last performance update provided to Investor 1, SHKRELI falsely

18

represented to Investor 1 that his investment had returned a profit of 5.51 percent. Similarly, on or about September 9, 2012, SHKRELI falsely represented to Investor 3 and another Healthcare Limited Partner that their investments had returned profits of 34.48 percent and 9.75 percent, respectively. The next day, in the Liquidation Email, SHKRELI informed the limited partners of MSMB Capital and MSMB Healthcare that he was winding down the funds and that they could have their interests redeemed by the fund for cash. Contrary to these representations, MSMB Capital had been defunct since February 2011 and all investments by the Capital Limited Partners had been lost following the February 2011 OREX trades. Similarly, SHKRELI's performance updates to the Healthcare Limited Partners were false because they were based on an internal, inflated valuation of Retrophin, and MSMB Healthcare did not have liquid assets to fulfill cash redemptions.

35.    In sum, the defendants MARTIN SHKRELI and EVAN GREEBEL, together with others, caused Retrophin to pay more than $7.6 million in cash and RTRX stock through sham consulting agreements to settle claims with Capital Limited Partners and Healthcare Limited Partners even though Retrophin was not responsible for those claims.

## COUNT ONE
(Conspiracy to Commit Securities Fraud – MSMB Capital Scheme)

36.    The allegations contained in paragraphs one through thirty-five are realleged and incorporated as though fully set forth in this paragraph.

37.    In or about and between September 2009 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MARTIN SHKRELI, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of

19

the Rules and Regulations of the United States Securities and Exchange Commission, Title 17,

Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and

artifices to defraud; (b) making untrue statements of material fact and omitting to state material

facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading; and (c) engaging in acts, practices and courses of business

which would and did operate as a fraud and deceit upon investors and potential investors in

MSMB Capital, in connection with the purchase and sale of investments in MSMB Capital,

directly and indirectly, by use of means and instrumentalities of interstate commerce and the

mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

      38.    In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York and elsewhere, the defendant MARTIN SHKRELI, together with

others, committed and caused to be committed, among others, the following:

OVERT ACTS

      a.    On or about October 24, 2009, Co-Conspirator 1 sent an email to

Investor 2, a Capital Limited Partner whose identity is known to the Grand Jury, copying

SHKRELI and enclosing the "MSMB Capital Investor Kit," which included a presentation and a

private placement memorandum.

      b.    On or about February 18, 2010, SHKRELI sent an email to the

Capital Limited Partners, including Investor 2, and stated, in part: "Our fund is open to new and

additional investments. Our terms are 1%/20% fees with monthly liquidity."

      c.    On or about June 9, 2010, SHKRELI sent an email to Investor 1, a

Capital Limited Partner whose identity is known to the Grand Jury, attaching MSMB Capital

documents, and stated, in part: "The fund is a 1/20 fee structure with no lock-ups. . . . we have a

20

daily results email some people like to see . . . hedge fund performance should be easy enough to report/calculate estimates on a daily basis, and it is. . . . I'd love to have you as an investor – it looks like we see eye-to-eye on a number of topics."

        d.     On or about October 6, 2010, SHKRELI sent an email to the Capital Limited Partners, including Investor 2, and attached a letter entitled "MSMB Capital Management Limited Partnership Letter for Q3 2010." In the letter, SHKRELI stated, in part, that the "partnership performed well, returning 9% in Q3 2010" and that brought the "gross year-to-date return to 44%."

        e.     On or about December 2, 2010, SHKRELI sent an email to Investor 1, and stated, in part, that MSMB Capital's current assets under management were $35 million, its auditor was Rothstein Kass, and its administrator was NAV Consulting.

        f.     On or about January 3, 2011, SHKRELI sent an email to the Capital Limited Partners, including Investor 2, and stated that MSMB Capital had "returned +30.44% in 2010" and "+30.97% since inception on 11/1/2009."

        g.     On or about February 2, 2011, SHKRELI sent an email to Co-Conspirator 1 and an employee and attached a spreadsheet detailing MSMB Capital's OREX trading.

        h.     On or about February 9, 2011, SHKRELI sent an email to the Capital Limited Partners, including Investor 1 and Investor 2, and stated that MSMB Capital had "returned +3.80% gross of fees year-to-date" and "+35.95% since inception on 11/1/2009."

        i.     On or about November 17, 2011, Investor 1 sent a letter to SHKRELI providing written notice of a request for a full withdrawal of his investment in MSMB Capital based on the fund's net asset value as of November 30, 2011.

j.      On or about January 25, 2012, SHKRELI sent an email to Investor 1, copying others, and stated, in part: "You invested $1,250,000 for the 12/31/2010 period. The value of this investment is now approximately $1,318,872, net of fees . . . We acknowledge your redemption and this will be your last statement."

k.      On or about September 10, 2012, SHKRELI sent an email to the Capital Limited Partners, including Investor 2, and stated, in part: "I have decided to wind down our hedge fund partnerships with a goal of completing the liquidation of the funds by November or December 1st, 2012. . . . Original MSMB investors (2009) have just about doubled their money net of fees. . . . investors will have their limited partnership interests redeemed by the fund for cash. Alternatively, investors may ask for a redemption of Retrophin shares, or a combination of Retrophin shares and cash."

