UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

UNITED STATES OF AMERICA                    :
                                            :
                                            :
            -against-                       :        Ind. No. 15 CR 637(S-1) (KAM)
                                            :
MARTIN SHKRELI                              :
EVAN GREEBEL,                               :
                                            :
                        Defendants.         :

-------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MARTIN SHKRELI'S MOTION FOR A SEVERANCE FROM EVAN GREEBEL


By:   **Brafman & Associates, PC**
      *Attorneys for the Defendant Martin Shkreli*
      767 3rd Avenue, 26th Fl.
      New York, NY 10017
      Tel – 212-750-7800
      Fax – 212-750-3906
      bbrafman@braflaw.com


Of Counsel:   Benjamin Brafman
              Andrea Zellan
              Marc Agnifilo
              Jacob Kaplan

## <u>Table of Contents</u>

I.      Preliminary Statement ........................................................................................1

        A.      Martin Shkreli's Background and History....................................................2

        B.      MSMB ...........................................................................................................3

        C.      Retrophin .....................................................................................................4

        D.      Retrophin Needs a Criminal Conviction to Expel Shkreli.......................7

        E.      Shkreli and Greebel ...................................................................................8

        F.      Shkreli's Two Statements to the Securities and Exchange Commission .............11

        G.      Shkreli's Statement to the FBI and U.S. Attorney's Office .................11

        H.      Greebel's Statement to the FBI................................................................11

II.     Legal Argument ...............................................................................................12

        A.      Introduction................................................................................................12

        B.      The Legal Standard for Rule 14 Severance .........................................13

        C.      The Core of Shkreli's Reliance on Counsel Defense Conflicts With the
                Core of Greebel's Anticipated Defense.................................................15

        D.      Greebel's Post-Arrest Statement Will Violate Shkreli's Confrontation
                Right If Greebel Opts Not To Testify.....................................................17

III.    Conclusion .......................................................................................................19

## <u>Table of Authorities</u>

### Cases

<u>Bruton v. United States</u>, 391 U.S. 123, 131 n.6 (1968) ...............................................14, 17

<u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993) ....................................................14

<u>United States v. Guillen-Rivas</u>, 950 F. Supp. 2d 446, 457 (E.D.N.Y. 2013) ...............14

<u>United States v. Ramos</u>, 346 F. Supp. 2d 567, 570 (S.D.N.Y. 2004)............................14

<u>United States v. Gallo</u>, 668 F. Supp. 736, 749 (E.D.N.Y.1987)....................................14

<u>United States v. James</u>, 712 F.3d 79, 105 (2d Cir. 2013) .............................................15

<u>United States v. Lyttle</u>, 460 F. App'x 3, 7 (2d Cir. 2012) ............................................15

<u>United States v. Yousef</u>, 327 F.3d 56, 151 (2d Cir.2003) .............................................15

<u>United States v. Salameh</u>, 152 F.3d 88, 116 (2d Cir. 1998) .........................................15

<u>United States v. Aronson</u>, CR-12-0245 (ADS) .....................................................16, 17

<u>United States v. Taylor</u>, 745 F.3d 15, 28 (2d Cir. 2014) ...................................17, 18, 19

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

UNITED STATES OF AMERICA                     :

                                             :
                                             :
            -against-                        :
                                             :
MARTIN SHKRELI                               :
EVAN GREEBEL,                                :
                                             :
                     Defendants.             :

---------------------------------------------------------------X

**MEMORANDUM IN SUPPORT
OF DEFENDANT MARTIN
SHKRELI'S SEVERANCE
MOTION**

Ind. No. 15 CR 637(S-1) (KAM)

## MEMORANDUM IN SUPPORT OF DEFENDANT
## MARTIN SHKRELI'S SEVERANCE MOTION

## I.      PRELIMINARY STATEMENT

Martin Shkreli paid almost **$10 million dollars** in legal fees to Evan Greebel and his law

firm.  Shkreli met, spoke and emailed with his lawyers virtually every day, often dozens of times

per day, on every topic facing Shkreli's businesses.   Greebel was the acting secretary at

Retrophin Board meetings; he directly communicated with many of the company's investors on a

regular basis; he "pitched" the company to potential investors in Shkreli's absence; he drafted a

code of ethics and other important policy documents; and he was intimately involved in every

decision Shkreli made.  In turn, Greebel provided legal advice and insight to Shkreli, which

Shkreli followed faithfully.  Because Shkreli relied closely on his experienced legal counsel and

other attorneys at the firm, Shkreli has a valid "reliance on counsel" defense.  To the extent that

his lawyer, Evan Greebel, will take an antagonistic position, such position is in clear

contradiction of the tens of thousands of emails between Shkreli and Greebel, and is inconsistent

with Shkreli having paid 10 million dollars to a well-respected and widely known firm for what

should be accurate legal advice, not advice that Mr. Shkreli relied on, only to find himself indicted for crimes he did not commit.

As will be further developed below, defendant Shkreli believes he cannot fairly proceed to trial alongside his former lawyer, with whom he discussed every important legal and business issue, and who, after billing him almost 10 million dollars in fees for legal advice intimately related to the charges in the indictment, now tries to distance himself from the legal decisions he himself made.  If Evan Greebel persists in his unfortunate, disingenuous and unfounded defense, Martin Shkreli has no choice but to move for a separate trial based on antagonistic and irreconcilable defenses and the fact that a very serious "reliance on counsel" defense will be interposed by Shkreli.  Greebel will desperately try to dispute the "reliance on counsel" defense with his claims that Shkreli kept certain facts from him, a claim that is not only false but preposterous based on the voluminous materials showing that Greebel, a fully informed attorney, advised Shkreli on virtually every important decision related to this case.

A.     **Martin Shkreli's Background and History**

Martin Shkreli was born on Friday April 1, 1983 to working-class Albanian parents.  His parents raised him in a modest Brooklyn apartment, with his brother and sister.  He attended high school at Hunter College High School, where his brilliance and ambition were obvious.   While in high school, he worked as an intern at Cramer, Berkowitz & Co. ("Cramer"), a hedge fund founded by the television personality, Jim Cramer.  Although he started in the Cramer mailroom, Shkreli showed a knack for understanding biotech stocks. Even as a child, Shkreli taught himself the complex chemistry and biology necessary to learn why certain drugs are effective and why others fail.  Even without formal training, Shkreli could often discern the efficacy of a drug by

understanding aspects of its chemistry that sometimes eluded highly trained and experienced specialists in the field.

Shkreli then attended Baruch College, graduating with a Bachelor's degree in Business Administration.  He continued to spend his days at Cramer, studying biotech stocks, while at night, he read patent and other filings concerning new drugs and novel approaches to illness.

In 2004, Shkreli briefly worked at UBS.  He stayed at UBS for a short time and left a few months later for a job with Intrepid Capital, which was starting a healthcare fund and was seeking an analyst with healthcare experience.

In 2006, Shkreli started Elea Capital Management, LLC ("Elea") with a well-known sole investor.

### B.  MSMB

Elea Capital shut down after suffering significant losses in 2008.  In 2009, Shkreli and a friend from college, Marek Biestek, formed MSMB.  They pitched it specifically to sophisticated, experienced, and wealthy investors as a hedge fund focusing on pharmaceutical companies.  A number of investors, including several whom Shkreli had previously known, invested in the fund.

Although Shkreli had taught himself much about the science of pharmaceutical products, and had spent thousands of hours reading about new drugs, at the age of 26, he was poorly prepared for the complexities of managing a hedge fund.  For starters, he had no money.  He did not take a salary and lived with his parents.  He had virtually no professional support in the form of lawyers and accountants for the simple reason that he couldn't pay them.  Mr. Shkreli may have lacked some resources, but he had a wealth of energy.  He worked constantly; Shkreli himself drafted or adapted many of the documents necessary to create and run the hedge fund.

He was able to gain the confidence of some high net worth individuals who were willing to take a risk with a young energetic new-comer.  No one was more disappointed than Martin Shkreli when MSMB Capital suffered significant losses. Mr. Shkreli did not assume that was the end; instead he assumed that he needed to prove to his investors that their faith in him was not misplaced.  He worked relentlessly to make a good financial return for those investors.

## C.   Retrophin

Whatever other shortcomings he may have, Shkreli was truly gifted in his ability to understand the pharmaceutical industry.  He used his ability to learn and understand the science to identify and reject the false, unfounded and exaggerated claims about prospective drug treatments, and focus on the few drugs holding genuine promise to cure or treat patients.

Shkreli decided that he could use this ability to start his own company instead of using it to succeed as an investor/hedge fund manager.  As he contemplated and planned his own drug company he knew that if he succeeded he would reap huge financial benefits.  But he also knew that he would help people suffering from disease, including many with terminal illness.  Growing up, Shkreli had seen several classmates and other children he knew struck down by debilitating diseases.  One such classmate suffered from Cystic Fibrosis; he knew of another child who suffered from Muscular Dystrophy.  He witnessed the heartbreak, and he realized at an early age that the big pharmaceutical companies were economically motivated to cure or contain certain widespread diseases, but were not incentivized to cure diseases that crippled or killed smaller segments of the population.  So Shkreli made the bold move to form his own company.

He had faith that if he worked tirelessly and read scientific and medical journals deep into the night, while his competitors slept, he would have an advantage solely because he out-worked

everyone else.  He lived in strict accordance with this belief every day, and every day his business grew a little bit.

To be clear, Shkreli was his own selling-point.  Even at a young age, he had a definitive reputation among investors in the pharmaceutical industry as a brilliant mind.  He prepared the presentations to scientists and investors himself as he built Retrophin.  Sophisticated pharmaceutical executives like Ken Banta and Brent Saunders recognized the potential in Shkreli's ideas and they supported him and Retrophin.

At the time, Shkreli had developed a strong interest in eradicating the disease Muscular Dystrophy, and he formed Retrophin as a company that would assist him in this endeavor.  Specifically, through Retrophin, Shkreli planned to develop orphan drugs that could treat Muscular Dystrophy and other diseases.  Many of the investors who had followed Shkreli's career, including Darren Blanton, Stephen Richardson and Alan Geller, were among the first Retrophin investors.

Led by Shkreli's experience and dedication, with Greebel's legal guidance, Retrophin successfully developed several "orphan drugs."  By way of background, Congress enacted the Orphan Drug Act of 1983 in order to facilitate the development of drugs for rare diseases.  The legislation was passed in response to a health crisis in the late 1970s and early 1980s where it was economically unfeasible to develop drugs to combat certain diseases afflicting discrete segments of the population.  Accordingly, rare diseases were ignored and said to be "orphaned" within the medical community in that no segment of that community was working toward a cure.  The congressional findings provided that "a pharmaceutical company which develops an orphan drug may reasonably expect the drug to generate relatively small sales in comparison to the cost of developing the drug and consequently to incur a financial loss."  Congress further noted that

"it is in the public interest to provide such changes and incentives for the development of orphan drugs."  Orphan Drug Act of 1983, Pub L. No. 97-414, Sec. 1, 96 Stat. 2049 (codified at 21 U.S.C. 301).

As Retrophin's CEO, Shkreli was directly and intimately involved in every aspect of every drug Retrophin developed.  As he always had, Shkreli reviewed and understood the breadth of medical research; he invented new drugs and compounds, often himself being the patent-holder of these inventions; and he made the key decisions regarding the overall direction of the company.[1]  In addition to providing life-saving drugs to people in need, Shkreli led Retrophin's funding of Canada's largest pediatric academic sciences center (The Hospital For Sick Children) to support a crucial brain study.

For example, Shkreli's research and innovation led to a potential cure of a rare and catastrophic disease called PKAN.[2]  Through his research, Shkreli learned that a particular medical geneticist in Portland Oregon had worked on a cure for PKAN for several years without success.  Shkreli contacted this person and suggested a particular molecular modification that the geneticist could incorporate into her testing.  To the geneticist's disbelief, Shkreli's modification proved to be the difference, and a treatment to this potentially fatal childhood disease was found. In 2015, and due solely to Shkreli's tireless work, Retrophin received FDA Orphan Drug Designation for RE-024 for the treatment of PKAN.

---

[1] As but a few examples, in March 2014, Retrophin acquired Chenodal, a product approved by the FDA to treat gallstones.  However, Shkreli recognized that Chenodal was also effective "off label" to treat a rare inherited disorder  that could lead to permanent neurological damage and death, and he sought FDA approval for this alternative use.  In 2014, Retrophin also acquired the license for Thiola, an FDA approved drug to prevent kidney stones in patients with a rare genetic disease that, if untreated, could lead to the loss of kidney function.

[2] Panthothenate kinase-associated neurodegeneration (PKAN) is a rare, inherited neurological movement disorder characterized by the progressive degeneration of specific regions in the central nervous system.  In most cases, progression of the disease extends over several years, leading to death in childhood or early adulthood in classic cases.

Shkreli, as is well-known, also had an unorthodox side in how he advocated for or against certain products which also contributed to his overall reputation.

### D.   Retrophin Needs a Criminal Conviction to Expel Shkreli

Despite the fact that Shkreli was the founder and CEO of Retrophin, and that he was the very heart and soul of the company, by mid 2014 there were certain Directors who wanted him terminated.  Certain board members who had came up in their careers in the traditional "big-pharma" mode, had grown tired of Shkreli's youthful arrogance and tweeting; others seemed put off by Shkreli's energy and opinions.  In either event, it was clear by the Summer of 2014, there was a segment of the Board of Directors who wanted Shkreli out of Retrophin.  However, the Board had a sizeable problem: Shkreli's Employment Agreement.  His Employment Agreement provided that he could be terminated for cause only if he had a "final conviction under United States federal or state laws for a felony or crime involving moral turpitude."  Simply put, if the Board wanted Shkreli out, they would have to get him criminally convicted.

On two occasions – May 14, 2014 and January 13, 2015 – the U.S. Attorney for the Eastern District of New York served Retrophin with Grand Jury document subpoenas.  On September 30, 2014 – after the first subpoena but before the second – the Retrophin Board removed Shkreli as CEO.  Based on a letter dated September 30, 2015, from Cooley LLP ("Cooley"), Retrophin's lawyers, Retrophin waived the attorney-client privilege as to three discreet subject areas.[3]  It seems fairly clear that Retrophin was working in conjunction with the U.S. Attorney and that the attorney-client waiver was designed to allow Retrophin to provide documents that would tend to implicate Shkreli in certain conduct, while allowing Retrophin to

---

[3] As noted later *infra*, in Section I (H), the purported limited scope of the Retrophin waiver is at odds with the general waiver as recounted by a federal Agent for Greebel during the post-arrest interview.  In addition, as this court is aware, Retrophin through its attorneys has expanded on the initial waiver of September 30, 2017 pursuant to Cooley's letters to the Court dated December 6, 2016, and January 23, 2017.

maintain confidentiality of the rest.  This belief is buttressed by the fact that on September 11, 2015, Retrophin's lawyers made a written presentation to the United States Attorney for the Eastern District of New York.  A little over three months later, Shkreli and Greebel were arrested on an Indictment.

### E.     Shkreli and Greebel

In about the Spring of 2011, Shkreli met co-defendant, Evan Greebel, a successful experienced attorney.  Greebel and his firm, Katten Muchin Rosenman LLP, were first retained to represent MSMB in connection with a number of transactions that were being considered at around this time, including a takeover bid for Amag Pharmaceuticals in the Summer of 2011. However, Shkreli's relationship with Greebel extended far beyond one particular matter. Greebel was a critical component of every legal decision Shkreli made.  Not only did Shkreli fully inform Greebel of  all the relevant facts, but Greebel had detailed knowledge of the innermost aspects of Shkreli's business from a variety of other sources, as well as Greebel's own direct involvement in most of the events on which his advice was sought.

For starters, Greebel attended Retrophin Board meetings, and "acted as Secretary" providing information, taking notes and preparing the final minutes.  Greebel drafted  Retrophin Code of Ethics and Insider Trading Policies.  He had direct involvement and communications with many, if not all, of the company's investors.   Greebel provided the investors with information and answered their questions.  On occasion, Greebel pitched Retrophin to potential investors without Shkreli even being present.  Greebel maintained updated, accurate, detailed financial information about the company, its pending transactions and its investor base.  He prepared capitalization tables for the company.  Very often, Shkreli would get the corporate information he needed from Greebel, rather than the other way around.  Shkreli described

Greebel at investor meetings and elsewhere as his "right-hand man," as counsel to the company and as someone who could speak for Shkreli personally.  Not only did Greebel implement Shkreli's wishes, more often than not, it was Greebel who provided critical solutions to corporate dilemmas facing Shkreli and the Board.  In this regard, Greebel was an important strategic partner, someone who could use his legal experience to see problems and to affirmatively solve them proactively, without anyone having to ask him to do so.

Shkreli and Greebel spoke or emailed with each other virtually every day for several years.  Some days they emailed each other numerous times and then also spoke by telephone. There are tens of thousands of emails between the two, far too many to submit with this motion. By way of example, on October 8, 2011, Shkreli discussed intricate details of a potential transaction with a professional in the finance industry and introduced  Greebel onto the email chain, explaining,  **"I am CCing Evan Greebel who is my right-hand-man (and legal counsel)."**

Email traffic between Shkreli and Greebel generally shows that the first thing Shkreli does when confronted with a potential new investor is refer the matter directly to Greebel.  The situation involving a potential investor J.B. is an example of this practice.  On January 18, 2012. At 7:57 PM, J.B. sent an email to Shkreli, saying, "my name is J.B., a friend of Brent Saunders. Very interested in your project with Retrophin.  If there is still an opportunity for investment in this endeavor please let me know...."  About 90 minutes later, Shkreli forwarded the J.B. email to Greebel, saying "Do you have everything you need?  I will send a cap table tonight.  I want to be able to take new money in ASAP."  Seven minutes later, Greebel responded, "makes sense – I will go through the information you sent in am.  We should be able to do it quickly -- key issue is how to describe the dmd and liver since you do not have either patent.  Perhaps it makes sense to

just sell series A/common B since the document lets you do it already.  Did you ever close the summer round?"  This Greebel email demonstrates that Greebel has a <u>detailed</u> familiarity with Shkreli's business and that Greebel is not only implementing the client's wishes but is providing legal and business solutions on a going forward basis.

Greebel guided Shkreli on MSMB matters including MSMB hostile shareholder activity. Specifically, on August 19, 2011, Greebel set out for Shkreli how to plan the finances around a hostile takeover attempt of AMAG by MSMB.   On another occasion, Shkreli asked Greebel to meet with a potential investor "who wants to put one mil(lion) in Retrophin."  Specifically, on February 13, 2012, Shkreli asked Greebel to meet with K.F.,[4] who is a potential investor in Retrophin.  Shkreli emails Greebel asking him if  is available immediately.  Greebel responds almost instantaneously, writing  "What do you want me to do?" Shkreli responds "Meet with K.F. and S.C. at pera restaurant right now, explain Retrophin to K."   Based on the email traffic, Greebel attended this meeting with K.F. and helped arrange a follow-up meeting for K.F. with Shkreli.

On February 16, 2012, Greebel sent an email to Jackson Su concerning a number of questions posed about the Retrophin Capitalization Table and the vesting of shares.  In the email, Greebel provides answers and backup documentation to five questions posed by Mr. Su., demonstrating that Greebel is in possession of detailed, first-hand information about the inner workings of the company.

These few emails are consistent with the tens of thousands of emails between Shkreli and Greebel, which clearly show two people – lawyer and client – working hand in hand through the issues facing Shkreli, Greebel and these businesses.

---

[4]Initials will be used in the brief.  The name is in full in the email.

**F.**     **Shkreli's Two Statements to the Securities and Exchange Commission**

In the Fall of 2012, the Securities and Exchange Commission ("SEC") opened an investigation into the MSMB Capital Management LLC valuation.  The first subpoena the SEC served on MSMB came on October 1, 2012.  Katten attorneys represented Shkreli in connection with that investigation.  On August 7, 2013, accompanied by Michael M. Rosensaft, Mr. Greebel's partner at Katten, Shkreli provided lengthy testimony to the SEC regarding MSMB Capital.  He testified again for the SEC on February 24, 2014, and again he was accompanied by Mr. Rosensaft.

**G.**     **Shkreli's Statement to the FBI and U.S. Attorney's Office**

When Shkreli learned that there was an investigation of MSMB Capital and Retrophin opened by the United States Attorney's Office for the Eastern District of New York, he voluntarily met with Assistant United States Attorneys ("AUSA") Winston Paes and Alixandra Smith, without counsel.  Two Agents from the Federal Bureau of Investigation were also present.  That meeting took place on February 11, 2015.

**H.**     **Greebel's Statement to the FBI**

On the morning of December 17, 2015, Greebel was arrested and brought to the FBI Office.  He was asked at length about dealings and conversations he had with Martin Shkreli.  At onc point during the interview, Greebel said in substance that he did not know how privilege works in the interview.  The agent responded that "Retrophin waived privilege."[5]   At that, Greebel continued speaking in detail about business deals and other matters he discussed with Shkreli.

---

[5] The Agent did not say that Retrophin waived privilege as to certain discrete areas or as to certain topics.  Rather, the Agent advised Greebel in a general, unlimited sense that Retrophin has waived its attorney client privilege.

Among many other topics, Greebel discussed the settlement agreements and the consulting agreements. Greebel explained to the Agents that a small fraction of investors complained about their returns and so a decision was made to settle with them. Greebel later stated that there was a Board meeting to review the settlement agreements because Marcum (the auditor) felt that for GAAP purposes (generally accepted accounting principles) that these agreements should not be Retrophin liabilities. Therefore, the auditor recommended and the Board approved that MSMB indemnify Retrophin for the value of the settlement agreements. MSMB executed promissory notes in favor of Retrophin along with indemnifying Retrophin.

Greebel also discussed the consulting agreements, explaining that when Retrophin went public, it had very little money, and so Shkreli hired people via these agreements. Greebel also stated that many of these people had a history with MSMB and may be owed money. Greebel stated clearly that the Board provided Shkreli with the authority to hire people and that it is commonplace for a Board to grant such hiring authority to a CEO.

## II.   LEGAL ARGUMENT

### A.   Introduction

As a starting point, even the Superseding Indictment alleges that Shkreli worked closely with his counsel, Evan Greebel, for a several-year period leading up to September 2014. In particular, the Government alleges that Shkreli and Greebel worked together in representing the "prior performance of the fund (MSMB), its assets under management and the retaining of an independent auditor and administrator, and then by preventing redemptions by investors in MSMB Capital…" Para. 7(a). The Government further alleges that Shkreli and Greebel induced potential investors to invest in MSMB Healthcare through alleged misrepresentations and

omissions about the fund's prior performance, its assets under management and existing liabilities.

The Government further alleges that Shkreli and Greebel sought to defraud Retrophin by misappropriating Retrophin's assets so that Shkreli could satisfy personal and unrelated professional debts and obligations. In particular, the Government states that Shkreli, assisted by Greebel, defrauded Retrophin by causing it to (1) transfer Retrophin shares to MSMB Capital even though MSMB Capital never invested in Retrophin; (ii) enter into settlement agreements with defrauded MSMB Capital and MSMB Healthcare investors to settle liabilities owed by MSMB Capital, MSMB Healthcare (together the "MSMB Funds") and Shkreli and (iii) enter into sham consulting agreements with other defrauded MSMB Capital and MSMB Healthcare investors and an Elea Capital investor as an alternative means to settle liabilities owed by the MSMB Funds and Shkreli.

Finally, the Government has also alleged that Shkreli and Greebel worked together in misrepresenting the beneficial ownership and control of Retrophin's unrestricted or "free trading" shares.

Therefore, through the Superseding Indictment itself, the Government lays bare its position that Greebel and Shkreli worked closely together during the relevant time periods alleged. A review of the tens of thousands of emails between the two men provides further details as to precisely how closely Shkreli and Greebel worked on a day-to-day basis, and the great extent to which Shkreli relied on Greebel for counsel and advice.

**B.     The Legal Standard for Rule 14 Severance**

Rule 14 of the Federal Rules of Criminal Procedure grants a court discretion to order severance where the joint trial of the defendants "appears to prejudice a defendant or the

government." Fed. R. Crim. P. 14(a).  While a joint trial might promote economy and efficiency, it should only be used "where these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." Bruton v. United States, 391 U.S. 123, 131 n.6 (1968). Accordingly, the Supreme Court has ruled that severance is appropriate where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993).

In determining whether severance is warranted, district courts in the Second Circuit have considered the following factors:  (1) the number of defendants and counts; (2) the complexity of the indictment; (3) the estimated length of trial; (4) disparities in the amount or type of proof offered against the defendants; (5) disparities in the degrees of involvement by defendants in the overall scheme; (6) possible conflict between defense theories or strategies; (7) potential prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant; and (8) potential prejudice if exculpatory evidence were unavailable in a joint trial, but would have been available to a defendant tried alone.  United States v. Guillen-Rivas, 950 F. Supp. 2d 446, 457 (E.D.N.Y. 2013); see also United States v. Ramos, 346 F. Supp. 2d 567, 570 (S.D.N.Y. 2004); United States v. Gallo, 668 F. Supp. 736, 749 (E.D.N.Y.1987).  "While none of these factors is dispositive, each is intended to provide guidance as to whether a jury will be capable of considering the evidence as to each defendant separately, independent of evidence against co-defendants." Gallo, 668 F.Supp. at 749.

The Second Circuit has found that severance is appropriate based on antagonistic defenses where the defendant demonstrates that "the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be

14

disbelieved." United States v. James, 712 F.3d 79, 105 (2d Cir. 2013); United States v. Lyttle, 460 F. App'x 3, 7 (2d Cir. 2012); United States v. Yousef, 327 F.3d 56, 151 (2d Cir.2003) ("Defenses are mutually antagonistic when accepting one defense requires that the jury must of necessity convict a second defendant." (quotation omitted)); United States v. Salameh, 152 F.3d 88, 116 (2d Cir. 1998) (severance is appropriate where the defendant makes "a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of [the] other." (quotation omitted)).

### C. The Core of Shkreli's Reliance on Counsel Defense Conflicts With The Core of Greebel's Anticipated Defense

Defendant Martin Shkreli maintains his complete innocence. The evidence will show that he did not defraud, steal, lie, or cheat anyone out of money, and that he devoted his best efforts to bringing value to his investors. The evidence, including the tens of thousands of emails between Shkreli and Greebel, as well as other documents maintained by Greebel's firm, is overwhelming that Shkreli ensured that his counsel was fully aware of all relevant information, and that his counsel provided legal advice on all topics. The evidence is clear moreover that Shkreli and his legal counsel at all times had a relationship of good-faith, meaning that Shkreli's lawyers had all the information they needed to render appropriate and accurate advice, and that he followed that advice, believing it to be proper and correct.

Upon information and belief, the core of Greebel's defense will be that Shkreli misled him, told him false or only partial information, and that Shkreli did not follow Greebel's advice. Shkreli and his counsel believe such a defense is patently unfounded and is flatly contradicted by the written record of communications between Shkreli and Greebel as well as other evidence. Nonetheless, if in fact this ends up being Greebel's defense, then the very core of Shkreli's

defense, where he was fully honest with Greebel and faithfully followed his legal advice would be in clear conflict with the core of Greebel's defense.

Accordingly, there is no doubt that the defenses here are directly antagonistic. Shkreli will defend himself by claiming that he relied on Greebel in good faith, and Greebel will contend that Shkreli kept him in the dark on several topics and thus, did not rely on his advice in good faith. However, that does not end the analysis. In addition to being antagonistic, the dual defenses simply cannot both be credited by a jury at the same trial. In order for the jury to credit the core of Shkreli's defense, it would have to reject the core of Greebel's defense, and vice versa.

In a similar situation, Judge Spatt granted a severance where he found two such defenses to be "mutually antagonistic in that in order to believe the testimony of (one defendant), the jury must necessarily disbelieve the testimony of (the other defendant)." Judge Spatt's decision in United States v. Aronson, CR-12-0245 (ADS), attached hereto as Exhibit A, addresses a situation where one defendant (Aaron), an attorney, claims that he rendered good faith legal advice to a second defendant (Aronson). Judge Spatt characterized the respective defenses as follows: "(t)he defense of the movant, Defendant Frederic Aaron, is that 'Eric Aronson lied to him, deceived him, and made him an unknowing person in a fraud about which Mr. Aaron was unaware.'" Quoting Dft's Memorandum, p.4. Judge Spatt continued, "(o)n the other hand, according to Aaron, Aronson is nearly certain to rely on an 'advice of counsel' defense after Aronson provided Aaron with complete and truthful information." Judge Spatt then ruled as follows: "(t)he Court finds that these defenses are mutually antagonistic in that in order to believe the testimony of the Defendant Aaron, the jury must necessarily disbelieve the testimony of Defendant Eric Aronson."

16

The instant case presents this identical situation.  Shkreli argues that based on the emails and other communications between him and Greebel, that it is abundantly clear that he has a valid, substantial reliance on counsel defense.  Greebel will likely argue (at the time of filing this memorandum, we have not seen Greebel's motion papers) that Shkreli failed or refused to provide Greebel with complete information such that Shkreli does not have a valid reliance on counsel defense.  As in Aronson, the jury cannot credit both versions of events.  By necessity, the jury would have to select one and reject the other.  Accordingly, the particular facts here warrant the unusual remedy of a trial severance.

### D.   Greebel's Post-Arrest Statement Will Violate Shkreli's Confrontation Right If Greebel Opts Not To Testify

In Bruton v. United States, "the Supreme Court recognized the risks posed by 'powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side-by-side with the defendant,' which are then 'deliberately spread before the jury in a joint trial.'" United States v. Taylor, 745 F.3d 15, 28 (2d Cir. 2014) citing Bruton v. United States, 391 U.S. 123, 135–36 (1968).  At a joint trial, Shkreli faces a tremendous risk of severe prejudice if Greebel's two hour statement to agents is introduced as evidence.

While Greebel's statement is neither a confession nor direct accusation against Shkreli, it is nonetheless harmful to Shkreli because Greebel significantly misleads the agents as to the frequency and nature of the communication between the two men.  For two hours, Greebel tells a story of his representation of Shkreli and his companies that deliberately minimizes the true nature of this attorney-client relationship.  For instance he indicates that his representation of the MSMB entities was limited to hostile takeovers.  Yet, he billed MSMB for approximately, $500,000.00 in legal services.  Conveniently, Greebel's statement does not mention that he and Shkreli emailed one another almost daily in 2012, and often late at night and on weekends.  Nor

17

does he mention that he advises Shkreli regarding potential Board slates for companies that are targets of his hostile shareholder activity. Nor does he mention that he advises Shkreli regarding Board formation at Retrophin. Nor does he mention that he advises Shkreli regarding the capitalization table for Retrophin, and that he drafts consulting agreements, settlement agreements and that he communicates directly with counsel for the parties seeking such agreements.

At trial, we anticipate Greebel will take this arrest statement one step further, and accuse Shkreli of deceiving and withholding important information. In this arrest statement, however, Greebel begins his campaign to persuade the Government that despite being the attorney to the companies, he was not privy to important, detailed information about the conditions and status of MSMB and Retrophin.

Greebel's statement contradicts and totally undermines the email evidence showing clearly that Shkreli and Greebel worked closely, hand-in-hand and that Greebel had accurate reliable information with which to provide legal advice to Shkreli. If the Government is permitted to introduce Greebel's statement at a joint trial, and Greebel elects not to testify, Shkreli will be deprived of his right to confront a critical witness against him.

There is no way to modify Greebel's statement to diminish the prejudice it will cause Shkreli. Shkreli and his companies permeate the statement—they are the only topics raised by the Agent. The Second Circuit recently ruled that where a statement could not be sufficiently modified to truly hide the identity of the defendants being referenced by a codefendant's statement, the convictions had to be vacated. In Taylor, the district court modified a statement of a co-defendant in an effort to conceal the identity of the defendants referenced in that statement, but the Second Circuit found that the modifications and substitutions so poorly obscured the

identity of the person(s) being referenced that the statement "point[ed] directly to the defendant[s], and it accuses the defendant[s] in a manner similar to ... a testifying codefendant's accusatory finger." Taylor, 745 F.3d at 29 (citations omitted).

Likewise, Greebel's two hour recitation of his four-year representation of Shkreli and his companies cannot be modified to obscure the identity of his co-defendant or the topic/s that he is addressing. The statement has one topic--Greebel's legal representation of Shkreli, MSMB and Retrophin. Even if the name Shkreli (or MSMB or Retrophin) is removed from the statement in an attempt to sanitize it for the jury, the jury would know exactly who and what Greebel was referencing. Id.

Further, Greebel's statement is not a statement about a small issue that can be carved out of the trial or otherwise quarantined to prevent prejudice to Shkreli. The truth about Greebel's representation of Shkreli and his companies is a critical factor for the jury to consider as it deliberates on Shkreli's reliance on counsel defense and in turn, his innocence or guilt. If believed, Greebel's statement works to negate the reliance on counsel defense. If Greebel opts not to testify, Shkreli will have had no chance to confront Greebel with the inaccuracies that riddle his self-serving narrative. Without question the result will be substantial and unfair prejudice to Shkreli. Shkreli's Constitutional right to confront Greebel regarding his statements to the agents, requires that his trial be severed from Greebel.

## III.  CONCLUSION

Based on the foregoing, defendant Shkreli cannot fairly proceed to trial alongside his former attorney given Shkreli's substantial "reliance on counsel" defense, and Greebel's claim that while his firm billed almost ten million dollars and was knowledgeable of every important

fact that somehow he did not know enough to render proper legal advice.  The defenses are not only antagonistic, they are irreconcilable.

We respectfully request that the Court grant Shkreli's request for a severance from Greebel for trial.

Respectfully submitted,

Benjamin Brafman
Marc Agnifilo
Andrea Zellan
Jacob Kaplan
Teny Geragos

**BRAFMAN & ASSOCIATES, PC**
*Attorneys for the*
*Defendant Martin Shkreli*
767 3rd Avenue, 26th Flr.
New York, NY 10017
212-750-7800
bbrafman@braflaw.com

20