UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA,

               Plaintiff,

      v.

MARTIN SHKRELI and EVAN GREEBEL,

               Defendants.

--------------------------------------------------------x

ECF Case

No. 15-cr-00637 (KAM)

**<u>ORAL ARGUMENT REQUESTED
AND SCHEDULED FOR APRIL 7,
2017</u>**

**MR. GREEBEL'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION FOR SEVERANCE**

# TABLE OF CONTENTS

<u>Page</u>

I.     Preliminary Statement ................................................................................. 1

II.    Relevant Procedural History ........................................................................ 4

III.   Argument ..................................................................................................... 6

    A.   Severance Must Be Granted Because Mr. Greebel's and Mr. Shkreli's Defenses
         Are Mutually Antagonistic................................................................... 8

        1.   The Law Governing Mutually Antagonistic Defenses............................. 8

        2.   At the Core Of Mr. Greebel's Defense Will Be Proof of Mr. Shkreli's
            Lies, and Misleading Statements to, Mr. Greebel and Katten Muchin ................. 9

        3.   Judge Spatt's Decision In *Aronson* And The Second Circuit's Decision in
            *Serpoosh* Demonstrate That Severance Is Necessary ........................... 18

        4.   The Conflict Alone Between Mr. Greebel's And Mr. Shkreli's Defenses
            Warrants Severance................................................................... 22

    B.   A Joint Trial Will Present Extensive Evidentiary Obstacles Including
         Confrontation Clause Problems ......................................................... 23

    C.   A Joint Trial Will Present a Severe Risk of Spillover Prejudice ................................. 29

    D.   Mr. Shkreli's Plan Of Creating Chaos To Distract The Jury's Attention Away
         From The Evidence And Obtain Jury Nullification Presents An Unacceptable
         Risk Of Depriving Mr. Greebel Of His Right To A Fair Trial ..................................... 34

IV.   Conclusion ................................................................................................. 38

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Bruton v. United States,
391 U.S. 123 (1968)...........................................................................................................1, 27

Cotto v. Herbert,
316 F.3d 198 (2d Cir. 2003)...................................................................................................24

Crawford v. Washington,
541 U.S. 36 (2004)..........................................................................................................1, 27

Davis v. Washington,
547 U.S. 813 (2006)..............................................................................................................27

Dutton v. Evans,
400 U.S. 74 (1970),
overruled on other grounds by Crawford, 541 U.S. 36 ...........................................................29

First Fed. Savings & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon &
Co.,
110 F.R.D. 557 (S.D.N.Y. 1986) ..........................................................................................25

Fiswick v. United States,
329 U.S. 211 (1946)..............................................................................................................28

Glasser v. United States,
315 U.S. 60 (1942)................................................................................................................32

Gray v. Maryland,
523 U.S. 185 (1998)..............................................................................................................27

Meyerhofer v. Empire Fire & Marine Ins. Co.,
497 F.2d 1190 (2d Cir. 1974).........................................................................................11, 25

Michigan v. Bryant,
562 U.S. 344 (2011)........................................................................................................26, 27

Murdoch v. Castro,
365 F.3d 699 (9th Cir. 2004) ................................................................................................25

People v. Jenkins,
2015 NY Slip Op. 51740, 2015 WL 7740695 (N.Y. Cty. Ct. Nov. 30, 2015) .......................35

Ryan v. Miller,
303 F.3d 231 (2d Cir. 2002)..................................................................................................27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*S.E.C. v. Forma*,
 117 F.R.D. 516 (S.D.N.Y. 1987) ........................................................25

*In re Terrorist Bombings of U.S. Embassies in East Africa*,
 552 F.3d 93 (2d Cir. 2008)................................................................24

*United States v. Abakporo*,
 No. S3 12 CR 340 (SAS), 2013 WL 6188260 (S.D.N.Y. Nov. 25, 2013) .......................21, 22

*United States v. Abbell*,
 926 F. Supp. 1545 (S.D. Fla. 1996) ......................................................21

*United States v. Abcasis*,
 45 F.3d 39 (2d Cir. 1995) ................................................................24

*United States v. Aloi*,
 511 F.2d 585 (2nd Cir. 1975)..............................................................34

*United States v. Aronson*,
 No. 2:12-cr-00245 (ADS) (E.D.N.Y. May 23, 2013), ECF No. 167........................8

*United States v. Aronson*,
 No. CR-12-0245 (ADS) (E.D.N.Y. Feb. 8, 2013), ECF No. 146 ..........................18

*United States v. Barret*,
 824 F. Supp. 2d 419 (E.D.N.Y. 2011) ..............................................6, 7, 21, 30

*United States v. Bellomo*,
 954 F. Supp. 630 (S.D.N.Y. 1997).........................................................30

*United States v. Birnbaum*,
 337 F.2d 490 (2d Cir. 1964)..............................................................29

*United States v. Boscia*,
 573 F.2d 827 (3d Cir. 1978)..............................................................7

*United States v. Branker*,
 395 F.2d 881 (2d Cir. 1968)..............................................................33

*United States v. Cardascia*,
 951 F.2d 474 (2d Cir. 1991)..........................................................9, 22

*United States v. Carpentier*,
 689 F.2d 21 (2d Cir. 1982)..............................................................8

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Casamento,*
  887 F.2d 1141 (2d Cir. 1989).................................................................................8

*United States v. Colasuonno,*
  697 F.3d 164 (2d Cir. 2012).................................................................................10

*United States v. DiNome,*
  954 F.2d 839 (2d Cir. 1992).................................................................................31

*United States v. Eire,*
  822 F.2d 56, 1987 WL 37830 (4th Cir. 1987) .......................................................29

*United States v. Faltine,*
  No. 13-CR-315 KAM, 2014 WL 4370811 (KAM) (E.D.N.Y. Sept. 2, 2014) ...............6, 8, 21

*United States v. Feng Ling Liu,*
  No. 12 Cr. 934 (RA), 2014 WL 917048 (S.D.N.Y. Mar. 7, 2014) .........................21

*United States v. Gilbert,*
  504 F. Supp. 565 (S.D.N.Y. 1980).................................................................33, 34

*United States v. Grace,*
  439 F. Supp. 2d 1125 (D. Mont. 2006) .........................................................7, 8, 25

*United States v. Kahale,*
  789 F. Supp. 2d 359 (E.D.N.Y. 2009) .................................................................30

*United States v. Kelly,*
  349 F.2d 720 (2d Cir. 1965).................................................................................33

*United States v. Lang,*
  589 F.2d 92 (2d Cir. 1978).................................................................................28

*United States v. Lee,*
  549 F.3d 84 (2d Cir. 2008).................................................................................27

*United States v. Locascio,*
  357 F. Supp. 2d 536 (E.D.N.Y. 2004) .........................................................26, 32

*United States v. Logan,*
  419 F.3d 172 (2d Cir. 2005).................................................................................28

*United States v. Mardian,*
  546 F.2d 973 (D.C. Cir. 1976) .........................................................................32, 33

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. McKeon*,
738 F.2d 26 (2d Cir. 1984)..................................................................................11

*United States v. Scott*,
637 Fed. Appx. 10 (2d Cir. 2015) ......................................................................22

*United States v. Serpoosh*,
919 F.2d 835 (2d Cir. 1990)..........................................................................20, 23

*United States v. Shkreli*,
Case No. 15-CR-637 (KAM) (E.D.N.Y. Sept. 9, 2016), ECF No. 84 .....................25

*United States v. Shkreli*,
Case No. 15-CR-637 (KAM) (E.D.N.Y. Sept. 9, 2016), ECF No. 138 ...................32

*United States v. Silver*,
No. 15-CR-093 (VEC), 2016 WL 2343879 (S.D.N.Y. May 3, 2016)....................29

*United States v. Spinelli*,
352 F.3d 48 (2d Cir. 2003)...................................................................................30

*United States v. Spy Factory*,
960 F. Supp. 684 (S.D.N.Y. 1997).......................................................................30

*United States v. Stein*,
2007 WL 3009650 (S.D.N.Y. Oct. 15, 2007) .......................................................28

*United States v. Stewart*,
433 F.3d 273 (2d Cir. 2006).................................................................................27

*United States v. Upton*,
856 F. Supp. 727 (E.D.N.Y. 1994) .........................................................................7

*United States v. Van Hise*,
No. S4 12 Cr. 847 (PGG), 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013)..............22

*United States v. Vargas*,
279 Fed. Appx. 56 (2d Cir. 2008) ........................................................................28

*United States v. Volpe*,
42 F. Supp. 2d 204 (E.D.N.Y. 1999) ......................................................................9

*United States v. Weisberg*,
08-Cr-347 (NGG) (RML), 2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011)..........11, 24, 25

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Williamson v. United States*,
207 U.S. 425 (1908)........................................................................................................10

*Zafiro v. United States*,
506 U.S. 534 (1993)..................................................................................................1, 6, 7

**Statutes**

22 CRR-NY § 1200 ..........................................................................................................25

**Rules**

Fed. R. Crim. P. 8(b)..........................................................................................................6

Fed. R. Crim. P. 14............................................................................................................6

Fed. R. Crim. P. 14(a)........................................................................................................6

Fed. R. Evid. 401 ............................................................................................................30

Fed. R. Evid. 403 ............................................................................................................30

Fed. R. Evid. 801(d)(2)(E) ..............................................................................................28

N.Y. Rules of Prof'l Responsibility 1.6 ....................................................................11, 25

N.Y. Rules of Prof'l Responsibility 1.6(a) .....................................................................25

N.Y. Rules of Prof'l Responsibility 1.6(b)(5)[i]..............................................................25

**Constitutional Provisions**

U.S. Const. amend. VI .............................................................................1, 3, 25, 26, 27, 28

Defendant Evan Greebel respectfully submits this memorandum of law in support of his Motion for Severance.  Oral argument is scheduled for April 7, 2017.

## I.    Preliminary Statement

*United States v. Martin Shkreli and Evan Greebel* is the quintessential case that requires severance.  There is "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent a jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  *First*, this case presents one of those uncommon circumstances when defendants have mutually antagonistic and irreconcilable defenses.  We will present strong evidence that Mr. Shkreli repeatedly lied to, misled, and omitted material information from Mr. Greebel and other attorneys at Katten Muchin Rosenman LLP ("Katten Muchin").  Indeed, we will demonstrate that Mr. Greebel was an unknowing pawn in a fraud about which Mr. Greebel was unaware.  We will also demonstrate through the evidence obtained during discovery that Mr. Shkreli is seeking to have Mr. Greebel found responsible for his misconduct in the same way that, over the years, he has repeatedly shifted the blame from himself to anyone and everyone around him.  In direct contrast, Mr. Shkreli's counsel will assert that he did not mislead Mr. Greebel and, in fact, "has perhaps the most relevant reliance on counsel defense [his experienced counsel has] ever encountered."  July 14, 2016 Hearing Tr. at 21:17-23.  *Second*, a trial of both defendants will present a thicket of potentially insurmountable evidentiary obstacles as well as constitutional problems under the Confrontation Clause pursuant to *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004), and *Bruton v. United States*, 391 U.S. 123, 126 (1968).  *Third*, there will be extensive spillover prejudice to Mr. Greebel given that six of the eight charges are solely against Mr. Shkreli. *Finally*, Mr. Shkreli has embarked on an improper campaign to make the case more polarizing,

instill confusion, and taint the jury, with the hope of achieving jury nullification rather than have the jury focus on and carefully consider the evidence. As a result, Mr. Shkreli's post-arrest conduct presents an unacceptable risk of depriving Mr. Greebel of his right to a trial by a fair and impartial jury.

In light of the mutually antagonistic defenses of Mr. Greebel and Mr. Shkreli, there will be no realistic way for a jury to find both defendants *not* guilty. In order to believe Mr. Greebel's core defense, the jury will have to disbelieve Mr. Shkreli's core defense; and, in order to believe Mr. Shkreli's core defense, the jury will have to disbelieve Mr. Greebel's core defense. The opposing defenses of Mr. Greebel and Mr. Shkreli go far beyond mere "finger pointing." Mr. Greebel's defenses require him to offer evidence at trial of Mr. Shkreli's lies, material omissions, and deception. In a joint trial, that will turn Mr. Greebel's counsel into another prosecutor of Mr. Shkreli.

Similarly, and in response to Mr. Greebel's defenses, Mr. Shkreli will argue that he relied on Mr. Greebel's advice and/or acted in good faith when consulting Mr. Greebel. Mr. Shkreli will undoubtedly argue that Mr. Greebel's defenses are meritless, that he did not lie to or withhold information from Mr. Greebel and others at Katten Muchin, and that Mr. Greebel and others at Katten Muchin are responsible for the legal advice upon which Mr. Shkreli relied for his actions. At a joint trial, Mr. Shkreli's counsel would in effect be a *de facto* prosecutor of Mr. Greebel. These mutually antagonistic defenses, alone, require severance in this case, just as they did in a recent criminal case involving the prosecution of an owner of a number of entities and an outside attorney who did work for those entities in the United States District Court for the Eastern District of New York, *United States v. Aronson*. Decl. of Lisa H. Rubin in Supp. of Mot.

for Severance ("Rubin Decl."), Ex. 1 at 14 (Mem. of Decision and Order Granting Severance at 14, No. CR-12-0245 (ADS) (E.D.N.Y. May 23, 2013), ECF No. 167).

The evidentiary obstacles and Confrontation Clause problems presented by a joint trial are also compelling grounds for a severance. Each defendant will likely be offering into evidence post-arrest statements that the other defendant will seek to exclude from trial, thus presenting serious problems under *Crawford* and *Bruton*. For example, Mr. Greebel will be offering into evidence certain post-arrest statements made by Mr. Shkreli that exculpate Mr. Greebel, but inculpate Mr. Shkreli. And the government and Mr. Shkreli will likely attempt to keep them out of evidence altogether. Moreover, Mr. Greebel will likely be moving to preclude the admission of certain testimonial statements of Mr. Shkreli to law enforcement and the SEC that would not be admissible as evidence in a separate trial against Mr. Greebel.

As demonstrated below, Mr. Shkreli's post-arrest conduct has been nothing short of bizarre and, in the absence of a severance, will present a serious risk of depriving Mr. Greebel of a fair trial. According to his own stated intentions, as corroborated by his well-publicized post-arrest actions, Mr. Shkreli is purposely creating a circus-like atmosphere pursuant to an improper and prejudicial plan to disrupt the trial and achieve jury nullification along the lines of, in Mr. Shkreli's own words, "OJ Simpson [and] Casey Anthony."[1] As the trial approaches and gets underway, and both the government and Mr. Greebel attack Mr. Shkreli's story, it is a near certainty that Mr. Shkreli will take actions and make statements to destroy the integrity of the court proceedings to detract from the applicable evidence and the law. His conduct creates an unacceptable risk of irreversible prejudice and harm to Mr. Greebel who wants a jury focused on the evidence and not the tornado of chaos swirling around Mr. Shkreli.

---

[1] Rubin Decl., Ex. 12.

Far from knowingly joining an alleged serial fraudster's scheme, Mr. Greebel—a family man—was an unknowing latecomer who advised a fledgling public company in good faith. He should not be forced to stand trial jointly with a codefendant who claims that he relied on Mr. Greebel's advice when Mr. Greebel's defense—that Mr. Shkreli purposefully lied to him and concealed key facts from him—runs directly counter to Mr. Shkreli's defense. Nor should Mr. Greebel be forced to sit for weeks as the jury is inundated with prejudicial information wholly unrelated to the limited charges against him while assuming the substantial risk that Mr. Shkreli's apparent plan to disrupt the trial, create a circus-like atmosphere, and achieve jury nullification will backfire not only on Mr. Shkreli, but also on Mr. Greebel.

## II.    Relevant Procedural History

The dichotomy between the charged codefendants is stark. It is reflected in both the Superseding Indictment and their own personal histories. In its Superseding Indictment (Dkt. 60 or "Ind.") (the "Indictment") filed on June 3, 2016, the government alleges six different conspiracies, involving different time periods, alleged victims, objectives, means, and methods. Mr. Greebel is charged with being a member of conspiracies in Counts Seven and Eight, which deal solely with Retrophin (hereinafter "Retrophin" or the "Company").

Mr. Greebel was one of multiple outside attorneys to Retrophin, not an executive, officer, or director of the Company. Since in or about 1998, Mr. Greebel has been an attorney in good standing. In or about 2002, he joined Katten Muchin as an associate and, in or about 2006, Mr. Greebel became a partner at the firm. Mr. Greebel worked on corporate transactions for multiple clients, principally representing public companies, private companies, and private equity funds. He comes from a long line of attorneys going back at least three generations, including his father and grandfather. He is a family man, husband, and father of three young children.

Mr. Shkreli, by contrast, is charged in all eight counts of the Indictment, including four additional conspiracies concerning MSMB Capital and MSMB Healthcare, the "MSMB Capital Scheme" (Ind. ¶¶ 41-43, 44-55), and the "MSMB Healthcare Scheme" (*id*. ¶¶ 48-50, 51-52). The allegations against Mr. Shkreli include deceiving MSMB Healthcare and MSMB Capital investors about a settlement with Merrill Lynch (*id.* ¶ 16); about losses from his management of a prior hedge fund, Elea Capital (*id.* ¶ 16); about the performance of both funds (*id.* ¶¶ 17-18); and about re-characterizing a $900,000 investment by MSMB Healthcare as an interest-bearing loan (*id.* ¶ 20). The Indictment does *not* allege that Mr. Greebel was aware of or took part in any of these activities. In fact, Mr. Greebel is not mentioned *at all* in *any* of them. These activities began as far back as 2009, while according to the Indictment, Mr. Greebel played no role at all in the charges until February 2011.

On multiple occasions, Mr. Shkreli and his counsel have informed the Court that he intends to raise an advice of counsel defense to address the charges in the Indictment. *See, e.g.*, June 6, 2016 Hearing Tr. at 9:20-24, 13:19-23. At the July 14, 2016 conference, Mr. Shkreli's counsel stated that he was seeking documents from Katten Muchin "based on the fact that I can already in good faith say to you, Your Honor, that the Defendant *Martin Shkreli has perhaps the most relevant reliance on counsel defense I've ever encountered.*" July 14, 2016 Hearing Tr. at 21:17-23 (emphasis added). Mr. Shkreli's counsel further asserted that there had been "virtual minute-by-minute almost on some days correspondence, e-mails, telephone calls, between Mr. Greebel . . . and Mr. Shkreli;" that Mr. Greebel "wore two hats" as counsel both for Retrophin and Mr. Shkreli; and that "Mr. Shkreli and his company was [sic] perhaps Greebel's most significant client during the period in question and where he was billed millions of dollars in fees for work done, and much of the work was done in connection with what I believe to be the heart

of the case." *Id.* at 22:7-16, 27:18-25.  To state the obvious, Mr. Greebel disagrees with much of what Mr. Shkreli's counsel has asserted.

### III.   Argument

Although joint trials are strongly favored in the criminal justice system, the unique circumstances of this case, pitting Mr. Greebel against Mr. Shkreli, and Mr. Shkreli against Mr. Greebel, along with other extraordinary aspects, clearly warrant a severance.

"Under Federal Rule of Criminal Procedure 8(b), multiple defendants who allegedly 'participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses' may be charged in a single indictment.  Fed. R. Crim. P. 8(b)." *United States v. Faltine*, No. 13-CR-315 KAM, 2014 WL 4370811, at *3 (KAM) (E.D.N.Y. Sept. 2, 2014).  "Federal Rule of Criminal Procedure 14(a) allows a court to 'order separate trials of counts, sever the defendants' trials, or provide any other relief that justice so requires' if 'the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government.'  Fed. R. Crim. P. 14(a)." *Id.*

"The Supreme Court has expressed a strong 'preference in the federal system for joint trials of defendants who are indicted together' to promote judicial efficiency and prevent the inequity of inconsistent verdicts."  *Id.* (citing *Zafiro v. United States*, 506 U.S. 534, 537 (1993)). "Indeed, 'a district court should grant severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilty or innocence.'"  *Id.* (internal citations omitted). "The determination of whether such prejudice exists is highly fact-specific and must be evaluated on a case-by-case basis."  *United States v. Barret*, 824 F. Supp. 2d 419, 433 (E.D.N.Y.

2011). "Moreover, the decision of whether to sever a trial is committed to the sound discretion of the district court." *Id*.

The Supreme Court in *Zafiro* listed several grounds for severance: "[W]hen evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant;" when "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty;" when "many defendants are tried together in a complex case and they have markedly different degrees of culpability;" when "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant" is introduced at trial; or when "essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." *Id.* at 539. Severance is warranted when any one factor, or a combination of factors, creates a risk that a defendant's rights will be compromised in a joint trial. *See United States v. Upton*, 856 F. Supp. 727, 736 (E.D.N.Y. 1994).

Here, as discussed below, the defendants' mutually antagonistic defenses, the conflicts likely to arise over the admission of evidence against one defendant over objections of the other, the spillover prejudice from six of the eight charges against Mr. Shkreli, and Mr. Shkreli's plan to make this case polarizing to achieve jury nullification compel a severance. Even if it were more economical or efficient to hold a joint trial in this case, "no defendant should ever be deprived of a fair trial because it is easier or more economical for the government to try several defendants in one trial rather than in protracted multiple trials." *United States v. Boscia*, 573 F.2d 827, 833 (3d Cir. 1978). Further, the prejudice to Mr. Greebel from the issues identified below would only grow over the course of a joint trial, necessitating retrial at a huge cost in terms of time and resources. *See United States v. Grace*, 439 F. Supp. 2d 1125, 1148 (D. Mont.

2006).  Where, as here, "there is so great a likelihood of unfair prejudice" over the course of the

trial, "[t]he joint trial does not serve its intended purpose of promoting judicial economy."  *Id.*

**A.  Severance Must Be Granted Because Mr. Greebel's and Mr. Shkreli's Defenses Are Mutually Antagonistic**

Mr. Greebel's defenses are mutually antagonistic with Mr. Shkreli's defenses.  Mr.

Greebel intends to prove that Mr. Shkreli deceived him through misrepresentations and material

omissions, whereas Mr. Shkreli's advice-of-counsel defense requires him to prove that he told

truthful and complete information to Mr. Greebel.  In order to believe Mr. Greebel's defenses,

the jury must necessarily disbelieve Mr. Shkreli's defenses, and vice versa.

### 1.  The Law Governing Mutually Antagonistic Defenses

Trials must be severed where codefendants present mutually antagonistic defenses.

Where an attorney and the CEO of a client are charged together, and the attorney asserts that the

client (through the CEO) lied and deceived him/her and the client/CEO asserts that he/she relied

on the attorney, the defenses are mutually antagonistic and compel severance.  Rubin Decl., Ex.

1 at 14.

Defenses are antagonistic "if the jury, in order to believe the core testimony offered on

behalf of [a] defendant, must necessarily disbelieve the testimony offered on behalf of that

codefendant."  *United States v. Carpentier*, 689 F.2d 21, 27-28 (2d Cir. 1982) (internal citations

omitted); *accord United States v. Casamento*, 887 F.2d 1141, 1153 (2d Cir. 1989) (same); *United

States v. Faltine*, No. 13-CR-315 KAM, 2014 WL 4370811, at *5 ("Antagonistic defenses rise to

the level of prejudice requiring severance only 'upon a showing that the jury, in order to believe

the core testimony offered on behalf of one defendant, must necessarily disbelieve the testimony

offered on behalf of his codefendant"); *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir.

1991) ("Defenses are mutually exclusive or irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant.") *United States v. Volpe*, 42 F. Supp. 2d 204, 210 (E.D.N.Y. 1999) (defenses are mutually antagonistic when "in order for the jury to believe *one* defendant, they *must* convict the other") (emphasis in original).

2. **At the Core Of Mr. Greebel's Defense Will Be Proof of Mr. Shkreli's Lies, and Misleading Statements to, Mr. Greebel and Katten Muchin**

Mr. Greebel's core defense will be based, in substantial part, on the following arguments that are antithetical to Mr. Shkreli's defense:  (1) Mr. Shkreli lied to Mr. Greebel and other attorneys at Katten Muchin; (2) Mr. Shkreli failed to disclose material information to Mr. Greebel and other attorneys at Katten Muchin; (3) Mr. Shkreli misrepresented on multiple occasions to third-parties that Mr. Greebel had offered or provided certain advice when in fact Mr. Greebel provided the opposite advice; (4) Mr. Shkreli misrepresented to others that he had obtained certain legal advice from Mr. Greebel when, in fact, Mr. Shkreli had not conferred with Mr. Greebel at all; (5) Mr. Shkreli deceived Mr. Greebel and other attorneys at Katten Muchin and misused them as pawns in fraudulent schemes unbeknownst to them; and (6) Mr. Shkreli has a long-term, pattern and practice of blaming others, including Mr. Greebel, for his own misconduct.  The misrepresentations and misleading statements will relate to core aspects of the Superseding Indictment.  For the jury to accept Mr. Greebel's defenses, it would have to reject Mr. Shkreli's defenses that he did not lie, did not omit material information, did not deceive others, and did not blame others for his own misconduct.

There can be no serious dispute that Mr. Shkreli strongly intends to assert a "reliance on the advice of counsel" defense and, at a minimum, the argument that he relied in good faith on Mr. Greebel's advice.  To assert a reliance on advice of counsel defense, Mr. Shkreli must show that he "(1) 'honestly and in good faith' sought the advice of counsel; (2) 'fully and honestly

9

la[id] all the facts before his counsel'; and (3) in good faith and 'honestly follow[ed]' counsel's advice, believing it to be correct and intending that his acts [were] lawful." *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) (quoting *Williamson v. United States*, 207 U.S. 425, 453 (1908)). In other words, an advice of counsel defense requires Mr. Shkreli to prove that he honestly sought Mr. Greebel's advice, fully disclosed "all the facts" to Mr. Greebel, and honestly followed that advice, believing it to be correct and "intending that his acts" be lawful. *Id.* That means Mr. Shkreli must argue to the jury not only that he informed Mr. Greebel of sufficient facts to justify his reliance on Mr. Greebel's legal opinion, but also that Mr. Shkreli followed Mr. Greebel's advice in a good faith effort to comply with the law. For the jury to accept Mr. Shkreli's defenses, it would have to reject Mr. Greebel's defenses that Mr. Shkreli lied to Mr. Greebel and others at Katten Muchin, that Mr. Shkreli omitted material information from Mr. Greebel and others at Katten Muchin, and that Mr. Shkreli deceived multiple attorneys at Katten Muchin.

Mr. Greebel will be offering into evidence numerous examples of admissible evidence of Mr. Shkreli's deception toward Mr. Greebel, other attorneys at Katten Muchin, and other professionals. Such evidence will relate to many topics including, but not limited to, consulting agreements at issue in the Superseding Indictment, stock transfers between parties at issue in the Superseding Indictment, and the Fearnow shares at issue in the Superseding Indictment. In the interests of preserving his defenses, we respectfully do not outline all of the evidence of such deception, but instead offer a few examples for purposes of demonstrating to the Court that Mr. Greebel's defenses and Mr. Shkreli's defenses are mutually antagonistic and irreconcilable.[2] In

---

[2] A defendant does not have to reveal his work product, trial strategies, and legal theories to the government. *See United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984) ("Moreover, where the attorney-client privilege, the privilege against self-incrimination, the fear of impeachment by a prior conviction, apprehension over having to

addition, as reflected in the attached declaration submitted by the undersigned counsel for Mr.

Greebel, we represent in good faith that we intend to present a defense at trial that Mr. Shkreli

deceived Mr. Greebel and other attorneys at Katten Muchin, and that we intend to, in effect,

prosecute Mr. Shkreli at trial for committing these acts of deception.  *See* Decl. of Reed Brodsky

in Supp. of Mot. for Severance ("Brodsky Decl.") ¶¶ 2 & 4.

        **(a)**     ***First Example*: Mr. Shkreli Lied to Mr. Greebel About** ██████

      A good example of Mr. Shkreli's deception is the evidence showing that ██████

████████████████████████████████████████████

█████████████████████████████████.

Such deception is highly relevant and probative of the charges.  In the Superseding Indictment,

for example, Mr. Shkreli is charged with a scheme to defraud investors and potential investors in

MSMB Capital and MSMB Healthcare through material misrepresentations and omissions about,

among other things, the prior performance of the funds and the assets under management (*see*

Ind. ¶¶ 7(a), 7(b), 8, 9, 12, 15, 17, 18).

---

change attorneys, the revelation of work product, trial tactics, or legal theories of defense counsel may be involved in explaining the changes in the defendant's version of events, the court should offer an opportunity to the defense to present those reasons *in camera*, outside the presence of the jury and of the prosecution.").

[3] In an abundance of caution, we have redacted the discussion of documents produced by Katten Muchin pursuant to the Court's order and listed on Mr. Shkreli's privilege log, and withheld those documents from the public filing and the filing sent to the government.  As explained below, *see infra* at 23-29, Mr. Greebel has a constitutional right to present confidential information, including information protected by the attorney-client privilege, for his self-defense.  *United States v. Weisberg*, 08 Cr. 347 (NGG) (RML), 2011 WL 1327689, at *4 (E.D.N.Y. Apr. 5, 2011).  Moreover, the use of such confidential information by counsel is permissible pursuant to Rule 1.6 of New York's Rules of Professional Responsibility.  *Meyerhofer v. Empire Fire & Marine Ins. Co.*, 497 F.2d 1190, 1195 (2d Cir. 1974).

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████ 4 ████████████████████

████████████████████████████████████████████████

███████████████████████████. Rubin Decl., Ex. 2 at

KAT_0110166, at *2.  Neither Mr. Greebel nor other attorneys at Katten Muchin represented

MSMB entities in a manner that required Mr. Shkreli to disclose or provide access to information

about the amount of assets MSMB entities had under management. ████████████████

██████████████████████ Unbeknownst to Mr. Greebel, that was a lie.

Mr. Greebel will prove that Mr. Shkreli's statement to him was a lie through the

admission of financial statements and other documents relating to MSMB that Mr. Shkreli

concealed from Mr. Greebel and Katten Muchin. ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

---

4   Katten Muchin, including Mr. Greebel, provided legal advice to MSMB entities relating to potential activist investor positions in public issuers.  Significantly, neither Mr. Greebel nor to our knowledge any other attorneys at Katten Muchin were representing MSMB entities in connection with fund formation, the management and oversight of the MSMB funds, and/or communications with investors relating to assets under MSMB's management.

████████████████████████████████████████

████████████

     (b)     *Second Example*:  **Mr. Shkreli Lied to Mr. Greebel About Retrophin's Receipt of a Loan from A Board Member**

A second example of Mr. Shkreli's lies and deception toward Mr. Greebel relates to a loan that a former member of the Board of Directors of Retrophin, Steve Richardson, made to Retrophin in connection with the Company going public in or about December 2012. Unbeknownst to Mr. Greebel, Mr. Richardson loaned money to Retrophin at Mr. Shkreli's request.  After Mr. Greebel informed Mr. Shkreli that Retrophin's Board of Directors had to approve of any loan that Retrophin received, Mr. Shkreli lied to Mr. Greebel.  Instead of telling Mr. Greebel the truth—that Mr. Richardson had loaned money to the Company (apparently without Board approval)—Mr. Shkreli told Mr. Greebel that Mr. Richardson made an *equity investment*.  Just as the government alleges in the Superseding Indictment that Mr. Shkreli's alleged reclassification of an equity investment into a loan in November 2012 had an impact on the capitalization table, (*see* Ind. ¶ 20), Mr. Shkreli's reclassification of the loan from Mr. Richardson into an equity investment had an impact on the capitalization table.

Specifically, on or about December 14, 2012, Mr. Shkreli sent an email to Mr. Richardson stating, in relevant part, "we are raising $50,000 from 5 people to cover an unexpected merger shell cost for Retrophin . . . is there any way you could support us as well? timeframe would be today/Monday".  Rubin Decl., Ex. 3 at SR001295.  Mr. Richardson responded, in relevant part, by email:  "On the $50k, is this a sunk cost, or further buy-in to the stock?  I'll commit $10k and wire to you on Monday."  *Id*.  Mr. Shkreli responded:  "[T]he other thing that would work is a loan – we'd give you the funds back by 12/31 – we just ran way short on this going public thing and they want their money ASAP".  *Id*.  Mr. Richardson responded, in

relevant part: "Ok I have sent the wire instruction for Monday for $10,000. *Lets go with it as a loan*, repayable by early January." *Id*. (emphasis added). On or about December 17, 2012, Mr. Shkreli then sent an email to Mr. Richardson with the subject of "loan" stating: "[W]e received $10,000 *and are booking it as a loan*". Rubin Decl., Ex. 4 at SR001302 (emphasis added).

On or about February 7, 2013, Mr. Greebel and Mr. Shkreli exchanged a number of emails relating to loans that Retrophin owed and, during those exchanges, Mr. Shkreli lied to Mr. Greebel about Mr. Richardson's loan to the Company. In an email (time stamped 8:54 am), Mr. Greebel wrote to Mr. Shkreli: "What is the aggregate amount of the notes that retrophin owes msmb, you or other affiliates?" Rubin Decl., Ex. 5 at R049808. Mr. Shkreli responded (time stamped 9:42 am): "<$1m will check full amount". *Id.* Mr. Greebel responded (time stamped 9:42 am): "Thanks—please also identify all affiliates that have notes". *Id.* at R049807. Mr. Shkreli then asked (time stamped 9:46 am) "what is this for?" *Id*. Mr. Greebel responded (time stamped 9:55 am): "The schedules—they are all affiliate transactions and if they are wrong the investors could sue". *Id.* Mr. Greebel's reference to "schedules" referred to the disclosures made to certain hedge funds purchasing Retrophin securities in a February 2013 private investment in public equity transaction. Mr. Greebel was obviously trying to make sure that the disclosures of all affiliate transactions to the hedge funds were correct as misstatements relating to those disclosures could lead to lawsuits against Retrophin.

When Mr. Shkreli asked Mr. Greebel "can you just refer to what is on the 8-k?" (time stamped 9:57 am), Mr. Greebel responded (time stamped 10:06 am): "The 8k refers to it as a note payable to a related party; I have never determined whether msmb and retrophin are affiliates (for sec purposes) but for the schedules I would rather err on the side of caution—the 8k references a 900k loan (then valued at 914k) and an employee note for 30k with 15% interest.

Were any others done?"  *Id.*  Mr. Greebel was doing the job of a diligent attorney in asking

whether there were any other loans to Retrophin.  Mr. Shkreli then responded in relevant part:

"[T]here is a 10k note I believe", and Mr. Greebel then stated:  "A 10k note is not referenced—

here is the language from the 8k" and Mr. Greebel copied and pasted the language from the Form

8-K filing.  *Id.* at R049806-7.  Mr. Shkreli then stated (time stamped 10:11 am):  "[I]t was a

subsequent event" and Mr. Greebel responded (time stamped 10:14 am) "*any time the company*

*wants to borrow money the board needs to approve it*".  *Id*. at R049805 (emphasis added).  In

short, Mr. Greebel was advising Mr. Shkreli that any loan to Retrophin had to be approved by the

Company's Board of Directors and that a $10,000 loan had not yet been approved or disclosed

by the Company to the public.  Mr. Shkreli responded, in relevant part, with a blatant lie:  "the

10k note was an equity purchase by steve richardson".  *Id.*  By lying to Mr. Greebel, Mr. Shkreli

failed to seek approval of the loan from the Board of Directors, failed to disclose the loan in the

Company's public filings, and failed to disclose that a member of the Board of Directors of the

Company had made a loan, resulting in inaccurate capitalization tables because the actual loan

was incorrectly portrayed as an equity investment by Mr. Richardson.

### (c)   Third Example:  Mr. Shkreli Lied to Mr. Greebel and Katten Muchin About Repaying a Loan From MSMB Healthcare

A third example of Mr. Shkreli's lies to and deception toward Mr. Greebel and another

Katten Muchin partner occurred in connection with Mr. Shkreli's communications with the SEC

Staff in or about February 2014.  As reflected in statements from Katten Muchin's Deputy

General Counsel, Michael Verde, to the parties, Mr. Shkreli asked Katten Muchin in or about

mid-2013 to work on Mr. Shkreli's communications with, production of documents to, and

testimony before the SEC.  A partner at Katten Muchin who served as a former federal

prosecutor and specialized in white collar and SEC enforcement matters oversaw such

communications, production of documents, and testimony. ████████████████████



Rubin Decl., Ex. 6 at KAT_0074929.

That was yet another lie by Mr. Shkreli to attorneys at Katten Muchin (including, but not limited to Mr. Greebel). ████████████████████████████

████████████████████████████████████████. *See*

Rubin Decl., Ex. 7 at BOA_000155; Rubin Decl., Ex. 8 at BOA_000181.

      **(d)**     **Unbeknownst to Mr. Greebel at the Time, Mr. Shkreli Had a History of Blaming Others for His Misconduct**

Mr. Greebel will demonstrate that, unbeknownst to Mr. Greebel during the relevant period, part of Mr. Shkreli's *modus operandi* was to maintain "plausible deniability" about giving others directives to take action and to blame others including outside counsel if something

went wrong.  Mr. Greebel will prove that, again unknown to him at the time, this was part of Mr.

Shkreli's *modus operandi* through testimony and documents.

For example, on or about March 30-31, 2011, Mr. Shkreli and Kevin Mulleady

exchanged emails during which Mr. Shkreli said that Mr. Mulleady should not have forwarded

one of Mr. Shkreli's emails criticizing outside counsel to that counsel, because it prevented Mr.

Shkreli from later denying that Mr. Shkreli had been critical.  Specifically, on or about March 30,

2011 (time stamped 7:37 pm), Mr. Shkreli sent an email to Mr. Mulleady with the subject matter

"EAPD – Amazing", referring to MSMB's outside counsel at Edwards Angell Palmer & Dodge,

stating:  "Still no PPM [Private Placement Memorandum] even though I explicitly said 31st is

the last day. Amazing. Making me look awful."  Rubin Decl., Ex. 9 at R021203.  It is our

understanding that Mr. Shkreli was criticizing the law firm Edwards Angell for failing to

complete the PPM for MSMB by the 31st of March 2011.  Mr. Mulleady forwarded Mr. Shkreli's

email to an attorney at Edwards Angell.  *Id.* at R021202.  Mr. Shkreli responded that his email

was "meant for me and you" and Mr. Mulleady disagreed and explained that "sometimes you

have to los[e] it a little bit to get ppl [people] to perform".  *Id.*  Mr. Shkreli then stated:  "You can

be the bad guy all you want *but forwarding my message removes my plausible deniability*".  *Id.*

(emphasis added).

In or about February 2015, Mr. Shkreli admitted publicly that he had plans to blame

counsel if he was accused of doing anything improperly.  Specifically, in an online investors'

website forum, Mr. Shkreli stated that "every transaction I've ever made at Retrophin was done

with outside counsel's blessing (I have the bills to prove it), board approval and made good

corporate sense."  Rubin Aff., Ex. 10.  Of course, Mr. Shkreli's stated explanation falls short.

Based on our review of the evidence through discovery, we proffer to the Court that we will be

able to prove through testimony and documents that Mr. Shkreli had a plan to blame counsel, and that unfortunately he used Mr. Greebel and other counsel at Katten Muchin as part of his cover for misconduct.  Moreover, we will demonstrate that, while Mr. Shkreli had plans to blame his counsel, he took many actions without the "blessing" of outside counsel at Katten Muchin, he lied to Katten Muchin on multiple occasions, and he misled Katten Muchin's counsel, including Mr. Greebel, by omitting significant information.

### 3. Judge Spatt's Decision In *Aronson* And The Second Circuit's Decision in *Serpoosh* Demonstrate That Severance Is Necessary

Given the mutually antagonistic and irreconcilable defenses between Mr. Greebel and Mr. Shkreli, this case is squarely on all fours with *United States v. Aronson*—a recent case in the Eastern District of New York before Judge Spatt—where the government alleged fraud against an attorney and the CEO/founder of the client entities that hired the attorney.  Rubin Decl., Ex. 1 (Mem. of Decision & Order Granting Severance, *United States v. Aronson*, No. 2:12-cr-00245 (E.D.N.Y. May 23, 2013), ECF No. 167) at 14.  The government charged that the attorney (Fredric Aaron) and the CEO/founder (Eric Aronson) of his client perpetrated a Ponzi scheme to defraud investors.  *Id.* at 2.  Specifically, "[t]he defendants [were] accused of soliciting money from investors by false representations and material omissions and paying returns to investors from other investors' funds instead of from any actual profit."  *Id.*.  The attorney Aaron was charged, along with the CEO/founder of his client and another individual, in nine of the fourteen counts.  *Id.*  The government alleged that the attorney Aaron helped Aronson restructure failing companies pursuant to Aronson's instructions to conceal the Ponzi scheme from investors. Rubin Decl., Ex. 11 (Mem. of Law in Supp. of Def. Frederic Aaron's Mot. for Severance, *United States v. Aronson*, No. CR-12-0245 (ADS) (E.D.N.Y. Feb. 8, 2013), ECF No. 146) at 6.  The attorney moved for severance, arguing that his "trial defense will consist of 'demonstrating that

Eric Aronson lied to him, deceived him and made him an unknowing pawn in a fraud about which Mr. Aaron was unaware.' Also, [Aaron] contend[ed] that his defense would be antagonistic to an 'advice of counsel' defense 'that Aronson is nearly certain to rely upon.'" Rubin Decl., Ex. 1 at 8 (internal citations omitted).

Rejecting the government's arguments that the defenses of the attorney and the client were not necessarily antagonistic, that a joint trial is highly favored and thus severance should not be granted, and that Aronson had not clearly asserted an "advice of counsel" defense, Judge Spatt granted Aaron a severance from his client. Judge Spatt explained:

> Aaron intends to demonstrate that Aronson, unbeknownst to Aaron, used Aaron to perpetrate his alleged Ponzi scheme. At the same time, Aronson . . . will undoubtedly try to paint Aaron as the legal mastermind behind the Ponzi scheme and blame him for giving him bad legal advice. Of importance, if a jury believes Aaron's defense that Aronson deceived him into becoming an unknowing person in the fraud, then the jury will have to find Aronson guilty of devising the Ponzi scheme. Similarly, if the jury believes Aronson's defense that the fraud was due to Aaron and his bad legal advice, then the jury will have to find that Aaron was responsible for the Ponzi scheme.

*Id*. at 14. Indeed, Judge Spatt stated that the case pitting the lawyer and the client against one another presented "a quintessential example of a situation where 'accepting one defense requires that the jury must of *necessity* convict a second defendant.'" *Id*. (emphasis in original).

So too, here. Just like Aaron, Mr. Greebel will argue that Mr. Shkreli, the CEO and founder of his client Retrophin, lied to and deceived him in order to perpetuate alleged schemes in the Indictment. And, just like Aronson, Mr. Shkreli likely will argue that he fully and truthfully informed Mr. Greebel of all the facts, including his objectives, and that Mr. Shkreli followed Mr. Greebel's advice. To the extent that Mr. Shkreli argues that the advice provided was legal and that his actions were lawful, Mr. Shkreli will have to prove that he relied on the

advice of Mr. Greebel and other attorneys.  But Mr. Greebel will demonstrate through admissible evidence that Mr. Shkreli lied, did not provide complete information, and deceived him and other attorneys, and thus Mr. Shkreli had no right to rely on that advice.  Further, Mr. Greebel will provide proof that Mr. Shkreli's deceit of investors was unbeknownst to Mr. Greebel and the other attorneys at Katten Muchin.  If the jury believes Mr. Shkreli's defenses that Mr. Shkreli acted based on Mr. Greebel's legal advice, the jury will disbelieve Mr. Greebel's defenses; if the jury believes Mr. Greebel's defenses that Mr. Shkreli deceived him into becoming an unknowing pawn, the jury will disbelieve Mr. Shkreli's advice of counsel and good faith defenses.  This is the "quintessential example" of a case requiring severance.

This same result is mandated by *United States v. Serpoosh*, 919 F.2d 835, 836-38 (2d Cir. 1990).  In *Serpoosh*, the Second Circuit reversed the district court's denial of a severance motion based on antagonistic defenses, when each defendant "described himself as the unwitting dupe of the other," giving "detailed and mutually exclusive explanations of their conduct" concerning a narcotics trafficking charge.  *Id.*.  The conflict was exacerbated by "the sparring by counsel for the two defendants in which each characterized the other defendant as a liar who concocted his story to escape blame." *Id.* at 838.  During the summation, "each defense counsel attacked the credibility of the other defendant as well as his version of events." *Id.* at 837.  As in *Serpoosh*, the gravamen of Mr. Greebel's defenses are that Mr. Shkreli failed to provide him with complete information, lied to him, and used him as an unwitting tool; and Mr. Shkreli's likely defenses will be that he provided complete and accurate information to Mr. Greebel, followed the advice of counsel, and acted in good faith given his communications and involvement of counsel.  As in *Serpoosh*, these explanations are "mutually exclusive," requiring each defendant's counsel to prove to the jury that the other lied.  Such circumstances demand severance.

20

These circumstances also distinguish the instant case from those where it was not clear that the codefendants would actually adopt mutually antagonistic defenses. *See, e.g.*, *United States v. Faltine*, No. 13-CR-315 KAM, 2014 WL 4370811, at *5 (severance denied in narcotics trafficking case where "the movants have failed to articulate any details regarding mutually antagonistic defenses, much less show that the core of one of their defenses conflicts with the defense of a codefendant"); *United States v. Feng Ling Liu*, No. 12 Cr. 934 (RA), 2014 WL 917048, at *3 (S.D.N.Y. Mar. 7, 2014) (severance denied when moving party was able to show only that codefendants would assert a lack of awareness of the alleged fraud such that their defenses were not mutually antagonistic); *United States v. Barret*, 824 F.Supp.2d 419, 435 (E.D.N.Y. 2011) (severance denied, in part, because the defenses of Jones and Barret that the gun belonged to neither of them did not conflict with one another as the jury could believe that neither used or possessed the gun); *United States v. Abbell*, 926 F. Supp. 1545, 1552 (S.D. Fla. 1996) (severance denied in narcotics trafficking case when the lawyer codefendant said that "he will probably testify at trial about his service as Defendant Santacruz-Echeverri's legal counsel" and "speculate[d] that such testimony could prejudice Santacruz-Echeverri's defense" because the defendants only offered "speculation" and "no reliable evidence of antagonism").

This case is also distinguishable from cases where the advice-of-counsel defense was not antagonistic between the attorney and client codefendants, and a jury could accept that both the attorney and the client were innocent. For example, in *United States v. Abakporo*, No. S3 12 CR 340 (SAS), 2013 WL 6188260, at *2-5 (S.D.N.Y. Nov. 25, 2013), the client codefendant (Latanya Pierce) argued at trial that she trusted her "mentor," "attorney," and "pastor" (Eric Abakporo) in connection with helping to obtain an allegedly fraudulent mortgage loan, but informed the Court that she would ***not*** argue that her attorney Abakporo had committed any of

the charged crimes.  Indeed, the client Pierce may have "implied" or "suggested" that her attorney Abakporo had committed the charged crimes, but Pierce did not go beyond finger-pointing.  *Id*. at *4-5.  Moreover, the attorney Abakporo did not allege the client had lied, misled him, or omitted material information.  By contrast, in this case, Mr. Greebel's defenses will include arguments and concomitant proof that Mr. Shkreli committed fraud—unbeknownst to Mr. Greebel—against investors.  And, if the jury believes Mr. Greebel, the jury will necessarily find Mr. Shkreli guilty.

Similarly, in *United States v. Scott*, 637 Fed. Appx. 10, 13 (2d Cir. 2015), unlike the mutually antagonistic defenses here, the codefendant attorney (Everette Scott) and his client (Tyronne Gilliams) both argued that they lacked the intent to commit the crime without accusing the other of doing anything wrong.  The attorney Scott had argued that he lacked the intent to commit fraud because Scott followed his client's instructions; and the client Gilliams argued that he lacked the intent to commit fraud because he followed his attorney's advice.  *Id*.   But—unlike in the instant case—the attorney did not argue that the client was deceptive and lied to him; and the client did not argue that he provided complete and truthful information to the attorney and then relied on the subsequent advice of counsel.  *Id*.; *see also United States v. Cardascia*, 951 F.2d 474, 485 (2d Cir. 1991) ("The defenses Cardascia and Rizzo offered, though antagonistic and at points inconsistent, were not mutually exclusive at their core or essence" as both claimed that they were duped by codefendants).

### 4.    The Conflict Alone Between Mr. Greebel's And Mr. Shkreli's Defenses Warrants Severance

Severance "should [also] be granted when antagonism at the essence of the defenses prevails to such a degree—even without being mutually exclusive—that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty."  *United States v. Van*

22

*Hise*, No. S4 12 Cr. 847 (PGG), 2013 WL 6877319, at *12 (S.D.N.Y. Dec. 31, 2013) (citing

*United States v. Serpoosh*, 919 F.2d 835, 838 (2d Cir. 1990)) (internal quotation marks omitted).

Here, the heart of Mr. Greebel's and Mr. Shkreli's defenses conflict with one another.

During the trial, there will be allegations of lying going back and forth between Mr. Greebel's

defense and Mr. Shkreli's defense.  Indeed, Mr. Greebel and Mr. Shkreli even disagree over a

basic principle of whether Mr. Greebel was counsel to Mr. Shkreli in his personal capacity.

Whereas we will prove that Mr. Greebel was never counsel to Mr. Shkreli but rather counsel to

Retrophin, Mr. Shkreli has insisted otherwise in his statements to law enforcement prior to his

arrest, and through his counsel's statements to the Court since his arrest.

The level of antagonism between these two defendants, and their respective defenses, will

only increase during any joint trial such that there is grave risk that the jury will "unjustifiably

infer" that both are guilty.  As in *Serpoosh*, the government would be able to use the conflicts

between the defendants' defenses against them, contrasting the "theoretical possibility" that both

defense versions were true with the "realistic world in which neither defendants' story could be

true."  919 F.2d at 838.  A jury would be more inclined to disbelieve them both rather than sort

through the many areas of disagreement.

**B.     A Joint Trial Will Present Extensive Evidentiary Obstacles Including Confrontation
Clause Problems**

The irreconcilable defenses of Mr. Greebel and Mr. Shkreli will lead to significant

evidentiary obstacles.  There will likely be multiple instances when one codefendant will be

attempting to introduce evidence that the other codefendant will be attempting to keep out of the

trial.  Moreover, there will likely be multiple instances when one codefendant will be attempting

to preclude the government's evidence against the other codefendant, and the admission of such

evidence may unduly prejudice and damage the codefendant's case.

For example, we will be offering proof that Mr. Shkreli deceived MSMB Capital investors and MSMB Healthcare investors unbeknownst to Mr. Greebel and other attorneys at Katten Muchin.  Moreover, we will also be offering evidence that Mr. Shkreli lied to, concealed material information from, and deceived Mr. Greebel and other attorneys at Katten Muchin with respect to many aspects of MSMB Capital and MSMB Healthcare.  This will be a core part of Mr. Greebel's defense.  Among other things, we will likely introduce evidence that Mr. Shkreli lied to and deceived Mr. Greebel about the assets under management at Mr. Shkreli's hedge funds before Mr. Greebel started to represent Retrophin.  Mr. Shkreli will likely try to preclude Mr. Greebel from introducing evidence that the government would not ordinarily be able to admit into evidence at trial but for Mr. Greebel's defenses.

In addition, we will be offering into evidence documents from Katten Muchin that Mr. Shkreli has listed on his privilege logs and will likely move to preclude us from presenting to the jury.  "It is, of course, well established as a fundamental matter of due process that the defendant in a criminal case has the right to present a defense, that is, to present to the jury admissible evidence that might influence the determination of guilt."  *Cotto v. Herbert*, 316 F.3d 198, 205–06 (2d Cir. 2003); *accord In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 126 (2d Cir. 2008); *United States v. Abcasis*, 45 F.3d 39, 42 (2d Cir. 1995); *United States v. Weisberg*, 08-Cr-347 (NGG) (RML), 2011 WL 1327689, at *4 (E.D.N.Y. Apr. 5, 2011).  Moreover, "[i]n certain cases, a criminal defendant's constitutional right to present a defense may outweigh a third party's right to assert privilege."  *Weisberg*, 08-Cr-347 (NGG) (RML), 2011 WL 1327689, at *4.  "Where a criminal defendant seeks to subpoena work product, he can overcome the privilege by demonstrating, as in the civil context, a 'substantial need' for the requested items and that he 'cannot, without undue hardship, obtain their substantial equivalent

by other means.'"  *Id.* at *5; *see also Murdoch v. Castro*, 365 F.3d 699, 705-06 (9th Cir. 2004)

(attorney-client privilege could yield to a defendant's Sixth Amendment rights); *United States v.

Grace*, 439 F. Supp. 2d 1125, 1142 (D. Mont. 2006) (privileged documents were "of such

probative and exculpatory value as to compel admission of the evidence over [the company's]

objection as the attorney-client privilege holder").[5]

Further, we will be offering into evidence certain post-arrest statements made by Mr.

Shkreli to law enforcement that inculpate Mr. Shkreli but exculpate Mr. Greebel.  One example

of such statements appears in the videotape of Mr. Shkreli's conversation with the FBI following

his arrest.  During the videotaped conversation, Mr. Shkreli expresses shock that Mr. Greebel

was arrested, describing the government's decision to charge Mr. Greebel as "just bizarre," and

stating that the fact that Mr. Greebel was charged proves Retrophin engendered the investigation

and charges against Mr. Shkreli and Mr. Greebel.  Decl. in Supp. of Mr. Greebel's Mots. for (1)

A Bill of Particulars and (2) Prompt Disclosure of *Brady* Materials, Ex. D at 16:35 & Ex. E at

14:20, *United States v. Shkreli*, Case No. 15-CR-637 (KAM) (E.D.N.Y. Sept. 9, 2016), ECF No.

84.  Given the context and other statements made by Mr. Shkreli, we anticipate that Mr. Greebel

will be offering these statements into evidence over the objections of the government and

---

[5]  Pursuant to Rule 1.6 of New York's Rules of Professional Conduct, "[a] lawyer may reveal or use confidential
information," including information "protected by the attorney-client privilege," to the extent that the lawyer
reasonably believes necessary: . . . (5)[i] to defend the lawyer or the lawyer's employees and associates against
an accusation of wrongful conduct."  22 CRR-NY § 1200, Rule 1.6(a) & (b)(5)[i].   For more than four decades,
the Second Circuit has interpreted this rule to allow an attorney accused of "violation[s] of criminal statutes"
and/or facing "civil liability" to disclose client confidences or secrets to "support his version of the facts with
suitable evidence."  *Meyerhofer v. Empire Fire & Marine Ins. Co.*, 497 F.2d 1190, 1195 (2d Cir. 1974)
(defendant attorney did not violate rules of professional conduct by providing a detailed affidavit, as submitted
to the S.E.C., to plaintiffs' counsel to "substantiate his innocence"), *cert. denied*, 419 U.S.  998 (1974); *see also
S.E.C. v. Forma*, 117 F.R.D. 516, 524 (S.D.N.Y. 1987) ("The self-defense doctrine permits an attorney to
disclose attorney-client communications in order to defend himself against accusations of wrongful conduct.");
*First Fed. Savings & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co*., 110 F.R.D. 557 (S.D.N.Y.
1986) ("recognizing a 'self-defense' exception to the attorney-client privilege" where, *inter alia*, "an attorney is
sued for alleged misconduct in representing a client").

possibly Mr. Shkreli.  Without laying out all of Mr. Greebel's evidence in advance of trial, Mr.

Greebel will be offering other similar evidence at the trial.

Moreover, Mr. Greebel will be moving to preclude the admission of certain evidence

relating to the scope and breadth of Mr. Shkreli's crimes relating to MSMB Capital and MSMB

Healthcare.  In *United States v. Locascio*, the district court noted that if the moving codefendants

were tried separately, the evidence relating to the other defendants' associations and history, "if

admissible at all, would be extremely limited in scope and purpose and would not generate the

level of prejudice that would result from a joint trial."  357 F. Supp. 2d 536, 545 (E.D.N.Y.

2004).  The same is true here.  If Mr. Greebel were tried separately, the evidence relating to

alleged schemes charged solely against Mr. Shkreli in Count One, Count Two, Count Three,

Count Four, Count Five, and Count Six would either be inadmissible entirely or admissible in a

much more limited manner.  Such evidence includes the evidence of Mr. Shkreli's alleged

misuse of MSMB monies; Mr. Shkreli's loss of investor money through the OREX trade and

Merrill Lynch settlement; and Mr. Shkreli's concealment of those losses.  The "level of

prejudice" such evidence would "generate" in a separate trial is far less than what "would result

from a joint trial."  *Id.*

Finally, a joint trial presents the serious problem that the government will likely be

moving to admit certain statements by Mr. Shkreli that would normally be inadmissible in a trial

against Mr. Greebel alone.  The admission of such statements would violate the Confrontation

Clause of the United States Constitution.  The Confrontation Clause provides:  "In all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him . . . ."  U.S. Const. amend. VI; *see also Michigan v. Bryant*, 562 U.S. 344, 354 (2011)

("[F]or testimonial evidence to be admissible, the Sixth Amendment 'demands what the common

law required: unavailability [of the witness] and a prior opportunity for cross-examination.'"

(quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004))).  "[I]nterrogations by law

enforcement officers fall squarely within [the] class of testimonial hearsay."  *Michigan*, 562

U.S., at 354 (quoting *Davis v. Washington*, 547 U.S. 813, 826 (2006)) (internal quotation marks

omitted).  "The product of such interrogation, whether reduced to a writing signed by the

declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is

testimonial."  *Id.*; *see also United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) (observing that

SEC testimony is implicated by *Crawford*'s bar against admission of testimonial statements).

   Similarly, the government may move for the admission of statements of Mr. Shkreli that

would violate the protections of *Bruton v. United States*, 391 U.S. 123, 126 (1968), as to Mr.

Greebel.  In *Bruton*, the Supreme Court held that the Confrontation Clause of the Sixth

Amendment prohibits the introduction of the confession of a non-testifying codefendant that

implicates the defendant in a crime.  *Id.; see also United States v. Lee*, 549 F.3d 84, 90-91 (2d

Cir. 2008) (holding that introduction of confession by non-testifying declarant violated

Confrontation Clause).  This cannot be cured through a limiting instruction.  *Bruton*, 391 U.S. at

137.  Here, to the extent that the government seeks to introduce testimonial admissions by Mr.

Shkreli that attribute criminal intent to Mr. Greebel or could be used to inculpate Mr. Greebel,

those statements also implicate the Confrontation Clause.  *See Gray v. Maryland*, 523 U.S. 185,

195 (1998) (noting that when the use of "[i]nference pure and simple" connects a codefendant's

testimony to the defendant, that "cannot make the critical difference" in determining when a

statement implicates *Bruton*); *see also Ryan v. Miller*, 303 F.3d 231, 248 (2d Cir. 2002)

("Testimony need not contain an explicit accusation in order to be excluded as a violation of the

Confrontation clause.").

While Federal Rule of Evidence 801(d)(2)(E) provides a hearsay exception for statements "made by the party's coconspirator during and in furtherance of the conspiracy," the constitutional principles in *Crawford* and *Bruton* trump the Federal Rules of Evidence in regards to testimonial evidence. *See United States v. Logan*, 419 F.3d 172, 178-79 (2d Cir. 2005) (holding that "[a]lthough [the codefendants'] alibi statements to Sergeant Sandy were in furtherance of the conspiracy, we believe they were also testimonial"); *United States v. Stein*, No. S1 05 Crim. 0888 (LAK), 2007 WL 3009650, at *1 (S.D.N.Y. Oct. 15, 2007) (noting generally that "[a] testimonial statement made in furtherance of a conspiracy triggers the Sixth Amendment right of confrontation"). And even assuming the government could prove the other elements required under Rule 801(d)(2)(E), those statements are not "in furtherance of the conspiracy." *United States v. Lang*, 589 F.2d 92, 100 (2d Cir. 1978). Statements made knowingly to law enforcement are not in furtherance of any conspiracy and would constitute inadmissible hearsay (unless they fall within an evidentiary exception). *United States v. Vargas*, 279 Fed. Appx. 56, 61 (2d Cir. 2008) (citing *Fiswick v. United States*, 329 U.S. 211, 217 (1946)).

Mr. Shkreli has, unsurprisingly, also made several post-arrest statements about this case to the press, which the government will likely seek to admit against him. *See, e.g.*, Crow, *Lunch with the Financial Times* ("'If you look at my life on a daily basis, it's not very different from a prison-like condition,' he says, 'although I'm going to miss my computer.'"); The Milo Yiannopoulous Show: Episode 4 – Martin Shkreli, YouTube (Apr. 15, 2016), https://www.youtube.com/watch?v=LKFiZ1s9kGQ, at 12:09 (the allegations in this case were "all over a very small amount of money"); *id.* at 14:30 (Mr. Shkreli stated that the success of his hedge fund "nullifies" the charges and his fund did so well the investors invested "again and again" and "implored the SEC" not to bring charges). Such statements, that Mr. Shkreli is

untroubled by the prospect of prison, that his subsequent actions nullified the fraud, and that no one was ultimately harmed, might be admissible as evidence of consciousness of guilt.  *See United States v. Silver*, No. 15-CR-093 (VEC), 2016 WL 2343879, at *44-47 (S.D.N.Y. May 3, 2016).

These statements, however, would not be admissible against Mr. Greebel—they are hearsay and not in furtherance of the charged conspiracy, having been made after the alleged conspiracy ended, and for Mr. Shkreli's purposes alone.  *See Dutton v. Evans*, 400 U.S. 74, 81 (1970), *overruled on other grounds by Crawford*, 541 U.S. 36 ("It is settled that in federal conspiracy trials the hearsay exception that allows evidence of an out-of-court statement of one conspirator to be admitted against his fellow conspirators applies only if the statement was made in the course of and in furtherance of the conspiracy"); *United States v. Birnbaum*, 337 F.2d 490, 494-96 (2d Cir. 1964) (finding alleged co-conspirator statements "fell well outside the scope of [the declarant's] authority" as a conspiratorial agent); *United States v. Eire*, 822 F.2d 56, 1987 WL 37830, at *4 (4th Cir. 1987) (holding co-conspirator exception inapplicable when the "statements advanced only [the declarant defendant's] private interests, and were to the detriment of the other defendants").

These extensive and significant evidentiary issues, and others yet to arise, will complicate an already intricate and complex case and severely prejudice Mr. Greebel if the trial of Mr. Greebel is not severed from Mr. Shkreli.

## C.    A Joint Trial Will Present a Severe Risk of Spillover Prejudice

A joint trial will also result in spillover prejudice against Mr. Greebel.  Four of the six alleged conspiracies concern only Mr. Shkreli, not Mr. Greebel.  As a result, much of the information introduced in the joint trial will be so far afield from the facts of Mr. Greebel's case

that it would be inadmissible in a single trial of Mr. Greebel.  *See* Fed. R. Evid. 401, 403.  And even if the evidence were somewhat relevant, evidence concerning, for example, the MSMB schemes would not be introduced at the level of detail they will be in the joint trial.  This excess of evidence that is unrelated to Mr. Greebel's case presents a significant risk of spillover prejudice, inhibiting Mr. Greebel's ability to have a fair trial.

To be sure, spillover prejudice may not, in and of itself, be a sufficient reason for severance.  "Even where the evidence offered against the individual defendant varies in kind and degree, there is no inherent prejudicial spillover in such circumstances, particularly where the court instructs a jury to consider the evidence against each defendant, on each count, separately." *United States v. Spy Factory*, 960 F. Supp. 684, 688 (S.D.N.Y. 1997); *see also United States v. Kahale*, 789 F. Supp. 2d 359, 393 (E.D.N.Y. 2009).  There are, however, "cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his codefendant that a severance is required to prevent unacceptable spillover prejudice." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).  As this Court has said, "there are some instances in which severance is necessary because the volume of irrelevant evidence to be adduced at trial against one defendant is grossly disproportional to that of his or her co-defendants." *United States v. Barret*, 824 F. Supp. 2d 419, 433-34 (E.D.N.Y. 2011); *see also United States v. Bellomo*, 954 F. Supp. 630, 650 (S.D.N.Y. 1997) ("[a]bsent severance, these defendants would face a lengthy trial that would include evidence of a RICO enterprise in which none of them is charged with participating . . . which would not be presented at a separate trial and which is not alleged to have been part of their criminal activity.").

Mr. Greebel will be forced to sit through a litany of testimony and evidence about Mr. Shkreli's alleged schemes to defraud MSMB Capital, MSMB Healthcare, and Elea investors as

detailed in Counts One through Six—schemes in which the government concedes that Mr. Greebel was entirely uninvolved.  Most of the evidence concerning these conspiracies is not necessary, nor admissible against Mr. Greebel.

In that way, this case is similar to *United States v. DiNome*, where the Second Circuit held that movants, "[i]nstead of being swamped by [a] mass of irrelevant evidence" concerning their codefendants, should have had their case severed.  954 F.2d 839, 844-45 (2d Cir. 1992). The panel relied on both the extent of the irrelevant evidence presented during the couple's trial and its prejudicial nature.  *Id.* at 844.  Here, the government will seek to introduce Mr. Shkreli's dealings with a variety of investors, from Elea Capital to MSMB Capital to MSMB Healthcare, and potentially reference schemes outside of those companies.  The charges against Mr. Greebel, however, involve actions concerning only one company—Retrophin—and discrete alleged schemes.  Mr. Shkreli's history of poor choices in his prior businesses ventures and alleged serial inducement of millions of dollars in investments by deceiving investors will doubtless color the jury's view of Mr. Greebel as the alleged co-conspirator of a repeat fraudster, despite the fact that such evidence would likely be entirely, or almost entirely, inadmissible in, a separate trial against Mr. Greebel.  The government's introduction of such evidence in a joint trial would undoubtedly prejudice Mr. Greebel.

Although spillover prejudice is often a factor in crimes involving violence, and Mr. Shkreli is not charged with violent crimes, the prejudicial nature of the evidence against Mr. Shkreli is comparable.  In fact, the government has repeatedly relied on Mr. Shkreli's alleged attempts to influence witnesses and threats against a potential witness to characterize him as a potentially dangerous and lawless actor.  *See, e.g.*, Govt's Mem. of Law in Response to Defendants' Discovery Motions at 38-39 (Sept. 30, 2016) (Dkt. 90).  And this Court found here

that the government's evidence of "codefendant Martin Shkreli's attempts to intimidate and influence witnesses" was "detailed" and could put unindicted co-conspirators "at risk of being threatened and intimidated by Mr. Shkreli . . . ."  Mem. of Decision & Order at 18, *United States v. Shkreli*, Case No. 15-CR-637 (KAM) (E.D.N.Y. Sept. 9, 2016), ECF No. 138.  Given that the government will likely seek to admit evidence of his alleged threats and attempted obstruction, which have nothing to do with Mr. Greebel, Mr. Greebel will suffer prejudice as a result.  *See, e.g.*, Rubin Decl., Ex. 13 at SHKRELI000005 ("Mr. Shkreli confronted Pierotti on the telephone and threatened him. . . . Mr. Shkreli did write Pierotti's wife a letter."); Rubin Decl., Ex. 14 (describing video made by Mr. Shkreli where one of his "hype men" threatens to kill the rapper Ghostface Killa).

In that sense, this case is indistinguishable from cases such as *United States v. Locascio*, where Judge Amon granted a severance motion when "much of the most prejudicial evidence does not pertain to" the codefendants moving for severance and the "mere association" with individuals like the defendant "is, in itself, highly prejudicial."  357 F. Supp. 2d 536, 544 (E.D.N.Y. 2004).  In this case, there is an acute danger that the jury could, influenced by evidence of Mr. Shkreli's alleged tactics, threats, and long history of similar schemes, view Mr. Greebel through a lens colored by Mr. Shkreli's outsized role in the charged conspiracies and fail to account for Mr. Greebel's significantly more minor alleged role.

The Supreme Court has noted that "the liberal rules of evidence and the wide latitude accorded the prosecutor may, and sometimes do, operate unfairly against an individual defendant."  *Glasser v. United States*, 315 U.S. 60, 76 (1942).  As Judge Skelly Wright observed in *United States v. Mardian*, 546 F.2d 973, 977 (D.C. Cir. 1976), "courts have always kept in mind the problems inherent in trial[s] of conspiracy cases involving numerous defendants."

While conspiracy cases sometimes present less concern about spillover prejudice when information concerning the conspiracy would be admissible against the conspiracy's alleged members, here, the fact that this is a conspiracy case presents *more* cause for concern about spillover prejudice because of the presence of separate preceding conspiracies in which Mr. Greebel played *no* role. *See also id.* ("[p]articularly where there is a great disparity in the weight of the evidence, strongly establishing the guilt of some defendants, the danger persists that that guilt will improperly 'rub off' on the others" (citing *United States v. Kelly*, 349 F.2d 720, 756-759 (2d Cir. 1965))).

"*Kelly* undoubtedly teaches that the gradual accumulation of evidence against the principal members of a conspiracy to violate the securities laws may require a separate trial for a minor participant, lately come to the venture." *United States v. Gilbert*, 504 F. Supp. 565, 566 (S.D.N.Y. 1980). Especially where, as here, the defendant is "charged in only a few of the many counts," and "involved in only a small portion of the evidence" involving "dozens of incidents of criminal misconduct which do not involve [him] in any way," "the mounting proof of the guilt of one is likely to affect another." *Id.* (quoting *United States v. Branker*, 395 F.2d 881, 888 (2d Cir. 1968)). In *Gilbert*, the court granted a motion for severance when the movant, Revson, "did not become implicated in the [illegal] trading until the alleged conspiracy, masterminded by [his codefendant] Gilbert, had been in operation for a year; [] Revson's involvement covered only the last two months of the scheme; [] his involvement with Gilbert was entirely fortuitous as far as the latter was concerned," and his codefendant was able "to manipulate Revson's holdings without the latter's full awareness of what was taking place." *Id.* at 571. In fact, Revson's role was "in connection with transactions where Revson played no part, or where his involvement was directed by others without full disclosure to Revson." *Id.* The court also noted the risk that,

33

considering the "volumes of evidence" concerning the company at issue and its investors, the jury "may tend to associate all investors with the wrongdoing of the architect of the scheme." *Id.* As a result, the Court held that "the risk of prejudicial spillover in respect of Revson, charged in relatively few counts of a complex indictment, is unacceptable." *Id.*

The same issues arise here.  Mr. Greebel allegedly entered into a conspiracy long after the events that illustrated its allegedly criminal nature occurred—after the failed OREX trades, Merrill Lynch settlement, and the loss of MSMB Capital and MSMB Healthcare investments through poor trading and poor fund management.  His entrance, like Revson's, was "fortuitous" based on preexisting contacts Mr. Shkreli had with Mr. Greebel's firm, Katten Muchin, and his actions were "directed by others without full disclosure" to Greebel.  Those factors give rise to an "unacceptable" risk of prejudicial spillover and further merit severance.

**D.      Mr. Shkreli's Plan Of Creating Chaos To Distract The Jury's Attention Away From The Evidence And Obtain Jury Nullification Presents An Unacceptable Risk Of Depriving Mr. Greebel Of His Right To A Fair Trial**

Unlike any other case that we have been able to identify in history, Mr. Shkreli has a stated plan—corroborated by his repeated post-arrest actions—to disrupt the criminal trial, instill confusion, taint the jury, and apparently seek jury nullification.  His notoriety, his post-arrest statements, and his post-arrest actions create an undue risk that Mr. Greebel will be deprived of his right to a fair trial—a trial Mr. Greebel wants focused on the evidence and the truth, and not the extracurricular chaos that Mr. Shkreli has created and intends to create at trial.

It is undeniable that Mr. Shkreli has garnered an extraordinary amount of negative notoriety whereas Mr. Greebel has absolutely *no* notoriety.  While the Second Circuit has held that "[q]uite naturally in any multi-defendant trial there will be differences in degree of guilt and possibly degree of notoriety of the defendants," *United States v. Aloi*, 511 F.2d 585, 598 (2nd

Cir. 1975), here the differences in notoriety is extreme.  "The adverse and negative publicity associated with the codefendant . . . is of Biblical proportions."  *People v. Jenkins*, 2015 NY Slip Op. 51740, 2015 WL 7740695 (N.Y. Cty. Ct. Nov. 30, 2015) (granting severance due to extreme notoriety of codefendant mayor of Monticello).  Even prior to his arrest, Mr. Shkreli has been the subject of numerous newspaper, social media, radio, and television reports regarding his controversial positions such as his raising of the price of a prescription drug used to treat a rare disease by 5,000 percent.[6]

What makes this case so different than any other is that Mr. Shkreli has embarked on a campaign since his arrest to create a bizarre, one-of-a-kind spectacle in an apparent effort to cause the jury to reject the evidence and refuse to apply the law.  In an interview with the *Financial Times* in November 2016, Mr. Shkreli admitted that his plan is to make the case "more polarizing and popular" by creating a circus-like atmosphere and encouraging hostile publicity.  And he admitted that his goal is to create the same kind of chaos that surrounded the OJ Simpson, Casey Anthony, and Sean "P Diddy" ombs trials to obtain an acquittal as the defendants did in those cases.  According to the *Financial Times*, Mr. Shkreli stated, in relevant part:

> 'I have this fringe theory that I've sort of stress-tested a little bit—
> the more polarizing and popular a case is, the more likely an
> acquittal,' [Mr. Shkreli] says, citing the cases of OJ Simpson,
> Casey Anthony, who stood trial for her daughter's murder, and
> Sean "P Diddy" Combs, whose attorney now works for Mr.

---

[6]  Mr. Shkreli's pre-arrest notoriety—which has nothing to do with the allegations in the Superseding Indictment—caused *The New York Post* to observe, on the day of Mr. Shkreli's arrest, that "much of America will be happy to see Shkreli behind bars."  Rubin Decl., Ex. 15.  Others, like *The New York Times*, commented that even "[b]efore the arrest, based on his tweets and live videos, he almost seemed to be playing the role of a movie bad guy."  Rubin Decl., Ex. 16.  Indeed, one journalist referred to Mr. Shkreli's pre-arrest Twitter feed as "a biohazard site" for its "toxic mix of hubris, arrogance, insults, and self-promotion" and a "spectacle of narcissism and lack of self-awareness."  Rubin Decl., Ex. 17.  A Google search of the terms "Martin Shkreli arrested" yielded nearly 250,000 results earlier this month.  Rubin Decl. ¶ 20.  By contrast, the equivalent search for Mr. Greebel produced fewer than 5,000 results.  *Id.*

> Shkreli.  'What's fascinating for all these cases?  They were all
> widely seen to be guilty.'

Rubin Decl., Ex. 12.  Mr. Shkreli further claims to be "spending millions to influence the jury

pool in Brooklyn."  Rubin Decl., Ex. 18 at 7.

As part of his calculated effort to become "more polarizing", Mr. Shkreli has engaged

and continues to engage on an almost-daily, if not hourly, basis in deeply offensive attacks on

women, the media, public figures, and government officials.  Appendix A to this memorandum

identifies approximately 75 examples of news articles, social media reports, and video and audio

recordings reflecting Mr. Shkreli's ongoing and deliberate efforts *since his arrest* to spread hate

and hostility.  We highlight a few to show thatn, while Mr. Greebel's defense will focus on

admissible evidence involving Mr. Shkreli's lies, deception, and pattern of blaming others for his

own misdeeds, Mr. Shkreli is doing and will do everything he can to persuade the jury to ignore

the Court's instructions.

First, Mr. Shkreli's attacks on women have been extreme, hostile, and unrelenting.  And

they create a disturbing risk that Mr. Shkreli will act the same way during the trial, attacking

prosecutors, public figures, and/or female jurors themselves.  Just two days after his December

2015 arrest, Mr. Shkreli boasted, while live streaming from his Manhattan apartment, that he

would let pop star Taylor Swift listen to an unreleased Wu-Tang Clan album he owns "in

exchange for sexual favors."  Rubin Decl., Ex. 19.  Mr. Shkreli has done the same to pop star

Katy Perry.  While awaiting the results of the 2016 presidential election, Perry tweeted, "Gonna

cry my false eye lashes off tonight."  Within hours, Shkreli responded to Perry (and her 45

million Twitter followers), anointing himself Perry's "new right-wing boyfriend," and promising

to "comfort" her.  Rubin Decl., Ex. 20.  Most recently, Mr. Shkreli sexually harassed a married

Teen Vogue writer, inviting her to attend the presidential inauguration with him and flooding his

Twitter feed with engineered photographs of the two of them together on which he emblazoned, "'Til Death Do Us Part." *E.g.*, Rubin Decl., Ex. 21.

Second, Mr. Shkreli has attacked journalists, public figures, and even the prosecutors in this case through social media. For example, in August 2016, tech writer Taylor Lorenz tweeted a joke about famed venture capitalist Marc Andreessen, who, according to Lorenz, "loves to block people on Twitter." Rubin Decl., Ex. 22. Unprovoked, Mr. Shkreli responded, "Well, you are a piece of trash, lol." *Id*. In September 2016 Twitter exchanges, Mr. Shkreli taunted Stephen Colbert with a homophobic slur; attacked comedian Patton Oswalt as a "pathetic loser" and "idiot"; and threatened to "destroy" action star Chris Evans. Rubin Decl., Exs. 23, 24 & 25.

Third, Mr. Shkreli has attacked and stalked elected officials. For example, in or about August 2016, Mr. Shkreli claimed that Democratic presidential candidate Hillary Rodham Clinton suffered from Parkinson's Disease and suggested that one of her "handlers" carries an Apokyn pen, which is used to treat that disease. Rubin Decl., Ex. 26. Approximately one month later, after Secretary Clinton fell ill at a 9/11 memorial service on September 11, 2016, she was transported to her daughter's home to recuperate. Rubin Decl., Ex. 27. Mr. Shkreli announced on Twitter that he was going to follow her there and soon conducted a live-feed video of himself taunting and heckling Secretary Clinton outside her daughter's home for approximately two hours. Rubin Decl., Exs. 27 & 28. On his Twitter feed, he then boasted, "I enjoyed screaming 'why are you so sick' and 'go trump' @HillaryClinton. Get well soon bae!" Rubin Decl., Exs. 28 & 29. Mr. Shkreli's bizarre antics on the solemn day of September 11 had the desired impact—they were covered extensively in New York and across the world. Rubin Decl., Exs. 30 & 31. Several weeks later, Mr. Shkreli again attacked Secretary Clinton by publishing her personal email address and those of several staff members on Twitter, prompting even a tabloid

reporter to state that "he's been trolling her all over the place" and that his latest stunt had "gone WAY too far!"  Rubin Decl., Ex. 32.

In short, this is an unprecedented case.  Mr. Greebel's codefendant has expressed his intent to become "more polarizing" to obtain an acquittal in the same vein as OJ Simpson, Casey Anthony, and Sean "P Diddy" Combs.  And he has backed up his words with repeated and unrelenting actions to spread hate, engender hostility, and create a circus-like atmosphere. Unfortunately, the predictable prejudice that will arise from Mr. Shkreli's continued behavior cannot be cured through jury selection, limiting instructions, and/or a change of venue.  Nothing has been able to stop—and nothing will be able to stop—Mr. Shkreli from trying to turn this trial into a circus as part of a deliberate strategy to obtain jury nullification rather than have the jury focus on and carefully consider the evidence.  By contrast, Mr. Greebel has no public persona, zero notoriety, lives a quiet life with his wife and three children away from cameras, reporters, and social media, and simply wants a trial by a fair and impartial jury without the intentional, obstructionist, and dangerous distractions of Mr. Shkreli's behavior.

## IV.   Conclusion

Taken separately and coupled together—the mutually antagonistic and irreconcilable defenses, the serious and complicated evidentiary obstacles to a joint trial, the spillover prejudice from the evidence against Mr. Shkreli in six of the eight counts, and Mr. Shkreli's deliberate and ongoing attempts to destroy the integrity of a fair and impartial jury trial for purposes of jury nullification—this Court should sever Mr. Greebel's trial from Mr. Shkreli.

Dated:   New York, New York
         February 17, 2017

                                        /s/ Reed Brodsky
                                        Reed Brodsky
                                        Winston Y. Chan
                                        Lisa H. Rubin

                                        GIBSON, DUNN & CRUTCHER LLP
                                        200 Park Avenue
                                        New York, NY 10166
                                        (212) 351-4000
                                        rbrodsky@gibsondunn.com
                                        *Counsel for Defendant Evan Greebel*