JMK:AES
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        15 CR 637 (KAM)

MARTIN SHKRELI and
EVAN GREEBEL,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


THE GOVERNMENT'S MEMORANDUM OF LAW SEEKING
A HEARING PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 104

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


WINSTON M. PAES
JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
G. KARTHIK SRINIVASAN
Assistant U.S. Attorneys
     (Of Counsel)

## PRELIMINARY STATEMENT

The government submits this memorandum of law seeking a preliminary hearing pursuant to Federal Rule of Criminal Procedure 104 to determine whether the defendant Martin Shkreli can meet his burden to show that there is sufficient evidence, as a matter of law, to advance an advice of counsel defense at trial and, if so, the scope of evidence admissible in support of any such defense.  For the reasons set forth below, such a hearing is required because Shkreli has to date proffered insufficient facts to make out an advice of counsel defense with respect to any of the four charged schemes.  A hearing will allow the Court to determine if Shkreli has a sufficient factual basis to advance an advice of counsel defense for any portion of the charged criminal conduct.  It will also ensure the orderly introduction of evidence at trial and avoid the risk of juror confusion, mid-trial delay, or unfair prejudice to the government.

## STATEMENT OF FACTS

### I.    The Defendants and Key Entities

Shkreli was a hedge fund manager and Chief Executive Officer ("CEO") of Retrophin, Inc., a publicly-traded company.  Beginning in 2006, Shkreli was the managing member and portfolio manager of Elea Capital Management ("Elea"), a hedge fund located in New York, New York.  Within approximately a year, Shkreli had lost all of the investor money in Elea and had to liquidate the fund.

Beginning in approximately 2009 and continuing until approximately 2012, Shkreli founded, and then served as the managing member and portfolio member for, two separate hedge funds based in New York that focused their investments in the healthcare sector:  MSMB Capital Management LP ("MSMB Capital") and MSMB Healthcare LP ("MSMB Healthcare").  During this time period, starting in approximately 2011, Shkreli also founded a biopharmaceutical

company called Retrophin LLC.   Retrophin LLC later became Retrophin, Inc. ("Retrophin" or "RTRX"), and became a publicly-traded company via a reverse merger with a shell company called Desert Gateway, Inc. ("Desert Gateway") in December 2012.   From approximately December 2012 to September 2014, Shkreli served as the CEO of Retrophin, which was ultimately a publicly-traded company on the NASDAQ exchange.

The defendant Evan Greebel was an attorney licensed to practice law in New York and a law partner in the New York office of Katten Muchin Rosenman LLP ("Katten").   Greebel served as counsel to the MSMB entities, lead outside counsel to Retrophin, and was the Principal Attorney at Katten for all matters related to the MSMB entities and Retrophin.

## II.   **The Fraudulent Schemes**[1]

### A.   **The MSMB Capital Hedge Fund Scheme**

Following the collapse of Elea Capital, in approximately 2009, Shkreli and Co-Conspirator 1 founded MSMB Capital.  To induce investments in MSMB Capital, Shkreli and Co-Conspirator 1 made a series of misrepresentations to potential investors, including that (i) MSMB Capital had monthly liquidity; (ii) MSMB Capital had retained independent certified public accountants as auditors; (iii) Shkreli had a successful track record as a hedge fund manager; and (iv) the fund had substantial assets under management ("AUM").   Based on such misrepresentations, between approximately September 2009 and January 2011, eight investors (the "Capital Limited Partners") invested a total of $3 million in MSMB Capital.

---

[1] The four fraudulent schemes are described in greater detail in the Superseding Indictment at paragraphs 8 to 40, as well as the government's September 30, 2016 memorandum of law in opposition to the defendants' discovery motions.  (Dkt. No. 90, at 3-10).  Individuals are identified here by the same terms as in the Superseding Indictment.

Subsequently, on or about February 1, 2011, Shkreli entered into a large short sale position in Orexigen Therapeutics, Inc. ("OREX") in MSMB Capital's brokerage account at Merrill, Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch"). MSMB Capital was unable to locate OREX shares to cover the position; as a result, Merrill Lynch suffered a loss of more than $7 million. In addition, MSMB Capital suffered more than $1 million in other trading losses in approximately February 2011. By the end of February 2011, MSMB Capital had approximately $58,500 remaining in its bank and brokerage accounts.

Shkreli concealed from the Capital Limited Partners the fact that he had lost all of the money they had invested in MSMB Capital. For more than a year following the complete loss of the investments in MSMB Capital and the end of trading activity, Shkreli continued to send fabricated performance updates to the Capital Limited Partners that touted profits of as high as forty percent since inception. Then, in September 2012, Shkreli told the Capital Limited Partners in an email (the "Liquidation Email") that he had "decided to wind down" both MSMB Capital and MSMB Healthcare and falsely stated that the original MSMB investors had "just about doubled their money net of fees." Additionally, even though the MSMB entities had essentially no liquid assets, Shkreli falsely advised the Capital Limited Partners that they could redeem their limited partnership interests for cash, Retrophin shares, or a combination of both.

Approximately one week prior to sending the Liquidation Email, Shkreli, Co-Conspirator 1 and MSMB Capital entered into a settlement agreement with Merrill Lynch in connection with the OREX trading losses and agreed to pay Merrill Lynch a total of $1,350,000 on or before December 15, 2012. In stark contrast to the false information provided to the Capital Limited Partners, Shkreli and Co-Conspirator 1 stated in the settlement agreement that MSMB Capital had $0 in assets.

3

### B.      The MSMB Healthcare Hedge Fund Scheme

Following the collapse of MSMB Capital after the failed OREX trade, Shkreli founded MSMB Healthcare.  From approximately February 2011 to November 2012, Shkreli and others solicited investments in MSMB Healthcare from potential investors based on material misrepresentations and omissions.  Once MSMB Healthcare was operational, Shkreli continued to make misrepresentations and omissions to MSMB Healthcare's investors (the "Healthcare Limited Partners") in order to prevent them from redeeming their investments.  These misrepresentations and omissions included, inter alia, that: (i) Shkreli had a successful track record as a hedge fund manager; (ii) MSMB Capital was a successful hedge fund; and (iii) MSMB Healthcare had substantial AUM (far in excess of the actual value of the fund).  As with MSMB Capital, Shkreli and others misappropriated funds from MSMB Healthcare by withdrawing funds from the hedge fund far in excess of the fees permitted under the partnership agreement for the fund.

Additionally, without the Healthcare Limited Partners' knowledge or consent, Shkreli improperly used MSMB Healthcare assets to pay for obligations that were not the responsibility of MSMB Healthcare.  For example, Shkreli caused assets from MSMB Healthcare to be used to pay a portion of the Merrill Lynch settlement (owed by MSMB Capital, Shkreli and Co-Conspirator 1).  Specifically, Shkreli improperly reclassified a $900,000 equity investment by MSMB Healthcare into Retrophin LLC as an interest-bearing loan via a back-dated promissory note; he subsequently caused Retrophin to "repay" the loan to MSMB Healthcare, and then funneled a total of $898,000 from that "repayment" to Merrill Lynch.

### C.      The Retrophin Misappropriation Scheme

Shkreli primarily raised capital for Retrophin by causing MSMB Healthcare to invest significant sums into Retrophin between 2011 and mid-2012.  Those investments were

4

reflected in Retrophin's capitalization table, which was maintained by Greebel.  As of September 2012, the capitalization table showed that MSMB Healthcare had invested approximately $2.1 million into Retrophin; it also indicated that MSMB Capital had not invested any money in Retrophin.

By the fall of 2012, Shkreli and Greebel were preparing to take Retrophin public, and Shkreli announced to the MSMB investors that he was winding down the funds in the Liquidation Email.  However, as detailed above, MSMB Capital had no funds that could be used to repay the Capital Limited Partners, let alone at the falsely inflated rates of return that Shkreli had been reporting for years.  Similarly, although MSMB Healthcare had invested in Retrophin – and, as a result, Healthcare Limited Partners would be entitled to receive some Retrophin stock at the time that the company went public, if it was able to do so – Shkreli did not have the cash to provide redemptions to those Healthcare Limited Partners who did not wish to receive Retrophin stock, as he had overvalued MSMB Healthcare's investment in Retrophin and had reported returns for the Healthcare Limited Partners far in excess of available funds.

By the time the reverse merger for Retrophin was finalized in December 2012, several MSMB Capital and MSMB Healthcare investors had become deeply suspicious of the process by which Shkreli had liquidated the hedge funds.  For example, Shkreli failed to provide cash redemptions for MSMB investors who requested such redemptions, and the method by which he purported to convert their investments into Retrophin stock was opaque and unsupported by documentation.  As a result, several MSMB investors began threatening to sue Shkreli if they did not get answers about what happened to their investments.

Faced with disgruntled investors, the defendants engaged in a scheme to defraud Retrophin by misappropriating millions of dollars of Retrophin's assets through material

misrepresentations and omissions in an effort to repay the previously defrauded MSMB investors. This scheme had three major components.  First, in the fall of 2012, Shkreli and Greebel engaged in a series of transactions designed to create the false appearance that MSMB Capital had invested in Retrophin and received shares in return.  Second, in the spring of 2013, the defendants caused Retrophin to enter into a series of settlement agreements with several of the defrauded MSMB Capital and MSMB Healthcare investors, which effectively caused Retrophin to reimburse those investors for their investments in the MSMB entities as well as for the fabricated returns that Shkreli had reported on those investments.  The defendants did not seek or obtain approval from Retrophin's Board of Directors for these agreements.  Third, in the fall of 2013 – after Retrophin's external auditor questioned the propriety of the settlement agreements and concluded that Retrophin was not responsible for repayment of the defrauded MSMB Capital and MSMB Healthcare investors – the defendants caused Retrophin to enter into a series of sham consulting agreements with additional defrauded MSMB Capital and MSMB Healthcare investors, as well as one defrauded Elea Capital investor, which again caused Retrophin to reimburse those investors for their lost investments in Shkreli's hedge funds.  Notably, the defrauded investors who entered into these sham consulting agreements did not perform any legitimate consulting services for Retrophin.

### D.    The Retrophin Unrestricted Shares Scheme

In connection with the reverse merger between Retrophin and Desert Gateway, Shkreli and Greebel engaged in a scheme to defraud investors and potential investors in Retrophin by concealing Shkreli's beneficial ownership and control of the majority of Retrophin's unrestricted or free trading shares.  These unrestricted shares, also known as the "Fearnow shares," were initially the shares of Desert Gateway; at the time of the reverse merger, the shares (2.5

million in total) became free-trading shares of Retrophin held by the sole stockholder ("John Doe 1") of Desert Gateway.  In late November 2012, Shkreli informed seven of his employees and contractors that they would each be permitted to purchase a portion of those shares from John Doe 1 for a nominal amount.

In or about December 2012, the defendants divided 2 million of the unrestricted shares across the seven individuals to ensure that each individual's ownership was below the Securities and Exchange Commission's ("SEC") five percent reporting requirement threshold; they also arranged for an additional 400,000 shares to be held for those individuals in the name of John Doe 1, for future distribution to those individuals.  Prior to this distribution, the defendants took steps to make it appear that these seven individuals were no longer associated with either the MSMB entities or Retrophin so that the shares would remain free-trading after the merger (as any free-trading shares held by individuals associated with Retrophin would become restricted).  These steps included an email sent by Shkreli (and subsequently forwarded by Shkreli to Greebel) that falsely decreed that the individuals were no longer employees or contractors of Retrophin or the MSMB entities; in reality, a number of the seven individuals continued to do work for the MSMB entities and/or Retrophin.

Subsequently, between December 2012 and September 2014, the defendants attempted to control – and in some cases, succeeded in controlling – these 2.4 million unrestricted shares (listed under the names of these seven individuals) for the benefit of Shkreli.  For example, the defendants orchestrated the transfer of shares from some of the seven individuals to defrauded MSMB Capital and MSMB Healthcare investors in order to settle liabilities owed by the MSMB entities and Shkreli.

## III.    Judge Weinstein's Crime-Fraud Ruling

In November 2015, the government filed an application, ex parte and under seal, with the United States District Court for the Eastern District of New York for an order compelling the production of 133 emails between Shkreli and Greebel and others (the "Crime Fraud Emails") pursuant to grand jury subpoenas issued to Retrophin.  See In Re Grand Jury Investigation, 15-MC-2227 (JBW), Dkt. Nos. 9, 10.  The application acknowledged that the Crime Fraud Emails might qualify as attorney-client communications (due to Greebel's provision of advice and information to Shkreli and others), but contended that the crime-fraud exception applied to the documents.  Id.  In furtherance of that application, the government submitted (1) redacted versions of the Crime Fraud Emails, (2) a motion detailing the reasons why the crime-fraud exception applied to those documents, and (3) a 47-page factual affidavit, signed by Special Agent Christopher Delzotto of the Federal Bureau of Investigation, which provided evidentiary support for the motion (the "Crime Fraud Affidavit").  Id.  The Crime Fraud Affidavit contained, inter alia, information about four categories of Shkreli and Greebel's criminal conduct related to the Retrophin Misappropriation and Unrestricted Shares Schemes, including the defendants' actions to backdate several transfers of Retrophin stock and manipulate the Retrophin capitalization table to make it appear that MSMB Capital had an interest in Retrophin (Crime Fraud Affdiavit ¶¶ 13-33); to allocate the Fearnow shares among a small group of Shkreli's associates in a manner that concealed Shkreli's ownership of, and control over, those shares (Crime Fraud Affidavit ¶¶ 34-57); and to improperly cause Retrophin to repay defrauded MSMB Capital and MSMB Healthcare investors via settlement and sham consulting agreements (Crime Fraud Affidavit ¶¶ 58-76).

The application was assigned to the Honorable Jack Weinstein, who subsequently conducted an in camera review of unredacted versions of the Crime Fraud Emails.  On December

3, 2015, after reviewing the Crime Fraud Emails and the Crime Fraud Affidavit, Judge Weinstein ruled that the Crime Fraud Emails "were part of a scheme, conspiracy or fraudulent attempt to commit a securities fraud" and thereby any attorney-client privilege that might have attached to the emails was "voided by the criminal conduct" of Shkreli and Greebel; alternatively, Judge Weinstein ruled that the Crime Fraud Emails were also not privileged because they concerned company business. Retrophin was then ordered to produce the Crime Fraud Emails to the government in unredacted form. In Re Grand Jury Investigation, 15-MC-2227 (JBW), Dkt. No. 6.[2]

## IV.    The Indictment and The Superseding Indictment[3]

On December 14, 2015, a federal grand jury sitting in the Eastern District of New York returned an indictment charging Shkreli and Greebel for their participation in the MSMB Capital, MSMB Healthcare and Retrophin Misappropriation Schemes (the "Indictment"). Specifically, the indictment alleges that in or about and between September 2009 and September 2014, Shkreli, together with Greebel and others, orchestrated "three interrelated fraudulent schemes" whereby they agreed to, inter alia, (1) "defraud investors and potential investors in MSMB Capital by inducing them to invest in MSMB Capital through material misrepresentations and omissions about, inter alia, the prior performance of the fund, its assets under management and the retaining of an independent auditor and administrator; and then by preventing redemptions by investors in MSMB Capital through material misrepresentations and omissions about, inter alia, "the performance of the fund and the misappropriation by Shkreli and others of fund assets"; (2)

---

[2] The government's application and Judge Weinstein's ruling remained under seal until January 21, 2016, when an unsealing order was granted. Id., Dkt. No. 8.

[3] The procedural history of this case is described in greater detail in the government's September 30, 2016 memorandum of law in opposition to the defendants' discovery motions. (Dkt. No. 90, at 10-17).

"defraud investors and potential investors in MSMB Healthcare by inducing them to invest in MSMB Healthcare through material misrepresentations and omissions about, inter alia, the prior performance of the fund, its assets under management and existing liabilities; and then by preventing redemptions by investors in MSMB Healthcare through material misrepresentations and omissions about, inter alia, the performance of the fund and the misappropriation by Shkreli and others of fund assets"; and (3) "defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy Shkreli's personal and unrelated professional debts and obligations," including by causing Retrophin to enter into settlement and/or sham consulting agreements with, inter alia, defrauded MSMB Capital and MSMB Healthcare investors to settle liabilities owed by the MSMB funds and Shkreli.  (See Dkt No. 1).

On June 3, 2016, a federal grand jury sitting in the Eastern District of New York returned a superseding indictment in the case (the "Superseding Indictment").  The Superseding Indictment differed from the Indictment in that it detailed information about the Retrophin Unrestricted Shares Scheme (at paragraphs 36 to 40) and added Count Eight, which charged Shkreli and Greebel with conspiracy to commit securities fraud in connection with that scheme. Specifically, the new portions of the Superseding Indictment allege that Shkreli and Greebel engaged in a scheme to defraud investors and potential investors in Retrophin through material misrepresentations and omissions about the beneficial ownership and control of Retrophin's unrestricted shares.  (See Dkt. No. 60).

10

V.     **Shkreli's Advice of Counsel Defense**

A.     **Shkreli's Initial Discussion of Defense and the MSMB-Related Katten Documents**

Following Shkreli's indictment, counsel for Shkreli stated on multiple occasions that Shkreli might seek to raise an advice of counsel defense to address the charges in the Superseding Indictment.  For example, at a status conference on July 14, 2016, counsel for Shkreli stated that "Martin Shkreli has perhaps the most relevant reliance on counsel defense I've ever encountered."  (July 14, 2016 Hearing Tr. at 21:17-23; see also June 6, 2016 Hearing Tr. at 9:20-24, 13:19-23).  Similarly, on November 22, 2016, counsel for Shkreli referenced "the advice of counsel defense that … he is going to be entitled to introduce at trial."  (November 22, 2016 Hearing Tr. at 6:23-24).  Counsel further elaborated that "the professional relationship between the defendant and the lawyer during the period in question shows that Shkreli doesn't do anything without checking with Katten and getting advice from Greebel on a whole host of matters."  (Id. at 41:16-21).

In connection with that potential defense, Shkreli sought to compel Katten to produce documents related to Katten's representation of the MSMB entities and Retrophin, because Shkreli believed that such documents would support his theory that he "acted in good faith and without criminal intent in regard to these transactions in that he sought the advice of one or more of Katten's highly experienced lawyers and followed that advice."  (Shkreli's Motion to Compel Katten dated October 27, 2016, Dkt. No 103).   Katten ultimately provided those documents to Shkreli, who initially – along with MSMB Capital employee Marek Biestek – maintained attorney-client privilege over those documents.  In response, the government advised the Court and Shkreli that if Shkreli intended to attempt to assert an advice of counsel defense at

trial, he would need to waive attorney-client privilege in connection with that decision. (Government Letter dated December 12, 2016, Dkt. No. 132, at 9-10).

On February 17, 2017, Shkreli filed a motion for severance, in which he clearly stated that he would pursue an advice of counsel defense at trial.  (See, e.g., Dkt. No. 161 ("Shkreli Severance Br.") at 16 ("Shkreli will defend himself by claiming that he relied on Greebel in good faith")).  On February 22, 2017, following a conversation with the government, counsel for Shkreli confirmed that Shkreli would waive attorney-client privilege with respect to both MSMB entities in connection with his decision to pursue that defense.  Subsequently, on February 28, 2017, counsel for Biestek advised the government that he would not assert privilege over any MSMB Capital documents in connection with this case, though he stated that he reserves all other rights with respect to those documents.  As a result, on March 3, 2017, Shkreli provided the government with what it represented was a copy of all MSMB-related Katten documents.[4]

**B.    Scope of Shkreli's Attorney-Client Privilege Waiver**

As noted above, counsel for Shkreli indicated that he would waive attorney-client privilege with respect to the MSMB entities in connection with his decision to pursue an advice of counsel defense.  Shkreli did not specifically detail the scope of that waiver; however, Shkreli had previously detailed the topics for which privilege had been asserted in connection with the MSMB-Katten documents.  These included:  advice from Katten regarding the AMAG takeover bid; advice from Katten regarding the SeraCare takeover bid; advice from Katten regarding the formation and start-up of SurePoint, an MSMB Capital affiliate; advice from Katten regarding a contemplated takeover bid of Myrexis; advice from Katten on a series of investment projects (titled Ticonderoga,

---

[4] Additional information about the parties' various filings regarding the Katten documents is set forth in the government's response to the defendants' severance motions.  (See Dkt. No. 166 at 16-18).

Santarus and Coagusense); advice from Katten and a second law firm in connection with an SEC inquiry related to MSMB Capital; advice from Katten related to MSMB Capital and MSMB Healthcare generally; and advice from Katten regarding the drafting of various nondisclosure agreements. (See Shkreli Letter to Government, dated January 20, 2017, attached hereto as Exhibit A). Based on Shkreli's provision of these MSMB-related Katten documents to the government – which include, inter alia, communications with additional law firms related to the MSMB entities – and his stated desire to waive privilege with respect to the MSMB entities, it is the government's understanding that Shkreli has in fact waived attorney-client privilege with respect to all communications with Katten, as well the other two law firms identified in the MSMB-related Katten documents, on all subjects related to their representation of the MSMB entities and/or Shkreli.[5]

## C.    Scope of Shkreli's Articulated Advice of Counsel Defense

As noted above, Shkreli finally confirmed that he would attempt to assert an advice of counsel defense at trial in his motion seeking a severance. Shkreli then provided the following overview of the defense as he envisions asserting it:

> Martin Shkreli paid almost $10 million dollars in legal fees to Evan Greebel and his law firm. Shkreli met, spoke and emailed with his lawyers virtually every day, often dozens of times per day, on every topic facing Shkreli's businesses. Greebel was the acting secretary at Retrophin Board meetings; he directly communicated with many of the company's investors on a regular basis; he "pitched" the company to potential investors in Shkreli's absence; he drafted a code of ethics and other important policy documents; and he was intimately involved in every decision Shkreli made. In turn, Greebel provided legal advice and insight to Shkreli, which Shkreli followed faithfully. Because Shkreli relied closely on his experienced legal

---

[5] Shkreli does not exercise any control over the attorney-client privilege for documents related to Retrophin; that privilege is controlled by Retrophin itself, which (1) has been ordered to produce certain otherwise privileged documents that were deemed no longer privileged because of the application of the crime-fraud exception (see Section III above), and (2) has further waived privilege for certain topic areas related to the charged schemes.

counsel and other attorneys at the firm, Shkreli has a valid "reliance on counsel" defense.

(Shkreli Severance Br. at 1).  Shkreli reiterates the apparently limitless scope of this defense with respect to Greebel – that Shkreli "was fully honest with Greebel and faithfully followed his legal advice" with respect to all aspects of all of his businesses – many times throughout his severance motion briefing.  (Id. at 16; see also id. at 8 ("Greebel was a critical component of every legal decision Shkreli made … Shkreli fully inform[ed] Greebel of all the relevant facts"); Dkt. No. 167 ("Shkreli Severance Reply Br.") at 6 (Shkreli "sought Greebel's advice on everything")).

However, it is not clear from Shkreli's motion whether he will contend, in connection with asserting this defense, that Greebel or any other Katten attorney was representing him – in whole or in part – in his personal capacity during the pendency of these schemes, as opposed to representing the corporate entities (the MSMB entities and Retrophin) with whom Katten (and Greebel) had engagement letters and to whom Katten actually billed for its services. Crucially, Greebel has stated that he was "never counsel to [] Shkreli but rather counsel to Retrophin" (see Dkt. No. 163 ("Greebel Severance Br.") at 23), and Shkreli has pointed to no evidence that other attorneys at Katten will provide a different response.  Shkreli also does not make clear whether he will seek to rely on advice from attorneys at firms other than Katten. Moreover, apart from the MSMB-related Katten documents and the documents otherwise produced by the government in discovery, Shkreli does not identify any source of evidence that would support his advice of counsel defense.[6]

---

[6] The government has repeatedly requested reciprocal discovery from both defendants – see, e.g., Dkt. Nos. 16, 21, 45, 48, 49, 57, 63, 68, 76, 88, 135, 155 – and has, to date, received no documents from either defendant other than the MSMB-related Katten documents.

Most significantly, Shkreli's broad characterization of his intended advice of counsel defense as all-encompassing seeks to obscure the fact that Shkreli does not provide any specific examples of instances where, in connection with the specific criminal conduct alleged in the Superseding Indictment, he went to Greebel (or to any other attorney) seeking legal advice in a good faith attempt to comply with the law; received legal advice from Greebel (or any other attorney); and followed that legal advice in good faith.

### 1.      The MSMB Capital and Healthcare Schemes

The Superseding Indictment details Shkreli's involvement in the MSMB Capital and MSMB Healthcare Schemes, described in Section II above.  These schemes involve, inter alia, misrepresentations and omissions made to potential investors in order to obtain and retain investments in the MSMB hedge funds.

In his severance brief, Shkreli admits that with respect to the MSMB entities, "[h]e had virtually no professional support in the form of lawyers and accountants [for those entities] for the simple reason that he couldn't pay them."  Shkreli Severance Br. at 3.  Shkreli further admits that he "himself drafted or adapted many of the documents necessary to create and run the hedge fund."  Id.  And Shkreli also admits that Greebel and Katten were first retained by him in the summer of 2011 (Shkreli Severance Br. at 8) – a point in time almost two years after MSMB Capital was founded, approximately six months after the final investments in MSMB Capital were made, approximately four months after Shkreli lost all of the money invested in MSMB Capital in connection with the OREX trade, and long after Shkreli began sending out monthly statements to investors falsely detailing wildly positive returns for MSMB Capital.

With respect to legal advice provided by Greebel and Katten related to the MSMB entities, Shkreli states that Greebel and Katten were initially hired to do work for those entities in

15

connection with a "number of transactions that were being considered around [that] time, including a takeover bid for A[MAG] Pharmaceuticals." (Shkreli Severance Br. at 8). The only other specific work related to the MSMB entities for which Shkreli states he provided information to and received advice from Greebel and Katten was "MSMB hostile shareholder activity," e.g., additional attempts by Shkreli at takeover bids of other companies. (Id. at 9). Shkreli does not state that he in good faith sought, received and/or relied on legal advice from Greebel or anyone else at Katten about the misrepresentations or omissions made to MSMB Capital and MSMB Healthcare investors in connection with the MSMB Schemes.

Shkreli does state that Katten attorneys – including another partner at Katten ("Katten Partner 1") – represented him[7] in connection with a subpoena served on MSMB Capital by the SEC on October 1, 2012, including at testimony Shkreli gave to the SEC on August 7, 2013 and February 24, 2014. (Shkreli Severance Br. at 11).[8] However, Shkreli does not assert that he sought legal advice from or provided Katten Partner 1 or any other Katten attorney with complete information about the MSMB Capital and MSMB Healthcare entities contemporaneously with his operation of those entities between 2009 and 2012, nor does he state that he relied on legal advice from Katten attorneys at the time that he was making omissions and misrepresentations to the MSMB Capital and MSMB Healthcare investors. Significantly, at the time that the October 1, 2012 SEC subpoena was served, Shkreli had already sent the Liquidation Email and falsely advised the MSMB Capital and MSMB Healthcare investors that he was winding down those funds after doubling the money of early investors, and that investors could redeem their investments for cash.

---

[7] Again, it is not clear whether Shkreli contends that Katten's representation of Shkreli in connection with the SEC investigation was of him personally, or of MSMB Capital as an entity.

[8] Shkreli is not currently charged with obstruction of the SEC's investigation in connection with the Fraudulent Schemes.

Finally, Shkreli does not identify any attorneys at Katten, other than Greebel and Katten Partner 1, from whom he sought legal advice in good faith, provided complete information to and received advice upon which he relied in connection with the MSMB entities, let alone the MSMB Capital and MSMB Healthcare Schemes. Shkreli similarly does not identify attorneys at firms other than Katten from whom he sought legal advice, provided complete information to and received advice upon which he relied with respect to those schemes.[9]

### 2.    The Retrophin Misappropriation and Unrestricted Shares Schemes

In contrast to the MSMB entities – where Shkreli describes Greebel and Katten's role as limited to hostile takeover bids and an after-the-fact SEC investigation – Shkreli does provide a long list of various tasks that Greebel allegedly undertook in his role as outside counsel to Retrophin. Shkreli states that Greebel "attended Retrophin Board meetings and acted as Secretary"; had "direct involvement and communications with many, if not all, of the company's investors"; "pitched Retrophin to potential investors without Shkreli even being present"; "maintained updated, accurate, detailed financial information about the company, its pending transactions and its investor base"; "prepared capitalization tables for the company"; and "provided critical solutions to corporate dilemmas facing Shkreli and the Board." (Shkreli Severance Br. at 8-9). Shkreli also alleged that he "spoke or emailed with [Greebel] virtually every day for several years," resulting in "tens of thousands of emails between the two." (Id. at 9). Based on this characterization of his relationship with Greebel, and Greebel's general duties for Retrophin, Shkreli asserts broadly that "Greebel was a critical component of every legal decision Shkreli made." (Id. at 8). Once again, however, Shkreli does not articulate any specific instances

---

[9] The MSMB-related Katten documents show that Shkreli engaged at least two other law firms in the 2011-2012 period in connection with an SEC inquiry related to MSMB Capital.

in which he in good faith sought, received and/or relied upon legal advice from Greebel, or any other Katten attorney, with respect to the specific conduct charged in the Retrophin Schemes.

In the Retrophin Misappropriation Scheme, Shkreli and Greebel stole funds from Retrophin by causing the company to, <u>inter alia</u>, enter settlement and consulting agreements in order to repay defrauded MSMB Capital and MSMB Healthcare investors; in the Retrophin Unrestricted Shares Scheme, Shkreli and Greebel made material misrepresentations and omissions about the beneficial ownership and control of Retrophin's unrestricted shares.  Shkreli does not, for example, assert that he went to Greebel (or any other Katten attorney) in good faith to seek legal advice about how to lawfully repay defrauded MSMB Capital and MSMB Healthcare investors who were seeking to recover stolen funds; he does not explain what information he provided Greebel about those defrauded investors; and he does not detail what advice Greebel provided in response to his query and how he relied on such advice.  In fact, Shkreli only mentions the settlement and consulting agreements in connection with Greebel's post-arrest statements, in which he recounts Greebel's explanations for entering into those agreements (Shkreli Severance Br. at 12); he does not contend that those explanations consist of the same advice upon which he relied at the time that the agreements were entered into.  And Shkreli never details that he sought legal advice from Greebel in good faith about the allocation of the free-trading shares; what information he provided to Greebel about those shares; or what advice he received from Greebel about those shares and how he acted in reliance upon it.

Shkreli does not identify any attorneys at Katten, other than Greebel – or any attorneys at firms other than Katten – from whom he sought, received and/or relied on legal advice in in connection with the criminal conduct charged in the Retrophin Schemes.[10]

---

[10] The government has identified at least one other law firm that provided legal advice to Retrophin in connection with the distribution of unrestricted shares.

**ARGUMENT**

**A HEARING PURSUANT TO FRE 104 IS REQUIRED TO DETERMINE THE
VIABILITY AND SCOPE OF SHKRELI'S ADVICE OF COUNSEL DEFENSE**

## I.   Legal Standard

### A.   Federal Rule of Criminal Procedure 104

Preliminary questions concerning the admissibility of evidence, including whether evidence is relevant or a privilege exists, are to be determined by the Court.  Fed. R. Crim. P. 104(a).  The Court has discretion to order a hearing to assist it in resolving such questions.  Fed. R. Crim. P. 104(c)(3) (the court "must conduct a[] hearing" when "justice so requires").  The Court's authority to resolve such questions is rooted in its "inherent authority to manage the course of trials."  United States v. Valencia, 826 F.2d 169, 171 (2d Cir. 1987) (internal quotation marks omitted).   At such a hearing, the proponent of evidence bears the burden of demonstrating its admissibility by a preponderance of the evidence.  See Bourjaily v. United States, 483 U.S. 171, 175 (1987); see also United States v. Camacho, 353 F. Supp. 2d 524, 535-36 (S.D.N.Y. 2005) (burden of showing admissibility by a preponderance of the evidence is on the defendant where the defendant is proponent of the evidence).

Courts in this circuit routinely hold pretrial hearings to determine, among other things, whether there is sufficient evidence for an affirmative defense to be presented to a jury. See United States v. Villegas, 899 F.2d 1324, 1343 (2d Cir. 1990).  Courts follow this procedure in part because "no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter."  Id.  This procedure is followed even though it may mean that the testimony of the defendant, who is most likely to be the witness to the facts and circumstances that form the predicate of a defense, is necessary.  See, e.g., United States v. Paul,

110 F.3d 869, 870-72 (2d. Cir. 1997) (preliminary hearing held, at which defendant testified, to determine whether defendant could present evidence sufficient as a matter of law to advance a defense of duress); United States v. Alicea, 837 F.2d 103 (2d Cir. 1988) (same).  "The sole question presented in such situations is whether the evidence, as described by the defendant, is sufficient as a matter of law to support the proffered defense."  United States v. Crown, 99-CR-1044, 2000 WL 35593864 (S.D.N.Y. May 31, 2000) (citing United States v. Aguilar, 883 F.2d 662, 692 (9th Cir. 1989)).

> **B.      Advice of Counsel Defense**

The affirmative defense of advice of counsel (or, as Shkreli occasionally terms it, reliance on counsel) is a more specific form of the defense of good faith, available in limited circumstances in which a good faith instruction may otherwise be applicable.  See Sand, Modern Federal Jury Instructions, Instruction 8-04.  It "is not a free-standing defense."  United States v. Van Allen, 524 F.3d 814, 823 (7th Cir. 2008) (internal quotation marks omitted).

In order to establish a colorable advice of counsel defense, and thus be entitled to a jury instruction with respect to those offenses to which it may apply, the burden is on the defendant to introduce evidence that:  (1) before taking action in connection with the charged conduct, he "honestly and in good faith [sought] the advice of a lawyer as to what he may lawfully do"; (2) he "fully and honestly [laid] all the facts before his counsel"; and (3) he acted strictly in accordance with the advice of his counsel.  United States v. Evangelista, 122 F.3d 112, 117 (2d Cir. 1997) (internal quotation marks omitted); see also United States v. Colasuonno, 697 F.3d 164, 181 (2d Cir. 2012).  Where a defendant fails to meet even one of these requirements, he is not entitled to a jury instruction regarding advice of counsel.  See Evangelista, 122 F.3d at 117 (affirming denial of instruction, as defendants did not satisfy the third prong of the test); Colasuonno, 697 F.3d at

181 (affirming denial of instruction, as defendant did not satisfy the second prong of the test); United States v. Quinones, 417 F. App'x 65, 67 (2d Cir. 2011) (affirming denial of instruction and order precluding defense from arguing advice of counsel in summation; "defendants are not entitled to such an instruction unless there are sufficient facts in the record to support the defense," and "the defendants [in this case] have not shown the required factual predicate for an advice-of-counsel defense"). However, "no [defendant] can willfully and knowingly violate the law and excuse himself from the consequences thereof by pleading that he followed the advice of counsel." United States v. Beech-Nut Corp., 871 F.2d 1181, 1195 (2d Cir. 1989) (quoting Williamson v. United States, 207 U.S. 425, 453 (1908)).

## II.   A PRELIMINARY HEARING IS REQUIRED

A hearing pursuant to Federal Rule of Criminal Procedure 104 is required in this case to determine whether Shkreli can demonstrate that the evidence he seeks to introduce at trial in support of his proposed advice of counsel defense is sufficient, as a matter of law, to support that defense. See, e.g., Paul, 110 F.3d at 870-72 (2d. Cir. 1997). Significantly, such a hearing will also determine the precise scope of such a defense, if it can be advanced – namely, (i) for which an aspect or aspects of the charged conduct (the MSMB Capital Scheme, the MSMB Healthcare Scheme, the Retrophin Misappropriation Scheme and the Retrophin Unrestricted Shares Scheme) did Shkreli, honestly and in good faith, seek the advice of an attorney before taking action about whether such action was lawful, provide complete information, and receive and rely on legal advice, and (ii) from which specific attorney or attorneys did Shkreli seek, receive and rely on such legal advice. Establishing the exact scope of Shkreli's permissible defense is essential, as evidence that Shkreli sought and received advice from attorneys on subjects other than the charged conduct is entirely irrelevant to whether he is entitled to an advice of counsel instruction with respect to

the specific offenses with which he has been charged.  See, e.g., United States v. Atias, 14-CR-403 (DRH), 2017 WL 563978, at *2-*3 (E.D.N.Y. Feb. 10, 2017) (defendant not permitted to introduce evidence at trial in furtherance of advice of counsel defense in connection with specific attorneys who defendant failed to demonstrate provided advice on charged conduct); United States v. Impastato, 543 F. Supp. 2d 569, 580 (E.D. La. 2008) (advice of counsel instruction not warranted because the alleged "advice provided does not concern the crimes charged"); see generally United States v. Rice, 449 F.3d 887, 896-97 (8th Cir. 2006) ("a defendant is not immunized from criminal prosecution merely because he consulted an attorney in connection with a particular transaction," absent evidence that he provided all "material facts" about the transaction).[11]

A.      **Shkreli Has Not Proffered Evidence Sufficient to Support His Proposed Defense**

A hearing is required because there is substantial reason to doubt whether Shkreli can establish a basis in evidence to warrant an advice of counsel instruction as to some or all of the charged conduct in the Superseding Indictment.

First, with respect to the MSMB Schemes, as set forth above, Shkreli has proffered no evidence that he consulted an attorney, before engaging in the charged misrepresentations and omissions, about how to either lawfully recruit investors to his funds or lawfully provide information to investors about the performance of his funds.  See, e.g., United States v. Al-Shahin,

---

[11] Even if Shkreli can show at an evidentiary hearing that there is a factual basis for him to advance some form of an advice of counsel defense at trial, the Court must nevertheless, after all evidence in the case has been admitted, conduct an analysis to determine whether such evidence is sufficient to warrant an advice of counsel jury instruction.  In many cases, a defendant who can clear the initial hurdle to show a factual basis for an advice of counsel defense nonetheless fails to secure an advice of jury instruction at trial because he or she did not introduce evidence sufficient to meet one or more of the required prongs.  See, e.g., Evangelista, 122 F.3d at 117 (defendant introduced evidence in support of advice of counsel defense at trial, but failed to meet all prongs of test and did not receive jury instruction); Colasuonno, 697 F.3d at 181 (same); Quinones, 417 F. App'x at 67 (same).

474 F.3d 941 (7th Cir. 2007) (affirming denial of advice of counsel instruction where defendants did not even contact their attorney until after taking the action that constituted criminal conduct). To the contrary, as detailed above, Shkreli admits that he had "virtually no professional support in the form of lawyers and accountants" for the MSMB entities, and that he alone "drafted or adapted many of the documents necessary to create and run the hedge fund." (Shkreli Severance Br. at 3). Shkreli also admits that Greebel and Katten were first retained by him in the summer of 2011, after many of the charged misrepresentations and omissions to MSMB investors (particularly with respect to the MSMB Capital Scheme) had been made. (Id. at 8). And, to the extent that Shkreli consulted with Greebel or other attorneys at Katten regarding the MSMB entities, Shkreli himself contends that such consultation was limited to takeover bids and related work, such as the drafting of nondisclosure agreements; there is no evidence that Greebel or other Katten attorneys made misrepresentations to MSMB investors to obtain or retain investments in either MSMB fund. (Shkreli Severance Br. at 8-9).

In addition, as detailed above, Shkreli himself contends that Katten did not begin to provide him with legal advice in connection with the SEC investigation of MSMB Capital before October 1, 2012, long after Shkreli had made many of his misrepresentations and omissions to MSMB investors, including the false statements in the Liquidation Email about having sufficient reserves to redeem MSMB investments for cash; nor does Shkreli contend that Katten, in connection with the SEC investigation, provided advice to Shkreli about interactions with MSMB investors. Shkreli has also not identified any additional attorneys, apart from those at Katten, to whom he allegedly went for advice before engaging in the charged conduct with respect to the MSMB Schemes. It therefore does not appear that Shkreli can meet even the first prong of the advice of counsel defense for the conduct charged in connection with the MSMB Schemes.

Second, with respect to the Retrophin Schemes, there is no dispute that Shkreli and Greebel, as well as other Katten attorneys, were in frequent – even daily – contact during the course of those schemes. However, merely demonstrating that Shkreli generally consulted with Greebel and other Katten attorneys on a wide variety of subjects related to Retrophin is not sufficient to establish that Shkreli can meet the three prongs of the advice of counsel defense with respect to the specific conduct charged in the Retrophin Schemes: that is, the theft of funds from Retrophin to repay the defrauded MSMB investors (via, inter alia, the settlement and consulting agreements), and material misrepresentations and omissions about the beneficial ownership and control of Retrophin's unrestricted shares.

As an initial matter, it is not clear that Shkreli can proffer evidence to show that he went to Greebel in a good-faith attempt to accomplish the conduct at issue in the Retrophin Schemes in a lawful manner; merely demonstrating that Greebel assisted Shkreli with the legal documents necessary to paper over the theft of funds from Retrophin by drafting the settlement and consulting agreements, for example, is not sufficient to meet that prong of the test. See Beech-Nut Corp., 871 F.2d at 1195 (a defendant cannot willfully violate the law and "excuse himself from the consequences thereof by pleading" that he or she followed the advice of an attorney). The evidence produced by the government to date shows that Shkreli, rather than going to Greebel seeking a lawful avenue to accomplish the goals of the Retrophin Schemes, conspired with Greebel to meet those goals by engaging in criminal conduct. As Judge Weinstein found after a review of the Crime Fraud Emails – which constitutes a very small subset of the evidence gathered to date – Shkreli and Greebel's correspondence about the charged conduct in the Retrophin Schemes demonstrates that they were in fact part of a "scheme, conspiracy or fraudulent attempt to commit a securities fraud" and had engaged in "criminal conduct." In Re Grand Jury Investigation, 15-

MC-2227 (JBW), Dkt. No. 6.  While Judge Weinstein's conclusion is not dispositive of the issue of whether Shkreli sought out Greebel's advice in connection with the Retrophin Schemes in good faith, it is clear that the Crime Fraud Emails and other evidence strongly show that Shkreli did not; and Shkreli himself has proffered no evidence to the contrary.

Shkreli also must show that there is a factual basis for the other prongs of the good faith defense, including that he received specific legal advice from Greebel with respect to the criminal conduct charged in the Retrophin Schemes, and that he followed such advice.  Moreover, other than Greebel, Shkreli has not identified any other attorneys at Katten – or any other attorneys at other firms – from whom he even sought advice about the criminal conduct charged in the Retrophin Schemes.

### B.     A Hearing Will Avoid Undue Delay, Jury Confusion, and Unfair Prejudice to the Government During Trial

In addition to clarifying whether Shkreli can advance an advice of counsel defense at trial – and if so, the scope of any such defense with respect to both the conduct for which he sought advice and the attorneys upon which he relied – a hearing pursuant to Federal Rule of Criminal Procedure 104 is in the interests of justice.  To the extent that no factual basis exists for some or all of the advice of counsel defense that Shkreli seeks to pursue, evidence in support of that defense should be excluded.  This is because, as courts have routinely recognized, to permit testimony about attorneys if a defendant cannot meet his or her burden to provide a factual basis for the defense is both "legally inappropriate and likely to mislead a jury."  Atias, 2017 WL 563978, at *2.  As discussed at length in S.E.C. v. Tourre, 960 F.Supp.2d 666 (S.D.N.Y. 2013) – a case where a defendant chose not to pursue an advice of counsel defense but nonetheless sought to introduce evidence related to the role of attorneys in the relevant transactions – the unfettered

26

introduction of such evidence where no viable advice of counsel defense exists is both legally

improper and can cause jury confusion and prejudice to the government:

> [G]iven [the defendant's] concession that he will not be able to prove the required
> elements of a reliance on advice of counsel defense[, i]t would be confusing and
> unduly prejudicial for [the defendant] to present extensive evidence on the presence
> and involvement of lawyers—who are presumably paid to ensure that any
> disclosures comply with the relevant legal requirements—while at the same time
> professing not to have relied on their advice in preparing or disseminating those
> disclosures. Much of that testimony would also be irrelevant, given [the
> defendant's] intention not to present a reliance on counsel defense. [The defendant]
> argues that the presence of lawyers is relevant to the overall context of the
> transaction, but that is such a fine-grained distinction from a reliance on counsel
> defense, that it would likely confuse the jury. A lay jury could easily believe that
> the fact that a lawyer is present at a meeting means that he or she must have
> implicitly or explicitly "blessed" the legality of all aspects of a transaction.
> Likewise, the fact that lawyers saw and commented on disclosure language could
> be understood as "blessing" the sufficiency of that disclosure. This
> misunderstanding would give the defendant all of the essential benefits of an advice
> of counsel defense without having to bear the burden of proving any of the elements
> of the defense.

Id. at 684 (placing severe restrictions on the defendant's ability to refer to the role of attorneys in

relevant transactions in the absence of a viable advice of counsel defense).

The same set of concerns that animated the decision in Tourre are present here.

Should Shkreli be unable to advance any advice of counsel defense, or an advice of counsel defense

with respect to only a subset of the charged conduct or in connection with only certain attorneys,

evidence of the involvement of other attorneys or advice received in connection with other conduct

would be not only irrelevant and inadmissible, but also extremely confusing to the jury and

prejudicial to the government.  For example, if Shkreli ultimately can establish a factual basis for

an advice of counsel defense only with respect to Greebel and in connection with the Retrophin

Schemes, Shkreli should be precluded from introducing evidence (that would not otherwise be

admissible) about advice he received from other Katten attorneys in connection with other

transactions, or from arguing to the jury that he relied on Greebel for, as he has previously argued,

27

"every legal decision [he] made" with respect to the MSMB entities.  Such evidence or argument would be inadmissible, and is likely to confuse the jury or cause it to improperly conclude that those other attorneys "implicitly or explicitly 'blessed' the legality" of charged conduct for which Shkreli could not otherwise advance an advice of counsel defense.  Id. at 684.

A preliminary hearing would therefore facilitate the orderly introduction of evidence during trial by enabling the Court to identify and preclude those portions of the defense that are irrelevant, would require time-consuming or confusing testimony, or would be unfairly prejudicial to the government.  Moreover, if the scope of any permissible defense is established ahead of time, it would greatly reduce the number of objections, sidebars and limiting instructions related to evidence that Shkreli might seek to introduce in support of his defense.  In addition, the Court could order the production of materials relevant to such a defense before such a hearing, including pertinent defense 3500 material and exhibits, affording the government the opportunity

to review the materials and file any objections thereto, thereby minimizing the likelihood that the government would need to seek a delay during trial.

\* \* \* \* \*

For the foregoing reasons, the Court should grant the government's request for a hearing pursuant to Federal Rule of Criminal Procedure 104.

Dated:  Brooklyn, New York
        March 27, 2017

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York

_____/s/_____
Winston M. Paes
Jacquelyn M. Kasulis
Alixandra E. Smith
G. Karthik Srinivasan
Assistant U.S. Attorneys
(718) 254-6103 (Kasulis)

cc:   Clerk of the Court (KAM)
      Defense Counsel (By ECF and Email)