UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X

UNITED STATES OF AMERICA,

                                              MEMORANDUM AND ORDER

          - against -

MARTIN SHKRELI and EVAN GREEBEL,              15-CR-637 (KAM)

              Defendant.

------------------------------------------X

**MATSUMOTO, United States District Judge:**

          Presently before the court are defendants Martin Shkreli's ("Shkreli") and Evan Greebel's ("Greebel") motions for severance of their trials (the "Motions"). (ECF Nos. 158, 161.) For the reasons stated herein, defendants' motions to sever their trials are granted.

## **Discussion**

### I.  **Background**

          The parties' submissions and the Superseding Indictment describe the following facts.  Starting in 2006, Shkreli was the managing member and portfolio manager of Elea Capital Management ("Elea"), a hedge fund located in New York, New York.  Within approximately a year, Shkreli had lost all of the investors' money in Elea and had to liquidate the fund. Beginning in approximately 2009 and continuing until approximately 2012, Shkreli founded, and served as the managing member and portfolio manager of, two separate hedge funds based

in New York that focused their investments in the healthcare sector: MSMB Capital Management LP ("MSMB Capital") and MSMB Healthcare LP ("MSMB Healthcare") (collectively "MSMB").   In approximately 2011, Shkreli also founded a biopharmaceutical company called Retrophin LLC, which later became Retrophin, Inc. ("Retrophin"), a publicly-traded company.   Shkreli served as the Chief Executive Officer ("CEO") of Retrophin from December 2012 to September 2014.

Mr. Greebel was a partner in the New York office of the law firm Katten Muchin Rosenman LLP ("Katten Muchin").   From approximately February 2011 to September 2014, Greebel served as outside counsel to Retrophin.   Greebel also served as counsel to the MSMB entities and was the principal attorney at Katten Muchin for all matters related to the MSMB entities and Retrophin.

Shkreli worked closely with Greebel from February 2011 to September 2014, when Greebel was engaged as Retrophin's outside counsel.   Shkreli met, spoke, and emailed with Greebel, and other attorneys working with Greebel, almost every day and often multiple times per day.   Greebel provided legal advice to Shkreli on a multitude of issues regarding Shkreli's businesses. Greebel was the acting secretary at Retrophin Board meetings, he directly communicated with many of the company's investors on a

2

regular basis, he met with potential investors in Shkreli's absence, and he drafted a code of ethics and other important policy documents for Retrophin.  Shkreli paid almost $10 million dollars to Greebel and his law firm for legal services rendered to Shkreli, the MSMB entities and Retrophin.

On June 3, 2016, the government charged Shkreli and Greebel in an eight count Superseding Indictment (the "Superseding Indictment") containing detailed factual allegations.  Shkreli is charged in all eight counts, and Greebel is charged in Counts Seven and Eight of the Superseding Indictment.  (ECF No. 60.)

Counts One, Two, and Three charge Shkreli for the conspiracy described as the "MSMB Capital Hedge Fund Scheme." The Superseding Indictment charges that Shkreli and Co-Conspirator 1, in a scheme to defraud investors and potential investors in MSMB, made a series of misrepresentations to potential investors to induce them to invest in MSMB Capital. Eight investors invested a total of $3 million dollars in MSMB Capital.  In February 2011, Shkreli entered into a short sale position in Orexigen Therapeutics, Inc. ("OREX"), which led to MSMB Capital losing more than $7 million dollars ("OREX Trade"). MSMB Capital also suffered more than $1 million dollars in other trading losses during February 2011.  By the end of February

3

2011, MSMB Capital had approximately $58,500 in its bank and brokerage accounts.

Shkreli concealed, for more than a year, that he lost all the investments in MSMB Capital and that he was no longer trading. Shkreli sent fabricated performance updates to the MSMB Capital investors. In September 2012, Shkreli informed the MSMB Capital investors that he had decided to wind down both MSMB Capital and MSMB Healthcare, that they had "just about doubled their money net of fees," and that they could redeem their interests for cash, Retrophin shares, or a combination of both. (Superseding Indictment at ¶ 15.) A week before Shkreli informed the investors of his intention to wind down MSMB Capital and MSMB Healthcare, Shkreli and Co-Conspirator 1 entered into a settlement agreement with Merrill Lynch in connection with the OREX trading losses and agreed to pay Merrill Lynch a total of $1,350,000 on or before December 15, 2012. Shkreli and Co-Conspirator 1 stated in the settlement agreement that MSMB Capital had $0 in assets.

Counts Four, Five and Six charge Shkreli with the conspiracy described as the "MSMB Healthcare Hedge Fund Scheme." After the failed OREX Trade, Shkreli founded MSMB Healthcare. From approximately February 2011 to November 2012, Shkreli and others solicited investments in MSMB Healthcare based on

4

"material misrepresentations and omissions." (*Id.* at ¶ 16.) Once MSMB Healthcare was operational, Shkreli allegedly continued to make misrepresentations and omissions to the MSMB Healthcare investors to prevent the investors from redeeming the investments. The government charges that Shkreli misappropriated funds from MSMB Healthcare by withdrawing funds far greater than the fees permitted under the partnership agreement for the fund. The government further claims that without the knowledge or consent of the MSMB Healthcare investors, Shkreli used the assets of MSMB Healthcare to pay for obligations that were not the responsibility of MSMB Healthcare.

Count Seven charges Shkreli and Greebel with the conspiracy described as the "Retrophin Misappropriation Scheme." The government contends that Greebel and Shkreli conspired to defraud Retrophin by misappropriating Retrophin's assets to satisfy Shkreli's personal and unrelated professional debts. Greebel and Shkreli allegedly caused Retrophin to transfer shares to MSMB Capital even though it had not invested in Retrophin and caused MSMB Healthcare to invest significant sums into Retrophin between 2011 and mid-2012, which investments were reflected in Retrophin's capitalization table, allegedly maintained by Greebel. As of September 2012, the Retrophin capitalization table showed that MSMB Healthcare had invested

approximately $2.1 million into Retrophin, and indicated that MSMB Capital had not invested in Retrophin.

In the fall of 2012, Shkreli, with Greebel acting as counsel, prepared to take Retrophin public. Shkreli announced to the MSMB investors that he was winding down both MSMB Healthcare and MSMB Capital. Although Shkreli told the MSMB Healthcare investors that they were entitled to receive Retrophin stock or cash at the time when Retrophin became a public company, Shkreli did not have enough cash to provide redemptions to the MSMB Healthcare investors who opted to receive cash, as Shkreli had overvalued MSMB Healthcare's investment in Retrophin. Both MSMB Healthcare and MSMB Capital investors expressed dissatisfaction with how Shkreli was liquidating the hedge funds and several threatened to sue Shkreli.

The government alleges that Shkreli and Greebel engaged in a three-part scheme to misappropriate millions of dollars of Retrophin's assets through material misrepresentations and omissions in an effort to repay the MSMB investors. First, in the fall of 2012, Shkreli and Greebel engaged in a series of transactions designed to create the false appearance that MSMB Capital had invested in Retrophin and received Retrophin shares in return. Second, in the spring of

2013, Shkreli and Greebel caused Retrophin to enter into a series of settlement agreements with several of the defrauded MSMB Capital and MSMB Healthcare investors, which effectively caused Retrophin to reimburse those investors for their investments in the MSMB entities as well as for the fabricated returns that Shkreli had reported on those investments. The government asserts that defendants did not seek or obtain approval from Retrophin's Board of Directors for the settlement agreements. Third, in the fall of 2013 — after Retrophin's external auditor questioned the propriety of the settlement agreements and concluded that Retrophin was not responsible for repayment of the defrauded MSMB Capital and MSMB Healthcare investors — the defendants cause Retrophin to enter into a series of "sham consulting agreements" with additional defrauded MSMB Capital and MSMB Healthcare investors, as well as one defrauded Elea Capital investor, which again caused Retrophin to reimburse investors for their lost investments in Shkreli's hedge funds. (Superseding Indictment at ¶¶ 21, 31-35.) The government contends that the defrauded investors who entered into the sham consulting agreements did not perform any legitimate consulting services for Retrophin.

Count Eight charges Shkreli and Greebel with the conspiracy described as the "Retrophin Unrestricted Shares

Scheme." The government alleges that in connection with the reverse merger between Retrophin and Desert Gateway, Shkreli and Greebel conspired in a scheme to defraud investors and potential investors in Retrophin by concealing Shkreli's beneficial ownership and control of the majority of Retrophin's unrestricted or free trading shares. The unrestricted shares, known as the "Fearnow shares," were initially the shares of Desert Gateway, and the shares (2.5 million in total) became free-trading shares of Retrophin, held by the seller and sole stockholder ("John Doe 1") of Desert Gateway at the time of the reverse merger. (*Id.* at ¶ 36.)

In November 2012, Shkreli informed seven of his employees and contractors that they would each be permitted to purchase some of the Fearnow shares from John Doe 1 for a nominal amount. In or about December 2012, the defendants divided 2 million of the unrestricted shares between seven individuals to ensure that each individual's ownership was below the Securities and Exchange Commission's ("SEC") five percent reporting requirement threshold; they also arranged for an additional 400,000 shares to be held for those seven individuals in the name of John Doe 1, for future distribution to those individuals. In furtherance of the conspiracy to commit securities fraud, Shkreli and Greebel took steps to make it

appear that these seven individuals were no longer employed by or associated with either the MSMB entities or Retrophin, so that the shares would remain free-trading after the merger (as any free-trading shares held by individuals associated with Retrophin would become restricted). These steps include an email sent by Shkreli, and later forwarded by Shkreli to Greebel, that falsely stated that the seven individuals were no longer employees or contractors of Retrophin or the MSMB entities. The government contends that Shkreli and Greebel attempted to control, and in some cases, succeeded in controlling, the 2.4 million Fearnow shares between December 2012 and September 2014. (*Id.* at ¶ 39, 59(c).)

On February 17, 2017, the defendants filed their motions to sever. (ECF Nos. 158, 161.) The government filed its opposition papers on March 3, 2017. (ECF No. 166.) The parties filed their reply papers on March 10, 2017. (ECF Nos. 167, 170.) The court heard oral arguments on the motions on April 7, 2017. (See Minute Entry dated April 7, 2017.)

## II. Analysis

### A. Legal Standard

Under Federal Rule of Criminal Procedure 8(b), multiple defendants who allegedly "participated in the same act or transaction, or in the same series of acts or transactions,

constituting an offense or offenses" may be charged in a single indictment. Fed. R. Crim. P. 8(b).  Federal Rule of Criminal Procedure 14(a) allows a court to "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" if "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).

The Supreme Court has expressed a strong "preference in the federal system for joint trials of defendants who are indicted together" to promote efficiency and serve the interests of justice by preventing the inequity of inconsistent verdicts. *Zafiro v. United States,* 506 U.S. 534, 537 (1993).  Indeed, "a district court should grant severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539; *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008).

Furthermore, a defendant who claims that there is a risk of prejudicial spillover from a joint trial "bears an extremely heavy burden." *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988) (internal quotation marks and citation omitted).  The defendant must prove that "prejudice would be so

10

great as to deprive him of his right to a fair trial." *United States v. Bellomo*, 954 F. Supp. 630, 649 (S.D.N.Y. 1997) (citing *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989)). The risk of prejudice against a defendant due to a joint trial may be heightened where, for example, "many defendants are tried together in a complex case and they have markedly different degrees of culpability." *Zafiro*, 506 U.S. at 539.   Prejudice warranting severance may also be present if "essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." *Id.*   Whether sufficient prejudice exists is a highly fact-specific determination. *Id.*   In many situations where a court is considering whether to grant separate trials when there is a high risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice" from a joint trial. *Id.*   Moreover, the decision of whether to sever a trial is committed to the "sound discretion of the district court." *Id.* at 541; *United States v. Wilson*, 11 F.3d 346, 353 (2d Cir. 1993).

## B. Mutually Antagonistic Defenses

Defendants primarily argue that their trials should be severed because their defenses are mutually antagonistic.   The

court disagrees however, and finds that defendants' defenses are not mutually antagonistic.

A defense is mutually antagonistic "or irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant." *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991); *United States v. Serpoosh*, 919 F.2d 835, 837-838 (2d Cir. 1990) (citations omitted); *United States v. Volpe*, 42 F. Supp. 2d 204, 210 (E.D.N.Y. 1999) (defenses are mutually antagonistic when they create "a conflict so irreconcilable that acceptance of one defendant's defense will lead the jury to convict the other"). "It is not the mere existence of antagonistic defenses that prompts a required severance. Instead, the defenses must conflict to the point of being so irreconcilable as to be mutually exclusive before [the court] will find such prejudice as denies defendants a fair trial." *Cardascia*, 951 F.2d at 484 (citing *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990) and *United States v. Carpentier*, 689 F.2d 21, 28 (2d Cir. 1982)). *See also United States v. Scott*, 637 F. App'x 10, 13 (2d Cir. 2015), *cert. denied*, 137 S. Ct. 208 (2016) ("It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal . . . the defendant must instead show prejudice so severe that his conviction

12

constituted a miscarriage of justice" and that denial of the motion to sever amounted to a "denial of a constitutionally fair trial") (citations omitted).

The defendants' intended trial defenses are as follows: Shkreli lacked intent to defraud because he relied and acted on the advice of counsel, one of whom was Greebel. Greebel contends that his legal advice was predicated on what he believed to be truthful and complete information provided by Shkreli but which, instead, was untrue. Although the defenses may be somewhat antagonistic, the defenses do not rise to the point that requires the jury to disbelieve the defense of one of the defendants if it accepts the defense of the other. *See Carpentier*, 689 F.2d at 27-29. Shkreli has indicated that he will "maintain[] his complete innocence" and will argue that he did not have the requisite intent because, among other reasons, he "ensured that his counsel was fully aware of all relevant information . . . they needed to render appropriate and accurate advice, and that he followed that advice, believing it to be proper and correct." (Memorandum of Law in Support of Defendant Martin Shkreli's Motion for a Severance from Evan Greebel ("Shkreli Br."), ECF No. 161-2 at 15.) Greebel, on the other hand, asserts that the core of his defense will be that Shkreli lied and failed to disclose material information to Greebel and

13

other attorneys at Katten Muchin, effectively using them as "pawns in fraudulent schemes unbeknownst to them." (Greebel's Memorandum of Law in Support of Greebel's Motion for Severance ("Greebel Br."), ECF No. 163 at 9.) The defendants further argue that because Shkreli will say that he provided "full information" to Greebel, while Greebel will say that Shkreli withheld information from and/or provided false information to Greebel, such defenses are "mutually antagonistic" because it would not be possible for a jury to accept the defense advanced by one defendant without finding the other defendant guilty. (See Shkreli Br. at 13-17; Greebel Br. at 6-23.)

Defendants' defenses are not mutually antagonistic because they do not require a jury to find one defendant guilty if that jury accepts the other defendant's defense. *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003). If a juror accepts Shkreli's defense, it does not follow that they must find Greebel guilty. Shkreli's primary defense is that there was no fraud because he had no criminal intent to defraud. That he relied on his counsel, Greebel, does not lead to the inference that Greebel had the requisite intent. Instead, a jury could find that Greebel may have been mistaken in his understanding of the information provided by Shkreli, or that Greebel was grossly negligent or incompetent in providing

14

Shkreli with legal advice.  Thus a jury would not be required to find that Greebel had the criminal intent to defraud Retrophin. If a juror accepts Shkreli's defense that he lacked criminal intent, it is also likely that they would acquit Greebel rather than find that Greebel, as Shkreli's counsel, had independent criminal intent to defraud Retrophin.  Thus, the court concludes that the defenses are not mutually antagonistic.[1]

The circumstances here are similar to the Second Circuit's decision in *Scott,* 637 F. App'x at 13.  In *Scott*, the Second Circuit considered whether the district court properly denied severance of the trial of two co-defendants, an attorney and his client, who were charged with securities fraud.  *Id.* There, as here, the client advised the district court that he would advance an advice of counsel defense at trial and claim he lacked the intent to commit the crime, while the attorney stated that at trial he would advance a defense that he "unwittingly" acted on his client's instructions.  *Id.*  The Second Circuit found that these proposed defenses were not "antagonistic" because, as here, "the jury could have accepted both anticipated defenses, finding that neither [defendant] had intent to defraud under the circumstances." *Id.*

---

[1] The government lays out several other examples of how a jury may accept one defendant's defense and still acquit the other defendant.  (*See* The Government's Memorandum of Law in Response to the Defendants' Severance Motions ("Gov't Br."), ECF No. 166 at 29.)

### C. Spillover Prejudice

The court next finds unavailing Greebel's arguments that he would suffer spillover prejudice in a joint trial with Shkreli. (Greebel Br. at 29.) "Evidence adduced against one alleged co-conspirator is 'neither spillover nor prejudicial' if it would be admissible at a separate trial against the movant as an act of a co-conspirator in furtherance of a conspiracy due to the nature of conspiratorial illegal activity." *United States v. Spicer*, No. 10-CR-657 (SJ) (RML), 2013 WL 871952, at *3 (E.D.N.Y. Mar. 7, 2013) (citing *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993) ("A defendant's right to a fair trial does not include the right to exclude relevant and competent evidence.  Thus, the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately.  Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial.")).  "This is true even when the co-conspirator's acts are of greater severity." *Id.*  "[W]here there is some connection between the alleged conspiracy and the counts that charge [the defendant alleging spillover prejudice] alone such

16

that some overlap of evidence can be anticipated at trial, [the defendant] has not carried his burden for showing a single trial to be prejudicial." *United States v. Alegria*, 761 F. Supp. 308, 312 (S.D.N.Y. 1991).

Even where one defendant has been charged in fewer counts than another or played a lesser role than another, courts routinely deny severance motions. "[I]t is well established that defendants who played a minor role in a conspiracy may be tried with those who played a larger or dominant role." *United States v. Ferrarini*, 9 F. Supp. 2d 284, 290 (S.D.N.Y. 1998) (citing *Cardascia*, 951 F.2d at 483); *Casamento*, 887 F.2d at 1153. A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance." *Cardascia*, 951 F.2d at 483. Rule 8 "requires only that the counts be connected by common facts or participants *or* that they arise out of a common plan or scheme. The similarity between the schemes reduces the likelihood of any prejudicial spillover." *Ferrarini*, 9 F. Supp. 2d at 292. Indeed, where one set of schemes served to "cover up" another set of criminal acts, all of the acts should be tried together. *Id.*

The government intends to introduce "most, if not all, of the MSMB schemes" if Greebel is tried separately. (Gov't.

Br. at 38.)   Greebel does not identify evidence that would be admissible in a trial against Shkreli, but would not be admissible in a separate trial against Greebel.   Therefore, the court is unpersuaded by Greebel's argument that he would suffer spillover prejudice in a joint trial.   The four charged conspiracies are inextricably interrelated and evidence relating to the MSMB Capital and the MSMB Healthcare conspiracies are likely to be admissible in a trial against Greebel.   The conduct charged against Shkreli and Greebel in the Retrophin conspiracies was allegedly undertaken to compensate some of the alleged victims, the investors, of the MSMB Capital and the MSMB Healthcare conspiracies.   Thus, evidence relating to the MSMB Capital and the MSMB Healthcare conspiracies, with which Greebel is not charged, is likely to be admissible on relevance grounds because the evidence will provide context as to the conduct charged in the Retrophin conspiracies.   *See Cardascia*, 951 F.2d at 483 (finding no spillover prejudice to two defendants who played minor roles in one conspiracy and were tried with other defendants charged with an an unrelated conspiracy, even where some evidence relating to that conspiracy would have been "irrelevant and inadmissible" in a separate trial of the defendants.)   Thus, Greebel's assertions of spillover prejudice do not provide grounds for severance.

18

### D. Constitutional Right to a Fair Trial

Although the court finds that the defendants have not shown that their defenses are mutually antagonistic, or that the risk of spillover prejudice is so great that severance is warranted, the court has serious concerns that under the unique circumstances presented, trying the defendants together would present a serious risk that Shkreli will not receive a constitutionally fair trial. A joint trial would place on Shkreli an unfair and heavy burden in defending himself against both the government and Greebel. Severance is granted because of the stated intention of Greebel's counsel, in his declaration (ECF No. 159) and at oral argument, that Greebel's defense team will act as a second prosecutor against Shkreli, by arguing that Shkreli is guilty and that Greebel is, himself, just another victim of Shkreli's fraud. (Transcript of Oral Argument on Severance Motions held on April 7, 2017 ("Tr.") Tr. at 52, 54.) Greebel's counsel intends to assert a defense that will be an "echo chamber" for the prosecution by presenting evidence of multiple instances of Shkreli's purported lies, deceptions, and misrepresentations. (Tr. at 74-77.) In addition, Greebel's counsel plans to present evidence, even if the government does not, that Shkreli lied to Greebel and other attorneys and investors. The court recognizes that counsel's arguments are

not evidence, and the jury will be so instructed, however, the underlying theme of Greebel's defense, that Shkreli lied, committed fraud, and is guilty, will permeate a joint trial to the substantial prejudice of Shkreli. Through such double prosecution of Shkreli by the government and Greebel, there is a serious risk that the jury would be prevented from making a reliable judgment about guilt or innocence even with limiting instructions by the court.

Further, both defense counsel have indicated that they expect to raise frequent objections during the trial, both to the government's and each co-defendant's evidence, leading to a litany of side bar debates about various legal issues including limiting instructions, admissions by a co-defendant and related *Bruton* issues, and to the use of undocumented information obtained by Greebel during his legal representation of the entities controlled by Shkreli. (Tr. 42, 49, 55, 63, 111.) Constant objections during opening statements, witness examinations and cross-examination, followed by side bars, will disrupt the flow of the trial and increase the length of the trial, will likely confuse the jury in what is already a complex case, and may risk prompting the jury to find both defendants guilty based on each defendant's arguments that he was deceived by the other, instead of deciding the case based on the evidence

presented.    Thus,  the  court  finds  that  from  a  trial  management perspective  and  to  prevent  substantial  prejudice  and  jury confusion, severance is warranted.

The  circumstances  here  are  not  solely  one  of  "co-defendants  seek[ing]  to  place  the  blame  on  each  other."  *United States v. Villegas*,  899  F.2d  1324,  1346  (2d  Cir.  1990).    Rather, one  defendant,  Shkreli,  intends  to  present  a  defense  that  no crime  was  committed  because  he  lacked  the  requisite  intent, while  his  co-defendant,  Greebel,  intends  to  present  evidence  and argue  that  Shkreli  is  guilty  as  charged,  and  that  Greebel  is  but another  victim  of  Shkreli's  lies  and  deceitfulness — a  pawn  in "fraudulent  schemes  unbeknownst  to  [him]."    (Declaration  of  Reed Brodsky,  ECF  No.  159.)    These  defenses  amount  to  more  than simple  finger  pointing  by  two  defendants.    Rather,  the  defense strategy  of  Shkreli's  co-defendant  presents  a  realistic  scenario that  Shkreli  will  be  prosecuted,  not  only  by  the  government,  but also  by  Greebel,  his  co-defendant.    Shkreli  will  be substantially  prejudiced  by  having  to  wage  a  defense  on  two fronts,  in  a  single  trial,  before  the  jury.    The  jury's  ability to  make  a  reliable  judgment  maybe  affected  by  the  compounded effect  of  hearing  the  government's  case  in  chief  twice,  once from  the  government  and  then  again  from  Greebel.    Such  a  burden on  Shkreli  causes  the  court  great  concern  and  rises  to  the  level

of "legally cognizable prejudice" that likely meets the level of denying Shkreli a constitutionally fair trial. *See Zafiro*, 506 U.S. at 539. Although severing the trial of defendants indicted together is rare, under the extraordinary and unique facts presented here, and in an abundance of caution, the court finds that severance is warranted. In circumstances like these where judicial economy is butting up against a defendant's right to a fair trial, judicial economy must give way to fairness. *See id*. Accordingly, the court grants the defendants' request for severance.

## <u>Conclusion</u>

For the foregoing reasons, defendants' motions to sever their trials is **GRANTED**. The parties shall adhere to the amended pre-trial scheduling order. The court will issue a trial date for Greebel at a later date.


**SO ORDERED.**

Dated:    April 19, 2017
          Brooklyn, New York


                                        _____/s/_____
                                        Hon. Kiyo A. Matsumoto
                                        United States District Judge

23