JMK:AES/GKS
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                 15 CR 637 (KAM)

MARTIN SHKRELI,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## THE GOVERNMENT'S MOTIONS IN LIMINE


                                            BRIDGET M. ROHDE
                                            Acting United States Attorney
                                            Eastern District of New York
                                            271 Cadman Plaza East
                                            Brooklyn, New York 11201


JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
G. KARTHIK SRINIVASAN
Assistant U.S. Attorneys
      (Of Counsel)

## TABLE OF CONTENTS

I.      THE COURT SHOULD ADMIT AS DIRECT EVIDENCE SHKRELI'S
MISMANAGEMENT OF ELEA CAPITAL, TERMINATION FROM
EMPLOYMENT FOR CONCEALING IMPROPER TRADES AND REPEATED
HARASSMENT OF A FEARNOW SHARE RECIPIENT ......................................... 2

II.     THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT THAT
SHKRELI RELIED ON COUNSEL WITH RESPECT TO THE CRIMES
CHARGED IN COUNTS ONE THROUGH SIX OR, IN THE ALTERNATIVE,
GRANT A HEARING PURSUANT TO FRE 104 .................................................... 13

III.    THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT OF
IRRELEVANT DETAILS OF SHKRELI'S BACKGROUND AND PLANS IF
ACQUITTED .......................................................................................................... 23

IV.     THE COURT SHOULD PRECLUDE HEARSAY EVIDENCE OF
ARBITRATIONS RELATING TO SHKRELI'S SHAM RETROPHIN
CONSULTING AGREEMENTS ............................................................................. 25

V.      THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT
REGARDING THE GOVERNMENT'S MOTIVES FOR PROSECUTION ........... 28

VI.     THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT REGARDING
THE LACK OF ULTIMATE HARM TO INVESTORS .......................................... 30

VII.    THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT REGARDING
SHKRELI'S PRIOR GOOD ACTS OR LACK OF CRIMINAL HISTORY ............ 33

The government respectfully submits the following motions in limine in connection with the upcoming trial of the defendant Martin Shkreli: (1) to admit evidence of Shkreli's mismanagement of Elea Capital ("Elea"), his termination from RBC for concealing improper trades and his harassment of and threats to a Fearnow Share recipient and his family, as direct evidence of the charged crimes; (2) to preclude evidence or argument that Shkreli relied on the advice of co-defendant Evan Greebel or other attorneys at Katten Muchin Rosenman LLP ("Katten") in connection with the crimes charged in Counts One through Six, and, as necessary, to order a hearing pursuant to Federal Rule of Evidence ("FRE") 104; (3) to preclude evidence and argument of irrelevant details of Shkreli's background and plans if acquitted; (4) to preclude hearsay evidence of arbitrations relating to the sham consulting agreements into which Shkreli caused Retrophin to enter; (5) to preclude evidence and argument regarding the government's motives for prosecution; (6) to preclude evidence or argument regarding the lack of ultimate harm to investors; and (7) to preclude evidence or argument regarding Shkreli's prior good acts or lack of criminal history.  As set forth in more detail below, the government's motions seek to admit direct evidence of Shkreli's crimes; preclude evidence or argument in furtherance of a reliance of counsel defense on charged crimes for which there is no evidence that Shkreli in fact relied on counsel; and preclude certain additional evidence or argument that is pure hearsay or wholly irrelevant to the issues at trial and/or for which any conceivable probative value is substantially outweighed by the risk of juror confusion, distraction from the evidence, unnecessary lengthening of the trial and/or prejudice to the government.[1]

---

[1] The government reserves its right to file additional motions in limine following the exchange of exhibits and 18 U.S.C. § 3500 material with Shkreli on June 12, 2017.  Additionally, the government intends to file motions in limine seeking the preclusion of cross-examination of certain government witnesses regarding specific topics pursuant to Rules 608 and 609 of the Federal Rules of Evidence.

I.    **THE COURT SHOULD ADMIT AS DIRECT EVIDENCE SHKRELI'S MISMANAGEMENT OF ELEA CAPITAL, TERMINATION FROM EMPLOYMENT FOR CONCEALING IMPROPER TRADES AND REPEATED HARASSMENT OF A FEARNOW SHARE RECIPIENT**

The government respectfully moves in limine to admit evidence of (i) Shkreli's mismanagement of Elea, a prior hedge fund run by Shkreli where Shkreli lost all of the fund investors' money; (ii) a prior employer's termination of Shkreli for concealing improper trades; and (iii) Shkreli's repeated harassment of and threats to a Fearnow share recipient and his family after said recipient refused to return his Fearnow shares to Shkreli. For the reasons set forth below, all of these actions by Shkreli are direct evidence of the charged crimes in the Superseding Indictment. In the alternative, evidence of such actions is admissible pursuant to FRE 404(b).

A.    **Relevant Facts**

1.    **Shkreli's Loss of Investments In Elea Capital**

As set forth in the Superseding Indictment ("SI"), Shkreli was the managing member and portfolio manager of Elea from 2006 and 2007. (See SI ¶ 1). Investors in this hedge fund included Elea Investor GY and Elea Investor JA, and Shkreli stated in testimony before the Securities and Exchange Commission ("SEC") that the fund had several million dollars under management. In approximately July 2007, Shkreli executed an option trade via Lehman Brothers that resulted in losses to the fund that exceeded the assets in the fund. Shkreli notified Elea Investor GY and Elea Investor JA that he had lost their entire investments as a result of the failed trade, and subsequently closed down the fund.

Lehman Brothers—which was left covering the failed trade when Shkreli could not—sued Shkreli for losses that it had incurred. In response, Shkreli falsely advised Lehman Brothers that Elea Investor JA had agreed to cover the trading loss. The suit was ultimately

2

resolved with a default judgment against Shkreli alone for approximately $2.3 million. Shortly after obtaining that judgment, Lehman Brothers filed for bankruptcy; the judgment remains outstanding against Shkreli, though no entity has ever collected on it.

Shkreli failed to disclose his management of Elea, or the fact that he lost all of the funds that had been invested in Elea, to investors in MSMB Capital and/or MSMB Healthcare. (See SI ¶ 9). Shkreli also falsely suggested to investors that he was currently managing money for Elea Investor JA (who was identified to the MSMB Capital and/or MSMB Healthcare investors only as a wealthy individual, and not an investor in Elea) and/or that Elea Investor JA had invested in one of Shkreli's hedge funds. Those investors are expected to testify at trial that these omissions and misrepresentations would have affected their decision to invest in the MSMB Capital and/or MSMB Healthcare funds.

Finally, as set forth in the Superseding Indictment, Shkreli and others caused Retrophin to enter into a sham consulting agreement with Elea Investor GY's son in order to repay Elea Investor GY for the losses caused by Shkreli when Elea imploded. (See SI ¶ 32). Following the implosion of Elea, Shkreli had for many years promised to personally repay Elea Investor GY for the loss of his investment in Elea. Ultimately, after Retrophin became a successful company, Shkreli—rather than repaying the personal debt to Elea Investor GY out of his own funds—caused Retrophin to repay that personal debt via a sham consulting agreement.

### 2. Shkreli's Termination For Concealing Improper Trades

In approximately June 2008, following the collapse of Elea, Shkreli was hired by RBC Professional Trading Group LLC ("RBC"),[2] a New York-based entity that offered trading services. Shkreli, who passed his Series 7 exam in 2004, was a registered representative with the

---

[2] In 2009, the firm was renamed G-2 Trading LLC.

3

Financial Industry Regulatory Association ("FINRA") at the time of his hiring.  At RBC, Shkreli

was given responsibility for the management of a portfolio of assets worth several million

dollars.

During his two-month tenure at RBC, Shkreli's trading caused the portfolio he

was managing to suffer losses.  More significantly, Shkreli executed trades away from the firm's

supervision, despite several verbal warnings he had received from firm management not to

engage in such trades, and then sought to conceal such trades by failing to promptly update the

trade blotter to reflect such trades as required by the firm's written procedures.  As a result of

this behavior—disregarding verbal warnings about trading away from the firm and then seeking

to hide such trades—Shkreli was fired from RBC in August 2008.   Subsequently, as required by

FINRA regulations, RBC reported the nature and circumstances of Shkreli's involuntary

termination to FINRA.

Shkreli failed to disclose his employment at and subsequent termination from

RBC to investors in the MSMB Capital and/or MSMB Healthcare funds.  In addition, when

Shkreli was interviewed by the SEC in 2011, Shkreli failed to disclose his employment at or

termination from RBC.  (Shkreli did disclose his employment at RBC to the SEC in connection

with interviews he gave in 2013 and 2014, but did not note his termination from the company).

### 3.    Shkreli's Threats Against and Harassment of Fearnow Share Recipient

In 2011, Shkreli hired an individual ("Fearnow Share Recipient TP") to run a fund

that Shkreli founded called MSMB Consumer.  Fearnow Share Recipient TP was technically

hired as an employee of MSMB Healthcare, and worked out of the same offices that were used

for Retrophin and other MSMB funds, including MSMB Healthcare.  Ultimately, MSMB

Consumer was not successful, and it was wound down in mid-2012.  After that time, Fearnow

Share Recipient TP worked with others (including the individual identified in the Superseding

4

Indictment as Co-Conspirator 1) on a series of other potential acquisitions in which Shkreli had agreed to invest money.  Fearnow Share Recipient TP was formally let go as an employee of MSMB Healthcare in October 2012, but continued to work on these acquisitions out of the offices of Retrophin throughout the fall of 2012.

In December 2012, Shkreli distributed free-trading Fearnow Shares to Fearnow Share Recipient TP, along with six other individuals who were either employees of or affiliated with Retrophin in an attempt to control the price and trading volume of shares of the newly-public Retrophin (as described in the Superseding Indictment at paragraphs 36-40).  After receiving the Fearnow Shares, however, Fearnow Share Recipient TP refused to follow Shkreli's instructions not to trade the Fearnow Shares, and proceeded to sell some of the shares he had received on the open market.

When Shkreli learned in approximately late December 2012 that Fearnow Share Recipient TP had sold some of the Fearnow Shares, he immediately demanded that Fearnow Share Recipient TP return the remaining shares to his control.  In contradiction to Shkreli's own statements at the time of the reverse merger that none of the Fearnow Share recipients were affiliated with Retrophin, Shkreli claimed in a lawsuit that Fearnow Share Recipient TP had agreed to be employed by Retrophin (when, in reality, Fearnow Share Recipient TP had agreed only to work on the described acquisitions with Co-Conspirator 1out of Retrophin's offices), and that his receipt of the Fearnow Shares had been a form of employee "incentive" to which Fearnow Share Recipient TP was no longer entitled.  After Fearnow Share Recipient TP refused to return the shares, Shkreli sent Fearnow Share Recipient TP's wife a letter that stated, inter alia, "Your husband has stolen $1.6 million from me and I will get it back.  I will go to any

length necessary to get it back … I hope to see you and your four children homeless and will do whatever I can to assure this."

Subsequently, Shkreli and Greebel caused Retrophin to sue Fearnow Share Recipient TP for the return of the Fearnow Shares, falsely claiming that Former Employee TP had made a promise to work for Retrophin in return for those shares.  During the pendency of the lawsuit, Shkreli continued to harass Fearnow Share Recipient TP and his family, including by sending threatening messages to Fearnow Share Recipient TP, his wife and his children via social media and text message.  Then, the day after Christmas in 2013, Shkreli simultaneously hacked into five email and social media accounts held by Fearnow Share Recipient TP in order to post information about the lawsuit on Fearnow Share Recipient TP's Facebook page.  When Fearnow Share Recipient TP contacted the local police department to report Shkreli's harassment, that department reached out to Shkreli directly; Shkreli initially denied knowing Fearnow Share Recipient TP, then agreed to call him to apologize.

Shkreli has not only admitted to his harassment of Fearnow Share Recipient TP, but has bragged about it publicly.  For example, in an interview given in December 2015, which was published the day before his arrest in the current case, Shkreli made the following statements about his harassment of Fearnow Share Recipient TP:

Shkreli:        Did you see that thing where I threatened that dude and his fucking kids, right?

Interviewer:  I did.

Shkreli:        That was over $3 million, I want to say.  He had to call the police, that guy.  There's a little "Shmurda" in me, too.  [Laughs]  . . . I'm definitely the real fucking deal.  This is not a fucking act.  I threatened that fucking guy and his fucking kids because he fucking took $3 million from me and he ended up paying me back. He called my bluff.  He said, "You're not fucking going to go after me."  [I said]  "Yes I motherfucking will."  I had two guys parked

6

> outside of his house for six months watching his every fucking
> move.  I can get down.

Justin Hunte, <u>Martin Shkreli Plans To Bail-Out Bobby Schmurda</u>, HipHopDx.com (Dec. 16, 2015, 4:13 p.m.), http://hiphopdx.com/interviews/id.2825/title.martin-shkreli-plans-to-bail-out-bobby-shmurda.

  **B.**  <u>**Legal Standard**</u>

    **1.**  <u>**Direct Evidence**</u>

    Evidence of Shkreli's actions related to Elea, his termination from RBC and/or his harassment of and threats to Fearnow Share Recipient TP is properly admissible "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." <u>United States v. Carboni</u>, 204 F.3d 39, 44 (2d Cir. 2000) (quoting <u>United States v. Gonzalez</u>, 110 F.3d 936, 942 (2d Cir. 1997)).  The Second Circuit has repeatedly held that evidence of "other" or "uncharged" acts or crimes is admissible to complete the story of the charged crimes and to establish the existence of the charged conspiracy.  "[W]here, as here, a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself." <u>United States v. Baez</u>, 349 F.3d 90, 93 (2d Cir. 2003) (internal quotation marks omitted) (upholding district court's admission of sixteen uncharged robberies).

    **2.**  <u>**Rule 404(b)**</u>

    Evidence of uncharged "other" acts is admissible pursuant to Rule 404(b) if relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  <u>See</u> <u>United States v. Ortiz</u>, 857 F.2d 900, 903 (2d Cir. 1988). The Second Circuit has adopted an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate a defendant's "criminal propensity." <u>United States v. Garcia</u>, 291 F.3d 127, 136 (2d

Cir. 2002); see also United States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992). Such evidence is correctly admitted if: (1) it is offered for a proper purpose; (2) it is relevant to a disputed trial issue; (3) its probative value substantially outweighs any possible prejudice; and (4) the trial court administers an appropriate limiting instruction.  United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003).

     **C.**    **Argument**

        **1.**    **Shkreli's Loss of Investments In Elea Capital**

       Evidence of Shkreli's mismanagement of Elea, his subsequent dissolution of the fund after losing all investments in a single trade, his misrepresentations and omissions to MSMB Capital and/or MSMB Healthcare investors about Elea and its performance and his repayment of Elea Investor GY via a sham consulting agreement with Retrophin are properly admissible as it is both "inextricably intertwined with the evidence regarding the charged offense" and "is necessary to complete the story of the crime[s] on trial."  Carboni, 204 F.3d at 44.

       First, evidence that Shkreli made material misstatements and omissions to investors in MSMB Capital and MSMB Healthcare about Elea is direct evidence of the crimes charged in Counts One through Six of the Superseding Indictment.  Shkreli painted a glowing account for those investors of his past successes in the industry and his acumen as an investor, starting with his time as a preternaturally young analyst at Cramer Berkowitz and continuing through to his then-current position as the manager of MSMB Capital.  Shkreli conveniently did not mention his management of Elea and its subsequent failure to those investors (and also falsely advised MSMB Healthcare investors about the successful track record of the MSMB Capital fund, even though Shkreli had lost all of the money invested in that fund in connection with the failed OREX trade in February 2011).  The government expects that investors will

testify that Shkreli's stated prior success in the industry was important to them in deciding to invest in MSMB Capital and/or MSMB Healthcare, and that they would not have agreed to invest with Shkreli had they known that Shkreli had run a hedge fund that was closed because Shkreli had lost all of the investments in that fund.  In order to demonstrate how Shkreli's narrative about his investing acumen and prior success was false, and how information contrary to that narrative was concealed from investors, the government must be able to "complete the story" of the misstatements and omissions by introducing evidence of the failure of Elea.

Second, evidence that Shkreli forced Retrophin to repay the losses suffered by Elea Investor GY via a sham consulting agreement is direct evidence of the crime charged in Count Seven of the Superseding Indictment.  As detailed above, Shkreli continually promised Elea Investor GY and his son—over a period spanning more than six years—that he would personally repay Elea Investor GY for the losses that Elea Investor GY incurred as a result of the failure of Elea.  Despite profiting personally from the success of Retrophin, Shkreli did not in fact repay the debt owed to Elea Investor GY out of his own money.  Instead, Shkreli caused Retrophin to enter into a sham consulting agreement with Elea Investor GY, which caused the public company to repay his personal debt.  Evidence of Elea's failure is necessary to explain why Shkreli owed Elea Investor GY a personal debt, and why Shkreli committed fraud by causing Retrophin—which owed no obligation to Elea Investor GY—to repay that debt under the auspices of a consulting agreement that provided no benefit to Retrophin.

Alternatively, evidence related to Shkreli's involvement in Elea is admissible for several recognized purposes under FRE 404(b) as evidence of his knowledge, intent and lack of mistake, all of which are squarely at issue in this case.  See United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("evidence of other bad acts may be admitted to provide the jury with the

complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"). The government anticipates that Shkreli will argue that he did not understand the implications of the failed OREX trade for MSMB Capital—that is, he did not know that he would be forced to actually pay Merrill Lynch (who handled the failed OREX trade, and was ultimately left with a $7 million deficit) to cover at least part of the failed trade, or that he might be able to recover some money for MSMB Capital investors from Merrill Lynch. Shkreli's prior experience with Elea—where Shkreli lost all of the money in the fund in a similar fashion, with one failed trade—is evidence that Shkreli knew he would be required to reimburse Merrill Lynch for its losses, and that no money would be returned to MSMB Capital. In addition, evidence of the failure of Elea and steps Shkreli took after that failure to notify Elea investors of their losses demonstrates that Shkreli's failure to notify the investors of MSMB Capital that their investments had been lost in the OREX trade was not a mistake or an accident, but rather a calculated decision by Shkreli to conceal the loss of the fund's assets.

Where the uncharged acts are similar in nature to the charged crimes—as they clearly are in this case—FRE 404(b) evidence is admissible under the FRE 403 balancing test. See United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (upholding admissibility of evidence that the defendant, a police officer charged with engaging in excessive use of force against an arrestee, choked another arrestee on the basis that "the evidence did not involve conduct more inflammatory than the charged crime, and the district court gave a careful limiting instruction"). The probative value of the evidence about Elea—with regard to knowledge, intent, lack of mistake or accident and good faith—substantially outweighs any potential for unfair prejudice. Moreover, that the evidence does "not involve conduct any more sensational or

disturbing" than the offenses charged, <u>Pitre</u>, 960 F.2d at 1120 (internal quotation marks omitted), there is no risk of unfair prejudice.

2.     **Shkreli's Termination For Concealing Improper Trades**

Evidence that Shkreli made material misstatements and omissions to investors in MSMB Capital and MSMB Healthcare about his employment at RBC is direct evidence of the crimes charged in Counts One through Six of the Superseding Indictment.  As detailed above, Shkreli advised those investors that he had a long track record of success in the industry, but failed to mention his termination from RBC for concealing trades that he conducted in contradiction of explicit orders by management.  The government expects that investors will testify that Shkreli's stated prior success in the industry was important to them in deciding to invest in MSMB Capital and/or MSMB Healthcare.  To demonstrate how Shkreli's narrative about his unblemished track record in the industry was false, and how information contrary to that narrative was concealed from investors, the government must be able to "complete the story" of the misstatements and omissions by introducing evidence of his termination from RBC for hiding improper trades.

Alternatively, evidence related to Shkreli's termination from RBC is admissible for several recognized purposes under Rule 404(b) as evidence of his knowledge, intent and lack of mistake.  <u>See</u> <u>Inserra</u>, 34 F.3d at 89.  Evidence that Shkreli disobeyed orders from RBC management to trade in a particular fashion and then concealed trades that had been forbidden, which had resulted in losses for the fund, is evidence that Shkreli's concealment of problematic trades and subsequent losses from the MSMB Capital and/or MSMB Healthcare investors was not a mistake or accident.  Moreover, Shkreli's actions at RBC are similar in nature to the crimes charged, and are therefore admissible under the Rule 403 balancing test.  <u>See</u> <u>Livoti</u>, 196 F.3d at 326.

11

**3.    Shkreli's Threats Against and Harassment of Fearnow Share Recipient TP**

Evidence of Shkreli's campaign of harassment against Fearnow Share Recipient TP is direct evidence of the crime charged in Count Eight of the Superseding Indictment.  As detailed in the Superseding Indictment, Shkreli distributed the Fearnow Shares to a small group of Retrophin employees and affiliates in an attempt to control the price and trading volume of Retrophin following the reverse merger.  (See SI ¶¶ 36-40).  Shkreli's extreme reaction to Fearnow Share Recipient TP's refusal not to sell the Fearnow Shares or return them to Shkreli—which consisted of falsely stating in a lawsuit that Fearnow Share Recipient TP had agreed to be an employee of Retrophin, insisting that Fearnow Share Recipient TP return the shares to him, and then engaging in a series of escalating acts of harassment including sending a threatening letter to Fearnow Share Recipient TP's wife, causing Retrophin to file a lawsuit to try and regain control over the shares, and ultimately hacking into Fearnow Share Recipient TP's personal social media and email accounts to try and embarrass him into conceding the lawsuit—is clear evidence that Shkreli intended to retain control over the Fearnow Shares even though they had been allegedly distributed to others, including Fearnow Share Recipient TP.  Such evidence is thus "inextricably intertwined with the evidence regarding" Count Eight and "is necessary to complete the story of [that] crime[s] on trial." Carboni, 204 F.3d at 44.   In the alternative, evidence of Shkreli's harassment of Fearnow Share Recipient TP is admissible pursuant to FRE 404(b) as evidence of his knowledge, intent and lack of mistake in seeking to control the Fearnow Shares.  See Inserra, 34 F.3d at 89.

II.    **THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT THAT
       SHKRELI RELIED ON COUNSEL WITH RESPECT TO THE CRIMES
       CHARGED IN COUNTS ONE THROUGH SIX OR, IN THE ALTERNATIVE,
       GRANT A HEARING PURSUANT TO FRE 104**

On March 27, 2017, the government filed a motion for a hearing pursuant to FRE 104, seeking to determine the scope of Shkreli's stated advice of counsel defense—specifically, the attorneys who Shkreli would say provided advice upon which he relied, and the charged conduct for which the advice was provided.  (Dkt. No. 180).  Shkreli's counsel opposed the motion on April 5, 2017, in part on the basis that the motion was premature (see Dkt. No. 182), and the government filed a reply on April 7, 2017 (Dkt. No. 185).  On April 7, 2017, the Court heard extensive oral argument on the motion.  (See Apr. 7, 2017 Oral Arg't Tr. at 1-37).  Ultimately, the Court denied the government's motion without prejudice, and asked that the parties meet-and-confer to see whether the issues could be narrowed for any subsequent motion.  (See Court's April 14, 2017 Order).

The government and counsel for Shkreli discussed the matter as directed by the Court's order.  On May 26, 2017, counsel for Shkreli advised the government that Shkreli would seek to assert the advice of counsel defense at trial with respect to the conduct charged in all counts, but would do so only with respect to advice provided by the following attorneys: (1) Greebel and (2) all other attorneys at Katten that appear on bills submitted by Katten to MSMB entities and/or Retrophin entities.  Counsel for Shkreli further stated that they may be able to further narrow the attorneys at Katten whose advice Shkreli relied upon, but were not at this time prepared to do so.

As a result, the government is re-filing its initial motion with the following parameters.  First, the government seeks to preclude the introduction of evidence or argument that Shkreli relied on Greebel or any other Katten attorney with respect to the conduct charged in

13

Counts One through Six of the Superseding Indictment because, for the reasons detailed below, Shkreli cannot meet the minimum threshold evidentiary showing required to introduce such evidence or argument at trial.  Moreover, as Shkreli has to date proffered no evidence in support of his position, the Court may rule on this motion without a hearing; however, in the alternative, the government requests a hearing pursuant to FRE 104.  Second, although the government strongly disagrees that Shkreli has a valid advice of counsel defense with respect to Greebel or any other Katten attorney with respect to the conduct charged in Counts Seven and Eight, it will not seek to preclude the introduction of evidence or argument with respect to those counts during the government's case-in-chief, the defense case, or the government's rebuttal case.  However, the government anticipates that it will move at the close of evidence for a ruling that Shkreli has not met the higher evidentiary threshold required to obtain an advice of counsel jury instruction with respect to Counts Seven and Eight.

A.    **Relevant Facts**

The government set forth relevant facts in its March 27, 2017 motion, and incorporates those facts by reference here.  (See Dkt. No. 180 at 1-19).

The Superseding Indictment details at length Shkreli's involvement in the MSMB Capital and MSMB Healthcare Schemes.  (See SI ¶¶ 8-20).  These schemes involve, inter alia, misrepresentations and omissions made to potential investors in order to obtain and retain investments in the MSMB hedge funds.  In legal filings in this case, Shkreli has admitted that with respect to the MSMB entities, "[h]e had virtually no professional support in the form of lawyers and accountants [for those entities] for the simple reason that he couldn't pay them." (Dkt. No. 161-2 at 3).  Shkreli further admits that he "himself drafted or adapted many of the documents necessary to create and run the hedge fund."  Id.  And Shkreli also admits that

14

Greebel and Katten were first retained by him in the summer of 2011 (id. at 8)—a point in time almost two years after MSMB Capital was founded, approximately six months after the final investments in MSMB Capital were made, approximately four months after Shkreli lost all of the money invested in MSMB Capital in connection with the failed OREX trade, and long after Shkreli began sending out monthly statements to investors falsely detailing wildly positive returns for MSMB Capital.

With respect to legal advice provided by Greebel and Katten related to the MSMB entities, Shkreli states that Greebel and Katten were initially hired to do work for those entities in connection with a "number of transactions that were being considered around [that] time, including a takeover bid for A[MAG] Pharmaceuticals." (Dkt. No. 161-2 at 8). The only other specific work related to the MSMB entities for which Shkreli states he provided information to and received advice from Greebel and Katten was "MSMB hostile shareholder activity," e.g., additional attempts by Shkreli at takeover bids of other companies. (Id. at 9). Shkreli does not state that he in good faith sought, received and/or relied on legal advice from Greebel or anyone else at Katten about the misrepresentations or omissions made to MSMB Capital and MSMB Healthcare investors in connection with the MSMB Schemes.

Shkreli does state that Katten attorneys—including another partner at Katten ("Katten Partner 1") —represented him[3] in connection with a subpoena served on MSMB Capital by the SEC on October 1, 2012, including at testimony Shkreli gave to the SEC on August 7, 2013 and February 24, 2014. (Dkt. No 161-2 at 8). However, Shkreli does not assert that he sought legal advice from or provided Katten Partner 1 or any other Katten attorney with

---

[3] Again, it is not clear whether Shkreli contends that Katten's representation of Shkreli in connection with the SEC investigation was of him personally, or of MSMB Capital as an entity.

complete information about the MSMB Capital and MSMB Healthcare entities contemporaneously with his operation of those entities between 2009 and 2012, nor does he state that he relied on legal advice from Katten attorneys at the time that he was making omissions and misrepresentations to the MSMB Capital and MSMB Healthcare investors.  Significantly, at the time that the October 1, 2012 SEC subpoena was served, Shkreli had already sent the Liquidation Email and falsely advised the MSMB Capital and MSMB Healthcare investors that he was winding down those funds after doubling the money of early investors, and that investors could redeem their investments for cash.

Furthermore, Shkreli's own prior statements make clear that he did not rely on Greebel or any other Katten attorneys in connection with the crimes charged in Counts One through Six.  In sworn testimony before the SEC in 2011, 2013 and 2014, as well as in a deposition in connection with a FINRA proceeding in 2012 related to the failed OREX trade, Shkreli repeatedly stated that he did not seek the advice of counsel in preparing documents that were used to solicit investments in MSMB Capital and/or MSMB Healthcare, nor did he seek the advice of counsel in preparing investor statements that contained false information.  For example, Shkreli testified on more than one occasion that he prepared the offering memorandum for MSMB Capital by revising an offering memorandum that he had used for Elea, and that no counsel—not Greebel, nor any Katten attorney, nor any other attorney—had assisted him in that process.  (See 5/15/2012 Shkreli FINRA Testimony at 37:3-38:3; 8/17/2013 Shkreli SEC Testimony at 18:2-7).[4]  Shkreli testified that he had also prepared similar documents for MSMB

---

[4] All cited portions of Shkreli's prior sworn testimony are attached hereto as Exhibit A (which has not been filed on ECF but will be provided to the Court and Shkreli in hard copy); please note that the relevant page numbers for the SEC testimony appear on the left-hand side of the page for each transcript.

Healthcare without consulting with any attorney.  (See 02/24/14 Shkreli SEC Testimony at 265:2-9, 266:18-267:4).

Similarly, Shkreli testified that "[he] and [he] alone" created the Microsoft Excel spreadsheets that were allegedly used to keep track of the daily performance of the MSMB Capital fund.[5]  (05/15/2012 Shkreli FINRA Testimony at 72:24-73:15).  He further testified that "[he] and [he] alone" created the periodic reports—which contained false statements—that were sent to MSMB Capital investors detailing the alleged performance of the fund.  (05/15/2012 Shkreli FINRA Testimony at 74:24-75:14; see also 08/17/2013 Shkreli SEC Testimony at 205:16-206:9 (Shkreli stated he created the performance reports "all by myself")).

Finally, Shkreli has also stated that when he transferred $775,000 from MSMB Healthcare to pay a portion of the settlement with the Merrill Lynch related to the failed OREX trade, it was a "personal loan" that he made to himself without consulting counsel.  (See 02/24/14 Shkreli SEC Testimony 255:7-256:5, 256:15-19).  Shkreli further stated that he did not consult counsel when he made the decision not to make written disclosure of the loan to MSMB Healthcare investors.  (Id. at 260:2-4, 260:20-22).

**B.**    **Legal Standard**

**1.**    **Federal Rule of Evidence 104**

Preliminary questions concerning the admissibility of evidence, including whether evidence is relevant or a privilege exists, are to be determined by the Court.  FRE 104(a).  The Court has discretion to order a hearing to assist it in resolving such questions.  FRE 104(c)(3) (the court "must conduct a[] hearing" when "justice so requires").  The Court's authority to

---

[5] When the SEC later requested that Shkreli produce the spreadsheets that were allegedly used to keep track of MSMB Capital's performance, Shkreli was unable to locate any such spreadsheets.

resolve such questions is rooted in its "inherent authority to manage the course of trials." United States v. Valencia, 826 F.2d 169, 171 (2d Cir. 1987) (internal quotation marks omitted).   At such a hearing, the proponent of evidence bears the burden of demonstrating its admissibility by a preponderance of the evidence.  See Bourjaily v. United States, 483 U.S. 171, 175 (1987); see also United States v. Camacho, 353 F. Supp. 2d 524, 535-36 (S.D.N.Y. 2005) (burden of showing admissibility by a preponderance of the evidence is on the defendant where the defendant is proponent of the evidence).

Courts in this circuit routinely hold pretrial hearings to determine, among other things, whether there is sufficient evidence for an affirmative defense to be presented to a jury. See United States v. Villegas, 899 F.2d 1324, 1343 (2d Cir. 1990).  Courts follow this procedure in part because "no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter."  Id.  This procedure is followed even though it may mean that the testimony of the defendant, who is most likely to be the witness to the facts and circumstances that form the predicate of a defense, is necessary.  See, e.g., United States v. Paul, 110 F.3d 869, 870-72 (2d. Cir. 1997) (preliminary hearing held, at which the defendant testified, to determine whether the defendant could present evidence sufficient as a matter of law to advance a defense of duress); United States v. Alicea, 837 F.2d 103 (2d Cir. 1988) (same).  "The sole question presented in such situations is whether the evidence, as described by the defendant, is sufficient as a matter of law to support the proffered defense."  United States v. Crown, Cr. No. 99- 1044, 2000 WL 35593864 (S.D.N.Y. May 31, 2000) (citing United States v. Aguilar, 883 F.2d 662, 692 (9th Cir. 1989)).

18

### 2.    **Advice of Counsel Defense**

The affirmative defense of advice of counsel is a more specific form of the defense of good faith, available in limited circumstances in which a good faith instruction may otherwise be applicable.  See Sand, Modern Federal Jury Instructions, Instruction 8-04.  It "is not a free-standing defense."  United States v. Van Allen, 524 F.3d 814, 823 (7th Cir. 2008) (internal quotation marks omitted).

In order to establish a colorable advice of counsel defense, and thus be entitled to a jury instruction with respect to those offenses to which it may apply, the burden is on the defendant to introduce evidence that: (1) before taking action in connection with the charged conduct, he "honestly and in good faith [sought] the advice of a lawyer as to what he may lawfully do"; (2) he "fully and honestly [laid] all the facts before his counsel"; and (3) he acted strictly in accordance with the advice of his counsel.  United States v. Evangelista, 122 F.3d 112, 117 (2d Cir. 1997) (internal quotation marks omitted); see also United States v. Colasuonno, 697 F.3d 164, 181 (2d Cir. 2012).  Where a defendant fails to meet even one of these requirements, he is not entitled to a jury instruction regarding advice of counsel.  See Evangelista, 122 F.3d at 117 (affirming denial of instruction, as the defendants did not satisfy the third prong of the test); Colasuonno, 697 F.3d at 181 (affirming denial of instruction, as the defendant did not satisfy the second prong of the test); United States v. Quinones, 417 F. App'x 65, 67 (2d Cir. 2011) (affirming denial of instruction and order precluding defense from arguing advice of counsel in summation; "defendants are not entitled to such an instruction unless there are sufficient facts in the record to support the defense," and "the defendants [in this case] have not shown the required factual predicate for an advice-of-counsel defense").  However, "no [defendant] can willfully and knowingly violate the law and excuse himself from the consequences thereof by pleading that he

19

followed the advice of counsel." United States v. Beech-Nut Corp., 871 F.2d 1181, 1195 (2d Cir. 1989) (quoting Williamson v. United States, 207 U.S. 425, 453 (1908)).

### C.   Argument[6]

There is substantial reason to doubt whether Shkreli can establish a basis in evidence to advance an advice of counsel defense as to the charged conduct in Counts One through Six.[7]  As set forth above, Shkreli has proffered no evidence that, before engaging in the charged misrepresentations and omissions regarding MSMB Capital and MSMB Healthcare, he consulted an attorney about how to either lawfully recruit investors to his funds or lawfully provide information to investors about the performance of his funds.  See, e.g., United States v. Al-Shahin, 474 F.3d 941 (7th Cir. 2007) (affirming denial of advice of counsel instruction where the defendants did not even contact their attorney until after taking the action that constituted criminal conduct).   To the contrary, as detailed above, Shkreli admits that he had "virtually no professional support in the form of lawyers and accountants" for the MSMB entities; that he alone "drafted or adapted many of the documents necessary to create and run the hedge fund," including the offering memoranda for MSMB Capital and MSMB Healthcare; that he alone calculated the alleged performance of the MSMB Capital fund; that he alone created the investor

---

[6] The government incorporates by reference the arguments made in its briefs filed in connection with the initial motion on March 27, 2017.  (See Dkt. Nos. 180, 185).

[7] As noted above, the government will not seek to preclude evidence or argument that Shkreli relied on Greebel or other Katten attorneys in connection with the crimes charged in Counts Seven and Eight of the Superseding Indictment, but will seek at the close of evidence to demonstrate that Shkreli is not entitled to a jury instruction regarding advice of counsel on those two counts (and on Counts One to Six should this motion be unsuccessful).  Even when a defendant can clear the initial hurdle to show a factual basis for an advice of counsel defense, such defendant will nonetheless fail to secure an advice of jury instruction at trial if he or she does not introduce evidence sufficient to meet one or more of the required prongs.  See, e.g., Evangelista, 122 F.3d at 117 (the defendant introduced evidence in support of advice of counsel defense at trial, but failed to meet all prongs of test and did not receive jury instruction); Colasuonno, 697 F.3d at 181 (same); Quinones, 417 F. App'x at 67 (same).

statements that were sent out to investors regarding the performance of the funds; and that he alone determined to make a personal loan to himself from MSMB Healthcare in order to pay a portion of the settlement with Merrill Lynch (which was a liability owed by Shkreli personally and by MSMB Capital) and to not provide a written disclosure to investors of that loan.  (Dkt. No. 161-2 at 3; see also Exhibit A).  Shkreli also admits that Greebel and Katten were first retained by him in the summer of 2011, after many of the charged misrepresentations and omissions to MSMB investors (particularly with respect to the MSMB Capital) had been made. (Dkt. No. 161-2 at 8).  And, to the extent that Shkreli consulted with Greebel or other attorneys at Katten regarding the MSMB entities, Shkreli himself contends that such consultation was limited to takeover bids and related work, such as the drafting of nondisclosure agreements; there is no evidence that Greebel or other Katten attorneys made misrepresentations to MSMB investors to obtain or retain investments in either MSMB fund.  (Id. at 8-9).

      In addition, as detailed above, Shkreli himself contends that Katten did not begin to provide him with legal advice in connection with the SEC investigation of MSMB Capital before October 1, 2012, long after Shkreli had made many of his misrepresentations and omissions to MSMB investors, including the false statements in the Liquidation Email about having sufficient reserves to redeem MSMB investments for cash; nor does Shkreli contend that Katten, in connection with the SEC investigation, provided advice to Shkreli about interactions with MSMB investors.  Shkreli has also not identified any additional attorneys, apart from those at Katten, to whom he allegedly went for advice before engaging in the charged conduct with respect to the MSMB Schemes.  It therefore does not appear that Shkreli can meet even the first prong of the advice of counsel defense for the conduct charged in connection with the MSMB Schemes.

The government's initial motion sought a hearing pursuant to FRE 104 to determine whether Shkreli could meet the threshold showing required to introduce evidence and/or argument that Shkreli "relied upon" attorneys with respect to the charged conduct.  (See Dkt. No. 180 at 22-29).  However, as Shkreli has to date proffered no evidence to support an advice of counsel defense with respect to Counts One through Six, the Court may rule to preclude evidence and/or argument without such a hearing.  For example, in United States v. Atias, Cr. No. 14--403 (DRH), 2017 WL 563978 (E.D.N.Y. Feb. 10, 2017), the district court ruled on the government's motion in limine to preclude the defendant from using the term "advice of counsel" with respect to an attorney whom the government argued did not represent the defendant at the time of the charged conduct.  Id. at *2-*3 (finding that "the term 'advice of counsel' should not be employed in referring to" an attorney who did not represent the defendant at the time of the charged conduct because "[d]oing so would be legally inappropriate and likely to mislead the jury").

To the extent that the Court needs additional information to make a ruling on the government's motion to preclude, however, the government seeks a hearing pursuant to FRE 104 to determine whether Shkreli can put forth sufficient evidence to meet the threshold showing that he in fact sought or received advice from Greebel and/or another attorney at Katten in connection with the charged conduct in Counts One through Six.  As noted in the government's prior motion, such a preliminary hearing would facilitate the orderly introduction of evidence during trial by enabling the Court to identify and preclude those portions of the defense that are irrelevant, would require time-consuming or confusing testimony, or would be unfairly prejudicial to the government.  Moreover, if the scope of any permissible defense is established ahead of time, it would greatly reduce the number of objections, sidebars and limiting

instructions related to evidence that Shkreli might seek to introduce in support of his defense.

(See Dkt. No. 180 at 26-29).

## III.   THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT OF IRRELEVANT DETAILS OF SHKRELI'S BACKGROUND AND PLANS IF ACQUITTED

Shkreli has repeatedly invoked irrelevant details about his upbringing and family circumstances, as well as his plans if acquitted, including the possibility he may "find the cure to certain dreaded diseases" someday.  In his severance motion, for example, Shkreli cited his "working-class Albanian parents," his "brilliance and ambition" at Hunter College High School and success in teaching "himself the complex chemistry and biology necessary to learn why certain drugs are effective and others fail" as a child.  (Dkt. No. 161-2 at 2-3.)  During oral argument regarding Shkreli's severance motion, counsel indicated that members of the public often try to take pictures with Shkreli and believe that he may "find the cure to certain dreaded diseases[.]"  (Apr. 7, 2017 Oral Arg't Tr. at 116:13.)  Such details about Shkreli's background and plans if he is acquitted—which are completely divorced from his management of the MSMB Capital and MSMB Healthcare funds or Retrophin—should be excluded under FRE 403.

"District courts have broad discretion to balance the probative value of evidence against possible undue sympathy or bias as well as prejudice." United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009).  Courts also have broad discretion to exclude evidence if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one[.]" FRE 403, Adv. Comm. Notes.  Indeed, when evidence is of limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offenses." Miller, 641 F. Supp. 2d at 167;  see also United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); United States

23

v. Battaglia, Cr. No. 05-774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008)

(precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of

whether Defendant committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447

(D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in

the sympathetic light of a dedicated family man").

       Similarly, evidence or argument about punishment or the consequences of

conviction—including that Shkreli will not have the opportunity to carry out good acts like

curing diseases—is impermissible.  The jury has no role in sentencing here and thus must "reach

its verdict without regard to what sentence might be imposed."  Shannon v. United States, 512

U.S. 573, 579 (1994) (citing Rogers v. United States, 422 U.S. 35, 40 (1975)).  Argument

concerning Shkreli's plans should he be acquitted would "invite[] [jurors] to ponder matters that

are not within their province, distract[] them from their factfinding responsibilities, and create[] a

strong possibility of confusion."  Id.

       Details about Shkreli's parents, his high school academic record and educational

accomplishments as a child, among other details about his background, along with his plans for

the future have no bearing on the issues in this case.  They are not probative of whether Shkreli

made material misrepresentations and omissions to investors in MSMB Capital and/or MSMB

Healthcare about, inter alia, assets under management, monthly performance or liquidity.  They

are also not relevant to whether Shkreli concealed from investors his failed 2011 OREX trade.

Nor are they relevant to whether Shkreli, together with Greebel, attempted to cover up his

massive losses by stealing funds from Retrophin to repay defrauded MSMB investors.

       The only purpose of seeking to admit details about Shkreli's personal background

would be to elicit sympathy for Shkreli as the hard-working son of immigrants who, for a time,

was a rising star in the elite world of hedge funds and biotechnology start-ups.  Indeed, the

defense would attempt to portray Shkreli as a Horatio Alger-like figure who, through hard work

and intelligence, is in a position to do great things if only the jury would ignore the evidence and

base its verdict on sympathy.  The risk of juror confusion and unfair prejudice is manifest

because the jury would be asked to look past Shkreli's behavior and record as an investment

manager.  This sort of emotional appeal to the jury's sympathy has no place in this trial and

should be excluded under Rule 403.

**IV.    THE COURT SHOULD PRECLUDE HEARSAY EVIDENCE OF
        ARBITRATIONS RELATING TO SHKRELI'S SHAM RETROPHIN
        CONSULTING AGREEMENTS**

The Court should preclude as inadmissible hearsay evidence of two separate

arbitrations regarding consulting agreements with Retrophin—one brought a defrauded MSMB

Healthcare investor ("Defrauded Investor SR") and the other brought by a former Retrophin

employee ("Defrauded Employee TK").  Alternatively, the Court should preclude such evidence

as irrelevant and unduly prejudicial.

As set forth in the Superseding Indictment, after Shkreli dissolved MSMB Capital

and MSMB Healthcare and investors demanded the returns on their investments reported to them

by Shkreli, he and Greebel devised a scheme to misappropriate Retrophin assets to repay some of

Shkreli's defrauded investors.  One of the major components of this scheme was the creation of a

series of sham consulting agreements with MSMB Capital and MSMB Healthcare investors (and

Elea Investor GY, as detailed above), which caused Retrophin to reimburse those investors for

their lost investments in Shkreli's funds.  Notably, the defrauded investors who entered into these

sham consulting agreements did not perform any legitimate consulting services for Retrophin.

The Superseding Indictment alleges a total of four sham consulting agreements

(SI at ¶ 32); Defrauded Investor SR's consulting agreement is one of those agreements.  In the

arbitration proceeding brought by Defrauded Investor SR, the arbitrator found that Retrophin

owed money to him pursuant to his consulting agreement.  As set forth more fully in the

government's opposition to Shkreli's Motion for Prompt Brady Disclosure (Dkt. No. 189 at 18-

19), Defrauded Investor TK had done work related to Retrophin at Shkreli's direction, and

Shkreli had promised to personally provide him with Retrophin shares as compensation for his

work.  Shkreli and Greebel attempted to cause Retrophin to repay the obligations that Shkreli

personally owed to Defrauded Employee TK via a consulting agreement with Retrophin, which

was never finalized because Shkreli was fired.  Defrauded Employee TK ultimately sued

Retrophin and Shkreli to recover the money owed to him by Shkreli.  The arbitrator determined

that it was solely Shkreli's personal obligation to provide Retrophin shares to Defrauded

Employee TK, and that Retrophin was not responsible for providing any shares to Defrauded

Employee TK.  Notably, the Superseding Indictment does not include Defrauded Employee TK's

draft consulting agreement as one of the four sham consulting agreements alleged in support of

Count Seven.

Shkreli has alleged that at least some consulting agreements were legitimate based

on the two arbitrations brought by Defrauded Investor SR and Defrauded Employee TK set forth

above.  (See, e.g., Shkreli Mot. for Prompt Brady Discl., Dkt. No. 174-1 at 11) ("[T]he only two

consulting agreements that have proceeded to arbitration have been upheld against Retrophin and

held to be legitimate.")  Shkreli has indicated that he intends to introduce evidence of at least

Defrauded Investor SR's arbitration in his defense:

> Now, the government cavalierly rejects those [consulting]
> agreements as sham agreements and that's just not the case.  Based
> on our investigation, there was at least one arbitration that upheld
> the agreement as being valid and ruled in favor of the applicant in
> that case who was entitled to compensation for the consulting

services he provided under the terms of the consulting agreement
that is charged in the indictment as a sham indictment (sic).

(Apr. 7, 2017 Oral Arg't Tr. at 6:2-9.)

Now, they may not have told the government that but we have
correspondence and the one arbitration that was resolved was
resolved in our favor in the [Defrauded Investor SR] arbitration. So,
this is not as clean cut a case as the government alleges.

(Id. at 32:14-18.)

Such evidence is, however, inadmissible hearsay pursuant to Rules 801 and 802

of the Federal Rules of Evidence.  Hearsay is a "statement that the declarant does not make while

testifying at the current trial or hearing and a party offers in evidence to prove the truth of the

matter asserted in the statement."  FRE 801(c).  Courts have routinely precluded the introduction

of arbitration findings as hearsay.  In Park W. Radiology v. Carecore, for example, the court

noted that the "arbitrator will not be testifying at trial and [the proponent does] not seek to use

the arbitration decision for any purpose other than to prove the substance and outcome of the

arbitration, in other words, for the truth of the matter asserted."  675 F. Supp. 2d 314, 329-30

(S.D.N.Y. 2009).  Arbitration decisions are thus pure hearsay.  Indeed, they are not "subject to

admission as nonhearsay through an exception."  Id.

Courts have further determined that arbitration decisions should be precluded as

irrelevant and unduly prejudicial under Rule 403.  In Carecore, the court held that an arbitration

decision should be precluded because it "could encourage the jury to make a decision [on guilt]

based on the arbitration panel's findings, not on the jury's own deliberations."  Id.  In Cary Oil

Co. v. MG Ref. & Mktg., Inc., 257 F. Supp. 2d 768, 773-74 (S.D.N.Y. 2003), the court found

that the introduction of an arbitration decision could "have a prejudicial effect on the jury's

deliberations, creating an impression that an official decision-maker" has already made a finding

on culpability.  Indeed, the risk of prejudice was so great that the court precluded the

27

introduction of testimony from the arbitration that "essentially serve[d] as a backdoor means to read the arbitration panel's hearsay and unduly prejudicial findings into the record of this case." Id.

In this case, Shkreli's purpose in introducing evidence of the aforementioned arbitrations is transparent and strictly prohibited under the Federal Rules of Evidence and cases like Carecore and Cary Oil. With respect to the arbitration regarding Defrauded Investor SR, the government anticipates that Shkreli will seek to admit evidence of the arbitration to argue that one of the sham consulting agreements alleged in the Superseding Indictment as fraudulent was in fact legitimate, as shown by the findings of a third-party factfinder. The government also anticipates that Shkreli will seek to admit the result of Defrauded Employee TK's arbitration, even though Defrauded Employee TK's consulting agreement is not at issue here and the result of the arbitration actually disfavors Shkreli, to argue generally that the sham consulting agreements alleged in the Superseding Indictment were not fraudulent. These arbitrators' findings, however, are pure hearsay and not subject to any exception to the rule against hearsay. And, as in Carecore and Cary Oil, the findings are also unduly prejudicial because Shkreli will essentially ask the jury to abandon its independent review of the evidence and accept the findings of the arbitrators. On these bases, evidence of both arbitrations should be precluded.

## V.   THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT REGARDING THE GOVERNMENT'S MOTIVES FOR PROSECUTION

The Court should preclude Shkreli from arguing that the government is prosecuting him because "Retrophin needs a criminal conviction to expel Shkreli" or that this case is Retrophin's pending civil action against Shkreli in disguise. (See Dkt. No. 161-2 at 7). In his severance motion, Shkreli argued that Retrophin cooperated with the government to generate a pretext for firing Shkreli because Retrophin had, among other things, "grown tired of

Shkreli's youthful arrogance and tweeting" and become "put off by Shkreli's energy and opinions." Id. Shkreli thus intends to argue that the government serves as a stalking horse for a company desperate to be rid of him.[8]

Courts have precluded defendants from admitting evidence and making arguments regarding the government's motive for bringing charges against them and the timing of those charges as unduly prejudicial and inviting jury nullification. See United States v. Stewart, Cr. No. 03-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude the defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting" the defendant); see also United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (a "selective prosecution defense is an issue for the court rather than the jury"); see generally United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court—in the words of the standard oath to jurors in the federal courts, to render a true verdict *according to the law and the evidence*. We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." (internal quotation marks and citation omitted; emphasis in original)); United States v. Clarke, Cr. No. 3-04, 2005 WL 2645003 (D. Conn. Jul. 19, 2005) (rejecting vindictive prosecution claim where defendant was prosecuted during the pendency of her civil suit against the government).

---

[8]     Notably, Retrophin and Shkreli negotiated and finalized an agreement regarding his departure from Retrophin in October 2014, more than a year prior to the filing of charges in this matter. Thus, a conviction on the charges in this case has no bearing on the future of Shkreli's employment at Retrophin.

Indeed, a challenge to the government's motives for prosecution must be addressed to the Court, and not the jury, because it "raises an issue that is independent of the question of the defendant's guilt or innocence." Stewart, 2004 WL 113506 at *1. Regardless, Shkreli has waived arguments about selective prosecution and the government's motives by not raising them to the Court before trial. See Foy v. United States, 838 F. Supp. 38, 41 n.3 (E.D.N.Y. 1993) (citing United States v. Taylor, 562 F.2d 1345, 1356 (2d Cir. 1977). Moreover, to the extent Shkreli seeks to undermine the credibility of certain potential witnesses due to their connections to Retrophin, he may not "use [his] ability to impeach such witnesses to introduce impermissible evidence of prosecutorial motive." Stewart, 2004 WL 113506 at *1.

Thus, all evidence or argument concerning the reasons for or the timing of Shkreli's arrest and this prosecution is irrelevant to the issues at trial, and would serve no purpose other than to confuse the jury, distract from the evidence at trial and encourage jury nullification. Such evidence and argument should be precluded.

## VI.   THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT REGARDING THE LACK OF ULTIMATE HARM TO INVESTORS

Shkreli should not be permitted to elicit evidence or argue to the jury that, while he made misrepresentations and omissions to the investors in MSMB Capital and MSMB Healthcare, he did not defraud investors because he had a good faith belief that the hedge funds would ultimately be profitable and that the investors would profit from their investment in the funds. Shkreli has repeatedly signaled that he intends to make such an improper argument the centerpiece of his defense. For example, counsel for Shkreli stated the following during oral argument regarding a government motion:

> Our argument from the beginning is that Martin Shkreli never intended to defraud any of the investors. We've spoken to some of the investors. Many of these investors came out smelling like roses

30

> in this case.  This may be the only fraud trial in the history of
> America where I think the investors weren't really defrauded.

(April 7, 2017 Oral Arg't Tr. at 10:12-17.)

   The parties do not dispute that a defendant's good faith belief in the truth of his

statements or representations made to investors may, in the appropriate circumstances, eliminate

the specific intent to defraud required to sustain the charges in this case.  However, the "well-

intentioned belief that a business venture in which a defendant was involved would be successful

and would allow for repayment of money taken from victims does not supply a basis for a

defense that there was a good faith belief that a representation was true."  United States v. Okun,

Cr. No. 08-132, 2009 WL 414009 (E.D. Va. Feb. 18, 2009) (citing United States v. Godwin, 272

F.3d 659, 666-67 (4th Cir. 2001)); United States v. Gole, 21 F. Supp. 2d 161, 166 (E.D.N.Y.

1997) ("The definition of good faith addresses the defendant's belief in the truth of the

representations, and not the defendant's belief as to the ultimate success of the plan.") (citing 1A

Sand,  Modern Federal Jury Instructions, ¶ 44.01); United States v. Berger, 188 F. Supp. 2d 307,

329 (S.D.N.Y. 2002) (finding that a guilty verdict on securities fraud charges based on the fact

that the defendant intentionally caused others to issue false or misleading statements to investors

would be proper regardless of evidence of the defendant's belief that his investment strategy

would be successful financially).

   In fact, in situations where a defendant has improperly presented evidence or

argument of his or her good faith belief in the success of a scheme in which false representations

have been made to victims or investors, the Second Circuit has routinely upheld the issuance of a

"no ultimate harm" charge, which instructs the jury that "a belief of a defendant, if such belief

existed, that ultimately everything would work out so that no one would lose any money does not

require a finding by you that he acted in good faith.  No amount of honest belief on the part of a

defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by [Shkreli]." United States v. Leonard, 529 F.3d 83, 91 (2d Cir. 2008) (finding that instruction in a securities fraud trial was appropriate where the defendants, who had defrauded investors in a movie by misleading those investors about how investment monies would be spent, had argued at trial that they had a good faith belief that the movie would be completed); United States v. Levis, Cr. No. 10-4819, 2012 WL 2914118, *3 (2d Cir. Jul. 18, 2012) (finding that instruction was appropriate where the defendant, who had made misrepresentations regarding the independent valuation of his company to investors, had argued at trial that he did not believe any harm would befall investors).  Often the instruction is given when this improper argument arises at trial.  Where it is clear prior to trial, as is the case here, that the defense intends to advance an improper legal theory, there is no reason to wait for the jury to hear the argument in opening statements (during which courts generally prefer minimal objections) to trigger the curative instruction.  Such an argument should be precluded in advance of trial.

Here, the government anticipates that, in connection with the MSMB Capital and MSMB Healthcare schemes, the jury will hear evidence that, among other things, Shkreli attempted to pay off investors in those funds and thus avoid the consequences of his material misrepresentations and omissions to those investors by paying them money and/or awarding them shares in Retrophin through settlement and sham consulting agreements.  The government anticipates that Shkreli will seek to establish that when these shares in Retrophin were eventually sold, a number of the defrauded investors profited on their investments in either MSMB Capital or MSMB Healthcare.  Based on counsel's arguments at the April 7, 2017 hearing in this case, it

32

is clear that Shkreli seeks to argue that his attempts to pay back investors after they were

defrauded is evidence of his good faith.

   However, any evidence that Shkreli may have believed that investors would come

out "smelling like roses" is not relevant to whether he knowingly made misrepresentations and

omissions to those investors in connection with their investments in MSMB Capital and MSMB

Healthcare.  Accordingly, evidence of any eventual profits made by investors and argument that

such profits is evidence of good faith should be precluded.

## VII. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT REGARDING SHKRELI'S PRIOR GOOD ACTS OR LACK OF CRIMINAL HISTORY

   To the extent Shkreli may seek to present evidence or argument concerning his

prior commission of "good acts," including his alleged intent to help the sufferers of devastating

diseases like muscular dystrophy, or offer proof of his lack of prior criminal history, he should be

precluded from doing so.  Specific-act propensity evidence is no more admissible to refute a

criminal charge than it is to establish one.

   It is settled law that "[a] defendant may not seek to establish his innocence . . .

through proof of the absence of criminal acts on [other] specific occasions." United States v.

Scarpa, 897 F.2d 63, 70 (2d Cir. 1990).  Similarly, while a defendant may offer general

testimony from a character witness about his reputation for a "pertinent trait of character," or the

witness's opinion of Shkreli regarding that trait, see FRE 404(a)(2)(A) & 405(a), a defendant can

neither testify nor offer other proof to establish specific acts in conformity with that trait that are

not an element of the offense.  See, e.g., United States v. Benedetto, 571 F.2d 1246, 1249-1250

(2d Cir. 1978) (defense-proffered character evidence of the defendant's specific acts improperly

admitted because "character evidence has long been admissible only in the form of reputation

and not in the form of a recitation of good or bad acts"); United States v. Rivera, Cr. No. 13-149

33

(KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving).

Indeed, evidence that a defendant lacks a criminal history has been held impermissible under Rule 405(a) of the Federal Rules of Evidence.  See Gov't of Virgin Islands v. Grant, 775 F.2d 508, 512 (3d Cir. 1985).  In Grant, the defendant "attempted to testify that he had never been arrested or charged with a crime."  Id. at 510.  The trial court excluded this testimony as improper character evidence and refused to give a character evidence charge.  Id. On appeal, the Third Circuit noted that "testimony as to the lack of prior bad acts is, in essence, testimony as to multiple instances of good conduct, and its admission would appear to violate a strict reading of Rule 405(a)."  Id. at 512.  "In addition, this kind of testimony is generally less probative of good character than general reputation or opinion evidence, for one's good reputation presumably reflects not only the absence of specific bad acts, but also one's good acts and general public conduct.  Indeed, testimony that one has never been arrested is especially weak character evidence; a clever criminal, after all, may never be caught."  Id. (citing Michelson v. United States, 335 U.S. 469, 482 (1948)).  The Third Circuit found "no reason to stretch" the character evidence rules "to make testimony as to absence of an arrest record sufficient to trigger a character charge" by admitting the evidence.  Id.  It thus held that "testimony as to an absence of prior arrests does not, standing alone, constitute evidence of good character admissible as such under Rule 405(a), and thus does not entitle the accused to a character evidence charge."  Id.

In his proposed list of names and places to be used by the Court during voir dire, Shkreli has included, among others, Joshua Frase, a young man who lost his life-long battle with myotubular myopathy in 2010.  In various statements made to investors and others, Shkreli

34

repeatedly cited Joshua Frase as an inspiration and his devastating disease as one that Shkreli wished to tackle.  Furthermore, Shkreli stated repeatedly to investors that Retrophin's purpose was to find a cure for Duchenne Muscular Dystrophy, a genetic disorder characterized by progressive muscle degeneration and weakness.  In this trial, Shkreli may seek to admit evidence related to Mr. Frase and Shkreli's alleged efforts to find treatments for such diseases as myotubular myopathy or Duchenne Muscular Dystrophy.  The evidence could include, for example, information about or visual depictions of the effects of these diseases.  Such evidence would be highly prejudicial and distract the jury from the evidence relevant to the charges in this case.

Moreover, Shkreli—without testifying—might seek to admit evidence of his lack of prior criminal history.  Any such evidence or argument would constitute specific instances of prior good acts or attempted good acts, or the lack of commission of other bad acts, that should be precluded.

## CONCLUSION

For the foregoing reasons, the government respectfully submits that the foregoing motions in limine should be granted.


Dated:  Brooklyn, New York
        May 31, 2017

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York


_____/s/_____
Jacquelyn M. Kasulis
Alixandra E. Smith
G. Karthik Srinivasan
Assistant U.S. Attorneys
(718) 254-7000


cc:   Clerk of the Court (KAM)
      Defense Counsel (By ECF and Email)