JMK:AES/GKS
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                           15 CR 637 (KAM)

MARTIN SHKRELI,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO PRECLUDE AND/OR MODIFY DEFENDANT'S PRIOR STATEMENTS

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
G. KARTHIK SRINIVASAN
Assistant U.S. Attorneys
      (Of Counsel)

The government respectfully submits the following response to the defendant Martin Shkreli's motion to preclude and/or modify certain of Shkreli's prior sworn statements that the government has identified to counsel for Shkreli that it intends to admit in its case-in-chief.  (See Dkt. No. 229 ("Shkreli Br.")).  As set forth in more detail below, Shkreli argues that (1) certain of his prior sworn statements are not admissible because such statements are "irrelevant" pursuant to Federal Rule of Evidence ("FRE") 403, and (2) certain of his prior sworn statements should be modified to include additional self-serving statements pursuant to FRE 106. (Shkreli Br. at 1).  Shkreli's arguments ignore the law and the purpose of the government's disclosure and should be rejected in their entirety.

## I.   **BACKGROUND**

On May 26, 2017, the government provided counsel for Shkreli with a 14-page chart detailing statements made by Shkreli under oath in prior proceedings and/or to law enforcement that the government might potentially introduce in its case-in-chief.  (See Dkt. No. 229, Exhibit 1).  The statements were drawn from the following sources: sworn testimony by Shkreli before the Securities and Exchange Commission ("SEC") on October 12, 2011, August 7, 2013 and February 24, 2014; sworn testimony by Shkreli in a Financial Industry Regulation Agency ("FINRA") proceeding between Shkreli, MSMB Capital Management LP and Merrill Lynch on May 15, 2012; and statements by Shkreli to the United States Attorney's Office ("USAO") and the Federal Bureau of Investigation ("FBI") at a meeting on January 29, 2015. The statements made by Shkreli to the SEC and in the FINRA proceeding were made during the charged conspiracy period (September 2009 to September 2014, see Superseding Indictment ("SI") ¶ 7).  The government further advised defense counsel that it may either introduce or refer to additional statements made by Shkreli during the defense case and/or during the government's rebuttal case.

1

## II.   LEGAL STANDARD

### A.   Federal Rules of Evidence 401 and 403

FRE 401 defines "relevant evidence" as evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Relevant evidence generally is admissible, see FRE 402, and there is a "very low standard for relevance." United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008); see, e.g., United States v. Quattrone, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").

Relevant evidence may be excluded based on the potential for unfair prejudice only when the risk of unfair prejudice "substantially outweighs" its probative value.  FRE 403. The Supreme Court has observed that "[t]he term 'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997).  Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).  "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair." Costantino v. Herzog, 203 F.3d 164, 174 (2d Cir. 2000) (emphasis in original). "The prejudice resulting to defendants from the fact that introduction of" relevant evidence is "damaging to their case is, of course, not the kind of prejudice against which Fed. R. Evid. 403 protects defendants." See United States v. DeLillo, 620 F.2d 939, 947 n.2 (2d Cir. 1980).

A trial judge's evidentiary rulings, including determinations of relevance and assessments of whether the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, are reviewed only for abuse of discretion.  See, e.g., United States v. Abreu, 342 F.3d 183 (2d Cir. 2003); United States v. Khalil, 214 F.3d 111, 122 (2d Cir. 2000).  "[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational."  United States v. Awadallah, 436 F.3d 125, 131 (2d Cir. 2006).

## B.   Admission of Defendant's Statements

A defendant's "own statement, if offered against him, is not hearsay."  United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982).  FRE 801(d)(2) provides that a statement is not considered hearsay if the "statement is offered against a party and is … the party's own statement."  United States v. Gotti, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006).  Statements made by a defendant are generally admissible "regardless of whether such statements were against his interest when made."  Id.  However, when a defendant—as opposed to the government—seeks "to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."  United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982).

## C.   Best Evidence Rule (FRE 1002)

Federal Rule of Evidence 1002, also known as the "best evidence rule," states that "[a]n original writing, recording or photograph is required in order to prove its content unless these rules or a federal statute provide otherwise."  FRE 1002.  However, FRE 1002 does not apply where the testimony or other evidence at issue is not offered to prove the contents of a writing.  See, e.g., Davis v. Peake, No. 08 CV 3570 (KTD), 2011 WL 4407551, at *5 (S.D.N.Y. Sept. 22, 2011), aff'd, 505 F. App'x 67 (2d Cir. 2012) ("The Best Evidence rule does not apply because [the proponent] is not attempting to prove the contents of a writing."); Bruce Lee

Enterprises, LLC v. A.V.E.L.A., Inc., No. 10 CV 2333 (KMW), 2013 WL 822173, at *7
(S.D.N.Y. Mar. 6, 2013) (finding, in connection with rejecting the applicability of the best
evidence rule, that the moving party "is not attempting to prove the contents of a particular
writing, but rather providing testimony regarding [the witness]'s recollection of what rights were
transferred."); In re TerreStar Corp., No. 12 CV 857 (RA), 2013 WL 1767068, at *5 (S.D.N.Y.
Apr. 24, 2013) ("Rule 1002 is inapplicable, as the declarants are not trying to prove the contents
of a writing.").

> ### D.   Rule of Completeness (FRE 106)

Federal Rule of Evidence 106, also known as the "rule of completeness," states
that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may
require the introduction, at that time, of any other part—or any other writing or recorded
statement—that in fairness ought to be considered at the same time."  FRE 106.  The Second
Circuit has made clear, however, that the rule does not provide a defendant with a blanket
opportunity to offer his own prior statements just because the government has introduced the
defendant's inculpatory statements.  See United States v. Terry, 702 F.2d 299, 314 (2d Cir. 1983)
("Rule 106 does not render admissible evidence that is otherwise inadmissible.").  Rather, a
defendant must demonstrate that the omitted portion of the hearsay statement is "necessary to
explain the admitted portion, to place the admitted portion in context, to avoid misleading the
jury, or to ensure fair and impartial understanding of the admitted portion."  United States v.
Johnson, 507 F.3d 793, 796 (2d Cir. 2007) (internal quotations and citations omitted).

"The completeness doctrine does not, however, require the admission of portions
of a statement that are neither explanatory of nor relevant to the admitted passages."  United
States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999) (citations omitted).  Moreover, a defendant's
self-serving, exculpatory statements are inadmissible hearsay, and he or she cannot use the rule

of completeness as "a mechanism to bypass hearsay rules for any self-serving testimony."

United States v. Gonzalez, 399 Fed. Appx. 641, 645 (2d Cir. 2010).  A self-serving statement is

any statement that "tends to reduce the charges or mitigate the punishment for which the

declarant might be liable."  Williamson v. United States, 512 U.S. 594, 618 (1994).

　　　　　For example, additional portions of a defendant's statement that provide "context

only insofar as [they] represents [the defendant's] self-serving attempts to shoehorn after-the-fact

justifications for his actions into his descriptions of his actions … [are] not the type of material

envisioned by Rule 106."  United States v. Lumiere, No. 16 CR 483 (JSR), 2017 WL 1391126,

at *6 (S.D.N.Y. Apr. 18, 2017).  Similarly, statements that "offer[] an alternative theory of the

evidence" are not "necessary to clarify or explain" a defendant's statements about the charged

crimes.  United States v. Blake, 195 F. Supp. 3d 605, 610-11 (S.D.N.Y. 2016).

### E.　　Government's Right to Present Evidence at Trial

　　　　　The Second Circuit has expressly held that "a criminal defendant may not

stipulate or admit his way out of the full evidentiary force of the case as the government chooses

to present it."  United States v. Salameh, 152 F.3d 88, 122 (2d Cir. 1998) (quoting Old Chief v.

United States, 519 U.S. 172, 187-88 (1997)) (citation omitted).  In other words, "the Government

generally has a right to present evidence of a fact that a defendant would prefer to admit, so as to

establish the 'human significance' of the fact and 'to implicate the law's moral underpinnings.'"

United States v. Velazquez, 246 F.3d 204, 211 (2d Cir. 2001) (quoting Old Chief, 519 U.S. at

187-88); see also United States v. Gantzer, 810 F.2d 349, 351 (2d Cir. 1987) (a "party is not

obliged to accept an adversary's 'judicial admission' in lieu of proving the fact . . . particularly in

the context of a criminal prosecution where the accused seeks to stipulate to an element of the

crime charged"); 9 Wigmore, Evidence § 2591 at 824 (Cadbourn Rev. 1981) ("a colorless

5

admission by the opponent may sometimes have the effect of depriving the party of the

legitimate moral force of his evidence").

    The Supreme Court has provided a compelling rationale for permitting parties to

present all the evidence they possess, rather than simply rely on admissions:

> Jury duty is usually unsought and sometimes resisted, and it may be as difficult for
> one juror suddenly to face the findings that can send another human being to prison,
> as it is for another to hold out conscientiously for acquittal.  When a juror's duty
> does seem hard, the evidentiary account of what a defendant has thought and done
> can accomplish what no set of abstract statements ever could, not just to prove a
> fact but to establish its human significance, and so to implicate the law's moral
> underpinnings and a juror's obligation to sit in judgment.  Thus, the prosecution
> may fairly seek to place its evidence before the jurors, as much to tell a story of
> guiltiness as to support an inference of guilt, to convince the jurors that a guilty
> verdict would be morally reasonable as much as to point to the discrete elements of
> a defendant's legal fault.
>
> But there is something even more to the prosecution's interest in resisting efforts to
> replace the evidence of its choice with admissions and stipulations, for beyond the
> power of conventional evidence to support allegations and give life to the moral
> underpinnings of law's claims, there lies the need for evidence in all its particularity
> to satisfy the jurors' expectations about what proper proof should be. . . .  A
> prosecutor who fails to produce [an essential piece of evidence], or some good
> reason for his failure, has something to be concerned about.  If jurors' expectations
> are not satisfied, triers of fact may penalize the party who disappoints them by
> drawing a negative inference against that party.  Expectations may also arise in
> jurors' minds simply from the experience of a trial itself.  If suddenly the
> prosecution presents some occurrence . . . by announcing a stipulation or admission[
> ] the effect may be like saying, "never mind what's behind the door," and jurors
> may well wonder what they are being kept from knowing. . . .

Old Chief, 519 U.S. at 188 (internal quotation marks, bracketed text, citation and footnote

omitted).

III.    **ARGUMENT**

    A.    **Statements Shkreli Seeks to Exclude Are Relevant and Admissible**

        1.    **Statements Made to the SEC That Shkreli Claims Were "Deceptive"**

Shkreli contends that the government seeks to admit Statements 1, 39 and 45 "for the purpose of showing some attempt by [] Shkreli to deceive the SEC" and, because the Superseding Indictment ("SI") does not allege that Shkreli made false statements to the SEC, Statement 1 should be precluded pursuant to FRE 403.  (Shkreli Br. at 2, 6-7).  Shkreli further contends these statements are not "relevant to proving any element of the crimes alleged in the indictment."  (Id.).[1]

Shkreli's argument that these three statements are not "relevant" to the charged crimes is without merit, as these statements are all directly related to the crimes charged in the indictment and meet the "very low standard" for relevance pursuant to FRE 403.  See Al-Moayad, 545 F.3d at 176.  In Statement 1, which Shkreli made in October 2011, Shkreli states that the alleged assets under management ("AUM") for MSMB Healthcare are $25 to $40 million.  Shkreli is charged with wire fraud, conspiracy to commit wire fraud, and conspiracy to commit securities fraud in connection with, inter alia, misrepresentations and omissions that Shkreli made to investors in MSMB Healthcare.  (See SI ¶¶ 16-20, 48-54).  At trial, the government expects to introduce evidence that Shkreli made statements similar to Statement 1 about MSMB Healthcare's AUM to investors and that such statements—which the government will demonstrate were false—were important to the investors' decision to entrust their money with Shkreli.  The fact that Shkreli made a similar false statement about MSMB Healthcare's

---

[1] Shkreli makes similar arguments with respect to Statements 2 and 3.  (Shkreli Br. at 2).  While these arguments are meritless, the government has determined that it will not seek to introduce Statements 2 and 3 in its case-in-chief.

AUM to the SEC corroborates the investors' expected testimony that Shkreli made similar false statements—many of which were made verbally—to them about MSMB Healthcare's AUM. Additionally, Statement 1, which was made during the time period charged in Counts Four to Six, evidences Shkreli's efforts to further the charged crimes by attempting to hide the actual AUM of the fund. Consequently, Statement 1 is directly relevant to the charged crimes in Counts Four through Six of the Superseding Indictment.

In Statement 39, Shkreli responds to questions about the September 2012 wind-down email, which is explicitly referenced in the Superseding Indictment as the "Liquidation Email" (see SI ¶¶ 15, 18), and the subsequent process for redeeming the investments made by MSMB Capital investors. Shkreli responds by describing the process of winding down MSMB Capital and MSMB Healthcare—"every MSMB entity, both MSMB entities, every one was redeemed for shares"—and then asserts that "no one asked for a cash payout." Again, Shkreli is charged with wire fraud, conspiracy to commit wire fraud and conspiracy to commit securities fraud in connection with, inter alia, misrepresentations and omissions that Shkreli made to investors in both MSMB Capital and MSMB Healthcare, including misrepresentations and omission regarding the redemption of investors' funds. (See SI ¶¶ 8-20, 41-54). The government expects to introduce at trial the Liquidation Email, in which Shkreli falsely represents to MSMB Capital and MSMB Healthcare investors that their investments may be redeemed either in cash or in Retrophin shares, as well as testimony from multiple investors about requests to redeem their investments in cash following their receipt of that email. The government anticipates that at least one of the investors will testify that Shkreli made a statement similar to Statement 39—which the government will prove was false—in an attempt to justify the use of Retrophin's shares in the settlement agreements of various MSMB Capital and MSMB

Healthcare investors orchestrated by Shkreli and others in 2013.   Thus, Statement 39 corroborates the expected testimony of at least one government witness regarding Shkreli's false statement to him that all MSMB Capital and MSMB Healthcare investors redeemed their investments for Retrophin shares.  As a result, Statement 39 is directly relevant to the charges in Counts One through Seven of the Superseding Indictment.

Finally, in Statement 45, Shkreli states that both MSMB Capital and MSMB Healthcare purchased shares in Retrophin.  As alleged in the Superseding Indictment, and as the government expects to prove at trial, Shkreli lost all of the remaining investments in MSMB Capital in the failed OREX trade prior to the creation of Retrophin; as a result, MSMB Capital never invested in Retrophin.  (See SI ¶ 25).  Subsequently, when Shkreli wanted to pay back MSMB Capital investors using Retrophin shares in the months after the Liquidation Email, he and others backdated documents in order to create a fabricated interest in Retrophin for MSMB Capital.  (See SI ).  As a result, Statement 45—in which Shkreli repeats the false narrative that MSMB Capital invested in Retrophin—is directly relevant to the charges in Counts One, Two, Three and Seven of the Superseding Indictment.

In addition to suggesting that these three statements are not relevant, Shkreli also contends that Statements 1, 39 and 45 should be precluded because the "only reason" the government would seek to introduce such statements would be to show that Shkreli was "inaccurate or deceptive to the SEC" and "the government has not sought to use any alleged misrepresentations to the SEC as part of its FRE 404(b) application."  (Shkreli Br. at 2, 6-7).  As detailed above, the statements are relevant to the charged crimes, and are admissible as direct evidence.  The government agrees with Shkreli that these three statements contain false information, and the government intends to demonstrate this during trial.  However, the

9

government is not introducing the statements for the purpose of proving that Shkreli committed a separate crime by lying to the SEC, and will not argue that Shkreli committed a separate crime by lying to the SEC.  Rather, the government will seek to admit Shkreli's statements as evidence in support of the charges – namely, that Shkreli in fact made false statements to investors and others about the AUM of MSMB Healthcare; about the ability of investors to get cash redemptions and the number of investors who redeemed their investments for Retrophin shares; and about whether MSMB Capital actually invested money in Retrophin.

### 2.    Statement Regarding Shkreli's Home and Business Addresses

Shkreli contends that Statement 4, in which he states his home address and business address, should be precluded because there are "other, more easier mechanisms for the Government to introduce that information."  (Shkreli Br. at 2).[2]  To date, Shkreli has not offered to stipulate to these facts.  Moreover, even if Shkreli were to offer to stipulate to such facts, a defendant "may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it."  Salameh, 152 F.3d at 122.  There is a considerable difference between an address that is listed in a document—and the government expects that Shkreli may well dispute the accuracy of or, more importantly, his authorship of, certain documents—and a statement by the defendant himself about the addresses at which he lives and works.  Consequently, Shkreli's argument is without merit.

---

[2] Shkreli also suggests that this statement might be used to support a contention that Shkreli was attempting to mislead the SEC (Shkreli Br. at 2); based on the current information available to the government, this is not an argument that the government anticipates it will make.

**3.     Statements Related to Elea Capital Management**

Shkreli contends that Statements 6, 7 and 44 should be precluded pursuant to FRE 403 because Shkreli's "conduct while he was operating Elea Capital" is not the "subject" of the Superseding Indictment.  (Shkreli Br. at 3).  This argument is without merit.

As detailed at length in the government's motions in limine, evidence related to Shkreli's operation of, subsequent representations about and repayment of investors in Elea Capital Management ("Elea") is direct evidence of the charged crimes.  (See Dkt. No. 230, at 2-3, 8-11).  Specifically, as alleged in the Superseding Indictment, Shkreli made misrepresentations to MSMB Capital and MSMB Healthcare investors about his prior success as a portfolio manager, and failed to explain that his operation of Elea resulted in a loss of all of the funds invested in Elea, as well as resulted in a $2.3 million judgment against him.  See SI ¶¶ 8, 16. The government expects that investors will testify that Shkreli's stated prior success in the industry was important to them in deciding to invest in MSMB Capital and/or MSMB Healthcare, and that they would not have agreed to invest with Shkreli had they known that Shkreli had run a hedge fund that was closed because Shkreli had lost all of the investments in that fund.  In addition, Shkreli used a sham consulting agreement to repay Elea Investor GY using funds stolen from Retrophin.  (See SI ¶ 32).  As a result, Statements 6, 7 and 44—in which Shkreli states that he founded and was the sole portfolio manager for Elea; that Elea was shut down as a result of trading losses; and that investors in Elea lost all of their money—are relevant to Counts One to Seven of the Superseding Indictment and admissible pursuant to FRE 403. Quattrone, 441 F.3d at 188.[3]

---

[3] The government notes that Shkreli did not seek to preclude all statements that mention Elea; specifically, Statements 9 and 15 discuss the fact that Shkreli hired counsel to prepare documents for Elea.  In addition, Shkreli proposed modifications to Statements 31 and 32 that added references to Law Firm E&C's work in connection with Elea.  Shrekli's positions on Statements

4.      **Statements Related to Shkreli's Failed OREX Trade for MSMB Capital**

Shkreli contends that Statements 13 and 17—in which Shkreli discusses his failed OREX trade, which resulted in the loss of all remaining investor money in MSMB Capital in February 2011—should be precluded pursuant to FRE 403 because "the OREX losses are not in dispute" and the statements "do not shed any light on the questions of fact for the jury." (Shkreli Br. at 3). This argument is without merit.

First, the failed OREX trade clearly meets the "very low standard" for relevance pursuant to FRE 403. See Al-Moayad, 545 F.3d at 176. The trade, which is detailed in the Superseding Indictment, was executed by Shkreli on February 1, 2011, and resulted not only in the loss of all remaining investments in the MSMB Capital fund, but in a $7 million debt owed by Shkreli and MSMB Capital to Merrill Lynch. (See SI ¶¶ 11-12). Following the trade, Shkreli failed to advise the MSMB Capital investors that he had lost all of their money in an attempt to prevent redemptions. Instead, as alleged in the Superseding Indictment, Shkreli continued to send out fabricated performance updates to investors that touted profits of as high as forty percent since inception. (See id.). Moreover, the fact that Shkreli lost all of the funds in MSMB Capital via the failed OREX trade led directly to his creation of a fabricated interest in Retrophin for MSMB Capital, which allowed Shkreli to loot Retrophin in order to repay defrauded MSMB Capital investors (See SI ¶¶ 22-25). As a result, the details of the OREX trade and the impact of that trade on MSMB Capital are relevant to Counts One, Two, Three and Seven.

Second, although Shkreli argues that the circumstances of the OREX trade are "not in dispute," Shkreli has not to date offered to stipulate to those circumstances. Moreover,

---

9, 15, 31 and 32 are inconsistent with his position that Statements 6, 7 and 44 should be precluded as irrelevant.

even if Shkreli were willing to stipulate to the fact that he lost all of the remaining money invested by MSMB Capital in connection with the OREX trade, he "may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it." Salameh, 152 F.3d at 122.  A stipulation to the details of the OREX trade would pale in comparison, in terms of evidentiary force, to statements made by Shkreli himself that he executed the trade and that it resulted in the complete loss of funds in MSMB Capital.  Most importantly, the introduction of Shkreli's own statements on this subject demonstrate his knowledge of the trade and its impact on and consequences for MSMB Capital.

### 5.    Statement Related to Merrill Lynch Settlement Agreement

Shkreli contends that Statement 33 is "essentially Shkreli being asked about the contents" of the settlement agreement with Merrill Lynch, and should be precluded because it "does not satisfy the Best Evidence Rule" as the government could simply put into evidence the settlement agreement itself.  (Shkreli Br. at 5).  Shkreli's argument fails because the government is not seeking to introduce Statement 33 to prove that the settlement agreement in fact contains particular content, but rather to show that Shkreli understood a representation that had been made in the Merrill Lynch settlement agreement, and confirmed that it was accurate.

Specifically, in Exhibit A to the settlement agreement in question, there is a schedule of assets and liabilities for the "MSMB Parties as of September 4, 2012," including MSMB Capital.  (See Merrill Lynch Settlement Agreement, attached hereto as Exhibit 1, at Exhibit A).  The schedule reflects that the assets and liabilities of MSMB Capital are zero.  In Statement 33, Shkreli is asked whether that representation is accurate, and he agrees.  Thus Statement 33 is not being introduced to show that the settlement agreement states that the assets and liabilities of MSMB Capital are zero, but rather to show that Shkreli himself agrees that the representation in the document that the assets and liabilities of MSMB Capital were zero as of

13

the date of the document (September 4, 2012).  As a result, the Best Evidence Rule is

inapplicable here, and Statement 33 is admissible.  See, e.g., Davis, 2011 WL 4407551, at *5

("The Best Evidence rule does not apply because [the proponent] is not attempting to prove the

contents of a writing.").

### 6. Statement Containing the Word "Probably" or "Could Have"

Shkreli seeks to preclude introduction of Statement 37 because, in his response to

questions about the source of information in the Desert Gateway Form 8K, Shkreli uses the term

"probably" twice and the phrase "could have" once.  (Shkreli Br. at 6).  Shkreli then contends

that, if he had tried to provide this answer during testimony at trial, it "would prompt an

objection that would likely be sustained"; he further contends that this renders Statement 37

"irrelevant and inadmissible."  (Id.).  Shkreli's argument is without merit.

First, Statement 37 is admissible as relevant.  In it, Shkreli is discussing which

Retrophin employees provided information for an SEC filing for Desert Gateway, the shell

company that was used by Shkreli and others to transform Retrophin into a public company via a

reverse merger.  The SEC filing in question was made on December 12, 2012, the date that the

merger was completed, and contains information about Retrophin, including representations

about the number of shares controlled by Shkreli, the company's financial health and prospects,

and related parties.  In Statement 37, Shkreli states that he contributed "technical information" to

the SEC filing on behalf of Retrophin, and that two other individuals may also have provided

such information.  Shkreli's statements about which individuals contributed information to an

SEC filing on behalf of Retrophin at the time of the merger is relevant to Count Eight, which

alleges that the two individuals—both of whom are Fearnow Share recipients—were in fact

employees or affiliates of Retrophin at the time that they received Fearnow Shares (which were

directed to be issued to those two individuals directly following the merger).  (See SI ¶¶ 36-40).

Shkreli offers no legal basis for his argument that a statement by a defendant is somehow rendered "irrelevant" because, if a defendant was testifying on the same subject at trial, the language used <u>might</u> prompt an objection (ostensibly for speculation) that <u>might</u> be sustained. Shkreli's statement is admissible as a statement of a party opponent pursuant to FRE 801(d)(2), see <u>Gotti</u>, 457 F.Supp.2d at 397; the fact that Shkreli qualified some of his statements with the word "probably" goes solely to the weight that the jury may assign to the statement, and not to its admissibility.  For example, counsel for Shkreli is free to argue, once the statement is admitted, that Shkreli was merely speculating about who else contributed information to that SEC filing.

### 7. <u>Statement Regarding Shkreli's Removal As Retrophin CEO</u>

Shkreli contends that Statement 40 should be precluded as "irrelevant" because Shkreli is discussing his removal as Retrophin CEO and such removal "sheds no light on whether he committed any of the crimes alleged in the indictment."  (Shkreli Br. at 6).  Shkreli also notes that he will contend at trial "that [Shkreli's] removal was in violation of his employment agreement."  (<u>Id.</u>).

As detailed in the government's motions <u>in</u> <u>limine</u>, Shkreli has repeatedly stated, in legal filings and at oral argument, that he believes that the government is prosecuting him because Retrophin "needs a criminal conviction to expel Shkreli," and that he was improperly removed as CEO from Retrophin.  (<u>See</u> Dkt. No. 230 at 28-30).  While the government has moved to preclude Shkreli from eliciting evidence or arguing about the timing of or reasons for his prosecution, the government nonetheless expects Shkreli to try and cross-examine the government's witnesses about the circumstances of Shkreli's removal; to argue that those circumstances demonstrate that the members of the Retrophin Board of Directors ("Board members") a personal and/or professional grudges against Shkreli; and to further argue that this

dynamic should be considered when evaluating the credibility of the Board members.  Shkreli's

reiteration of this theme in this very motion is further evidence of Shkreli's intent to make his

removal as CEO of Retrophin an issue at trial.  (Shkreli Br. at 6).[4]  As a result, Shkreli's

statements about his removal—specifically, that he ended the conversation in which he was

removed by the Board members as CEO by wishing the Board members good luck (suggesting

the conversation ended on good terms), and that investors in Retrophin were not as supportive of

Shkreli as he thought they would be when he sought their help to try and remain as Retrophin's

CEO—are relevant to counter the narrative that the government expects Shkreli to advance at

trial.  See Quattrone, 441 F.3d at 188 ("[S]o long as a chain of inferences leads the trier of fact to

conclude that the proffered submission affects the mix of material information, the evidence

cannot be excluded at the threshold relevance inquiry.").

> **8.      Statement Regarding Shkreli's Harassment of Fearnow Share Recipient TP**

Shkreli contends that Statement 42, in which Shkreli admits that he telephoned

Fearnow Share Recipient TP and threatened him, should be precluded as "irrelevant."  As

detailed at length in the government's motions in limine, Shkreli's protracted campaign of

harassment against Fearnow Share Recipient TP is direct evidence of the crime charged in Count

Eight, because it shows his desperation to control the Fearnow Shares that had been issued to

Fearnow Share Recipient TP.  (See Dkt. No. 230 at 4-7, 12; SI ¶¶ 36-40).  As such, it is relevant

pursuant to FRE 403.

---

[4] In addition, the government notes that Shkreli did not seek to preclude Statement 47, which
also discusses Shkreli's separation from Retrophin; rather, Shkreli proposed modifying
Statement 47 to include additional statements regarding the Board members' decision to place
Shkreli on leave.  Shkreli's position on Statement 47 is inconsistent with Shkreli's contention
that Statement 40 should be precluded as irrelevant.

Shkreli also argues, without explanation, that Statement 42 is "unduly prejudicial." However, "[t]he prejudice resulting to defendants from the fact that introduction of" relevant evidence is "damaging to their case is, of course, not the kind of prejudice against which Fed. R. Evid. 403 protects defendants." DeLillo, 620 F.2d 939 at n.2. Here, the fact that Shkreli not only asked Fearnow Share Recipient TP to return the shares, but took the extra step to threaten him when he refused to do so, is significant direct evidence of how important it was to Shkreli to have the shares returned to him, and to prevent Fearnow Share Recipient TP from doing damage to the share price of Retrophin shortly after the reverse merger by selling the Fearnow Shares; it is also significant evidence of Shkreli's consciousness of guilt. For these reasons, any risk of prejudice presented by Statement 42 does not "substantially outweigh" its probative value, and it should be admitted. FRE 403; see also Old Chief, 519 U.S. at 180 (evidence should only be excluded as unfairly prejudicial if it would "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged").

## B. Shkreli's Modifications of His Prior Statements Under the Guise of Rule 106 Are Improper and Should be Rejected

Shkreli contends that 23 of the prior statements that the government has indicated it might seek to introduce in its case-in-chief "require additions pursuant to FRE 106" in order to "provide the jury with the full context of the statement and an accurate understanding of [Shkreli's] comments." (Shkreli Br. at 2). Shkreli provides no further argument in support of his proposed modifications other than the stock phrase "[t]his statement requires a modification pursuant to FRE 106," nor does Shkreli cite to any caselaw to support his proposed modifications.

As detailed above, FRE 106 has a very circumscribed purpose: to ensure that when the government seeks to introduce a portion of a defendant's statement, related statements

17

that are "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion" are not omitted.  Johnson, 507 F.3d at 796.  However, the rule "does not render admissible evidence that is otherwise admissible," Terry, 702 F.2d at 314; cannot be used as a "mechanism to bypass hearsay rules" to admit a defendant's self-serving or exculpatory statement, Gonzalez, 399 Fed. Appx. at 645; and "does not [] require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages," Jackson, 180 F.3d at 73.

       The vast majority of Shkreli's proposed modifications seek to employ FRE 106 for exactly these improper purposes.  In many cases, Shkreli proposes appending pages and pages of testimony to relatively short, self-contained statements, allegedly to place the original statements "in context"; to the contrary, such additional testimony is either unnecessary to understand or explain the original statements, or contains self-serving and exculpatory statements that are inadmissible.  The following is a statement-by-statement analysis of Shkreli's proposed modifications.

       **1.**       <u>**Statement 9**</u>

       Statement 9 consists of approximately 27 lines of testimony from the OREX deposition in May 2012 in which Shkreli answers a series of questions about what entity or individual drafted the private offering memorandum for MSMB Capital, as well as whether Law Firm C&E and Auditor Firm RK—who are listed in the offering memorandum as the law firm and auditor working for MSMB Capital—performed services for MSMB Capital between the formation of the fund in 2009 and the failed OREX trade in 2011.  In the statement, Shkreli states that he drafted the private offering memorandum for MSMB Capital based on an earlier

memorandum for Elea, and also admits that Law Firm C&E and Auditor Firm RK did not in fact perform services for MSMB Capital during the 2009-February 2011 time period.

Shkreli seeks to modify the statement by adding more than 60 lines of testimony, almost tripling the length of the original statement.  This additional testimony consists of questions and answers about whether Law Firm C&E and Auditor Firm RK performed work for MSMB entities other than MSMB Capital during time periods other than when MSMB Capital was in operation.  These statements are not "necessary to explain" the original statement, which is the complete discussion of whether Law Firm C&E and Auditor Firm RK performed work for MSMB Capital during the 2009 to February 2011 time period.  See Jackson, 180 F.3d at 73.  As a result, Shkreli's modification should be rejected in its entirety.

### 2.        Statements 10, 20 and 21

Statement 10 consists of approximately eight lines of testimony, in which Shkreli is asked whether Administrator NC ever performed any services for MSMB Capital; Shkreli states that the firm did not.  Statement 20 consists of approximately five lines of testimony in which Shkreli is asked whether Administrator NC or Auditor RK performed any work for MSMB Capital, and Shkreli stated that they did not.  Statement 21 consists of approximately 13 lines of testimony, in which Shkreli is asked whether he informed the MSMB Capital investors that he was not going to retain an auditor, and Shkreli states that he did inform the MSMB Capital investors of that fact in conversations.

Shkreli seeks to modify these three short statements—which stand for the limited proposition that neither Administrator NC nor Auditor RK ever performed any services for MSMB Capital—by appending twelve additional pages of testimony.  Those additional twelve pages of testimony contain statements from Shkreli—many of which are self-serving and

exculpatory—about, inter alia, Shkreli's convoluted and incredible explanation for why he falsely stated in the MSMB Capital offering memorandum that he had in fact hired Administrator NC and Auditor RK for the fund; a recounting of Shkreli's relationship with MSMB Capital DB; Shkreli's personal beliefs that MSMB investors are "really happy" about how their investments ultimately performed; how Co-Conspirator 1 hired Administrator NC for a prior fund; and how Shkreli used an outside fund to value Retrophin.

Shkreli's proposal to modify these three statements makes a mockery of the true purpose of FRE 106. Not only are many of the topics covered in the additional twelve pages irrelevant to the narrow issue of whether Administrator NC nor Auditor RK ever performed any services for MSMB Capital, but those pages are riddled with self-serving and exculpatory statements that seek to excuse or explain Shkreli's clear misrepresentations to MSMB Capital investors about the fund's use of Administrator NC and Auditor RK. Consequently, Shkreli's proposed modifications should be rejected in their entirety. See Lumiere, 2017 WL 1391126, at *6; Gonzalez, 399 Fed. Appx. at 645.

### 3.   Statement 15

The government does not object to the modification proposed by Shkreli to Statement 15.

### 4.   Statement 18

Statement 18 consists of approximately five lines of testimony in which Shkreli is asked whether he ever had trading discretion over Elea Investor JA's money, and responds that he did not. Shkreli's proposed modification would add approximately 36 lines of testimony, both before and after the proposed excerpt. In this additional testimony, Shkreli provides long, self-serving and exculpatory explanations of his relationship with Elea Investor JA, including

that Shkreli and Elea Investor JA "invested together" and that Elea Investor JA "explicit[ly]" promised Shkreli that he would pay Shkreli for successful investment ideas.

The government anticipates that it will demonstrate at trial that not only are these self-serving and exculpatory statements about Elea Investor JA untrue—Shkreli never managed Elea Investor JA's money and was never promised by Elea Investor JA that he would be compensated for successful investment ideas—but that Shkreli made similar statements to MSMB Capital investors in order to justify his representations to those investors that he was managing Elea Investor JA's money at the time that MSMB Capital was in operation, and thus could include Elea Investor JA's assets in the calculation of MSMB Capital's AUM.  Such statements are not permitted to be appended to Statement 18 because they represent an "attempt[] to shoehorn after-the-fact justifications for [Shkreli's] self-serving" and exculpatory statements about MSMB Capital's AUM.  Lumiere, 2017 WL 1391126, at *6.  Moreover, those additional statements are not necessary to understand or explain Statement 18, which is a complete articulation of the idea that Shkreli did not have trading discretion over Elea Investor JA's money.  See Jackson, 180 F.3d at 73.

In addition, the portion of testimony that Shkreli proposes to include that precedes Statement 18 – Page 172, Lines 2-16 – is, taken alone, incomplete and lacks important context. That excerpt starts with the question "I take it that wouldn't have been accurate as of that time?" and it is not clear from the answer that Shkreli provides to what either underlined portion of the question is referring.  In the prior series of questions, Shkreli is shown a document where another individual associated with Shkreli relates that MSMB Capital had an AUM of $125 million in June 2010, and Shkreli denies making that representation; he then gives a long, self-serving answer to why someone might have gotten the misimpression that MSMB Capital had an AUM

of $125 million.  That self-serving answer is the excerpt that Shkreli seeks to append to the beginning of Statement 18.  While Shkreli's modification should be rejected in its entirety for the reasons detailed above, if the modification is permitted, those additional questions and answers should be included (specifically, Page 171, Line 11 to Page 172, Line 1).

     **5.**     **<u>Statement 19</u>**

     Statement 19 consists of approximately five lines of testimony, in which Shkreli is asked what the maximum asset value was for MSMB Capital in December 2010, and responds that the fund never had more than approximately $3 million in assets.  Shkreli's proposed modification would add approximately 30 lines of testimony, in which Shkreli talks about the asset value for an unrelated account known as the Lattice account, and the amount of money that Elea Investor JA allegedly invested based on Shkreli's suggestions that could be considered part of the total assets he personally managed.  None of these additional statements about the separate Lattice account or Shkreli's investment suggestions to Elea Investor JA are necessary to understand or explain the complete answer that Shkreli gave to the question of what was the asset value of the MSMB Capital size itself.  <u>See</u> <u>Jackson</u>, 180 F.3d at 73.  Moreover, for the reasons detailed above in connection with Statement 18, Shkreli cannot use FRE 106 as an end-run around the evidentiary rules in order to admit his own self-serving and exculpatory statements regarding Elea Investor JA.  <u>See</u> <u>Lumiere</u>, 2017 WL 1391126, at *6; <u>Gonzalez</u>, 399 Fed. Appx. at 645.  Consequently, Shkreli's proposed modification should be rejected.

     **6.**     **<u>Statement 22</u>**

     Statement 22 consists of approximately 19 lines of testimony, in which Shkreli is asked whether he drafted the performance updates that were provided to MSMB Capital investors and whether he performed the calculations underlying those updates.  Shkreli's

proposed modification would add approximately 29 lines of additional testimony, in which

Shkreli gives a self-serving and exculpatory explanation for how he calculated the performance

updates provided to MSMB Capital investors.  That explanation includes various excuses for

why the calculations in the performance updates might not be accurate—for example, Shkreli

states "I'm not a professional accountant" and states that he did "my very best job to provide

accurate statements"—as well as false information, including the fact that MSMB Capital "had

private stock in Retrophin."  The additional testimony proposed by Shkreli is not necessary to

understand or explain the complete answer to the questions that Shkreli was asked about <u>whether</u>

he wrote the MSMB Capital performance updates and completed the calculations in those

updates; it is on another topic entirely, which is the question of <u>how</u> he arrived at such

calculations.  <u>See</u> <u>Jackson</u>, 180 F.3d at 73.  Moreover, Shkreli cannot use FRE 106 to admit his

self-serving and exculpatory explanation for how he completed the calculations underlying the

MSMB Capital performance updates, which the government will demonstrate at trial were

inaccurate.  <u>See</u> <u>Lumiere</u>, 2017 WL 1391126, at *6; <u>Gonzalez</u>, 399 Fed. Appx. at 645.

Consequently, Shkreli's proposed modification should be rejected.

### 7.    <u>Statement 23</u>

Statement 23 consists of five lines of testimony—taken from sworn testimony that

Shkreli gave to the SEC on August 7, 2013—in which Shkreli, who previously stated he spoke to

MSMB Capital Investor DB about the OREX trading losses, is asked whether he ever spoke to

any other investors about the OREX trading losses.  In response, Shkreli states that he would

"say" that he spoke to "all of them."

Shkreli's proposed "modification" of Statement 23 is not in fact a modification, as

it does not draw from other testimony that Shkreli gave just prior to or just after Statement 23 on

August 7, 2013—rather, Shkreli proposes to admit 12 additional pages of testimony from a completely separate proceeding on a completely separate date.  Specifically, Shkreli proposes that Statement 23 be "modified" by adding 12 pages of sworn testimony that Shkreli gave on May 15, 2012 during a deposition for the FINRA arbitration.  In these additional 12 pages of testimony, Shkreli is presented by the attorney for Merrill Lynch with a list of phone numbers that ostensibly represent the phone numbers that Shkreli made calls to or received calls from on February 1, 2011, and then on February 2, 2011; Shkreli identified some of the numbers and then discussed a phone call he had with MSMB Capital Investor DB on February 2, 2011 during which Shkreli alleges that the two spoke about the failed OREX trade.

Shkreli provides no caselaw to support the proposition that FRE 106 permits a defendant to "complete" a particular prior statement of the defendant by appending another, completely unrelated statement of that defendant from an entirely different proceeding that took place more than a year before the testimony of the statement in question.  Even assuming Shkreli's approach is permissible, however, Shkreli's submission of additional testimony in conjunction with Statement 23 should be rejected.  The recitation of the individuals with whom Shkreli allegedly spoke on February 1, 2011 and/or February 2, 2011 does not help to complete or explain Shkreli's statement that he spoke to "all" of the MSMB Capital investors about the OREX trading losses, because whether or not Shkreli spoke to an MSMB Capital investor on one of those two days is not dispositive of whether Shkreli ever had a conversation with those investors about the OREX trading losses.  Moreover, the proposed additional testimony includes inadmissible self-serving and exculpatory statements, including a long explanation of Shkreli's conversation with MSMB Capital Investor DB on February 2, 2011, in which Shkreli alleges that MSMB Capital Investor DB was "very sympathetic" and that Shkreli was truthful about the

extent of the OREX trading losses.  As Shkreli cannot admit such self-serving and exculpatory statements, and the additional testimony is not necessary to complete the very narrow question and answer in the original Statement 23, Shkreli's proposed additions should be rejected.  See Jackson, 180 F.3d at 73; Gonzalez, 399 Fed. Appx. at 645.

### 8.    Statement 24

The government does not object to Shkreli's proposed modification to Statement 24.

### 9.    Statements 26, 27, 28, 29 and 30

Statements 26-30 are five short statements that discuss a $775,000 personal loan that Shkreli allegedly made from MSMB Healthcare to himself in order to make a payment to Merrill Lynch in satisfaction of his personal debt to Merrill Lynch.  Those statements detail Shkreli's explanation of the loan itself, along with the facts that he drafted it personally without counsel; that he did not make a disclosure of the loan to investors or consult with counsel about a disclosure; and that, but for the loan, the remaining assets of MSMB Healthcare had been distributed pro rata to investors.  Shkreli seeks to append approximately 7 pages to these original five statements, which include long, self-serving and exculpatory explanations for why he granted himself the loan; why he failed to document the loan; whether he discussed the loan with various investors; his explanation for how the loan was related to Retrophin; etc.  Similar to the discussion of Statements 10, 20 and 21 above, Shkreli's attempt to append multiple pages of testimony to these five succinct statements—none of which is necessary to explain or understand the original statements, and all of which is riddled with self-serving and exculpatory statements that seek to excuse or explain the alleged loan—is antithetical to the purpose of FRE 106.

Consequently, Shkreli's proposed modifications should be rejected in their entirety.  See Lumiere, 2017 WL 1391126, at *6; Gonzalez, 399 Fed. Appx. at 645.

   **10.**  **Statement 31**

    Statement 31 consists of approximately eight lines of testimony, in which Shkreli is asked whether he reviewed the private offering memorandum for MSMB Healthcare before sending it to investors, and whether he had counsel review it.  Shkreli's proposed modification would add approximately 25 lines of testimony, in which Shkreli detailed that Law Firm C&E drafted the private offering memorandum for MSMB Healthcare and that Law Firm C&E drafted the private offering memorandum for MSMB Capital.

    As an initial matter, the additional testimony that Shkreli seeks to append to Statement 31 is extremely misleading—as detailed in Statement 9, Law Firm C&E drafted the offering memorandum for Elea, which Shkreli modified on his own for MSMB Capital (as Law Firm C&E never did any work for MSMB Capital).  Shkreli then further modified the offering memorandum himself for MSMB Healthcare, again without input from Law Firm C&E. Shkreli's additional statements falsely suggest—in contradiction to Shkreli's own testimony at other hearings—that Law Firm C&E drafted the offering memoranda for both funds, and should not be permitted to be appended to Statement 31 for that reason.  In addition, this testimony— which discusses the drafting of and revisions to the MSMB Healthcare private offering memorandum—is not necessary to complete or explain the question of whether Shkreli or counsel reviewed the MSMB Healthcare memorandum before it was circulated to investors.  It is also self-serving and exculpatory, to the extent that Shkreli is suggesting that he had assistance from an attorney in drafting the document.  For these reasons, Shkreli's modification should be rejected.  See Jackson, 180 F.3d at 73; Gonzalez, 399 Fed. Appx. at 645.

11.    **Statement 32**

Statement 32 consists of approximately 15 lines of testimony, in which Shkreli is asked about the process of revising the MSMB Capital offering memorandum to use for MSMB Healthcare, and responds that he completed the revisions himself and that no one else reviewed those revisions.  Shkreli seeks to modify Statement 32 by adding two sentences in which he is asked who drafted the document and Shkreli responds that he is not sure, but he thinks potentially a lawyer from Law Firm C&E.  As discussed in connection with Statement 31 above, Shkreli's proposed modification seeks to conflate two separate subjects—who drafted the memorandum versus who revised and/or reviewed it—in an attempt to add testimony that is not necessary to explain or understand the proposed excerpt.  In addition, the proposed modification would add self-serving and exculpatory statements that suggest that an attorney drafted the MSMB Healthcare offering memorandum when, in fact, the offering memorandum had been drafted for Elea and subsequently modified only by Shkreli.  For these reasons, Shkreli's proposed modification should be rejected.

12.    **Statement 34**

Statement 34 consists of approximately 11 lines of testimony, in which Shkreli is asked about an amendment to a settlement agreement with Merrill Lynch that extended the date of a particular $125,000 payment from December 15, 2012 to March 1, 2013; Shkreli is asked if the extension was necessary because he was unable to make payments by December 15, 2012, and he agrees that he could not make payments by the original due date.  Shkreli's proposed modification would add approximately 31 lines of testimony, in which Shkreli answered questions about whether he ever made the particular $125,000 payment and where the funds for that payment came from.  As part of that additional testimony, Shkreli gives a long, self-serving

27

and exculpatory answer about how Shkreli and Co-Conspirator 1 had foregone payments of salary for Retrophin and that some of those payments may have been used to pay Merrill Lynch; he also suggests that he made part of the payment out of his own personal money and part of it out of MSMB Healthcare via a loan that he had promised to repay.

Shkreli is not permitted to admit his self-serving and exculpatory statements to try and explain payments made to Merrill Lynch.  The government anticipates that the evidence will show at trial that Shkreli, as detailed in the Superseding Indictment, backdated a $900,000 promissory note from Retrophin to MSMB Healthcare in order to steal money from Retrophin, funnel it through MSMB Healthcare, and repay the debt he owed personally to Merrill Lynch (see SI ¶ 20); it will also show that Shkreli looted Retrophin directly to repay the remainder of his personal debt to Merrill Lynch.  Shkreli's attempt to provide an "alternative theory of the evidence" regarding the source of the funds used to repay Merrill Lynch is not permissible pursuant to FRE 106.  Blake, 195 F. Supp. 3d at 610-611.  Moreover, these additional explanations about the source of the funds for that and other payments to Merrill Lynch is not necessary to explain the original excerpt, which focused solely on whether Shkreli had the ability to make the $125,000 payment prior to December 15, 2012.  Jackson, 180 F.3d at 73. Consequently, Shkreli's proposed modification should be rejected.

## 13.    <u>Statement 38</u>

Statement 38 consists of a single question and answer, in which Shkreli is asked whether he would have had sufficient cash to provide cash redemptions to all of the MSMB Capital and MSMB Healthcare investors in September 2012 (following the Liquidation Email) and Shkreli responds that there would not have been enough cash.  Shkreli's modification seeks to append two questions about a different section of the Liquidation Email that discusses

Retrophin's alleged valuation in September 2012.  The testimony that Shkreli seeks to append to Statement 38 is entirely unrelated to the substance of that statement, which focuses only on whether he had sufficient cash for redemptions.  As such additional testimony is not necessary to explain or understand Shkreli's testimony that he did not have enough cash to provide all investors with cash redemptions as promised in the Liquidation Email, Shkreli's modification should be rejected.  See Jackson, 180 F.3d at 73.

### 14.     Statement 41

In Statement 41, Shkreli explained to the USAO and FBI that he left Retrophin pursuant to a settlement agreement in which Retrophin agreed to sell three of its assets to Shkreli.  Shkreli seeks to modify that statement to include information about how Shkreli believed that his employment agreement did not permit him to be fired unless he was convicted of a crime, and how he thought about suing Retrophin for firing him.  Shkreli's proposed modifications to Statement 41 about his own personal feelings and beliefs about his separation from Retrophin are not necessary to explain or understand Shkreli's statement about the terms of the agreement that Shkreli and Retrophin reached.  See Jackson, 180 F.3d at 73.  Consequently, Shkreli's proposed modifications should be rejected.

### 15.     Statement 46

In Statement 46, Shkreli explained to the USAO and FBI that investors in the MSMB entities received monthly statements, and that he calculated the performance of the funds itself.  Shkreli's proposed modification seeks to add statements about the process by which Shkreli completed those calculations; the valuations at which individuals FH and BS allegedly agreed to purchase Retrophin shares; and that Retrophin utilized two outside firms to perform valuations of Retrophin.  None of these additional statements are necessary to explain or

29

understand Statement 46, which doesn't discuss the process by which Shkreli completed the performance calculations, any valuation of Retrophin or what individuals may or may not have purchased Retrophin shares.  Moreover, Shkreli's explanation of his calculation of the performance of the funds is self-serving and exculpatory, for the reasons set forth above in connection with Statement 22.  For these reasons, Shkreli's proposed modifications should be rejected in their entirety.  See Jackson, 180 F.3d at 73; Gonzalez, 399 Fed. Appx. at 645.

    **16.**    **Statement 47**

        In Statement 47, Shkreli explained to the USAO and FBI that he decided which individuals were to receive Fearnow Shares, and that he expected Fearnow Share recipients not to trade those shares.  Shkreli seeks to modify the statement by adding statements on entirely different subjects, including the Retrophin Board members' feelings about whether the reverse merger was the best way to take Retrophin public; that he did not want the Fearnow Share recipients to sell shares during a PIPE transaction (which took place months after the merger, in February 2013); and an attempt Shkreli made to bring everyone at Retrophin "over-the-wall." These additional statements are not necessary to explain or understand Shkreli's statements that he determined the distribution of the Fearnow Shares and expected recipients not to trade them. Moreover, to the extent that Shkreli might suggest that the PIPE transaction was the reason he did not want the Fearnow Share recipients to trade their shares, such a statement is self-serving and exculpatory—the government anticipates that the evidence at trial will show that Shkreli sought to control the Fearnow Shares to control the price and trading of Retrophin stock.  For these reasons, Shkreli's proposed modifications should be rejected in their entirety.  See Jackson, 180 F.3d at 73; Gonzalez, 399 Fed. Appx. at 645.

17.     **Statement 48**

The government has determined not to introduce Statement 48 in its case-in-chief,

and thus the Court does not need to address the modifications proposed by Shkreli to this

statement.

**<u>CONCLUSION</u>**

For the foregoing reasons, the government respectfully submits that

Dated:  Brooklyn, New York
        June 7, 2017

                                        Respectfully submitted,

                                        BRIDGET M. ROHDE
                                        Acting United States Attorney
                                        Eastern District of New York


                                        _____/s/_____

                                        Jacquelyn M. Kasulis
                                        Alixandra E. Smith
                                        G. Karthik Srinivasan
                                        Assistant U.S. Attorneys
                                        (718) 254-7000


cc:     Clerk of the Court (KAM)
        Defense Counsel (By ECF and Email)