

U.S. Department of Justice

United States Attorney
Eastern District of New York

JMK:GKS/AES  
F. #2014R00501

271 Cadman Plaza East  
Brooklyn, New York 11201

July 3, 2017

By Hand and ECF

Hon. Kiyo A. Matsumoto  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, NY 11201

   Re: United States v. Martin Shkreli  
     Criminal Docket No. 15-637 (KAM)

Dear Judge Matsumoto:

   The government respectfully moves this Court for an order limiting extrajudicial statements by the defendant Martin Shkreli and counsel for all parties during the pendency of this trial. Since the empanelment of the jury, Shkreli has engaged with the press—in apparent contravention of the instructions of his lawyers—in the courthouse itself, directly outside the courthouse and on digital media in a manner that risks tainting the jury. In order to protect the public's interest in a fair trial in which the jury will reach a verdict based solely on the evidence presented in the courtroom, the defendant should be restrained from further public comment during the pendency of the trial. In addition, or in the alternative, the government seeks semi-sequestration of the jury.

### I. BACKGROUND

   As this Court is well aware, Shkreli has been an active and deeply divisive media presence for years. Shkreli's numerous controversial public statements were a concern of the parties even before jury selection. Indeed, Shkreli's media persona was cited as a key reason why co-defendant Evan Greebel requested severance of his trial from that of Shkreli. In connection with his severance motion, counsel for Greebel argued at length that Shkreli was likely to disrupt any trial by, inter alia, "attacking prosecutors [and] public figures" and "trying to turn this trial into a circus as part of a deliberate strategy to obtain jury nullification rather than have the jury focus on and carefully consider the evidence." (See Dkt. No. 161).

In response, defense counsel stated vigorously that Shkreli would not create any issues at trial:

> MR. BRAFMAN: . . . Mr. Greebel in his papers -- and one thing I want to assure the Court as a sidebar just for a moment since it's unfortunately in the papers, I represent to Your Honor as an officer of the court whose probably tried 25 cases to verdict in this building, that there will be no disruption of these proceedings by Mr. Shkreli. He's not going to do anything to undermine the integrity of these proceedings, as Mr. Brodsky warns. And I promise you, this case, if Mr. Shkreli goes to trial alone, will have substantially less disruptions and less difficulties than if we have a joint trial. So I just want to make sure that Your Honor understands that, because I was taken aback by some of their arguments.

(Apr. 7, 2017 Oral Arg't Tr. at 43:1-12.)

At the time, based on Shkreli's appropriate behavior in the courtroom during status conferences and other pre-trial hearings, the Court agreed with counsel for Shkreli:

> THE COURT: . . . In terms of the fear that Mr. Shkreli will disrupt this trial, I see no reason to think that he would do that. He's demonstrated nothing but appropriate conduct throughout all of his appearances here. And, you know, he's entitled to his opinions. I think you as his attorney would be responsible for counseling him about the downside of making certain kinds of statements or engaging in certain types of conduct, but I don't control his conduct right now outside the courthouse as long as it's not having an adverse impact on the proceedings before me. But I have no reasonable to think that Mr. Shkreli would do anything that would impact adversely on the proceedings.
>
> MR. BRAFMAN: And he will not . . . .

(Apr. 7, 2017 Oral Arg't Tr. at 48:10-22.)

During jury selection in this case (which took place from June 26, 2017 to June 28, 2017), the Court engaged in a lengthy and searching voir dire process that involved over 250 potential jurors. Many of the questions the Court asked of potential jurors concerned their views of and potential biases against Shkreli, including any views developed as a result of Shkreli's public statements on social media and to the press about this case. This process resulted in 18 jurors who are able to serve for a lengthy period of time, who indicated no disqualifying biases against Shkreli, and who agreed not to read any press or

2

social media accounts of the trial. At the time that the jury was selected, it appeared that the trial would proceed in an orderly fashion.

Unfortunately, despite the assurances of defense counsel prior to trial—as well as efforts by defense counsel to control Shkreli—once the jury was selected and empaneled, Shkreli embarked on a campaign of disruption by commenting on trial evidence and witnesses to the press and on social media, and by making a spectacle of himself and the trial directly on the courthouse grounds.

During the lunch break on June 30, 2017, the defendant paid a highly-publicized visit to reporters and members of the public in the overflow viewing room, which is located on the same floor of the courthouse in which the trial is taking place.[1] Among other things, the defendant repeatedly commented on evidence the jury had heard just the day before and the credibility of testifying witnesses. For example, Shkreli claimed that investor Sarah Hassan was not a "victim" because she eventually made money by selling Retrophin stock. As quoted in the article, Shkreli stated: "How can a victim make $2.7 million? She's not a victim." (See Exhibit D; see also Exhibit A (Shkreli "blasted" Sarah Hassan); Exhibit B (Shkreli stated of Sarah Hassan "we should all only be this victimized in life")). Shkreli added that he personally "made nothing" from MSMB Capital. (See Exhibit D). Shkreli even previewed his response to evidence that is only partially before the jury at this stage of the case. In the words of the CNBC article, "Shkreli also told reporters that he did not prepare tax documents or Retrophin marketing documents that Hassan testified about on Thursday. Other people did that, he said." (See Exhibit D). The other articles attached to this motion as Exhibits A through C reflect similar comments by Shkreli to the press in the courthouse on June 30, 2017.

Following the end of the court day on June 30, 2017, Shkreli and Mr. Brafman were interviewed on camera by CNBC reporter Meg Tirrell as they exited the door of the courthouse and headed toward Tillary Street. (See CNBC interview of Shkreli and Brafman, attached hereto as Exhibit E). Ms. Tirrell asked, "Mr. Brafman, how did you feel about Martin coming to talk to reporters today in the middle of trial?" (Id.). Before counsel could

---

[1] See, e.g., "'Pharma Bro' Compares Prosecutors to 'Junior Varsity'," available at http://nypost.com/2017/06/30/pharma-bro-compares-prosecutors-to-junior-varsity/ (annexed hereto as Exhibit A); "Martin Shkreli Makes Surprise Visit to Reporters: 'The World Blames Me for Almost Everything,'" available at https://www.washingtonpost.com/news/business/wp/2017/06/30/do-i-want-to-exonerate-myself-yes-martin-shkreli-makes-surprise-visit-to-reporters/?utm_term=.334a58bbcb7b (annexed hereto as Exhibit B); "Shkreli Slams Feds in Brooklyn as 'JV'," available at http://www.nydailynews.com/new-york/martin-shkreli-jaws-reporters-lawyer-peels-article-1.3291666 (annexed hereto as Exhibit C); "'Pharma Bro' Martin Shkreli Blasts Prosecutors as 'Junior Varsity,' Says Investor Wasn't 'Victim' and Criticizes Headlines in Lunch Visit to Reporters," available at http://www.cnbc.com/2017/06/30/shkreli-blasts-prosecutors-as-junior-varsity-to-reporters.html (annexed hereto as Exhibit D).

respond, Shkreli spoke directly to the reporter and, referring to himself in the third person, said "He'll do whatever he wants." (Id.). Ms. Tirrell asked Shkreli, "You can do whatever you want, Martin?" to which Shkreli replied, "Yes." (Id.). Mr. Brafman then indicated his hope that Shkreli would no longer talk to the press, saying "I would very much appreciate it if he did not talk to the press because sometimes he doesn't have a filter." (Id.). Throughout the video, Shkreli is grinning broadly. (See id.).

Shkreli also appears to be active again on Twitter (despite an ongoing ban from the platform) under the handle "@BLMBro" and is commenting on the evidence presented at trial. Near the end of the CNBC video interview described above, a different reporter asks Shkreli if he is @BLMBro; Shkreli did not deny that the handle belongs to him. (See Exhibit E). Moreover, in a YouTube video posted on or about June 25, 2017, Shkreli identified himself as @BLMBro.[2] (See YouTube video posted by Martin Shkreli on June 25, 2017, available at https://www.youtube.com/watch?v=B3FDsMtEpbs, attached hereto as Exhibit F, at 6:13-6:16 ("Follow me on Twitter, @BLMBro")).

Not only did Shkreli claim ownership over @BLMBro in the YouTube video, but there are strong correlations between Shkreli's recent public actions and Tweets by @BLMBro. For example, on June 27, 2017 (the second day of jury selection), Shkreli announced on his Facebook page that he had bought Internet domains in the names of two reporters who had recently written critical stories about him.[3] That same day, @BLMBro declared:



There is thus a strong likelihood that the defendant is back on Twitter under the name @BLMBro.

---

[2] The government notes that @BLMBro has written the following:



Given Shkreli's public claim of ownership over the @BLMBro handle and active comments on the evidence, there is a strong likelihood that Shkreli is indeed @BLMBro despite this post.

[3] "Shkreli Loses Mistrial Bid and Retaliates Against Reporters," available at https://www.bloomberg.com/news/articles/2017-06-27/shkreli-judge-denies-request-for-mistrial-during-jury-selection.

4

The Twitter user @BLMBro has commented on the evidence at trial and issues connected with the trial, both with direct Tweets and by "re-Tweeting" comments that are critical of the witnesses and/or the evidence. The following is a selection of recent posts about the trial from the @BLMBro account, in which the credibility of witnesses and evidence at trial are questioned, and Shkreli suggests that the media's portrayal of events during jury selection (for which he was not present, and which are accurately reflected in the trial transcript) are untrue:







(See June 26, 2017 Trial Tr. at 220:18).

Finally, in addition to his comments on the evidence and witnesses, Shkreli also made inappropriate personal attacks on current and former prosecutors in this case. (See Exhibits A-D).

## II. DISCUSSION

### A. Legal Standard

"Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." Bridges v. California, 314 U.S. 252, 271 (1941). As the Supreme Court explained in Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991), "the theory on which our criminal justice system is founded" is that:

> The outcome of a criminal trial is to be decided by impartial jurors, who know as little as possible of the case, based on material admitted into evidence before them in a court proceeding. Extrajudicial comments on, or discussion of, evidence which might never be admitted at trial and ex parte statements by counsel giving their version of the facts obviously threaten to undermine this basic tenet.

Id. at 1070.

Gentile is the most recent of several Supreme Court cases that underscore that a fair trial requires ensuring that the case is determined only by the jurors' evaluation of admissible evidence. In Pennelamp v. Florida, Justice Frankfurter observed that "it is indispensable ... that in a particular controversy pending before a court and awaiting judgment, human beings, however strong, should not be torn from their moorings of impartiality by the undertow of extraneous influence." 328 U.S. 331, 366 (1946) (Frankfurter, J., concurring). Similarly, in Estes v. Texas, the Supreme Court noted that "[w]e have always held that the atmosphere essential to the preservation of a fair trial-the most fundamental of all freedoms-must be maintained at all costs." 381 U.S. 532, 540 (1965).

6

In the same vein, "[s]ociety has the right to expect that the judicial system will be fair and impartial to all who come before it." Levine v. United States Dist. Ct., 764 F.2d 590, 596-97 (9th Cir. 1985). In this sense, "[t]he concept of a fair trial applies both to the prosecution and the defense." United States v. Tijerina, 412 F.2d 661, 666 (10th Cir. 1969) (upholding gag order on attorneys, witnesses, and parties); Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 254 (7th Cir. 1975) ("the Government is entitled to a fair trial"). "The vigilance of trial courts against the prejudicial effects of pretrial publicity also protects the interest of the public and the state in the fair administration of criminal justice." United States v. Brown, 218 F.3d 415, 424 (5th Cir. 2000) (upholding gag order on attorneys, parties, and witnesses). Accordingly, the Court "must consider the fundamental interest of the public in insuring the integrity of the judicial process" in imposing restrictions for the purpose of preventing prejudicial outside interference with an impartial trial. Levine, 764 F.2d at 596-97.

Courts are obligated to take steps to "protect their processes from prejudicial outside interference." Sheppard v. Maxwell, 384 U.S. 333, 363 (1966); Chicago Council of Lawyers, 522 F.2d at 254. "Neither prosecutors, counsel for defense, the accused, witnesses, court staff[,] nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." Sheppard, 384 U.S. at 363. Once a trial begins, "there is likely to be the most intense news coverage[,] which therefore creates the most need to ensure that inadmissible opinions or statements do not encroach upon the laboratory conditions of the trial." Chicago Council of Lawyers, 522 F.2d at 255. Statements of trial counsel carry substantial danger, since the public tends to believe counsel have special access to information, making their comments "especially authoritative." Gentile, 501 U.S. at 1074. Statements of the parties also pose significant risks, as "trial participants, like attorneys, are privy to a wealth of information that, if disclosed to the public, could readily jeopardize the fair trial rights of all parties." Brown, 218 F.3d at 428 (affirming gag order on attorneys, parties, and witnesses) (internal quotations omitted); Tijerina, 412 F.2d at 666-67 (same); cf. In re Russell, 726 F.2d 1007, 1010 (4th Cir. 1984) (affirming gag order on trial witnesses).

The Supreme Court has held that a court may restrict extrajudicial statements of the parties and their counsel in order to protect the proceedings from prejudicial external influences. Gentile, 501 U.S. at 1075; Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 n. 18 (1984); Shepherd, 384 U.S. at 361 (stating that a "trial court might well . . . proscribe[] extrajudicial statements by any lawyer, party, witness, or court official, which divulged prejudicial matters"). In imposing such restrictions, the Court must balance the defendant's right to a fair trial and the public's interest in the fair administration of justice against the parties' and the public's competing interests in free expression and comment. Accordingly, any restrictions on speech protected by the First Amendment must be narrowly tailored, that is, no more extensive than necessary to preserve the parties' rights to a fair trial. Chicago Council of Lawyers, 522 F.2d at 249; Brown, 218 F.3d at 423.

Although courts have differed regarding precisely where the line must be drawn with respect to such prohibitions, compare Levine, 764 F.2d at 599 (holding that a ban

on all statements about "the merits" of a case is overbroad); Tijerina, 412 F.2d at 663, 667 (affirming ban on comments concerning "the merits of the case, the evidence, actual or anticipated, the witnesses[,] or rulings of the Court"), the Supreme Court has held that a court may prohibit comments to the press that have a substantial likelihood of materially prejudicing the trial. Gentile, 501 U.S. at 1075; id. at 1082 (O'Connor, J., concurring) (upholding the constitutionality of a state bar rule limiting the extrajudicial comments of lawyers that created a substantial likelihood of materially prejudicing the trial). See United States v. Scarfo, 263 F.3d 80, 92-93 (3d Cir. 2001); cf. Model Rule of Professional Conduct 3.6(a) (adopting Gentile standard); but see United States v. Salameh, 992 F.2d 445, 447 (2d Cir. 1993) (limitation on statements by attorneys must be "narrowly tailored" and the district court must "make a finding that alternatives … would be inadequate to protect" a fair trial).[4] This is because such regulations apply to a narrow class of speech, are viewpoint-neutral, apply equally to all participants in a case, and merely postpone speech until after the trial, rather than prohibiting it. Id.

It is important to note that whereas the Court is limited with respect to imposing restrictions on the press, it has more leeway to impose restrictions on the parties. See Gentile, 501 U.S. at 1074-75 (holding that in the case of restraints on the speech of trial participants, rather than the press, a more permissive standard is constitutionally permissible). In order to protect the trial process from outside influences, the Court has the power to prevent the participants from making extrajudicial comments that may prejudice the jury. See Local Criminal Rule 23.1(h) ("[t]he Court, on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury . . . and any other matters which the court may deem appropriate for inclusion in such order").

Finally, in order to satisfy society's "overriding interest that justice be done in a controversy between the government and individuals" and its expectation of "fair trials designed to end in just judgments," an order against extrajudicial statements must apply to all parties to a controversy. Tijerina, 412 F.2d at 666. See also Levine, 764 F.2d at 596-97 (upholding gag order on attorneys) (noting that, although the Sixth Amendment is a limitation on the government and does not give the prosecution the right to a fair trial, "the need to restrict publicity is [not] lessened when the publicity is caused by the actions of the defense, rather than the prosecution"); Tijerina, 412 F.2d at 666 (rejecting defendant's suggestion that "because the [gag] order was entered for their protection, they cannot be charged with a violation," and upholding gag order on attorneys, witnesses, and parties). The

---

[4] Prior to the Supreme Court's decision in Gentile, some circuit courts held that, given the First Amendment interests at stake, gag orders may only reach comments that pose a "clear and present danger" or a "substantial and imminent threat" to a fair trial. See Chicago Council of Lawyers, 522 F.2d at 251; see also Levine, 764 F.2d at 595. While the Second Circuit has not addressed this issue since the Supreme Court's decision in Gentile, the Fifth Circuit has determined that Gentile "foreclosed" application of the stricter test. See Brown, 218 F.3d at 427.

8

order proposed by the government, as described below, meets these standards of being narrowly tailored and applying to all parties.

### B. A Court Order is Necessary

In the weeks and months leading up to this trial, defense counsel promised this Court that Shkreli would not disrupt these proceedings. The parties and the Court worked hard to find 18 impartial jurors who are warned at least four times a day not to watch news coverage of this trial or discuss the trial with others. This case has generated intense media interest from the start and that interest has peaked in connection with jury selection and opening arguments. The media glare may not abate as reporters continue to cover the trial, with some reporters going so far as to live-Tweet the evidence. Independent of anything said or done by the parties, jurors must conscientiously avoid news about this case.

But now, Shkreli appears determined to ignore the instructions of defense counsel and to wage his own public relations campaign against the witnesses and the government during the trial. With Shkreli trying the case through the press, the risk of jury interference and a mistrial are becoming manifest. He is roaming the halls of the courthouse commenting to reporters on the evidence at trial, his personal views on the credibility of witnesses and his defense strategy—all of which the reporters are, understandably, then discussing amongst themselves and with members of the public, and repeating to attorneys in the case in search of a comment—at the very same time that jurors are also in the halls of the courthouse on their breaks. He continues to give impromptu statements to reporters at the courthouse doors, possibly in full view and earshot of jurors. He is riling up his social media following to publicly criticize witnesses and evidence. If this behavior continues, it is only a matter of time before Shkreli, or a member of the public who is repeating Shkreli's statements, exposes one or more jurors to precisely the sort of extrajudicial evidence or commentary that our system forbids. Indeed, Shkreli's actions "clearly foreshadow" that without a gag order, there is a real possibility of this trial becoming a "circus show performed outside the courtroom." Levine, 764 F.2d at 597.

The circumstances of this case fall well within those of other cases in which district courts have imposed gag orders, and appellate courts have approved them. See Levine, 764 F.2d at 596-97 (upholding gag order); Brown, 218 F.3d at 418 (same). See also United States v. Cutler, 815 F. Supp. 599, 605 (E.D.N.Y. 1993) (denying motion to dismiss contempt charge based upon violation of gag order, in which a defense attorney launched a public relations campaign, making public statements that the prosecutors had a personal vendetta against his client, did not want a fair fight, and had brought trumped-up charges, and further claimed that taped conversations being used by the government were not crimes and were "'snippets deliberately taken out of context by the prosecutors'" and that "'[w]hen the whole tapes are played, not just the snippets,'" his client would be vindicated). Id. at 606 (quoting statement).

For example, one court found a substantial likelihood of prejudice where the defendant, a prominent Louisiana political figure, made statements to the media "declar[ing]

9

his innocence as well as his belief that he was the victim of a 'political drive-by shooting' at the hands of 'an out-of-control prosecutor.'" Brown, 218 F.3d at 418. The court based its order primarily on its concern that "pretrial publicity, especially in the form of extrajudicial comments by the parties, would taint the unsequestered jury already impaneled in [the first of a trio of related cases], as well as the pool from which the juries in the other two cases would be drawn." Id. at 429. The court noted that the parties' "demonstrated . . . desire to manipulate media coverage to gain favorable attention" drove this concern. Id. Here, Shkreli has demonstrated a similar desire to manipulate media coverage by granting interviews within and just outside the courthouse, and to broadcast similar comments via Twitter.

Another district court previously entered such an order under circumstances analogous to those presented by this case. In United States v. Calabrese, 2007 WL 2075630 (N.D. Ill. July 13, 2007), the court was conducting a highly publicized trial involving the Chicago Outfit. There, defense counsel disclosed in the early stages of the trial a sealed portion of the government's proffer of a co-conspirator's statements; in addition, "one of the trial participants ha[d] been quoted (on more than one occasion, and even subsequent to an oral admonition from the Court) making arguably prejudicial comments on a web log." Id. at *2. The court found that these and any future statements to the press about the merits of the case had a "substantial likelihood" of prejudicing the parties' ability to receive a fair trial. Id. at *2-3. The court found that such comments to the press were likely to increase the volume of press coverage and contribute to "a carnival-like atmosphere." Id. at *2. The court determined that "[c]ommentary or spin" from lawyers was particularly likely to prejudice jurors, hindering their ability to remain impartial and to decide the case solely based on evidence presented in court:

> The risk that jurors will be prejudiced by news reports that simply recite that which happened in open court is quite small. Even if seen, heard, or read, such reports merely reiterate that to which the juror has already been exposed. Commentary or spin is different. It does not merely reiterate what has already been before the jury; it applies the speaker's own gloss to material presented to the jury. It is, at best, comprised of material suitable for closing argument. There is a time for closing argument-it comes at the end of the case, not at the end of each court day.

Id. at *3. After considering and rejecting alternatives to a gag order, such as change of venue and sequestration, the court determined that a gag order applicable to "lawyers appearing in the case and parties" was necessary to protect the parties' rights to a fair trial. Id. at *2-3.

Likewise, Shkreli's inflammatory "commentary or spin" (id.) in multiple fora poses a substantial likelihood of materially prejudicing the trial by creating a "carnival-like atmosphere" (id.); indeed, Shkreli will be the subject of significant media attention every time he speaks or writes during the trial. Shkreli's comments, amplified by multi-platform media outlets, pose great risk of tainting the jury pool. Although the government assumes

10

that the jury will be conscientious about following the Court's instructions, the more intense the media attention becomes (and the government anticipates it will only increase if Shkreli tries this case in the press) and the longer the trial lasts, the greater the likelihood that a juror will inadvertently be exposed to prejudicial external influences, thereby undermining the effectiveness of the Court's instructions.

Courts have also issued gag orders to protect jury deliberations. See Order, Dkt. No. 747, United States v. Blagojevich, No. 08-CR-888 (N.D. Ill. June 16, 2011) ("all counsel of record to this case are hereby barred from making any public statement about the trial of Defendant Rod Blagojevich until the jury verdict is returned and read in open court . . ."); Order, Dkt. No. 748, United States v. Blagojevich, No. 08-CR-888 (N.D. Ill. June 24, 2011) (reaffirming gag order). The orders in Blagojevich are instructive because they were issued while the defendant waged a public relations campaign during trial that ventured into misrepresentations of pretrial developments and efforts to influence jurors and the public. See, e.g., Gov't Resp. to Defs. Mot. to Reconsider Gag Order and Sealing, Dkt. No. 746, No. 08-CR-888 (N.D. Ill. June 22, 2011). Shkreli has launched a similar campaign here.

In sum, Shkreli cannot be permitted to create an atmosphere that substantially increases the risk of tainting the jury with external influences. Less restrictive alternatives, such as admonishing the jurors not to conduct internet research and questioning jurors about their exposure to media accounts of the trial will not suffice. See Neb. Press Ass'n v. Stuart, 427 U.S. 539, 563-64 (1976). An order prohibiting counsel and the parties from making certain extra-judicial comments regarding the case is thus "the least restrictive and most effective means" of ensuring a fair trial in this case. See Calabrese, 2007 WL 2075630, at *2; Levine, 764 F.2d at 599-600 (rejecting alternatives after detailed discussion); see also Brown, 218 F.3d at 430-31.

## III. CONCLUSION

For all of the foregoing reasons, the government respectfully requests that this Court enter an order prohibiting the parties and counsel, from the date of any order to be entered by the Court until a verdict is rendered, from providing any public commentary about the trial, the parties and any trial witnesses, whether via social media or by communications with the press. The government further requests that the publication of publicly-available information, such as trial testimony, admitted exhibits and scheduling matters, be exempted from any such order.

To the extent that the Court determines not to enter such an order, the government respectfully requests that the Court consider semi-sequestration of the jury as an alternative. The government is deeply concerned that Shkreli's statements about the evidence at trial and his personal views of that evidence in the courthouse itself—which are

11

then repeated by other individuals in the courthouse—will inadvertently be overheard by members of the jury during their breaks, and render a fair trial impossible.

        Respectfully submitted,

        BRIDGET M. ROHDE
        Acting United States Attorney

By:   /s/
        Jacquelyn M. Kasulis
        Alixandra E. Smith
        G. Karthik Srinivasan
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Clerk of Court (KAM) (by ECF)
        Counsel for Defendant Shkreli (by ECF)