JMK:AES/GKS
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        15 CR 637 (KAM)

MARTIN SHKRELI,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE OF THE CHARGED CRIMES


BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
G. KARTHIK SRINIVASAN
Assistant U.S. Attorneys
     (Of Counsel)

At trial in the above-captioned matter, the defendant Martin Shkreli stated that he will object to the admission of certain evidence related to defrauded investors in MSMB Capital and MSMB Healthcare who will not testify at trial (the "Disputed Evidence"), which the government anticipates that it will seek to introduce through two upcoming witnesses:  the case agent and an employee of Standard Registrar, the transfer agent for Retrophin.  The Disputed Evidence goes to the heart of the charged crimes against Shkreli and is plainly admissible because it is relevant and not unduly prejudicial, is not hearsay, and because the Confrontation Clause does not apply.  For these reasons, as set forth in more detail below, the government moves to admit the Disputed Evidence at trial.

I.    **BACKGROUND**

    A.    **Shkreli's Objections to Admission of the Disputed Evidence**

Shkreli was charged in a Superseding Indictment with securities fraud, conspiracy to commit wire fraud and conspiracy to commit securities fraud in connection with defrauding investors in the hedge fund MSMB Capital (Counts One, Two and Three); securities fraud, conspiracy to commit wire fraud and conspiracy to commit securities fraud in connection with defrauding investors in the hedge fund MSMB Healthcare (Counts Four, Five and Six); conspiracy to commit wire fraud in connection with Shkreli's theft of assets from Retrophin, Inc. ("Retrophin"), a public company, to repay defrauded MSMB Capital and MSMB Healthcare investors and personal debts (Count Seven); and conspiracy to commit securities fraud in connection with an attempt to control the price and trading volume of Retrophin (Count Eight).

Trial commenced in the above-captioned matter on June 28, 2017.  During the course of the trial, the government has called approximately 20 witnesses, including members of the Board of Directors of Retrophin; employees of MSMB Capital, MSMB Healthcare and Retrophin; and investors in Elea Capital, a prior hedge fund that Shkreli operated and caused to

fail.  In addition, the government has called six defrauded MSMB Capital investors (Sarah Hassan, Darren Blanton, John Neill, Schuyler Marshall, Steven Richardson and Lindsay Rosenwald) and two defrauded MSMB Healthcare investors (David Geller and Richard Kocher); all but one of those defrauded investors ultimately entered into a settlement agreement and/or a consulting agreement with Retrophin at Shkreli's direction as a means to recover some of the funds they invested in MSMB Capital and/or MSMB Healthcare and which were owed to them by Shkreli in his personal capacity.  The government also called Lee Yaffe, an Elea Capital investor who entered into a consulting agreement with Retrophin at Shkreli's direction as a means to recover funds he lost in Elea Capital, and which were owed to him by Shkreli in his personal capacity.

On July 18, 2017, the government advised Shkreli that the government would not call any additional defrauded MSMB Capital or MSMB Healthcare investors.  On July 19, 2017, Shkreli stated to the Court that he would object to the admission of the Disputed Evidence, which he defined as any evidence related to defrauded investors who did not testify at trial, including but not limited to (1) performance statements sent by Shkreli to those defrauded investors, (2) email conversations in which Shkreli communicates with those defrauded investors and/or discusses with others a resolution of disputes with those defrauded investors, (3) legal documents (including settlement and consulting agreements) showing that defrauded investors were repaid with funds and shares from Retrophin, and (4) subscription agreements for MSMB Capital and/or MSMB Healthcare related to those defrauded investors.  Shkreli contended that that such evidence was "irrelevant" and that the government could not introduce such evidence unless the defrauded investor in question was a witness at trial.  See 07/19/2017 Tr. at 4564-80.  Shkreli cited no specific caselaw or rules of evidence in support of this position, but suggested that admission of such

evidence was in violation of Federal Rules of Evidence 401 and 403, and/or Shkreli's Sixth Amendment right to confront witnesses.  Id.

### B.     The Disputed Evidence

The government will seek to admit the Disputed Evidence during the testimony of a case agent and a witness from Standard Registrar, the company that served as the transfer agent for Retrophin between December 2012 and late 2014.  The following is an overview of the Disputed Evidence and the government's understanding of Shkreli's likely objections to that evidence.

### 1.     Relevant Evidence to Be Admitted Through The Case Agent

The government attaches hereto a list of the exhibits that it currently anticipates it will admit during the testimony of its case agent.  See Case Agent Exhibits, attached hereto Exhibit A.  The government may add to or subtract from this list depending on further developments at trial.

### A.     Subscription Agreements for MSMB Capital and MSMB Healthcare Investors

The government will seek to admit subscription agreements for additional MSMB Capital and MSMB Healthcare investors; specifically, the government will seek to introduce the subscription agreements for MSMB Capital investors Brent Saunders and MSMB Healthcare investors Alan Geller, Michael Lavelle, Molly Tschang, Steven Rosenfeld, Seymour Block, Diandra Douglas and George Blasko (GXs 24, 27, 29, 30, 30-A, 31, 32, 35-39).  These subscription agreements detail the dates and amounts of the investors' investments into MSMB Capital and/or MSMB Healthcare.  While the bank records already in evidence demonstrate that these individuals deposited money into MSMB Capital and/or MSMB Healthcare bank accounts, the subscription agreements documents are being offered to show that those deposits were made

3

in connection with an investment in MSMB Capital and/or MSMB Healthcare, and are not a loan or other form of payment to those entities.[1]

### B.      Performance Estimates Sent to MSMB Capital and MSMB Healthcare Investors

The government will seek to admit monthly investment statements (referred to by Shkreli as "performance estimates") sent via email to additional MSMB Capital and MSMB Healthcare investors.  Specifically, the government will seek to introduce investment statements sent to MSMB Capital investor Brent Saunders (GXs 78-1 to 78-6), and to MSMB Healthcare investors Alan Geller (GXs 84-1 to 84-13), Molly Tschang (GXs 85-1 to 85-4), Seymour Block (GXs 86-1 to 86-2), Steven Rosenfeld (GX 87-1), Robert Johnson (GXs 88-1 to 88-4), Michael Lavelle (GXs 89-1 to 89-16), Spencer Spielberg (GXs 90-1 to 90-9), Patrick McGowan (GXs 92-1 to 92-11), George Blasko (GXs 93-1 to 93-5) and Diandra de Morrell Douglas (GX 94-1). These investment statements were either sent by Shkreli himself, or at Shkreli's direction (by either NAV Consulting or by MSMB employee and co-conspirator Kevin Mulleady).  Evidence introduced at the trial to date, including bank and brokerage records from MSMB Capital and MSMB Healthcare (GXs 501-507), has demonstrated that these monthly investor statements contained false information about the performance of the MSMB Capital and MSMB Healthcare funds.

The case agent has also prepared two summary charts (GXs 704 and 705) that are based on the information contained in the monthly investor statements that were sent by Shkreli to MSMB Capital and MSMB Healthcare investors.  These summary charts compare, at month

---

[1] The government is not seeking to introduce the private placement memoranda ("PPMs") sent to additional investors in MSMB Capital and/or MSMB Healthcare.  The subscription agreements, unlike the PPMs, do not contain any representations by Shkreli about the funds.

4

end, (1) the funds that were actually in the MSMB Capital and MSMB Healthcare bank and brokerage accounts, to (2) Shkreli's statements to investors about the value of their MSMB Capital and MSMB Healthcare investments at that time.

> ### C.   Email Correspondence To/From Shkreli and Co-Conspirators Regarding Defrauded MSMB Capital and MSMB Healthcare Investors

The government had originally marked as exhibits approximately 150 documents – primarily emails to and from Shkreli and/or other co-conspirators, and other documents containing Shkreli's statements (identified as GXs 200-351) – as additional relevant evidence that it would seek to introduce through the case agent.  In anticipation of the case agent's testimony, and based on the evidence that has already come in at trial, the government has narrowed this list to approximately 80 documents.  The government expects that Shkreli will not object to the admissibility of many of these documents, as they are primarily Shkreli's statements and directly relevant to the charged crimes.  However, this category does include a small number of emails in which Shkreli and others either discuss, or communicate directly with, defrauded MSMB Capital and MSMB Healthcare investors who have not testified at trial.  In those emails, Shkreli and others discuss the investments made by those additional investors in the funds and/or attempts by those investors to seek repayment from Shkreli.  The following are a few examples of such documents:

- In GX 254, Ron Tilles emails Shkreli on February 4, 2013, and advises him that MSMB Healthcare investors Molly Tschang, Seymour Block, Diandra Douglas and Steven Rosenfeld are inquiring about the "status" of their investments.  Shkreli responds on February 6, 2013, as follows:  "everyone will get some amount of stock no matter what.  no one can get full cash.  the fund invested a lot into retrophin."

- In GX 295, Evan Greebel (who was also charged in the Superseding Indictment with the two Retrophin schemes) sends Shkreli an email on April 25, 2013 with the subject line "Lavelle."  Greebel asks Shkreli "Do you want

5

me to send him the settlement agreement – attached is another copy for you." On May 3, 2013, Shkreli responds that the agreement looks good and directs Greebel to send it to Lavelle.  Greebel responds with a question for Shkreli about how much stock Lavelle should receive, and also states "Also kocher's lawyer keeps calling me and he wants more than you are willing to offer – he said Kocher has instructed him to file papers."  In response, Shkreli says "Okay don't let them sue us.  Just capitulate with kocher."

- In GX 301, Alan Geller emails Shkreli and Greebel on May 16, 2013 to inquire about the status of his investment.  Geller states that he has unsuccessfully tried to reach Greebel by phone on a number of occasions and that he wants to know the "plan going forward."  Greebel responds to Geller and Shkreli on the same day, stating that he and Shkreli are "preparing the other agreement we discussed."  Subsequently, Greebel and Shkreli discuss Geller's email amongst themselves, with Shkreli stating that Geller is "high maintenance," and Greebel responding to ask if Shkreli has "any thoughts on how [he] want[s] to handle [Geller's] and his brother's requests?" (in reference to Geller's brother David Geller).  Shkreli then gives the following directive:  "Ignore."

## D.    Settlement Agreements with MSMB Healthcare Investors

The government will seek to admit two additional settlement agreements that Shkreli caused Retrophin to enter into with defrauded MSMB Healthcare investors.  Specifically, the government will seek to admit a settlement agreement dated May 1, 2013 between Retrophin and MSMB Healthcare investor Spencer Spielberg (GX 53), and a settlement agreement dated June 2013 between Retrophin and MSMB Healthcare investor Michael Lavelle (GX 56).[2]  Both agreements were signed by Shkreli in his individual capacity, as well as on behalf of Retrophin, Inc.; MSMB Capital Management LLC; MSMB Capital Management LP; MSMB Healthcare LP; MSMB Healthcare Investors LLC; and MSMB Healthcare Management LLC.  Both settlement agreements also contain a release that discharges Shkreli (in his personal capacity), the MSMB entities and Retrophin for any claims.

---

[2] The government will also admit as GX 54 another stand-alone copy of the settlement agreement Shkreli caused Retrophin to enter into with defrauded MSMB Healthcare investor Richard Kocher, which is already in evidence as an attachment to GX 107-32.

### E.     Consulting Agreements with MSMB Healthcare Investors

The government will seek to admit two additional consulting agreements that

Shkreli caused Retrophin to enter into with defrauded MSMB Healthcare investors.  Specifically,

the government will seek to admit a consulting agreement dated February 19, 2014 between

Retrophin and MSMB Healthcare investor Steven Rosenfeld (GX 58), and a consulting

agreement dated September 20, 2013 between Retrophin and MSMB Healthcare investor Alan

Geller (GX 59-A).  Both consulting agreements contain a release (paragraph 10 to each

agreement) that discharges Shkreli (in his personal capacity), MSMB Capital Management LP,

MSMB Capital Management LLC, MSMB Healthcare LP, MSMB Healthcare Investors LLC,

MSMB Healthcare Management LLC and Retrophin for any claims.  Steven Rosenfeld's

agreement was signed by Shkreli on behalf of Retrophin; Alan Geller's agreement was signed by

Marc Panoff, the Chief Financial Officer of Retrophin, on behalf of Retrophin.

### F.     Additional Evidence

In addition to the evidence detailed above, the government also expects to

introduce through the case agent the following categories of documents that it does not expect

will draw an objection from Shkreli:  (1) additional relevant Retrophin business records

(specifically, GXs 124-3, 124-10 and 124-26); (2) 2013 SEC filings for Retrophin, Inc.

(specifically, GXs 609, 610, 611 and 612); (3) stipulations that the parties have already agreed to

related to NAV Consulting, Cobb & Associates, Kleinberg Kaplan and Rothstein Kass &

Company, and any related documents (specifically, GXs 806-809); and (4) certain prior

statements by Shkreli, which the Court has already ruled admissible in connection with its

decision on the parties' motions in limine (specifically, GXs 902-906, 908, 916-918, 924, 926,

932 and 935, with accompanying stipulations, and certain statements from Shkreli's January 2015 proffer).

### 2. Standard Registrar Business Records

Finally, the government will call as a witness an employee of Standard Registrar, the company that functioned as Retrophin's transfer agent from December 2012 (when the company went public) until late 2014.  In conjunction with the witness's testimony, the government will seek to admit GXs 125-1 to 125-30, 123-31, 125-32 to 125-47, which are all business records of Standard Registrar that reflect the issuance or transfer of Retrophin shares.  Shkreli has stated that he will object to the admission of eight of the 47 exhibits on the grounds that the records in those exhibits detail share transfers to three defrauded MSMB Healthcare investors – Alan Geller, Spencer Spielberg and Michael Lavelle – in connection with settlement and/or consulting agreements that those individuals entered into with Retrophin.

Specifically, Shkreli objects to GXs 125-22, 125-32, 125-40, 125-43, 125-44, and 125-45, which detail all share transfers from Retrophin to Alan Geller during this period (GXs 125-40, 125-42 and 125-45 are specifically related to Geller's consulting agreement); GX 125-30, which details a share transfer from Retrophin to Spencer Spielberg on May 28, 2013, in connection with his settlement agreement; and GX 125-46, which details a transfer of Retrophin shares from Retrophin to Michael Lavelle on October 22, 2013, in connection with his settlement agreement.  To the extent that the share transfers were made pursuant to a settlement and/or consulting agreement, Standard Registrar's records for these transfers include a copy of the relevant settlement and/or consulting agreement that was provided to Standard Registrar by the individual requesting the transfer; in all cases, that individual was either an employee of Retrophin or Greebel.

## II.    ARGUMENT

### A.    The Disputed Evidence Is Relevant and Not Unduly Prejudicial

#### 1.    Legal Standard

FRE 401 defines "relevant evidence" as evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Relevant evidence generally is admissible, see FRE 402, and there is a "very low standard for relevance."  United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008); see, e.g., United States v. Quattrone, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").

Relevant evidence may be excluded based on the potential for unfair prejudice only when the risk of unfair prejudice "substantially outweighs" its probative value.  FRE 403. The Supreme Court has observed that "[t]he term 'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  Old Chief v. United States, 519 U.S. 172, 180 (1997).  Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."  United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).  "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."  Costantino v. Herzog, 203 F.3d 164, 174 (2d Cir. 2000) (emphasis in original). "The prejudice resulting to defendants from the fact that introduction of" relevant evidence is "damaging to their case is, of course, not the kind of prejudice against which Fed. R. Evid. 403 protects defendants."  See United States v. DeLillo, 620 F.2d 939, 947 n.2 (2d Cir. 1980).

A trial judge's evidentiary rulings, including determinations of relevance and assessments of whether the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, are reviewed only for abuse of discretion.  See, e.g., United States v. Abreu, 342 F.3d 183 (2d Cir. 2003); United States v. Khalil, 214 F.3d 111, 122 (2d Cir. 2000). "[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational."  United States v. Awadallah, 436 F.3d 125, 131 (2d Cir. 2006).

## 2.    Argument

Shkreli asserts, without a single authority other than blanket invocations of fairness, that the government cannot prove that a victim was defrauded without haling that victim into court.  If that proposition were true, there would be no complex fraud trials in America; there would be no trials involving investment schemes in which hundreds or thousands of victims are implicated.  Shkreli contends, in essence, that because each investor is different, each investor must testify.  Moreover, he asserts that if an investor does not testify, evidence relating to that investor is inadmissible.  Shkreli is wrong as a matter of law.

First, evidence relating to non-testifying investors is relevant for a host of purposes beyond their subjective experience as investors.  This evidence is relevant to show, at a minimum, the scope, nature and duration of the fraudulent schemes.

Second, unlike the civil securities or wire fraud context, reliance is simply not an element of federal securities and wire fraud laws.[3]  Materiality does not turn on the subjective experience of investors.  Victims are differentiated in every complex criminal

---

[3] In addition, success in not an element with respect to the conspiracy charges in this case.

10

fraud prosecution because the specific mix of information they use to invest and maintain their investments is different.  The information provided to non-testifying investors was part of the total mix of information that a jury could conclude an objective reasonable investor would find material.

### i.   The Disputed Evidence Clearly Relevant and Not Unduly Prejudicial

The Disputed Evidence is heartland evidence.  Communications by Shkreli with non-testifying investors, contracts (such as the subscription, settlement and consulting agreements) and the transfer agent records are all relevant to prove the scope, nature and duration of the charged fraudulent schemes.

As an initial matter, the government must be able to show the scope of Shkreli's fraudulent schemes.  The Superseding Indictment charges Shkreli with conspiracy to commit wire fraud, securities fraud and conspiracy to commit securities fraud regarding MSMB Capital, MSMB Healthcare and Retrophin.  It does not charge him with defrauding only the eight investors who have testified at this trial.  To hold otherwise would unjustifiably narrow the charges in this case.

Moreover, if the jury were to hear evidence relating only to the eight investors who testified, but no evidence relating to non-testifying investors, the jury would be left with the misleading impression that the Superseding Indictment is narrower than it actually is. Furthermore, it would leave the jury with the misleading impression that Shkreli paired legitimate activity with respect to some non-testifying investors with illegitimate activity with respect to the testifying investors.  Indeed, the jury could be led to conclude that Shkreli

told the truth to the non-testifying investors and lied only to the testifying investors.  This is extraordinarily prejudicial to the government's theory of the case.

To prove the scope of the fraudulent schemes, the government must be able to show the number of investors in MSMB Capital and MSMB Healthcare and communications to the investors.  The subscription agreements are the best proof of that those investments occurred on specific dates and for specific amounts.

To prove the nature of the fraudulent schemes, the government is entitled to show that Shkreli sent consistent lies to all investors regarding the performance of the funds, and that he did not pick and choose among the investors to whom he lied.  The performance estimates are the among best evidence of this pattern and practice of lies.

The government is also entitled to prove that Shkreli knew he was lying—that he had fraudulent intent.  And the jury is entitled to conclude that Shkreli knew he was lying because he lied to every last MSMB investor, not just the eight investors who testified.  The email correspondence between non-testifying investors, Shkreli and his co-conspirators are essential.  These documents show how he led them also to believe that the funds were successful.  In truth, they were abject failures.  These communications show the brazenness of Shkreli's lies.  For example, many of the non-testifying investors—just as the testifying investors—were promised that they could redeem their investments for cash.  But Shkreli knew he had no cash to give them.  The consistency, pattern and practice of lies to investors in the fund are all circumstantial evidence of Shkreli's intent.  If the jury is misled to believe that he may have told the truth to the non-testifying investors, they may also believe that he did not intentionally lie to the investors who testified.

Evidence regarding the non-testifying investors also corroborates and ties-out the voluminous evidence that is already in the record.  For example, the bank and brokerage records for MSMB Capital show that Shkreli repeatedly solicited new investors, only to lose their money before he found new victims.  This evidence shows the boom and bust cycles at MSMB Capital that were subsidized by new unsuspecting investors.  For the evidence to include some investors, but not others, would disable the government from showing the true nature of the Shkreli's fraudulent schemes.  Furthermore, without documents such as the subscription agreements, the jury will see simply bank records or other evidence with names and other information without any context.  This is likely to lead to juror confusion and leave the jury with the misimpression that Shkreli undertook activities through the funds that are not covered by the Superseding Indictment.

Finally, none of the Disputed Evidence is unduly prejudicial under Federal Rule of Evidence 403, because it is similar in nature to evidence that has already been admitted at trial.  Indeed, the jury has seen numerous subscription agreements, emails from Shkreli, investor statements, settlement agreements and consulting agreements.[4]

### ii.   There is No Legal Requirement That The Government Prove Investors Relied On Shkreli's Misrepresentations

Shkreli also mistakenly asserts that statements he made to MSMB Capital and MSMB Healthcare investors who have not testified at this trial are not relevant because the government cannot prove either that those investors actually relied on Shkreli's

---

[4] Indeed, similar evidence related to non-testifying defrauded investors was admitted at two recent trials in this district.  See United States v. Lange, No. 10-CR-968 (DLI) (E.D.N.Y.); United States v. Mazella, No. 11-CR-300 (CBA) (E.D.N.Y.).

misrepresentations, or that the misrepresentations were material to those investors without their testimony.  As set forth below, in making such an argument, Shkreli fundamentally misunderstands the federal fraud statutes.

Shkreli is charged in Counts Two, Five and Seven with wire fraud conspiracy in relation to the MSMB Capital, MSMB Healthcare and Retrophin schemes.  The essential elements of wire fraud, the object of those conspiracies, are: 1) a scheme to defraud; 2) money or property as the object of the scheme; and 3) use of the mails or wires to further the scheme.  United States v. Greenberg, 835 F.3d 295, 305 (2d Cir. 2016).  As set forth by the Supreme Court in Neder v. United States, "common-law requirements of 'justifiable reliance' and 'damages' . . . plainly have no place in the federal fraud statutes."  527 U.S. 1, 24-25 (1999).

In proving a scheme to defraud (the first element of wire fraud), the government must prove that the misrepresentations at issue are material.  United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000).  A false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  Neder, 527 U.S. at 16.  The Supreme Court in Neder made clear, however, that a matter is material if a "reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."  Id. at 22 n.5; see also United States v. Lindsey, 850 F.3d 1009, 1013 (9th Cir. 2017) (noting that materiality "is evaluated under an objective test, in which we must examine the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end") (internal quotation marks omitted).

Shkreli is also charged in Counts One, Four, and Eight with securities fraud conspiracy in relation to the MSMB Capital, MSMB Healthcare and the Retrophin Unrestricted Shares schemes, and Counts Three and Six with securities fraud in relation to the MSMB Capital and MSMB Healthcare schemes.  A misrepresentation is material under Section 10(b) of the Securities Exchange Act and Rule 10b-5 where there is "a substantial likelihood that a reasonable investor would find . . . the misrepresentation important in making an investment decision."  United States v. Vilar, 729 F.3d 62, 89 (2d Cir. 2013) (also noting that the federal fraud statutes prohibit the 'scheme to defraud' rather than the completed fraud).  Determinations regarding materiality under the securities law are mixed questions of law and fact that the Supreme Court has identified as especially "well suited for jury determination."  United States v. Litvak, 808 F.3d 160, 175 (2015), citing United States v. Blizerian, 926 F.2d 1285, 1298 (2d. Cir. 1991).

Here, in order to prove that Shkreli is guilty of the wire and securities fraud charges in this case, the government does not need to prove that each and every investor in MSMB Capital and MSMB Healthcare relied on Shkreli's misrepresentations in either making his or her decision to invest in the hedge funds, or making the decision not to request a redemption of his or her investment.  Instead, the government must show that the misrepresentations made by Shkreli in furtherance of the charged schemes were material by an objective reasonableness standard.  The government can make this showing in a number of ways, including through victim testimony, documentary evidence, and admissions made by Shkreli himself in furtherance of his schemes to defraud MSMB Capital and MSMB Healthcare investors.  The government should not be limited in its proof as to the scope and breadth of the fraudulent schemes at issue here because of Shkreli's erroneous understanding

15

of the elements of federal fraud charges – namely, that the government must show that the investors actually relied on Shkreli's misrepresentations. Such an understanding runs afoul of the criminal fraud statutes applicable here. Accordingly, the government should not be limited in introducing statements made by Shkreli in furtherance of the charged schemes to MSMB investors that are not expected to testify at trial.

### B. The Disputed Evidence Is Not Hearsay

The Disputed Evidence is admissible as either non-hearsay or under a well-established hearsay exception. To the extent that the probative value of these documents outweighs their prejudicial value—as discussed above—they are admissible at trial.

### 1. Shkreli's Statements Are Admissible Pursuant to 801(d)(2)(A)

At a bare minimum, statements made by Shkreli in furtherance of the charged conduct during the charged time period are admissible as statements of a party opponent under Federal Rule of Evidence 801(d)(2)(A). A defendant's "own statement, if offered against him, is not hearsay." United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982). FRE 801(d)(2) provides that a statement is not considered hearsay if the "statement is offered against a party and is … the party's own statement." United States v. Gotti, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006). Statements made by a defendant are generally admissible "regardless of whether such statements were against his interest when made." Id. However, when a defendant—as opposed to the government—seeks "to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982).

Relevant communications that Shkreli sent to investors, including emails and investor statements, are paradigm statements by a party opponent under Rule 801(d)(2)(A)

and are thus not hearsay.  Emails between Shkreli and co-conspirators and others in which

Shkreli made statements in furtherance of the conspiracy are similarly admissible under this

rule.  In fact, the Court has already admitted dozens of emails, investor statements and other

documents—and has precluded numerous exhibits offered by the defense during cross-

examination— at this trial on this very basis.

### 2. To The Extent the Disputed Evidence Contains Hearsay Statements, Such Statements are Admissible

Any hearsay statements made by non-testifying investors to Shkreli that are

also contained within the Shkreli's communications are not being offered for their truth and

are thus admissible on three independent grounds.

First, statements made by non-testifying investors to Shkreli demonstrate his

knowledge of a variety of topics.  See 5-801 Weinstein's Fed. Evid. § 801.11 ("statements

are not hearsay when offered not for their truth but to prove the extent of declarant's

knowledge or a recipient's notice of certain conditions").  Because much of Shkreli's

evidence at trial thus far has been aimed at his fraudulent intent, it is impossible to catalogue

for this brief every issue of which Shkreli had knowledge, in part, because of the statements

of others.  However, a few pertinent examples of these issues demonstrate the propriety of

admitting such statements.

For example, communications between Shkreli and non-testifying investors

like Alan Geller and Michael Lavelle demonstrate, at a minimum, Shkreli's knowledge of a

variety of topics, including that the investors believed that the funds were performing well,

their desire to redeem their investments and their frustration at their inability to redeem their

investments.  Additionally, statements made by co-conspirators like Greebel about, among

17

other things, the settlement and consulting agreements pertaining to non-testifying investors,

demonstrate Shkreli's knowledge that he was using Retrophin's assets to pay off his old

investors.   Statements made by employees of the audit firm Marcum or SEC Solutions

demonstrate Shkreli's knowledge of the state of Retrophin's financial information.  None of

these statements are being offered for their truth, but rather to show that Shkreli—as the head

of the MSMB entities and Retrophin, and the only person privy to the full financial picture

for all of the entities in this case—was aware of the entire mix of information that he then

used to defraud investors and Retrophin.  See, e.g., United States v. Ansaldi, 372 F.3d 118,

130-31 (2d Cir. 2004) (holding that a document could be admitted to show the defendant's

knowledge even though he had not even seen it because there was sufficient circumstantial

evidence that the defendant was aware of the contents of the document).

       Second, statements made by others to Shkreli are admissible show their effect

on Shkreli as the listener.  See, e.g., United States v. Rowland, 826 F.3d 100, 115 (2d Cir.

2016).  When a non-testifying investor reached out to Shkreli regarding, for example, the

status of his or her redemption, Shkreli's response was often to delay by failing to respond or

by providing inaccurate information that reassured the investor.  Similarly, when investors

demanded their money or threatened legal action, Shkreli often responded by deploying

Greebel to negotiate a settlement or consulting agreement that misappropriated money or

shares from Retrophin.  The non-testifying investors' statements thus had a distinct effect on

Shkreli and thus are admissible.

       Third, a statement can be offered simply to prove that it was made.  One type

of statement admissible under this doctrine are "verbal acts that give rise to legal

consequences."  United States v. Cardascia, 951 F.2d 474, 486-87 (2d Cir. 1991).  The

investors in this case made numerous statements with distinct legal consequences.  For example, many of them discussed their settlement and consulting agreements with Shkreli via email.  This included rejecting or accepting certain offers made by Shkreli.

### 3.    Signed Agreements Are Admissible As Legal Contracts

The signed subscription, settlement and consulting agreements as between a non-testifying investor, Shkreli, MSMB Capital, MSMB Healthcare and Retrophin are legal contracts that were entered into by the investors and the entities.  These contracts are paradigm examples of non-hearsay "verbal acts" or "verbal parts of an act in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights."  Fed. R. Evid. 801(c), Adv. Comm. Notes.  Indeed, "[a] contract . . . is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay. . . . In addition, various communications, e.g., conversations, letters and telegrams—relevant to the making of the contract are also not hearsay."  See Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992) (citing, among other authorities, McCormick on Evidence and the Wigmore evidence treatise); New Era Publications Int'l v. Henry Holt & Co., Inc., 873 F.2d 576, 592 (2d Cir. 1989) (Oakes, J., concurring) ("The law recognizes that words themselves may be facts to be proven.  For example, in evidence law, words of independent legal significance such as a contract or slander, are verbal acts and not hearsay.").

### 4.    Business Records Are Not Hearsay

Documents maintained by the stock transfer agent Standard Registrar are classic business records subject to the applicable hearsay exception embodied in FRE 803(6).  The government expects that a witness from Standard Registrar will lay the adequate foundation to establish their admissibility as business records.

19

Documents that are contained within Standard Registrar's files are also independently admissible.  Communications from Shkreli to Standard Registrar in which he requests specific stock transfers relating to, among other things, non-testifying MSMB Capital and MSMB Healthcare investors, are statements of a party opponent that are not hearsay under Rule 801(d)(2)(A).  Communications from Greebel to Standard Registrar in which he also requests stock transfers are admissible as co-conspirator statements under Rule 801(d)(2)(E).  Communications between other employees of Retrophin and Standard Registrar regarding stock transfers are admissible as the statements of a party opponent's agent or employee under Rule 801(d)(2)(D).  See also Zaken v. Borer, 964 F.2d 1319 (2d Cir. 1992) (holding that statements by a corporate employee are admissible against a corporate officer, not just the corporation); United States v. Agne, 214 F.3d 47 (1st Cir. 2000) (same).  Standard Registrar received copies of settlement and consulting agreements as part of their ordinary course of business.  The company requests evidence of legal authority for a particular stock transaction.  These contracts are verbal acts as indicated above.

### C.    The Confrontation Clause Does Not Apply to the Disputed Evidence

Shkreli's Sixth Amendment arguments are wholly inapplicable to the Disputed Evidence.  The Sixth Amendment is limited "to testimonial statements[.]"  Michigan v. Bryant, 562 U.S. 344, 354 (2010).  In Bryant, the Supreme Court further clarified that the "primary purpose" of a testimonial statement is crucial—"when a statement is not procured with the primary purpose of creating an out-of-court substitute for trial testimony," the Sixth Amendment is not implicated.  Id. at 358-59.  "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."  Id. at 359.  As the Supreme Court has held, "the confrontation right

does not bar admission of statements of an unavailable witness if the statements bear

adequate indicia of reliability [and] reliability can be established if the evidence falls within a

firmly rooted hearsay exception or if it does not fall within such an exception, then if it bears

particularized guarantees of trustworthiness."  Id. at 353.

In a deep irony given the cross-examinations in this case, classic Confrontation

Clause issues have been found to arise where the government simply read into the record

"pretrial examinations of suspects and witnesses[.]"  Id. at 353-54.  In this case, not a single

piece of evidence that the government intends to offer was "procured with the primary

purpose of creating an out-of-court substitute for trial testimony."  Id. at 358-59.  None of the

documents were created for the purpose of litigation or criminal prosecution—indeed, many

of the documents were created or adopted by Shkreli to avoid litigation and/or criminal

prosecution.  All of the documents date from the time period of the charged fraud and

involve Shkreli, a co-conspirator and/or a victim.  None of the government's proof is

predicated on reading into the record statements by victims that were obtained for the

purpose of investigating or prosecuting a criminal case.  None of the evidence is testimonial

under the leading Supreme Court jurisprudence.

Indeed, the business records exception—applicable in this case since many of

the documents come from the files of Retrophin itself or another entity—ameliorates any

concerns about Confrontation Clause issues.  U.S. v. Baker, 458 F.3d 513, 519 (2006).

Business records are "nontestimonial and therefore do not implicate the Confrontation

Clause concerns of Crawford."  Id.; see also Ohio v. Roberts, 448 U.S. 56, 66 n.8 ("Properly

administered, the business and public records exceptions would seem to be among the safest

of the hearsay exceptions.").

21

Even in situations where the out-of-court statements were obtained in the course of a government investigation or prosecution and subsequently offered at trial, Confrontation Clause issues do not arise if a "firmly rooted" hearsay exception applies.  For example, where an arguably testimonial statement by an out-of-court declarant—which the evidence in this case is not— is incorporated into a statement by the defendant, the Sixth Amendment is not implicated where the out-of-court statements merely "establish a context" for the defendant's statements or are otherwise admissible under another hearsay exception. United States v. Walker, No. 99 CR 379 (BSJ), 1999 WL 777885, at *4 (Sep. 29, 1999).  In Walker, for example, the defendant challenged recordings of his communications because the government failed to call an informant who was recorded on the tapes speaking with the defendant.  Id.  The court turned aside the challenge, holding: "So long as the informant's recorded statements are not presented for the truth of the matter asserted, but only to establish a context for the recorded statements of the accused, the defendant's Sixth Amendment rights are not violated."  Id.; see also, United States v. Barone,  913 F.2d 46, 49 (2d Cir. 1990) (same).

Thus, even if Shkreli grasps for the argument that Shkreli's statements to investors, the consulting and settlement agreements he signed, the emails he exchanged with co-conspirators or the communications his co-conspirators sent to victims, among the other evidence at issue here, are testimonial—which they are not—all fall within the hearsay exceptions outlined above and do not implicate the Confrontation Clause.

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the Disputed

Evidence should be admitted.


Dated:  Brooklyn, New York
        July 17, 2017

                                        Respectfully submitted,

                                        BRIDGET M. ROHDE
                                        Acting United States Attorney
                                        Eastern District of New York


                                        _____/s/_____
                                        Jacquelyn M. Kasulis
                                        Alixandra E. Smith
                                        G. Karthik Srinivasan
                                        Assistant U.S. Attorneys
                                        (718) 254-7000


cc:    Clerk of the Court (KAM)
       Defense Counsel (By ECF and Email)