UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

UNITED STATES OF AMERICA     :

                     :

                     :

     -against-              :

                     :     Ind. No. 15 CR 637 (KAM)

                     :

MARTIN SHKRELI           :

EVAN GREEBEL,           :

                     :

          Defendants.     :

-------------------------------------------------------------X

## MARTIN SHKRELI'S RESPONSE TO THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE OF THE CHARGED CRIMES

By:    **Brafman & Associates, PC**
*Attorneys for the*
*Defendant Martin Shkreli*
767 3rd Avenue, 26th Fl.
New York, NY 10017
Tel - 212-750-7800
Fax - 212-750-3906
bbrafman@braflaw.com

Of Counsel:   Benjamin Brafman
               Marc Agnifilo
               Andrea Zellan
               Jacob Kaplan
               Teny Geragos

## PRELIMINARY STATEMENT

Having apparently concluded that continuing to call witnesses and subjecting them to cross examination is not in its best interests, the Government seeks to embark on a novel and unconstitutional way of putting "evidence of fraud" before this jury without the perils of actual witness testimony.    Instead of calling Brent Saunders, Alan Geller, Michael Lavelle, Molly Tschang, Steven Rosenfeld, Seymour Block, Diandra Douglass, George Blasko, Spencer Spielberg, Robert Johnson, Patrick McGowan and Edmund Sullivan to the witness stand, the Government now[1] seeks to admit into evidence, without a witness, a host of settlement agreements, consulting agreements, subscription agreements, investor statements, email communications and other documents that purport to prove that these people are in fact the recipients of fraudulent agreements.[2]

The defense objects to this procedure on a variety of bases.  **First**, the Government's failure to provide notice of this process should itself lead to a denial of this motion.  **Second**, under the particular facts here, the Government's motion to admit documentary evidence of fraud without calling witnesses -- each of whom the Government knows will testify in a manner inconsistent with the Government's theory of the case – violates the defendant's right to Due Process under the U.S. Constitution.    **Third**, many of the documents proffered by the Government are offered for the truth of the documents and are accordingly inadmissible hearsay.

---

[1] The other possibility, to be addressed below, is that the Government intended to do this the entire time and made a strategic decision to not inform defense counsel or the Court of the fact that it intended to admit all of these materials through a summary witness until Wednesday July 19, 2017, immediately before the witness testified.

[2] As will be addressed further below, the very decision to admit this material as relevant evidence is to decide that these materials are evidence of a fraud without the testimony of any witness on this topic.  If the Court were to conclude that these materials were not evidence of a fraud, then the materials would not be relevant at this trial.

1

**Fourth**, admitting documents and failing or intentionally refusing to call the witnesses related to those documents violates Fed. R. Evid. 403.

## ARGUMENT

### A. The Government's Failure To Raise This Issue Pre-Trial Alone Should Cause The Court To Deny The Government's Application In Its Entirety

The Government informed the defendant that it intended to admit settlement agreements, consulting agreements, subscription agreements, investor statements, certain email communications[3] and other documents through a summary agent for the **first** time, on Wednesday July 19, 2017.  Before that date, the defense expected only that the Government would seek to admit various email communications between Shkreli and Greebel as either admissions of the defendant or as co-conspirator statements and the defense learned of the email issue only because we specifically asked the Government last week if it intended to offer email evidence of this type. For the past week or so, there have been discussions between the parties about only the emails, as this was the only thing the defense had been told the summary agent would testify to that seemed at all controversial.  Specifically, as early as the middle of last week, the defense and the Government spoke about the need for the defense to know the specific emails the Government was seeking to admit so that we could discuss legal issues such as Rule 106 completeness and general admissibility sufficiently in advance of the case agent's testimony. The defense also raised the possibility that the Government had not established that Greebel was a co-conspirator for the purpose of admitting email communications from Greebel.   At some point toward the end of last week, the Government indicated that it would inform us of the

---

[3] To be clear, the defense has known for about a week that the Government sought to <u>admit email communications between Shkreli and Greebel</u>.  However, the Government did not inform us that the summary agent intended to testify to anything more than that.

specific emails it would use by Wednesday July 19, 2017.[4]  The Government stated that it had

not made a final decision on which emails it would use, and could not do so until Wednesday

July 19th.

At no time during these detailed discussions about the Shkreli-Greebel emails did the

Government so much as allude to the fact, much less put the defense on clear, specific notice,

that in addition to emails, it would seek to admit the wide array of documents included on its

most recent exhibit list.  The best evidence of the fact that the defense was completely in the dark

as to the Government's intentions, aside from the emails alone, is a colloquy taking place

yesterday morning (July 19, 2017) immediately prior to the Government providing defense

counsel with the list of exhibits, including all the documents now the subject of the

Government's motions.  At the colloquy, defense counsel stated as follows:

> MR. AGNIFILO:  The problem we have now is the case agent is going to put in the
> Greebel Shkreli emails.  We still don't know which ones they
> intend to put in.  There is nothing I can possibly opine on from a
> 106 standpoint or admissibility standpoint, we still don't have the
> Emails.

Tr. 4555.

As of yesterday morning, therefore, the defense believed, based on the Government's

representations and omissions made up until that point, that the sole issue to be decided in

advance of the case agent's testimony was the emails.  Otherwise, it would be unimaginable that

the only issue being raised would be the Rule 106 issue.  Even during the colloquy yesterday

morning, the Government said nothing to disabuse the defense of the fact that it was operating

under a clear misapprehension as to what the Government actually intended.  This was a

---

[4] At that point, the parties were operating on the assumption that the case agent would not testify
before Friday, July 21st.  Therefore, if the defense had the specific emails the Government
intended to use by Wednesday, July 19th, we could either find consensus on admissibility issues
or, if necessary, bring the issue to the attention of the Court on Thursday July 20th.

misapprehension intentionally cultivated and perpetuated by the Government through what it failed to say. One would have expected them to tell the defense everything the case agent was going to testify to.   In addition, counsel repeatedly asked the Government whether Al Geller was going to testify and when he was scheduled to appear.  Mr. Geller was listed as a witness for this week in a list provided by the Government last weekend.  It would now appear that Mr. Geller was never going to testify and the Government was misleading counsel.

This alone should preclude the Government's motion.  That the Government did not raise this issue squarely and clearly pre-trial is unforgivable.  The defense shouldn't beg for scraps of information about what a summary witness will testify about, and be told partial-truths, half truths and otherwise be kept completely in the dark.  The Government had the obligation long before yesterday to make this crystal clear for everyone.  For the defense and the Court to now scramble to address a complex issue regarding a massive amount of documentary evidence that the Government seeks to elicit without a witness is in and of itself wrong[5].  The fact is that the Government never told the defendant or the Court of its intention to engage in this procedure until yesterday, immediately before the testimony relating to these issues.   Perhaps the Government believed that failing to notify the defense of the issue and by putting this huge swath of evidence before the jury without calling an investor would catch defense counsel unaware. Such a tactic should be soundly condemned by this Court.   The simple fact is this: the Government has no excuse for not clearly putting all parties -- the defendant and the Court – on

---

[5] No party in an important criminal matter should be compelled to write a brief overnight on a weighty issue of evidence such as whether certain evidence would violate a defendant's due process right.   The defendant is in that position now solely and exclusively because the Government did not provide sufficient notice of this issue.   Had the Government included this bombshell of an issue as part of its *in limine* motions, the briefing on this matter could have been completed in a far more responsible and reasonable fashion before opening statements.

clear, unambiguous notice of this issue in detail well in advance of the testimony of the witness through whom such evidence would be admitted.

If the Government knew it was going to do this at the pretrial stage –and it is hard to imagine it did not know it then – then this should have been an *in limine* motion that the Government made pursuant to the Court's schedule for *in limine* motions. The motion made yesterday to admit through a case agent a tremendous number of documents that the Government claims is evidence of fraud is obviously precisely what *in limine* motions are intended to address.

At a minimum, the Government failed to provide reasonable notice of its intention to engage in this process. The very real possibility exists that this failure to provide notice was altogether intentional and strategic. However, in either event, the evidence should be precluded on this basis alone.

### B.  The Government's Efforts To Admit Documentary Evidence Without Calling Investor Witnesses Whose Testimony the Government Knows Would Be Inconsistent With Its Trial Theory Amounts To A Violation Of Due Process

The Government argues that, without abridging Defendant's right to cross-examination, it need not call Brent Saunders, Alan Geller, Michael Lavelle, Molly Tschang, Steven Rosenfeld, Seymour Block, Diandra Douglas and George Blasko to the stand, but rather it will only offer a paper case henceforth, because the Sixth Amendment is limited "to testimonial statements[,]" citing Michigan v. Bryant, 562 U.S. 344, 354 (2010). The Government thus does cartwheels in seeking to convince this court to admit its evidentiary proffer, as non-"testimonial," so as to avoid having to subject its credibility-challenged witnesses to cross-examination. Concededly, to be "testimonial," and hence subject to confrontation under the *Sixth Amendment,* a statement must have a " 'primary purpose' " of " 'establish [ing] or prov[ing] past events potentially relevant to later criminal prosecution.' " Bullcoming v. New Mexico, --- U.S. ----, 131 S.Ct. 2705,

2714 n. 6 (2011) (alterations in original) (quoting Davis v. Washington, 547 U.S. 813, 822 (2006)).

Defendant's rights, however, do not end with the Sixth Amendment. Rather, he has a *Fifth Amendment* right to fundamental fairness and due process which the government, by precluding Defendant's ability to confront his accusers, is trammeling upon to the point of evisceration. Indeed, as long ago stated in Chambers v. Mississippi, 410 U.S. 284 (1973),

The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. *The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.* Mr. Justice Black, writing for the Court in In re Oliver, 333 U.S. 257, 273 (1948), identified these rights as among the minimum essentials of a fair trial: "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, *a right to examine the witnesses against him,* to offer testimony, and to be represented by counsel." 410 U.S. 284, 294–95 (citing Morrissey v. Brewer, 408 U.S. 471, 488—489 (1972); Jenkins v. McKeithen, 395 U.S. 411, 428-29 (1969); Specht v. Patterson, 386 U.S. 605, 610 (1967) (emphasis added).

Otherwise stated , "[t]he right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process[,]' and [i]t is, indeed, 'an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Id., 410 U.S. at 295 (citing Dutton v. Evans, 400 U.S. 74, 89 (1970); Bruton v. United States, 391 U.S. 123, 135-37 (1968) and  Pointer v. Texas, 380 U.S. 400, 405 (1965). Consequently, the fact that the Government

cowardly avoids presenting its witnesses to this jury cannot be so blithely dismissed as not violative of Defendant's rights under Crawford.

Indeed, the government has accused Defendant of serious acts of fraud, has hauled him into court, and, in so doing, has portrayed myriad individuals as having been victimized by those acts. Yet, when push comes to shove, and it comes time to present those individuals before the jury, the government cowers in fright, obviously given the defense's demonstrated ability during the course of this trial to garner the truth upon exercising Defendant's *due process* right to confrontation. Most respectfully, if this honorable court is to protect that right, as is its charge, that the government should not be empowered to do. For the "denial or significant diminution [of such right] calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely examined." *Chambers,* 410 U.S. at 295 (citing Berger v. California, 393 U.S. 314, 315 (1969)). See also Marrant v. Cuomo, 447 F. App'x 234, 236 (2d Cir. 2011) ("Recognizing that 'the rights to confront and cross-examine witnesses ... in one's own behalf have long been recognized as essential to due process[.]'") (quoting Drake v. Portuondo, 321 F.3d 338, 344 (2d Cir.2003) quoting Chambers v. Mississippi,410 U.S. at 294)); United States v. Tureseo, 566 F.3d 77, 83 (2d Cir. 2009) ("Through the Due Process Clause of the Fifth and Fourteenth Amendments, this right to be present has been extended to other critical stages of trial *beyond those related to the defendant's rights to confronting witnesses* and evidence.") (emphasis added); *United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("The right of confrontation is also a fundamental component of the constitutional guarantee of due process of law." (Citing Specht v. Patterson, 386 U.S. 605, 609-10 (1967); Pointer v. Texas, 380 U.S. 400, 403 (1965); and *Howard* v. Walker, 406 F.3d 114, 131 (2d Cir.2005)).

The Government does not want these witnesses on the stand for a good reason. The Government has nationwide subpoena power as well as the power and authority of the FBI at its disposal to serve trial subpoenas anywhere in the United States. The Government also has treaty powers under the Mutual Legal Assistance Treaties (MLATs) to subpoena witnesses in most foreign countries. So, to be crystal clear, the Government has the power and ability to call these witnesses if it wants to do so and may force witnesses to testify by offering reluctant witnesses immunity or Non-Prosecution Agreements as they did with Lee Yaffe for example.

The Government complains in their motion that they must be permitted to elicit evidence of the full scope of the charged conspiracy. Our response: "go for it." Bring the witnesses in one by one and we will cross examine them one by one and allow the jury to see what credible evidence remains. The Government obviously does not want that, and for good reason.

Significantly, these are witnesses with whom the Government has spoken.[6] The Government knows what these witnesses will testify to, and it can call them if it wants to. It doesn't want to. It doesn't want to because the Government knows these witnesses will contradict the Government's overarching theory of this case. Nonetheless, the Government wants to put in the documents and agreements of these witnesses as fraud evidence. However, by putting such evidence into the record as fraud evidence, knowing all the while that the witness

---

[6] Conversely, these witnesses are plainly not available to the defense, even though that should play no role whatsoever in this analysis. The Government announced at a court proceeding several months ago that the grand jury investigation in this matter was ongoing. The Government moreover has taken the position that the recipients of fraudulent consulting and settlement agreements are co-conspirators. The Government added bite to this bark when it compelled Lee Yaffe to surrender the money he made from his allegedly unlawful agreement and provided him with a Cooperation Agreement that indicated that he was not being prosecuted for certain crimes that he committed. So, for the Government to suggest that any of the investor witnesses would speak to Shkreli's counsel is preposterous. The Government ensured this would not happen a long time ago, and the Government has effectively scared these witnesses away from the defense.

would testify that there was no fraud, is a violation of Mr. Shkreli's constitutional right to due process.

### 1.    The Expected Testimony Of The Witnesses Not Being Called

Al Geller would testify, in substance, that he invested in Martin Shkreli, the genius, and not in the company. He would also testify that he provided consulting services by being a "life coach" for Shkreli, a particular type of guidance that could benefit both Shkreli and any company with which Shkreli was associated. He would further state that he counseled Shkreli between 20 and 30 times on business-related issues. He will testify that he loved Shkreli and that he made millions of dollars as a result of his investments in both MSMB and Retrophin. Al Geller would further state that he wanted his brother, David Geller, to also invest with Shkreli because of all the money that he (Al Geller) made with Shkreli, and that he and Shkreli discussed Al Geller being compensated not only as a consultant but also as one of the investor-founders of Retrophin. Finally, Al Geller thinks so highly of Shkreli that he invested $1,500,000 in Turing Pharmaceutical, Shkreli's current company.

Steven Rosenfeld would testify that he provided actual, real, legitimate consulting services to Retrophin and that when Steve Aselage and other Retrophin Board members claimed he did not, he sued them in an arbitration proceeding and won.[7] He will testify that he received a consulting agreement in good faith, that he relied on the agreement in good faith and that he performed valuable services to the company as part of that agreement. There are hundreds of pages of testimony of this witness at the arbitration hearing. The Government has it, and obviously does not want this witness saying anything similar at this trial.

---

[7] The Arbitrator's written decision is available to the Court in the defense binder as DX 4990. It is currently not a public document.

Steve Rosenfeld, like many of the now non-testifying investors will testify that he "chose to invest in MSMB Healthcare because of Ron Tilles" and their decade-long friendship. See Government Exhibit 3500-SR2-2.   Rosenfeld would further say that he invests his money through his LLC Park Avenue Discoveries and is well-known for his investments in biomedical companies. See 3500-SR2-1.

Rosenfeld signed a consulting agreement in February 2014 that was subsequently disclosed in a Retrophin SEC filing.  His 3500 material and his arbitration testimony indicate he will testify that he provided consulting services and that his agreement was not a sham.  He will testify Ron Tilles told Rosenfeld that Retrophin was pursuing companies that were "income producing, held Phase Three drugs, or orphan drugs." 3500-SR2-2.  Accordingly, Rosenfeld performed consulting services by networking with connected people in the medical community and "asking them to identify orphan drug companies."  He spoke with David Carter, Chairman of Symatics, who knew of a prosthetics company, Axial, that needed $1 million.  Rosenfeld also met with Professor Zvi Loewy to see if Prof. Loewy could identify any orphan drug companies to pursue.  Rosenfeld also met with David Filer, a former professor of Microbiology at New York University and a current consultant for biotechnology and pharmaceutical companies, to introduce him to Tilles.  Rosenfeld met with Mark Urlich from Buckman & Buckman to discuss orphan drug companies that Retrohpin could also pursue. Id.

Michael Lavelle, an MSMB Healthcare investor, negotiated and received a settlement agreement from Retrophin.  If called to the witness stand, he will testify that he invested in MSMB Healthcare because of Kevin Mulleady, his cousin.  Lavelle acted as a mentor to Mulleady and felt comfortable in his investment "because Mulleady was in an authoritative position and Lavelle trusted Mulleady." See 3500-ML-1.  Lavelle was also impressed by Shkreli

as "super-technical, a great salesman, a domain expert, [with] an impressive feel for the market." Id.

### 2.    The Role Of Cross Examination At This Trial On Relevant Issues

As has been made clear by the testimony to date, each investor invested with Shkreli's fund for different reasons and for reasons unique to him or herself.  Some investors read the investment documents; others did not; one investor had his attorney read the documents; some relied on the recommendations of friends; some cared deeply about liquidity; others knew they were tying up their money for a long time; some read the performance estimates; others did not appear to care about them except to use the emails to ask personal questions of Shkreli, including questions about bubble baths; some investors witnessed first-hand Shkreli's knack for picking stocks and didn't care about the documents at all.

In addition, there are certain questions that are relevant to the overall analysis of reliance and materiality that are answered differently by each investors; these questions include, without limitation, the following:

- Whether the investor had any communications with Martin Shkreli before investing
- Whether the investor communicated exclusively with other MSMB employees before investing
- Whether the investor received a private placement memorandum from Mr. Shkreli
- Whether the investor read the private placement memorandum supplied by Mr. Shkreli
- Whether the investor discussed the private placement memorandum with an attorney
- Whether the private placement memorandum was material to the investor' decision to invest
- Whether the investor received performance estimates from Martin Shkreli
- Whether the investor actually reviewed the performance estimates
- Whether the investor only received the performance estimates after investing
- Whether the performance estimate was material to the investor' decision to invest
- Whether the investor received investor statements from Martin Shkreli

11

- Whether the investor reviewed the investor statements from Martin Shkreli
- Whether the investor statements were material to the investor' decision to invest
- Whether the investor knew about Mr. Shkreli's prior fund experience
- Whether Mr. Shkreli's prior fund experience was material to the investor' decision to invest
- Whether the investor requested a redemption
- Whether MSMB having an auditor was material to the investor's decision to invest
- Whether Mr. Shkreli informed the investor that he would invest their money in Retrophin
- Whether the investor wanted their money invested in Retrophin

In sum, there is no common thread linking the investor witnesses in this case.  Rather, each invested for reasons that were important and personal to him or her, and each investor was permitted to testify precisely to the personal, subjective reasons he or she had for deciding to invest with MSMB.  Given this fact, the right to cross examine each of these investors as to the individualized decisions to invest is relevant to the issues at this trial and critical to this defendant's right to due process.

Also, in regard to the alleged fraudulent consulting agreements, cross examination has proven to be critical to the jury's full understanding of the witness' role and credibility.   For example, Lee Yaffe testified on direct examination that he provided no consulting services whatsoever to Retrophin.  On cross examination, however, he testified that in fact he received many pages of medical literature on cluster headaches and also had specific, detailed conversations with Shkreli and/or Marek Biestek about cluster headaches.  He explained during cross examination that he had no recollection of the medical literature, which he admits receiving by email, until he was shown the materials on cross examination.   Moreover, while he characterizes his conversations with Shkreli and/or Biestek on the topic of cluster headaches as brief – one or two phone calls between two and five minutes each – the cross examination casts

doubt on the veracity of his recollection due to the amount of information Yaffe admitted that he recieved.  In any event, it is for the jury, and the jury alone, to decide after hearing the direct and the cross examination what the credible evidence is.   The jury may very well conclude after hearing the cross examination of Mr. Yaffe that in fact his initial statements to the FBI were true – that he did have multiple conversations with Marek Biestek about cluster headaches. Additionally, the jury may conclude that his close contacts and companies such as Leerink Swann were of sufficient benefit to the nascent biotechnology company that in fact he earned his consultants fee.

Mr. Yaffe, who admitted being scared by two FBI agents visiting him at home unexpectedly, later made the decision to capitulate to law enforcement as a matter of self-preservation.  His testimony is not to be uncritically accepted by the defense.  Indeed, our position is that Yaffe did in fact have conversations with Shkreli and Biestek about cluster headaches, that he held himself out as being a helpful consultant to Retrophin and that in addition to his assistance with cluster headaches, he had important business contacts, including his good friend Swanny at Leerink Swann that were of true value to Retrophin.   We are permitted to argue that faced with the prospect of having the U.S. Government as an enemy or an ally, he chose the latter, and that he then conformed his story in a manner consistent with that role so as to avoid prosecution.  This is but one small example of important cross-examination in what has been a long trial filled with important cross-examinations of Government witnesses.

### 3. Individual Reliance By Investors On Alleged Misrepresentations Has Uniformly Been Deemed By This Court In This Case To Be Relevant And That Ruling Is Now The Law Of This Case

The Government now asserts that it is not required to prove that investors relied on the alleged misrepresentations, and complains that the defense "fundamentally misunderstands the

federal fraud statutes" in arguing to the contrary.   Government's Motion, pp. 13-14.   However, it is the Government which fails to recognize that during this entire trial, it has proceeded on the factual premise that the subjective viewpoints and beliefs of the individual investors, and what specifically each one relied upon in deciding to invest, was directly relevant to what an objective investor would do in the same circumstances.   Specifically, in regard to each investor witness who testified in this case, the Government elicited, over defendant's objection, that witness' particular subjective viewpoint about what he or she believed was important and material in deciding to invest with the defendant's fund.

For example, in regard to Sarah Hassan, the Government's examination proceeded as follows:

| | |
|---|---|
| [MS. KASULIS]: | Now, at this time, if the defendant had run a prior hedge fund that had performed poorly, would that have been important for you to know at the time you were making your investment in MSMB Capital? |
| MR. BRAFMAN: | Objection. |
| THE COURT: | I'm going to overrule the objection. |
| | You may answer. |
| [S. HASSAN]: | Yes. |
| [MS. KASULIS]: | Why is that? |
| [S. HASSAN]: | It's very important to know what someone's track record is. It's very common in the hedge fund world that you make investments in someone's current fund based on their track records of old funds. So, if there was an old fund that I could have used to make a decision, that would have been very helpful. |

Tr. 947-48.  There are numerous other examples of the Government arguing the relevance of individual investor decisions and of the Court agreeing to such relevance.  See Exhibit A.

Indeed, after the Government succeeded in eliciting such subjective, individual viewpoints and opinions of several of the investor witnesses, the defendant lodged a specific objection to the Government's questioning.  The Government's counterargument was that it was critical that it be permitted to question the investor witnesses as to their subjective individualized reasons for investing with the defendant's fund because it was relevant to the charged conduct.  Indeed, the Government's arguments in this regard were so compelling, that it prompted the Court to rule as follows:

> You can't just throw the reasonable investor concept in front of the jury and ask them in a vacuum to try to determine what a reasonable investor would do.  I think one way to get there is to … to hear testimony from investors that would help the jury understand what would be important to an investor.  What information would be important, what information influenced their investor decision.  And I believe she (J. Seybert) noted in *Hatflield* that what influence an investment decision is probative of what a reasonable investor would have considered.
>
> So, there has to be some way for the Government to establish that standard and it seems to me that the jury would listen to those investors and decide whether they exemplify a reasonable investor, maybe they're not, but to understand what facts those investors considered important to their investment decision I think is relevant and material to their burden of proof.

Tr. 2718-19 (emphasis added).

Up until yesterday, the Government argued forcefully that it must be permitted to elicit from each investor that specific investor's subjective view of what he or she considered important in deciding whether or not to invest.  However, now that the Government is looking to elicit evidence of fraud in the absence of actual testimony from investors, it takes the precisely opposite viewpoint and argues that the individual, subjective viewpoints of the investors are irrelevant.

This Court has already ruled on this precise issue, and it has ruled specifically that the individual, subjective belief and viewpoint of the individual investor are relevant to the charged conduct.  As the Court specifically stated, "to understand what facts those investors considered important to their investment decision I think is relevant and material to their burden of proof." Tr. 2719.

Just as the subjective, individual beliefs and viewpoints of investors were found to be relevant during the phase of this case when the Government was calling actual witnesses, it is likewise relevant now.  Indeed, the Court's ruling in this regard has become the <u>law of this case</u>, and it cannot be altered now by the Government, regardless of how inconvenient to their new-found position the Court's ruling on this point has become.

The Second Circuit has held that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case," <u>United States v. Uccio</u>, 940 F.2d 753, 759 (2d Cir. 1991), "unless 'cogent' and 'compelling' reasons militate otherwise.  <u>United States v. Quintieri</u>, 306 F.3d 1217 (2d Cir. 2002) *quoting* <u>United States v. Tenzer</u>, 213 F.3d 34, 39 (2d Cir. 2000).

The Government fought hard to convince this Court that the individual, subjective viewpoints of the investors were relevant to the charges.  That issue is settled.

## C.    A Finding Of Relevance Presupposes A Fraud

The Government claims that these settlement agreements, consulting agreements, subscription agreements, investor statements, email communications and other documents are relevant and should be admissible under FRE 401.  However, these materials are only relevant at this fraud trial if they are the instrumentalities of a fraud.  If they are not instrumentalities of a fraud, they are not relevant.

The Court has no basis to find, in the absence of a witness testifying that these materials were instrumentalities of a fraud. Indeed, for the Court to admit these documents as relevant in the absence of a witness, the Court would have to conclude as a factual matter that they are instrumentalities of a fraud, a conclusion that the Court, most respectfully, cannot reach absent actual testimony. Unlike, for instance, a kilogram of cocaine or a silencer, a consulting agreement can be just a consulting agreement. It is undisputed that certain persons received consulting agreements from Retrophin that were wholly legitimate. For instance, Ken Banta received a consulting agreement in 2011, which is not alleged to be illegitimate.[8] Moreover, someone named Mark Lapolla received a consulting agreement in 2014 which is not alleged to be illegitimate.

As a result, the Court has no basis in the absence of witness testimony to find that a particular consulting agreement, settlement agreement or subscription agreement is an instrumentality of a fraud and therefore relevant at this trial.

### D.    The Agreements With The Witnesses Are Inadmissible Hearsay

The Government seeks to introduce the following:

subscription agreements for additional MSMB Capital and MSMB Healthcare investors; specifically, the government will seek to introduce the subscription agreements for MSMB Capital investors Brent Saunders and MSMB Healthcare investors Alan Geller, Michael Lavelle, Molly Tschang, Steven Rosenfeld, Seymour Block, Diandra Douglas and George Blasko (GXs 24, 27, 29, 30, 30-A, 31, 32, 35-39).

Motion at 4.

In furtherance of this proffer, the Governments explains that

---

[8] The Government alleges that the 2013 Banta agreement was illegitimate because it was not disclosed to the Board of Directors, a factual conclusion flatly contradicted by signed SEC documents already admitted into evidence.

> [t]hese subscription agreements detail the dates and amounts of the investors'
> investments into MSMB Capital and/or MSMB Healthcare. While the bank
> records already in evidence demonstrate that these individuals deposited money
> into MSMB Capital and/or MSMB Healthcare bank accounts, the subscription
> agreements documents are being offered *to show that those deposits were made in
> connection with an investment in MSMB Capital and/or MSMB Healthcare*, and
> are not a loan or other form of payment to those entities.

Motion at 4-5; emphasis added (footnote omitted).

The Government supports this claim by arguing that such documents are not hearsay

because they are only offered as "verbal acts." According to this argument,

> [t]he signed subscription, settlement and consulting agreements as between a non-
> testifying investor, Shkreli, MSMB Capital, MSMB Healthcare and Retrophin are
> legal contracts that were entered into by the investors and the entities. These
> contracts are paradigm examples of non-hearsay "verbal acts" or "verbal parts of
> an act in which the statement itself affects the legal rights of the parties or is a
> circumstance bearing on conduct affecting their rights." Fed. R. Evid. 801(c),
> Adv. Comm. Notes.

Motion at 19 (citing Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992) (citing, McCormick

on Evidence and the Wigmore evidence treatise); and New Era Publications Int'l v. Henry Holt

& Co., Inc., 873 F.2d 576, 592 (2d Cir. 1989) (Oakes, J., concurring).

The Government's argument cannot withstand the weight of its own expressed purpose

for offering these agreements. The subscription agreements are being offered to prove that "those

deposits were made in connection with an investment in MSMB Capital and/or MSMB

Healthcare, and are not a loan or other form of payment to those entities." In other words, they

are being offered to prove the *truth* of the provisions therein included, rather than the mere fact

that such provisions had been included in the respective documents.

This purpose, substantively, is a completely inappropriate use of non-admissible hearsay.

It is not at all the use of a "verbal act" as that term was applied in Mueller v. Abdnor. Rather, in

that case, the subject contract was so described because it is "a form of verbal act to which the

law attaches duties and liabilities and therefore is not hearsay." 972 F.2d at 937. Thus, explained *Mueller*, "[i]n particular, evidence of lost profits based on a contract is not subject to the hearsay rule because such evidence concerns the existence of the contractual terms rather than an assertion of their 'truth.'" Id. *(*citing 6 Wigmore, Evidence § 1770 at 259–60 n.1 as setting forth the text of United States Fidelity and Guaranty Co. v. Davis, 3 Ariz. App. 259, 261, 413 P.2d 590, 592 (1966)). See also Crawford v. Franklin Credit Mgmt. Corp., No. 08-CV-6293 KMW, 2015 WL 1378882, at *4 (S.D.N.Y. Mar. 26, 2015), aff'd sub nom. Crawford v. Tribeca Lending Corp., 815 F.3d 121 (2d Cir. 2016) (accepting the contract as verbal acts because "Defendants offered the loan documents not for the truth of the terms contained within the documents, but to establish that Crawford had entered into a contract with Defendants.").

In this case, without their testimony -- since the Government is obviously deathly afraid that, like its earlier witnesses, their credibility will not withstand cross-examination -- the Government seeks to affirmatively prove that, rather than making *loans* to MSMB Capital, Brent Saunders, Alan Geller, Michael Lavelle, Molly Tschang, Steven Rosenfeld, Seymour Block, Diandra Douglas and George Blasko, instead made *investments* -- assumedly based on the alleged misrepresentations of Defendant Shkreli. But, in doing so, the government is resorting to the truth of the matter asserted in those very documents. That, however, is precisely what is prohibited by the definition of hearsay under  FRE 801(c ). United States v. Rowland, 826 F.3d 100, 114 (2d Cir. 2016), cert. denied, 137 S. Ct. 1330 2017) Therefore, the Government may not be allowed to do so.

### E.      Rule 403 Precludes Admissibility

In addition to the constitutional due process violation and the hearsay violations discussed earlier, the Government's motion should be denied on Fed. R. Ev. 403 grounds as the

proposed procedure creates great risk of jury confusion and prejudice to the defendant. After hearing individual investors be questioned in detail about their individual reasons for investing, the jury is then asked to consider a host of unknown investors in a vacuum.  The jury will not be able to discern the specific motivations of the investor to invest – as it could with the others – because that information is intentionally being withheld by the Government by refusing to call the witness.  The jury will be told that this is an investor and will assume, or not, that this investor is similar to the others and that the court has apparently determined that like the others, this investor is a victim of some sort of fraud at the hands of the defendant.  After all, why else would this evidence even be admissible?  Moreover, in the absence of a witness to give the documentary materials sufficient context, the documents are of little relevance.  What is the jury to think about a number of documents without a witness to tell the jury if he or she received them, read them and what role they play in the case.

The Government refers to two cases where written decisions cannot be found, at least in the 18 hours since the Government's submission. The two cases United States v. Lange, No. 10 CR 968 (DLI) (E.D.N.Y.) and United States v. Mazella, No. 11 CR 300 (CBA) (E.D.N.Y). Written decisions on the evidentiary rulings that the Government relies upon were not readily available if such written decisions exist.   However, based upon review of the submissions in United States v. Lange, that case and the documents that the Government sought to admit are distinguishable from the instant case and the documents at issue here.

In Lange, the government sought to admit records and correspondence sent to the defendants by business partners and clients.  The Lange records and correspondence included complaints about the defendants' actions and the return of funds. They were offered by the government to show that the defendants were on notice of certain conditions and to show that the

defendants took no action in response.   In <u>Lange</u>, the Government filed their motion for admission of the documents <u>well in advance of trial</u>.   In our case on the other hand, the Government has moved to admit these documents without witness testimony <u>in the</u> <u>middle of</u> <u>trial</u>.

In sum, neither of these cases, to the extent they even have written decisions, influence the outcome here. As noted, the only remarkable aspect of <u>Lange</u> is that the issue was raised pre-trial.

## CONCLUSION

It is patently obvious that the Government is advancing this indefensible position because they are afraid of exposing their remaining witnesses to further episodes of embarrassing and withering cross examinations that have been the hallmark of this trial to date.  In attempting to do so, they are saying out loud to the Court, the defendant, to the jury, and to the public at large that the fundamental right to a fair trial with due process of law <u>be damned</u>.  The Government should do what prosecutors have done for over 228 years in America: call witnesses to try and prove their case and allow the defense to vigorously cross-examine them.

Respectfully submitted,

Benjamin Brafman
Marc Agnifilo
Andrea Zellan
Jacob Kaplan
Teny Geragos

**BRAFMAN & ASSOCIATES, PC**
*Attorneys for Martin Shkreli*
767 3rd Avenue, 26th Fl.
New York, NY 10017
212-750-7800
bbrafman@braflaw.com

cc:    All Counsel (via ECF)