

U.S. Department of Justice

United States Attorney
Eastern District of New York

JMK:GKS/AES
F. #2014R00501

271 Cadman Plaza East
Brooklyn, New York 11201

July 21, 2017

<u>By Hand and ECF</u>

Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Martin Shkreli
                  <u>Criminal Docket No. 15-637 (KAM)</u>

Dear Judge Matsumoto:

      The government respectfully submits this letter in further support of its motion to admit the settlement agreements entered into between the defendant, various MSMB entities, Retrophin and MSMB Healthcare investors Spencer Spielberg and Michael Lavelle. (GX 53 (Spielberg); GX 56 (Lavelle)). These settlement agreements, which are legal documents signed by the defendant, are instrumentalities of the wire fraud conspiracy charged in Count Seven, which involves the defendant's fraud on Retrophin for the money and shares used to pay back defrauded MSMB investors. As such, the agreements are clearly admissible pursuant to Federal Rule of Evidence ("FRE") 401, FRE 801(d)(2)(A) and as verbal acts.

FACTUAL BACKGROUND

      The Court has already received or will receive a number of exhibits that discuss Spencer Spielberg and Michael Lavelle, including investor statements sent to the two investors; SEC filings that discuss the total value of the settlement agreements that the MSMB entities and the defendant owe to Retrophin; bank and brokerage records; and a Summary Cash Flow document that mentions the Spielberg settlement (<u>see</u> GX 122-43, discussed during the testimony on direct and cross of Steven Aselage (07/13/17 Tr. at 3350; 07/14/17 at 3520) and Steven Richardson (07/12/17 Tr. at 2909, 3078)). The settlement agreements for these two individuals are a crucial link in the chain of evidence demonstrating that these individuals were MSMB Healthcare investors; requested redemptions following their receipt of the wind-down email from the defendant; received an initial distribution of shares from Retrophin in connection with the liquidation of the fund; were dissatisfied with

the redemption of their MSMB Healthcare investment for illiquid Retrophin shares worth less than the defendant had represented as the value of their MSMB Healthcare investments; and that the defendant subsequently paid them off with Retrophin cash and shares, without giving notice to or getting approval from the Board of Directors. If anything, exclusion of the settlement agreements will case juror confusion because the jury will have no understanding of how to evaluate the partial evidence in their possession of payments and share transfers to Lavelle and Spielberg.

A. Context for Settlement Agreements Already in Evidence

Documents already in evidence (or documents to be admitted through the case agent) show that Spencer Spielberg invested $25,000 in MSMB Healthcare in or around September 2011. (GX 505-E). He received monthly investor statements from NAV Consulting (with the defendant carbon-copied on the emails through April 9, 2012). (GXs 90-1 through 90-5). On September 9, 2012, he received a monthly performance statement directly from the defendant for the months of May, June and July 2012. (GXs 90-6 through 90-9). The final statement, for July 2012, indicated that Spielberg's investment was $36,251. (GX 90-9). Spielberg's investment in MSMB Healthcare was redeemed by the defendant for 3,695 shares of Retrophin on or about March 12, 2013. (GX 125-20).

Similarly, documents already in evidence or which will be admitted show that Michael Lavelle invested a total of $1,050,000 in MSMB Healthcare in three tranches between August 2011 and February 2012. (GXs 505-E, 507-B). He received performance statements from NAV Consulting through April 9, 2012 (for the month of January 2012). (GXs 89-1 through GX 89-11). On September 9, 2012, he received statements directly from the defendant for the months of May, June and July 2012. (GXs 89-12 through 89-16). In the final statement, for July 2012, the defendant told Lavelle that his investment had grown to $1,267,032. (GX 89-16.) Both Lavelle and Spielberg then received the wind-down email from the defendant in September 2012. (GX 109-9).

Subsequently, both Lavelle and Spielberg contacted the defendant directly to seek a redemption of their investments, and to express confusion and concern about the redemption process, including how the defendant was valuing their investments in MSMB Healthcare.[1] For example, on January 22, 2013, Spielberg stated that he hadn't gotten "a

---

[1] During oral argument on July 20, 2017, the Court suggested that Spielberg and Lavelle may have been happy with MSMB Healthcare's investment in Retrophin and with with the process of redeeming their investment. Although this issue is irrelevant to the question of whether the settlement agreements are admissible, the government will offer the through the case agent certain additional emails (GXs 112-1, 112-4, 112-7, 112-16, 113-10 and 113-14, previously marked as exhibits), which are clearly admissible as statements of the defendant, statements of a co-conspirator and/or statements of the defendant's agents under FRE 801(d)(2), in order to demonstrate the additional misrepresentations that the defendant made to these investors during the redemption process.

2

statement or anything in what seems like almost 4-5 months.  When can I expect to get some kind of clarification??" (GX 112-1).  After approximately a month, and after the defendant failed to provide any information, Spielberg asked to formally redeem his investment and asked for his "funds."  (Id.).  When the defendant still did not provide the requested information, Spielberg stated on March 6, 2013, that he "highly doubt[s] I'm your only investor who's questioned the monetary value of their investment" and again pressed the defendant for more information.  (GX 112-16).  The defendant then falsely stated that the fund "is mostly RTRX shares"—when, in fact, the fund had no other assets.  (Id.).

Similarly, Lavelle contacted the defendant to try and "understand a number of things" about his MSMB Healthcare investment, stating that "The redemption procedure remains unclear to me … Retrophin was always pitched to me as additive to MSMB, not an alternative to it.  I was told by both you and Kevin [Mulleady] that Retrophin was an MSMB option.  I was not given an option to debate transfer from MSMB and want to understand it." (GX 113-10).

Subsequently, the defendant—working with co-defendant and co-conspirator Evan Greebel—took money and cash from Retrophin to placate Spielberg and Lavelle, who were unhappy with the initial distribution of shares they received as the liquidation of their MSMB Healthcare investments.  (See GX 112-4 (Spielberg states to the defendant "Today I received a FedEx with 3,965 shares currently valued at $17,551.25.  I am owed 515 more shares of RTRX and $25,000 cash); GX 113-14 (Lavelle states to the defendant "We discussed 2 x my initial investment in a mix of cash and stock").  Spielberg signed a settlement agreement that incorporated a $25,000 cash payment from Retrophin on or about March 14, 2013 and an additional payment transfer from Retrophin (not the defendant) of 6,000 shares.  (GX 53).  The new issuance of 6,000 Retrophin shares to Spielberg occurred on or about May 28, 2013, as reflected in the Standard Registrar records.  (GX 125-30).  Lavelle signed a settlement agreement providing that "the MSMB entities or Retrophin" would pay him $1,355,000 in cash and 5,000 shares of Retrophin stock.  (GX 56).  The new issuance of 5,000 Retrophin shares to Lavelle occurred on or about October 22, 2013.  (GX 125-46).

    B.    Settlement Agreements Discussed in SEC Filings and Indemnification Agreements

In or around August, 2013, Retrophin's auditors, Marcum LLP, discovered the settlement agreements through which the defendant used Retrophin to pay the old MSMB Capital and MSMB Healthcare investors in Retrophin cash and stock (including agreements with Spielberg and Lavelle).  Marcum identified—and then notified the defendant and Retrophin management—that it was improper for Retrophin to have paid cash and stock to settle liabilities that had been incurred by the defendant in his personal capacity and/or by the MSMB entities.  This discovery led to the restatement of Retrophin's financial statements for 2012 and the first quarter of 2013, which made clear that the payments of stock and money

that resulted in the settlement agreements were the responsibilities of the defendant and/or the MSMB entities, and not Retrophin. (GXs 609 through 612).[2]

In August and September 2013, the defendant and Evan Greebel caused MSMB Capital and MSMB Healthcare to execute indemnification agreements and promissory notes for the benefit of Retrophin, and assured Retrophin (and the company's auditors) that the MSMB entities would repay the notes to Retrophin. These indemnification agreements—which reflect the total amount of money and shares paid via all of the settlement agreements, including those signed by Spielberg and Lavelle—are reflected in numerous SEC filings that will be entered in evidence. (GXs 609 through 612).

The jury will have no context for these agreements and the treatment of these agreements in the SEC filings without the settlement agreements to which they pertain. Furthermore, the government should be permitted to argue one of its theories of Count Seven, namely that if Retrophin truly faced liability from Lavelle or Spielberg (or any other investor) that required a settlement agreement, there would have been no reason for the MSMB entities to indemnify Retrophin. If Retrophin was truly on the hook for these payments—as the defendant argues—then the settlement agreements were properly part of Retrophin's liabilities. The indemnification agreements that are reflected in the SEC filings are but one piece of evidence that put the lie to the defendant's claim that he was acting in Retrophin's best interests. In truth, he was acting solely in his own best interest.

## THE LAVELLE AND SPIELBERG SETTLEMENT AGREEMENTS ARE CLEARLY RELEVANT AND ADMISSIBLE

The Lavelle and Spielberg settlement agreements should be admitted for three reasons. First, they are contracts—verbal acts that are not hearsay under well-established law. Second, they are the defendant's statements, as he signed them. Finally, they are relevant and their probative value far outweighs the minimal risk of undue prejudice their admission would pose.

### A. The Settlement Agreements Are Not Hearsay

The settlement agreements are legal contracts between and among the defendant, the MSMB entities, Retrophin and the investor in question. They are not special contracts that are subject to any special rules of evidence based on the facts of this case. The contracts are not hearsay and may be used to prove the existence of the contract and the contractual terms, which is the purpose for which the government seeks admission. (See Gov't Mot. at 19.) The defendant concedes that a contract is admissible to prove the existence of the contract and its terms. (Defs. Resp. at 18 (citing Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992) ("evidence of lost profits based on a contract is not subject to

---

[2] These SEC filings will be admitted through the case agent.

4

the hearsay rule because such evidence concerns the existence of the contractual terms rather than an assertion of their truth")).)

Next, the defendant signed the settlement agreements in his individual capacity, as managing member of the MSMB entities and as the head of Retrophin. Indeed, the fact that he signed the documents in three separate capacities on behalf of three separate entities created joint and several liability is highly probative of the issues in this case. The settlement agreements are plainly admissible under FRE 801(d)(2)(A) as statements of a party opponent. (See Gov't Mot., Dkt. No. 274 at 16).

B. The Settlement Agreements Are Relevant

The settlement agreements are plainly relevant and their probative value far outweighs the minimal risk of undue prejudice they pose. Relevant evidence generally is admissible, see FRE 401, and there is a "very low standard for relevance." United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008); see, e.g., United States v. Quattrone, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").

Relevant evidence may be excluded based on the potential for unfair prejudice only when the risk of unfair prejudice "substantially outweighs" its probative value. FRE 403. The Supreme Court has observed that "[t]he term 'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980). "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair." Costantino v. Herzog, 203 F.3d 164, 174 (2d Cir. 2000) (emphasis in original). "The prejudice resulting to defendants from the fact that introduction of" relevant evidence is "damaging to their case is, of course, not the kind of prejudice against which Fed. R. Evid. 403 protects defendants." See United States v. DeLillo, 620 F.2d 939, 947 n.2 (2d Cir. 1980).

The Lavelle and Spielberg settlement agreements pass muster under FRE 401 and FRE 403 for three reasons.

First, they corroborate investor statements showing that these individuals were investors in MSMB Healthcare, and not shareholders or investment unit holders in Retrophin. As a result, to the extent they were owed money after they received the initial distribution of MSMB Healthcare's shares in Retrophin based on the fund's investment in that company, they are owed payment from the fund and, by extension, the defendant as manager of the fund. Retrophin—which was an entirely separate legal entity and a public company—simply had no liability to these investors that needed to be discharged. For

5

example, if a hedge fund invests in the stock of General Electric and, as part of its wind down, informs the hedge fund investors that they will receive the fund's General Electric stock as the redemption of their investments, any investor who is unhappy with the amount of General Electric stock he or she receives from the fund has a claim against the fund and its manager, <u>not against</u> General Electric.  The evidence has shown that MSMB Healthcare was merely one of many investors in Retrophin.  The defendant may argue that he "was" both MSMB Healthcare and Retrophin, but that is simply argument.  It is not a basis for the exclusion of relevant evidence.

Second, the settlement agreements corroborate information in the bank records.  Specifically, the settlement agreements explain why vast sums of money (<u>e.g.</u>, $1,355,000 in the case of Lavelle's agreement) were taken from Retrophin's bank accounts by the defendant in 2013.  Without the agreements, the jury will simply see expenditures with none of the necessary context that explains why the defendant made these payments through Retrophin.  The jury could be misled into believing that these were simple outlays to MSMB investors made during the ordinary course of Retrophin's business.  That misimpression is extraordinarily prejudicial and damaging to the government's theory of Count Seven.

Third, there is little risk of undue prejudice.  As the government has made clear repeatedly, it will not argue that Lavelle and Spielberg relied on misstatements or omissions by the defendant at the time they invested in MSMB Healthcare.  The defendant's post-investment misrepresentations to these investors are, however, highly relevant.  Such misrepresentations include the performance statements that misled the investors into believing that their investment in MSMB Healthcare was worth vastly more than it was in reality.  When the investors complained about their redemption—complaints that were based on their understanding of the value of their investments as a result of the defendant's lies—the defendant and Greebel used the settlement agreements to pay off the investors with Retrophin's cash and shares.  The settlement agreements thus help complete the story for the jury.  Moreover, the jury has seen multiple settlement and consulting agreements already.  The marginal prejudice posed by the Lavelle and Spielberg settlement agreements—after all,

all relevant evidence is inherently prejudicial—is far outweighed by the probative value of these agreements.

\* \* \* \* \*

For the foregoing reasons, the Court should admit the Spielberg and Lavelle settlement agreements in evidence.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:    /s/_____
Jacquelyn M. Kasulis
Alixandra E. Smith
G. Karthik Srinivasan
Assistant U.S. Attorneys
(718) 254-7000

cc:  Clerk of Court (KAM) (by ECF)
     Counsel for Defendant Shkreli (by ECF)