

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| JMK:GKS/AES | *271 Cadman Plaza East* |
| F. #2014R00501 | *Brooklyn, New York 11201* |

July 22, 2017

By Hand and ECF

Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

>        Re:     United States v. Martin Shkreli
>                Criminal Docket No. 15-637 (KAM)

Dear Judge Matsumoto:

              The government respectfully submits this response to the defendant Martin Shkreli's objections to 32 documents that the government intends to admit through the case agent. (Shkreli Br., Dkt. No. 276.) The defendant cites no legal authority in his two-page letter. The question squarely presented to the Court in this motion is whether the evidence should be admitted, not whether its weight would convince a jury of the defendant's guilt. The standards governing the admission of relevant evidence under Federal Rules of Evidence ("FRE") 401 and 403, and the statements of party opponents and co-conspirators under FRE 801(d)(2), set a low threshold for admissibility. The documents offered by the government all meet this threshold. The bulk of the defendant's arguments as to specific documents go to the weight of the evidence, not its admissibility. The Court should overrule the defendant's objections and permit the jury to weigh the full range of evidence available in this case to determine the defendant's guilt.

              Because the defendant's objections cut across a range of issues, the government will begin by addressing overarching issues (1) relating to the admission of the defendant's statements and the hearsay statements of others that are contained within the defendant's communications, and (2) relating to the admission of co-conspirator statements. The government will then turn to the defendant's specific objections.

A.      Admission Of The Defendant's Statements

The vast majority of the documents that the government seeks to admit through the case agent are statements of the defendant.  These documents consist in large part of email chains in which the defendant is a participant.  There is no basis under FRE 801(d)(2)(A) for excluding statements of a party opponent that are probative.  Indeed, the defendant cites no authority for the proposition that a statement of a party opponent is inadmissible because the statements are supposedly "incidental and non-substantive." (Shkreli Br. at 1.)  That is not the test for admissibility.  That is an issue of weight for the jury to determine, not of admissibility.

Further, within the email chains are statements made by people with whom the defendant corresponds.  These hearsay statements are admissible on three independent grounds.  As set forth in the government's recent Motion to Admit Evidence of the Charged Crimes, such statements are evidence of the defendant's knowledge or his notice of certain conditions, the effect on the defendant as the listener and as evidence that the statement was made. (Dkt. No. 273 at 17-19.)

Because the co-conspirator provisions of FRE 801(d)(2) are not the sole basis for the admission of these statements, the government need not prove by a preponderance— though it has—that the defendant is communicating with a co-conspirator.  These documents directly concern the charged conduct and fall within the timeframe of the charged conduct.  The defendant is free to argue that the jury should not give much weight to these documents, but there is no basis for excluding them.

B.      Co-Conspirator Statements

The evidence adduced so far has provided independent corroborating evidence that Evan Greebel, Kevin Mulleady and Marek Biestek were among the defendant's co-conspirators.  Coupled with the statements of Greebel, Mulleady and Biestek themselves, the government has more than satisfied its burden of showing by a mere preponderance that they were the defendant's co-conspirators.  The government will first address the governing legal standards and then the defendant's objections on a document-by-document basis.

1.      Legal Standard

"The law is well settled within this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances." United States of America v. Cambindo Valencia, 609 F.2d 603, 630 (2d Cir. 1979).  "To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence:  first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the

course of and in furtherance of the conspiracy." United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999).

"The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." Id. "[W]hile the hearsay statement itself may be considered in establishing the existence of the conspiracy, 'there must be some independent corroborating evidence of the defendant's participation in the conspiracy.'" Id. (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)). Moreover, statements that "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" are admissible. Id. However, the "Government need not show that the listener, or the person who heard the declarant's statement, was also a member of the conspiracy." United States v. Paredes, 176 F. Supp. 2d 183, 187 (2001). Indeed, a communication "with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the plan's goals" is admissible. Id.

Crucially, the independent evidence must corroborate the hearsay statements to show that they are reliable. The requirement is not that the government must establish fully that an individual is a co-conspirator before admitting hearsay statements of such co-conspirator. That requirement would swallow the hearsay exception because it is often the communications among individuals that fully establish the scope, nature and duration of the conspiracy. Indeed, conspiracy depends on a verbal or non-verbal communicative act—an agreement. Rather, as Cambindo Valencia, Paredes and Gigante demonstrate, there must be "some independent corroborating evidence of the defendant's participation in the conspiracy" and the totality of the evidence—both the independent corroborative evidence and the hearsay statements themselves—must be considered when the Court determines whether a particular individual is a co-conspirator. Gigante, 166 F.3d at 82.

At various points, the defendant objects to a specific document because the document displays some disagreement between the defendant and a co-conspirator over a particular issue. (See, e.g., Shkreli Objections to GX 255.) The defendant cites no authority for the proposition that co-conspirators are never allowed to disagree in the course of the conspiracy. For example, in a murder-for-hire conspiracy case, the fact that a text message exchange shows that one hitman wants to take the FDR and the other wants to take the Brooklyn-Queens Expressway to commit a murder does not mean that the exchange is inadmissible as a co-conspirator communication on the ground that there is some form of disagreement within the communication. The legal requirement is specific: the communication must be in furtherance of the conspiracy. A disagreement along the way towards communications and actions in furtherance of the conspiracy is irrelevant and not a bar to admission. See, e.g., United States v. Kassir, No. 04 Cr. 356 (JFK), 2009 WL 2913651, at *6 (S.D.N.Y. Sep. 11, 2009) ("Although [the co-conspirators] had a number of disagreements during the course of the conspiracy, it was within the jury's discretion to conclude that these did not rise to the level of nullifying the conspiracy itself.").

The defendant also appears to be under the misapprehension that the provision of legal advice by an attorney to a client cannot be accomplished in furtherance of a conspiracy. (See, e.g., Shkreli Objections to GX 284.) The Honorable Jack B. Weinstein, United States District Judge, however, has already squarely rejected this theory when he pierced the attorney-client privilege in connection with the crime-fraud emails in this case. In reference to the defendant and Greebel, Judge Weinstein held: "exchanges in redacted emails between the attorney and employee were part of a scheme, conspiracy or fraudulent attempt to commit a securities fraud. The attorney-client relationship and privilege, if any, is voided by the criminal conduct." (Order, In re Grand Jury Investigation, No. 15-MC-2227 (E.D.N.Y. Dec. 3, 2015) (discussing emails between the defendant and Greebel as subject to the crime-fraud exception to attorney client privilege).) Moreover, the defendant cites no additional authority for his argument. To the extent that the defendant argues that he was acting in good faith due to Greebel's advice, that argument goes to the weight and not the admissibility of the evidence.

2.     GX 217

In this email chain, the defendant and Greebel discuss the allocation of Retrophin's free-trading shares after its merger with Desert Gateway. On November 1, 2012 at 7:06 pm, the defendant indicates that Desert Gateway needs to issue 8 million shares unless "the convert note can be given to a Retrophin investor or multiple Retrophin investors." Greebel responds by saying, in part, that "the challenge is the ability to trade the stock underlying the note[.]" The defendant then replies that: "If the note can be given to current shareholders, they can get that in lieu of the share exchange, so 5.5m in the share exchange and note divided up into 2.5m shares for some of the other investors." Further along in the chain, Greebel clarifies: "issue: note/shares currently held by a nonaffiliate of [Desert Gateway][.] in merger, Retrophin [shareholders] get newly issued shares from the company (and company acquires Retrophin), no way to get the stock from non-affiliate to Retrophin stockholders without a 1:1 stock purchase agreement."

This email is direct evidence of the conspiracy charged in Count Eight pertaining to the defendant's attempt to control of the price and volume of the free-trading shares of Retrophin. Greebel was a central figure in the process of converting Retrophin into a public company as well as the allocation and distribution of the newly-public company's freely-trading or "Fearnow" shares to a group of individuals that Shkreli selected and then sought to control (and in some cases did).

In the records of the transfer agent Standard Registrar are documents showing that Greebel participated in the distribution of Retrophin's 2.4 million freely-trading shares in December 2012 to affiliates and employees of Retrophin (100,000 shares were withheld). For example, on December 14, 2012, Greebel informed Standard Registrar that it would be receiving a legal opinion from the law firm of Anslow & Jaclin authorizing the distribution of the freely-trading shares. (See GX 125-4 at STANDARD 000494.) Greebel then goes on to direct Standard Registrar as to the mailing of the Fearnow shares to the affiliates and employees. (Id.) The "note" referenced in GX 217 is the convertible promissory note that

4

allowed Troy Fearnow to obtain 2.5 million freely-trading shares of Retrophin, a document that was attached to the stock transaction distributing the Fearnow shares. (GX 125-4 at STANDARD 000480.)  The "nonaffiliate" referenced in GX 217 is Troy Fearnow.  The "1:1 stock purchase agreement[s]" that Greebel mentions are a series of stock purchase agreements between Troy Fearnow and the Fearnow share recipients. Examples of such agreements and amendments to the agreements are reflected in a number of the subsequent transfers of Fearnow shares.  (See, e.g., GX 125-23 (Lindsay Rosenwald stock transfer) at STANDARD 000626.)

As the government has alleged and will prove, the defendant and Greebel used their control over the Fearnow shares to attempt to control the price and volume of Retrophin shares, and to use the freely-trading shares to pay off defrauded MSMB investors.  GX 217 thus reflects the defendant and Greebel communicating in furtherance of the conspiracy to obtain control of the freely-trading shares of Retrophin after its merger with Desert Gateway.

3.   GX 236

This document is an email from Greebel to the defendant in which Greebel forwards a communication he sent to Biestek and Edmund Sullivan.  In Greebel's email to Biestek and Sullivan, he requested confirmation that neither Biestek nor Sullivan is "an officer, a director or holder of 10% or more of the outstanding equity securities of Desert Gateway" and is "not an affiliate . . . of Desert Gateway."  This language tracks the representation in the Anslow & Jaclin opinion letter (see GX 125-4 at STANDARD 000494; GX 125-5 at R049711) that none of the Fearnow share recipients are affiliates of Desert Gateway and do not hold more than 10% of the shares of the company.  The Anslow & Jaclin letter thus independently corroborates Greebel's participation—as reflected in GX 236—in the scheme to distribute Retrophin's freely-trading shares to individuals under the defendant's control.  Greebel did this with knowledge that Biestek was an employee of Retrophin at the time of the reverse merger, as evidenced by testimony from multiple witnesses.

4.   GX 237

This document is an email from Biestek to Greebel dated December 14, 2012 in which Biestek asks Greebel for a letter that would allow him to deposit his freely-trading shares of Retrophin into a Scotttrade account.  Greebel's and Biestek's roles in the conspiracy are corroborated by, among other things, the testimony of Timothy Pierotti:

> Q And whose idea was it to open Scottrade accounts?
> A Martin's.
> Q What was going to be put into the Scottrade accounts?
> A Retrophin stock.
> Q And was that the stock you received pursuant to the
> purchase agreement?
> A Yes.

5

Q And the other individuals who received this e-mail with
the exception of Lenora Izerne, were they also individuals who
purchased stock of Desert Gateway in the same manner as you
did?
A Yes.

(Trial Tr. at 4279:3-14.)  It is further corroborated by GX 120-11, an email in which the defendant's assistant, Michael Smith, demands that the Fearnow recipients give the defendant a summary of their holdings of Retrophin every morning.  Specifically, Mr. Smith says that he only needs "the holdings of the Scottrade account you recently opened, even if there is nothing in it."  (GX 120-11.)  As the government has alleged and has the evidence has shown, the defendant directed the Fearnow share recipients to deposit their shares in Scottrade accounts.  One way that the defendant and Greebel attempted to control the shares, and thus the price and trading volume of Retrophin stock, was to seek to review daily holdings summaries for the Fearnow share recipients.

     5.    <u>GX 242</u>

The defendant lodges a FRE 106 objection and suggests the addition of R023195.  The defendant's addition of a subsequent email by Greebel does not complete the narrative of GX 242 and is inadmissible.

FRE 106, also known as the "rule of completeness," states that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  FRE 106.  The Second Circuit has made clear, however, that the rule does not provide a defendant with a blanket opportunity to offer his own prior statements just because the government has introduced the defendant's inculpatory statements.  <u>See</u> <u>United States v. Terry</u>, 702 F.2d 299, 314 (2d Cir. 1983) ("Rule 106 does not render admissible evidence that is otherwise inadmissible.").  Rather, a defendant must demonstrate that the omitted portion of the hearsay statement is "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."  <u>United States v. Johnson</u>, 507 F.3d 793, 796 (2d Cir. 2007) (internal quotations and citations omitted).

"The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages."  <u>United States v. Jackson</u>, 180 F.3d 55, 73 (2d Cir. 1999) (citations omitted).  Moreover, a defendant's self-serving, exculpatory statements are inadmissible hearsay, and he or she cannot use the rule of completeness as "a mechanism to bypass hearsay rules for any self-serving testimony."  <u>United States v. Gonzalez</u>, 399 Fed. Appx. 641, 645 (2d Cir. 2010).  A self-serving statement is any statement that "tends to reduce the charges or mitigate the punishment for which the declarant might be liable."  <u>Williamson v. United States</u>, 512 U.S. 594, 618 (1994).

For example, additional portions of a defendant's statement that provide "context only insofar as [they] represents [the defendant's] self-serving attempts to shoehorn after-the-fact justifications for his actions into his descriptions of his actions … [are] not the type of material envisioned by Rule 106." United States v. Lumiere, No. 16 CR 483 (JSR), 2017 WL 1391126, at *6 (S.D.N.Y. Apr. 18, 2017).  Similarly, statements that "offer[] an alternative theory of the evidence" are not "necessary to clarify or explain" a defendant's statements about the charged crimes.  United States v. Blake, 195 F. Supp. 3d 605, 610-11 (S.D.N.Y. 2016).

Greebel's gratuitous reference to MSMB Capital's distribution to its investors in R023195 has nothing to do with the defendant's false statement to Fearnow share recipients that they are no longer employees of Retrophin or MSMB Capital.  The latter is prime evidence of the conspiracy pertaining to Count Eight.  The former is a vague and ambiguous reference to redemptions from MSMB Capital.  It is hearsay and inadmissible.

### 6.   GX 246

In this document, the defendant forwards to Greebel an email from Timothy Pierotti asking the defendant to contact Pierotti through Biestek.  Greebel responds on December 29, 2012: "leave it alone-you are an affiliate and it will only create problems." The correspondence between the defendant and Pierotti is in evidence as GX 120-16.  In that email chain, the defendant—apparently ignoring Greebel's advice—responds to Pierotti on December 30, 2012 by demanding that Pierotti surrender the 300,000 Fearnow shares that were still in his possession at the time.  The fact that the defendant ignored Greebel's advice is immaterial.  The government is entitled to argue that Greebel was seeking to protect the conspiracy charged in Count Eight by warning the defendant not to take actions that might expose the conspiracy, including by escalating the defendant's nascent conflict with Pierotti.

The document is also evidence that the defendant and Greebel were on notice of the defendant's status as an affiliate of Retrophin.  Thus, their subsequent steps to attempt to control Retrophin's shares constituted undisclosed beneficial ownership that was not disclosed in the Schedule 13D filings prepared by Greebel and signed by the defendant.  (See GX 604, GX 605).

### 7.   GX 248

The defendant lodges a FRE 106 objection and suggests the addition of Bates number R012894.  The government objects to the addition of this document.  It does not complete the narrative set forth in GX 248.  In GX 248, Greebel approves of the defendant sending an "over the wall" email intended to prevent the Fearnow share recipients from trading in Retrophin stock by making them privy to inside information.  Indeed, Greebel says "I like it" and suggests that the inside information be placed "at the end of the email[.]" When the defendant asked "Whats wrong with the subject line," Greebel replies "He [meaning Pierotti] will not open it once he sees it[.]"  Greebel is thus providing the defendant with advice in furtherance of the conspiracy, namely about the best way to ensure that the

defendant's gratuitous provision of inside information to the Fearnow share recipients succeeds and prevents further sale of the freely-trading stock. Greebel later clarifies that putting "over the wall" in the subject line is an "interesting idea," but he isn't sure "what happens if [Pierotti] deletes and doesn't read" the email.[1]

R012894, however, is self-serving hearsay by the defendant. In this chain, Marek Biestek asks whether the defendant is "legally allowed to put someone over the wall without asking their permission first[.]" The defendant responds: "As with everything I do I ask counsel before I did it."

Bates number R012894 does not complete the narrative of the conversation between Greebel and Shkreli as reflected in GX 248. Rather, R012894 is a completely different conversation with Biestek. It injects a self-serving advice of counsel issue into an email chain that no longer involves Evan Greebel. FRE 106 cannot be used as a "mechanism to bypass hearsay rules" to admit a defendant's self-serving or exculpatory statement, Gonzalez, 399 Fed. Appx. at 645; and "does not [] require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages," Jackson, 180 F.3d at 73.

8.   GX 249

GX 249 is, in part, a series of email chains in furtherance of the conspiracy charged in Count Eight, as described above. For example, in emails dated December 28, 2012, Greebel and the defendant discuss how it was possible that the share price of Retrophin was falling on heavy selling volume. This email reflects the defendant's and Greebel's bewilderment given the defendant's purported control over the Fearnow share recipients. The conversation turns to the defendant's failure to timely pay Greebel for legal work—the issue the defendant now identifies as objectionable. The discussion of payment demonstrates that Greebel willfully participated in the conspiracy. Despite the disagreement over payment, Greebel continues to work for the defendant. In addition, this document shows Greebel's knowledge of Retrophin's tenuous financial state and the importance of shoring up Retrophin's stock price.

---

[1]    Pierotti testified that he, in fact, did delete the "over the wall" email as soon as he received it. (Trial Tr. 4320:3-11 (cross-examination); Trial Tr. 4321:2-14 ("Q So, weren't you curious as someone who held 350,000 shares of Retrophin stock, and that you now read 'over the wall,' and do you think it is the responsible thing to delete that e-mail? A Yeah. Q Yeah? A Yeah. Q You think that is what a responsible person who has received an E-mail that contains inside information does, is they delete the E-mail? A I didn't want inside information. I didn't want to be an insider, I didn't want the E-mail, I didn't want that information. That is why I deleted it.")

9.    GX 251

As described above, part of the conduct charged in Count Eight involved the defendant's attempts to control Pierotti's Fearnow shares.  In GX 251, the defendant asks for Greebel's input on a litigation threat to Pierotti.  Greebel replies: "Very risky given what your agreement was-could be opening a much bigger can of worms[.]"  The government is entitled to argue that "opening a much bigger can of worms" is a warning to the defendant that the conspiracy might be exposed if he sues Pierotti.  The government is thus entitled to argue that this email is in furtherance of the conspiracy, and not simply innocent legal advice.  The defendant argues that this phrase requires a live witness to interpret.  The phrase, however, is commonplace and well within the ability of jurors to interpret.  Jurors are also well-equipped to place the statement in the context of the defendant's desire to sue Pierotti over the Fearnow shares.  There is little risk of juror confusion.

In addition, GX 120-13—which is already in evidence—demonstrates that the defendant in fact sent this draft email on to Pierotti, copying Greebel.  When viewed together, GX 251 and GX 120-13 show that the defendant did not follow Greebel's advice (contrary to the defendant's stated affirmative defense for this count); moreover, it shows that Greebel permitted himself to be copied on a legal threat to Pierotti that he knew was baseless.  Subsequently, the defendant and Greebel followed through on the threat by having Retrophin (represented by Katten) sue Pierotti on behalf of Retrophin in furtherance of the conspiracy charged in Count Eight.  (See Trial Tr. at 4303 (Pierotti testimony).)

10.    GX 254

This is a statement of the defendant and there is no requirement that the government demonstrate that Ron Tilles was a co-conspirator for purposes of this email.  The Tilles email is also admissible for its notice to and effect on the defendant.  The email is in furtherance of the conspiracy, as the defendant provides false information for tilles to pass onto investors:  the fund invested "a lot" into Retrophin when Retrophin was, in fact, the only asset held by the fund.

11.    GX 255

In this email chain dated February 13, 2013, Greebel specifically notifies the defendant that he is "the director and CEO of a public company" and as such "now ha[s] a duty of loyalty" to the company.  Thus "getting stock below market could be problematic[.]"  The defendant's responds: "f that."  The defendant further asserts that he is free to buy stock of Retrophin at below market prices and Greebel asks the defendant to discuss the issue with him.

The statements of the defendant are admissible as statements of a party opponent.  The emails from Greebel to which the defendant replies all are admissible as evidence of the defendant's knowledge and state of mind.  Indeed, the defendant's suggestion that this email is inadmissible under FRE 403 is ironic.  A central issue that has

emerged in the last week is whether the defendant had a duty of loyalty to Retrophin. Greebel is expressly notifying the defendant that he does as the company's CEO.  The defendant's response to notice of his duty is "f that."  This email is essential evidence in the case as direct evidence of the conspiracy and certainly now given that the defendant is arguing that he owed no duties to Retrophin.

12.  GX 258/GX 261

These documents pertain to conduct charged in Count Eight.  In February 2013, defrauded MSMB Capital investor Lindsay Rosenwald threatened the defendant with litigation over his failure to redeem Rosenwald in cash as promised.  GX 258 reflects Greebel's knowledge that the defendant could not simply add Rosenwald to Retrophin's share registration statement (a way to give Rosenwald freely-trading shares of Retrophin). The defendant and Greebel then negotiated and concluded a settlement with Rosenwald that gave Rosenwald 80,000 shares of Retrophin.  Without a way to add Rosenwald to the company's registration statement, the defendant and Greebel tapped the Fearnow shares under the defendant's effective control.  GX 261 reflects the defendant's and Greebel's agreement that Rosenwald's 80,000 shares would come from a combination of Fearnow share recipients.  The transaction came to fruition in April 2013 when Greebel directed the distribution of a portion of the free-trading Fearnow shares to Rosenwald.  (GX 125-25.) Greebel specifically provided the instructions transferring 80,000 of the Fearnow shares from Marek Biestek and Edmund Sullivan to Lindsay Rosenwald, in full satisfaction of a settlement agreement reached between the defendant, the MSMB entities and Retrophin with Rosenwald.  (GX 125-25 at STANDARD 000643.)  GX 258 and GX 261 were thus part of the defendant's and Greebel's conspiracy to control the freely-trading shares of Retrophin.

13.  GX 263

GX 263 reflects a few different aspects of the defendant's conspiratorial conduct with Greebel.  The emails dated February 21, 2013 between Greebel and the defendant regarding the settlement with Lindsay Rosenwald are evidence of the conspiracy charged in Count Eight, as described above.  An email dated February 25, 2013 in which the defendant writes "I want to turn up the heat on Tim" is evidence of the defendant's attempts to control Pierotti's Fearnow shares, as described above, which Greebel agreed to do by suing Pierotti.  Finally, as described above, Greebel does not withdraw from the conspiracy despite an ongoing dispute over the payment of legal fees by the defendant.

14.  GX 268

These emails are direct evidence of Count Eight.  On March 7, 2013, Greebel asks the defendant "who do you want the shares going to or will you let the individuals keep the stock[.]"  The defendant responds that he wants some Fearnow shares to go to Lindsay Rosenwald and that the rest of the freely-trading shares should, over time, be transferred to

the defendant.  In other words, the defendant and Greebel are conspiring to increase the defendant's control over the freely-trading Retrophin shares over time.

15.   GX 277

These emails are evidence of the defendant's control over Greebel during the conspiracy.  The emails show that the defendant was not simply seeking legal advice from counsel and following that advice.  Rather, the emails show that the defendant is in control of the relationship.  Furthermore, the email from Greebel to Shkreli dated March 21, 2013 discussed "the importance of getting Fearnow done"—additional direct evidence of the conspiracy charged in Count Eight.

16.   GX 284

These emails demonstrate Greebel's participation in the conspiracy charged in Count Seven.  The defendant and Greebel are discussing the settlement agreement with defrauded MSMB Capital investor Sarah Hassan.  Pursuant to that agreement, Hassan received $400,000 cash from Retrophin, money that the government alleges the defendant and Greebel conspired to misappropriate from Retrophin.

17.   GX 295

The defendant argues that a portion of this exhibit is irrelevant because it discusses Michael Lavelle.  Lavelle is a defrauded MSMB Healthcare investor and therefore discussions regarding him are squarely relevant to the charges in this case. The Court has not excluded all evidence as to Lavelle entirely.  Thus, the defendant has not articulated a valid FRE 403 objection to the specific content of this document.

18.   GX 298/GX 299

These exhibits reflect more evidence of the conspiracy charged in Counts Seven and Eight.  The defendant caused Retrophin to pay defrauded MSMB Healthcare investor Richard Kocher $123,711 in cash, money that the government alleges the defendant misappropriated from Retrophin.  Furthermore, in GX 298, Greebel actively discusses the source of Kocher's 47,128 shares and says that they are "coming out of the Fearnow block[.]"  In GX 299, Greebel specifically describes a breakdown of the Fearnow shares to, among other things, pay Kocher's settlement agreement.  As with the Rosenwald share transfer described above, Greebel instructed the transfer agent to transfer 47,128 Fearnow shares to Kocher on May 23, 2013.  (GX 125-28 at STANDARD 000679.)  The Fearnow share purchase agreement amendment included in the transfer agent's files shows that these shares came from Fearnow share recipient Andrew Vaino.  (GX 125-28 at STANDARD 000673-674.)

      19.   GX 301/GX 304/GX 311

These emails are directly relevant to the defendant's treatment of defrauded MSMB Healthcare investor David Geller.  Greebel asks the defendant "how to handle" requests for Alan and David Geller, both defrauded MSMB Healthcare investors.  The defendant replies, "Ignore."  These emails corroborate David Geller's testimony that the defendant was not responsive to his redemption request.  (See, e.g., Trial Tr. at 3167:8-19 ("Q If we go up another e-mail, the defendant wrote to you on June 11. He wrote, 'We're going to be unable to send the funds on the timeline requested. I'm available to do a call today to discuss.' What was your reaction to receiving this? A Disappointment, sadness, disappointment.").  GX 311, in particular, is relevant to show the defendant's and Greebel's efforts to avoid paying David Geller after his settlement agreement was finalized in May 2013.  Furthermore, the documents demonstrate that Retrophin had almost no funds when it was finalizing millions of dollars in settlement agreements with defrauded MSMB investors.  Greebel's comment about an "SEC threat" is admissible for its effect on the defendant— namely to direct Greebel to talk David Geller "off the ledge" and offer a "modest" monetary sweetener of $400,000 for the delay in payment.

      20.   GX 305/GX 309

For the reasons set forth in the government's motion to admit the settlement agreements of defrauded MSMB Healthcare investors Spencer Spielberg and Michael Lavelle, these documents are relevant and should be admitted.

      21.   GX 313

This exhibit is admissible as evidence of the defendant's knowledge of the concerns of Marcum, Retrophin's auditor, regarding the settlement agreements, which were only discovered after they were signed, and the defendant's state of mind.

      22.   GX 315

The defendant is simply wrong in arguing that this email chain reflects a disagreement between the defendant and Greebel.  The defendant and Greebel agree on the terms of a proposed consulting agreement with Darren Blanton, yet another defrauded MSMB Capital investor.  The government agrees to redact the reference to Alan Geller's consulting agreement.

      23.   GX 316

This first document in this email chain is a paradigmatic example of a statement of a party opponent and is admissible.  As to the email from Marc Panoff, the Chief Financial Officer of Retrophin at this time, to the defendant, Panoff notifies the defendant that Marcum has been unable to complete the company's quarterly financial statements due to "the settlement issues"—the issues identified in GX 313 and elsewhere and

12

lead to the restatement of Retrophin's financial statements.  The defendant responds, in all capital letters:

> FIX THE FUCKING ISSUE
> THERE IS NO ISSUE
> HOW MANY TIMES DO WE HAVE TO TALK ABOUT THIS

Panoff's email speaks directly to the defendant's knowledge, state of mind and notice of the problems Marcum identified with the settlement agreements with defrauded MSMB investors.

### 24.   GX 322

These emails are direct evidence of the conspiracy charged in Count Seven. The defendant's objections go to the weight, not the admissibility of the emails.  On August 23, 2013, the defendant admitted to Greebel: "There were serious faults with the agreements including lack of board approval so perhaps a second go isn't the worst idea."  This is a bald admission by the defendant that he did not obtain approval from Retrophin's Board of Directors for his settlement agreements with the defrauded MSMB investors.  Greebel then suggests that Retrophin should pay the settlements and obtain a note from the MSMB entities (which are effectively bankrupt by this point).  Greebel is aware that the MSMB entities will not pay this supposed debt to Retrophin, at which point Retrophin—a public company—will simply write off the debt.  This is direct evidence of a conspiracy to defraud Retrophin by, among other things, generating bad debts that both Greebel and the defendant know the MSMB entities will never pay back to Retrophin.

### 25.   GX 326

The government agrees with redacting the reference to the "Geller document."

This email further indicates that Greebel was drafting sham consulting agreements for the purpose of paying Darren Blanton for his investment in MSMB Capital. There is certainly enough evidence in the record to pass the threshold of admissibility.  The defendant is free to argue there was no conspiracy between him and Greebel at this point in time.

### 26.   GX 349

The top email in this chain is a statement of the defendant.  The rest of the emails reflect Mulleady's and Biestek's knowledge of and notice of the statements made by Caroline Stewart regarding the defendant's track record, performance and other issues.  It is direct evidence that Mulleady and Biestek were co-conspirators.  Despite receiving notice of the defendant's misrepresentations and omissions, Mulleady and Biestek continued to work for the MSMB entities and solicit investors for the funds, peddling inaccurate information.

Moreover, the instant messaging chat between Mulleady and Stewart has already been admitted into evidence as GX 349-A.

        27.   <u>GX 351</u>

        Christine Giordano was the defendant's executive assistant.  Under FRE 801(d)(2)(D), this document contains statements of a party opponent's agent or employee within the scope of his or her duties.  Indeed, Giordano confirms that these communications were sent pursuant to express directions from the defendant.  In an email dated January 10, 2014 at 12:27 pm, Giordano writes to David Kravitz (an associate and Katten Muchin Rosenman LLP) and Greebel: "Martin asked that I send you the attached, as per his direction."  The attached questionnaire was signed by the defendant.

CONCLUSION

        For the foregoing reasons, the Court should overrule the defendant's objections and allow the admission into evidence of the government exhibits at issue.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:      /s/

Jacquelyn M. Kasulis
Alixandra E. Smith
G. Karthik Srinivasan
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (KAM) (by ECF)
       Counsel for Shkreli (by ECF)