# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN
———
ANDREA ZELLAN
JOSHUA D. KIRSHNER
JACOB KAPLAN
ALEX SPIRO

MARK M. BAKER
OF COUNSEL

MARC AGNIFILO
OF COUNSEL
ADMITTED IN N.Y. AND N.J.

July 22, 2017

<u>Via ECF</u>
Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     **United States v. Martin Shkreli, Crim. No. 15 Cr. 637 (KAM)**

Dear Judge Matsumoto:

Defendant Martin Shkreli is in receipt of the Court's July 21, 2017 order, directing the defense to submit a proposed jury instruction or stipulation regarding the obligations and restrictions, if any, imposed upon a corporate officer under Delaware law with regard to the contested agreements in Count Seven.[1]   Based on the Court's order of Friday, the defense understands that the Government will not be calling a witness to testify as to Delaware corporate law on Monday.

The defense takes the position that, for the reasons set forth below, Section 144 of the General Corporation Law of the State of Delaware ("section 144)[2] in no way limits the conduct of Mr. Shkreli in regard to the consulting and settlement agreements that comprise Count Seven of the Superseding Indictment.   As a result, we request an instruction that "there is no rule or law within the State of Delaware, the State in which Retrophin has been incorporated, that in any way prevents, precludes or makes illegal or improper the decision of a corporate officer to enter consulting or settlement agreements of the type alleged in Count Seven."

The legal basis for our requested charge is as follows:

---

[1] The defense asks for the opportunity to supplement this submission, if necessary, due to the fact that two members of the defense team are Sabbath-observers and are not permitted to work or receive emails until sundown on a Saturday.
[2] Del. Code Ann. Tit 8, Sec. 144 (2006)

BRAFMAN & ASSOCIATES, P.C.

1.    The Text of Section 144

Section 144 is entitled "Interested directors; quorum"

It provides as follows:

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if:

  (1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

  (2) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or

  (3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the stockholders

(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transactions

2.    Background of Section 144

"Section 144 was adopted in 1967 as part of the wholesale revision of the General Corporation Law of the State of Delaware (DGCL). By its own terms, section 144 deals with a specific sliver of transactions in which the directors and officers have an interest. Its stated purpose is to rescue those transactions from per se voidability if they qualify for safe-harbor protection under the statute." Rohrbacher, Zeberkiewicz, Ubeler, The Delaware Journal of Corporate Law, "Finding Safe Harbor: Clarifying The Limited Application of Section 144; Vol 33 (2008), p.1. ("Finding Safe Harbor"). The reason for the section is that "(b)efore section 144 was enacted, a contract or transaction in which a majority of voting directors or officers had an interest was generally presumed to be voidable." Id., p. 2, see also Kerbs v. Cal. E. Airways, Inc., 90 A.2d 652, 655 (Del. 1952). The section was enacted in order to bring greater efficiency to Delaware

BRAFMAN & ASSOCIATES, P.C.

corporations in that their transactions would be effective and could be relied upon even though there was self-interest on the part of the corporate decision-maker. "The need for loosening the traditional common law restrictions on interested director transactions has been recognized in decisions validating by-laws varying the common law rules. These more flexible procedures clearly 'fill a legitimate need in the efficient functioning of the corporate enterprise.'" Folk, Ernest L., <u>Review of the Delaware General Corporation Law</u>, 67 (1967).

The history behind section 144 shows that the provision is not directed at creating liability or particular responsibility on an officer or director. Rather, the provision reverses the common-law rule that self-interested transactions are voidable under the law. As made clear by the commentators cited above, the rule is focused on corporate efficiency, and on instilling confidence in individuals doing business with Delaware corporations that corporate contracts will bind the corporation on a going forward basis.

    3.    <u>Limitations to Section 144</u>

As revealed by the text of section 144, it "does not apply to all potentially 'interested' officer or director transactions – merely the limited subset of transactions identified in Section 144(a)'s first paragraph." <u>Finding Safe Harbor</u>, p. 7. The first portion of that paragraph "addresses contracts or transactions between the corporation and one or more of its directors or officers." <u>Id</u>. The second portion covers "contracts or transactions between the corporation on the one hand, and another enterprise in which the corporation's officers or directors are officers or directors or have a financial interest, on the other hand." <u>Id</u>.

The transactions at issue in Count 7 do not fall into either of these provisions. As to the first, there is no allegation in Count 7 that Retrophin entered into a contract with Shkreli. Rather, the contracts at issue are between Retrophin and the various individuals receiving consulting or settlement agreements. Shkreli is not contracting with Retrophin in any of these transactions.

As to the second provision, there is no allegation as part of Count 7 that the settlement or consulting agreements involved a contract between Retrophin and another entity in which Shkreli had a financial interest. Rather, the agreements are made directly with the individual receiving the consulting or settlement agreement.

As a result, section 144 does not impose on a Delaware director any obligation to notify the Board, consult the Board or seek Board approval for the simple reason that Rule 144 does not impose an obligation on a director to do anything. Rather, as noted, it is focused on circumstances where a Delaware corporation will, or will not, be bound to a transaction or contract. Additionally, even to the extent that section 144 can somehow be interpreted to impose some affirmative obligation on a director, and we assert there is none, it does not apply to the circumstances set forth concerning the settlement and consulting agreements of Count 7. This is because the settlement and consulting agreements involve agreements between Retrophin and the individual persons receiving

BRAFMAN & ASSOCIATES, P.C.

the agreements. As a result, they are simply not within the narrow purview of section 144.

Moreover, there is no allegation, nor could there be, that Shkreli stands to benefit financially from the agreements in some way that Retrophin would not. The agreements include releases from liability for Retrophin, Shkreli and the MSMB entities. Retrophin its officers and directors are deriving the same benefit from the release as is Shkreli, if not more so. Indeed, the auditing company, Marcum, concluded that these were Retrophin liabilities on a number of corporate documents already submitted into evidence. In addition, the commingling of funds between the MSMB entities and Retrophin, as well as the absence of corporate separateness between the entities given the fact that they shared employees, office space, computer terminals and resources[3] as well as a common founder, all indicate that Retrophin would have liability for any debt incurred by an MSMB entity. Simply put, there was a reason – a legitimate, sound reason – that Evan Greebel counseled Shkreli to ensure that Retrophin was being released from liability as part of these agreements.[4] That reason is because Shkreli and Greebel would have every reason to believe that Retrophin faced liability. Steve Aselage made it clear during his testimony that in America, anyone can sue anyone for anything and it doesn't matter which party is right. The results of such a suit, testified Aselage, could be disastrous. Shkreli and Greebel were taking sound, prudent steps to avoid a disastrous lawsuit against a young, vulnerable company. In the end, their prudent steps paid off. Today, Retrophin is successful in part because the founder and his smart, prescient lawyer staved off disaster in the early stages of the company.

Indeed, the release from liability provision benefited Retrophin more than it did Shkreli. A lawsuit against Shkreli would be pointless. He was broke, sleeping in a sleeping bag in his office and living modestly. Retrophin would have been the proverbial "deep pocket." As Josiah Austin observed, in litigation it is common for plaintiffs to target a person or entity with deep pockets. Retrophin would have been that deep pocket. In this regard, and in addition to the other limitations set forth concerning Section 144, Delaware law generally is clear that "(a) director is considered interested in a transaction if he receives a **personal** benefit from a transaction that is not equally shared by the shareholders." In re Ply Gem Industries, Inc. Shareholders Litig., No. 15779-NC, 2001 WL 755133, at 6 (Del. Ch.)(Del. Ch. June 26, 2001). Put differently, "(i)f a challenged transaction would confer a unique benefit on a party exercising de facto control, then the entire fairness is the standard of review." OTK Assocs., LLC v. Friedman, 85 A.3d 696, 724 (Del.Ch. 2014). The true beneficiary of these agreements was Retrophin.

---

[3] Richardson testified to this, as have several other witnesses. Also this inescapable conclusion is clear from dozens of emails and other documents admitted into evidence.
[4] The evidence is clear that Greebel drafted, modified and finalized most if not all of these agreements.

BRAFMAN & ASSOCIATES, P.C.

4.    Section 144 Does Not Apply to the Facts of This Case

The jury has been shown that the board of directors signed SEC filings clearly containing explicit reference of the settlement agreements.  Moreover, there are numerous documents in evidence clearly indicating that the Board received notice of various consulting and settlement agreements, that the accountants and the auditors clearly knew about the agreements, and were incorporating them into official corporate documents and reflecting them clearly on the books of Retrophin repeatedly and in various formats.

Moreover, the evidence is clear that Steve Richardson, at all times a member of the Board of Directors, knew full well that Retrophin was reaching agreements with MSMB investors.  He testified to such on direct and cross examination.  Indeed, he expressed frustration that he was being relegated to the "back of the queue" behind the MSMB investors who were in line to receive Retrophin shares.   Therefore, not only did Richardson clearly know about the activity in Count 7, he was a beneficiary of it, all the while as a full Board Member.

For these reasons, among many others that have been soundly established at this trial, the credible evidence is that the agreements were disclosed to the Board.  As a result, section 144 does not apply for the simple reason that the agreements were disclosed.

Secondarily, it does not apply because it is of a highly limited scope, for the reasons set forth in Section 3, and does not encompass agreements of this type between Retrophin and an individual investor.

5.    Delaware Section 144 Should Play No Role in Establishing Criminal Liability

As an initial matter, we have been unable to find any pattern jury instructions for section 144, and certainly have not found any such instructions in regard to a criminal case.  Moreover, there is at least one decision holding that unclear corporate rules relevant to establishing civil liability should not be incorporated into a criminal case charging wire fraud.  United States v. Weimert,  819 F.3d 351 (7th Cir. 2016) .  The Court in Weimert stated as follows:

Our point here is not to resolve whether or not the government proved a civil breach of fiduciary duty to Weimart….Our point is a narrower one: that at the time relevant in this case, civil corporate law standards of fiduciary duty did not provide a clear answer for a situation like this: a corporate officer negotiating with his employer in a three-sides deal in which he, his employer, and a third party took part, in which his personal financial interest was known, but in which he misled that employer about his and others' negotiating positions in the transaction.  Perhaps (certain parties) would have had a viable civil case against Weimart, or perhaps

## BRAFMAN & ASSOCIATES, P.C.

not.  But particularly in light of the rule of lenity invoked in <u>Skilling</u>, 561 U.S. 358 (2010), we do not believe the government has proven criminal fraud….We leave the civil law issues and remedies for civil cases."

6.      <u>Conclusion</u>

Based on the foregoing, if the Court insists on giving a jury charge on this issue, the only legally appropriate charge is as follows:

"there is no rule or law within the State of Delaware, the State in which Retrophin has been incorporated, that in any way prevents, precludes or makes illegal or improper the decision of a corporate officer to enter consulting or settlement agreements of the type alleged in Count Seven."

However, we believe a jury charge is inappropriate for the reasons set forth above.

Respectfully submitted,

/s/

Marc Agnifilo

cc:      All Counsel (via ECF)