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Commit Wire Fraud – MSMB Capital Scheme)

39.     The allegations contained in paragraphs one through thirty-five are realleged and incorporated as though fully set forth in this paragraph.

40.     In or about and between September 2009 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MARTIN SHKRELI, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud investors and potential investors in MSMB Capital, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate

22

and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
(Securities Fraud – MSMB Capital Scheme)

41.     The allegations contained in paragraphs one through thirty-five are realleged and incorporated as though fully set forth in this paragraph.

42.     In or about and between September 2009 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MARTIN SHKRELI, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in MSMB Capital, in connection with the purchase and sale of investments in MSMB Capital, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

<u>COUNT FOUR</u>
(Conspiracy to Commit Securities Fraud – MSMB Healthcare Scheme)

43.     The allegations contained in paragraphs one through thirty-five are rephrased and incorporated as though fully set forth in this paragraph.

44.     In or about and between February 2011 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MARTIN SHKRELI, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in MSMB Healthcare, in connection with the purchase and sale of investments in MSMB Healthcare, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

45.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant MARTIN SHKRELI, together with others, committed and caused to be committed, among others, the following:

<u>OVERT ACTS</u>

a.      On or about December 16, 2011, SHKRELI sent an email to Corrupt Employee 1, an individual employed by SHKRELI whose identity is known to the

Grand Jury, and stated that MSMB Healthcare had $45 million in assets under management, and $80 million in assets under management if the full value of Retrophin was taken into account.

b.      On or about January 24, 2012, in response to an email from Investor 3, a Healthcare Limited Partner whose identity is known to the Grand Jury, who had expressed concerned about MSMB Healthcare's performance, SHKRELI stated: "The real loss is -2% and 2% will be added to December – we negotiated hard with accountants to represent -2% but time constraints resulted in us printing -4%."

c.      On or about April 18, 2012, SHKRELI sent an email to Corrupt Employee 1, and stated that MSMB Healthcare had $55 million in assets under management.

d.      On or about April 19, 2012, in response to an inquiry by a potential sophisticated investor about how MSMB Healthcare could pay employee salaries with a modest asset base of $55 million, SHKRELI stated: "Lots of ways – many of us have zero salaries or low salaries.  We have some expenses the fund pays for and yet other deferments that are creative.  Will tell more when we meet!"

e.      On or about September 10, 2012, SHKRELI sent an email to the Healthcare Limited Partners, including Investor 3, and stated, in part: "I have decided to wind down our hedge fund partnerships with a goal of completing the liquidation of the funds by November or December 1st, 2012. . . . Original MSMB investors (2009) have just about doubled their money net of fees. . . . investors will have their limited partnership interests redeemed by the fund for cash.  Alternatively, investors may ask for a redemption of Retrophin shares, or a combination of Retrophin shares and cash."

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT FIVE
(Conspiracy to Commit Wire Fraud – MSMB Healthcare Scheme)

46.     The allegations contained in paragraphs one through thirty-five are realleged and incorporated as though fully set forth in this paragraph.

47.     In or about and between February 2011 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MARTIN SHKRELI, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud investors and potential investors in MSMB Healthcare, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT SIX
(Securities Fraud – MSMB Healthcare Scheme)

48.     The allegations contained in paragraphs one through thirty-five are realleged and incorporated as though fully set forth in this paragraph.

49.     In or about and between February 2011 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MARTIN SHKRELI, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices,

26

schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in MSMB Healthcare, in connection with the purchase and sale of investments in MSMB Healthcare, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT SEVEN
(Conspiracy to Commit Wire Fraud – Retrophin Scheme)

50.     The allegations contained in paragraphs one through thirty-five are realleged and incorporated as though fully set forth in this paragraph.

51.     In or about and between February 2011 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARTIN SHKRELI and EVAN GREEBEL, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud Retrophin, and to obtain money and property from Retrophin by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH SEVEN

52.     The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts One through Seven, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any property, real or personal, which constitutes or is derived from proceeds traceable to any such offenses.

53.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____
FOREPERSON

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK